UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11531 RGS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP., <br><br> Plaintiff, <br><br> vs. <br><br> METRO-BOSTON BROADCASTING, INC., <br><br> Defendant, | DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS SPECIAL MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION TO ENDORSE LIS PENDENS |

## Introduction

This is precisely the sort of case the legislature had in mind when it recently amended the lis pendens statute to provide for special motions to dismiss. Defendant did not breach a contract for the sale of real estate. The contract expired. Defendant was never required to perform because plaintiff had informed defendant in writing – many times in the last year including three times in the two weeks before the agreement's expiration date – that plaintiff was not willing or able to close the transaction until an access issue was resolved, an issue that depended on plaintiff's ability to conclude a negotiation for the purchase from defendant either of additional land or of an easement for purposes of creating an access road. Defendant has never agreed, and is under no obligation, to sell plaintiff this additional land or easement. Without the road that this additional land or easement would enable plaintiff to build, plaintiff has no use for the land it seeks to buy from defendant and is unwilling to buy it.

Moreover, the parties never had a meeting of the minds on an essential term of the agreement. Specifically the parties' minds never met on the location of the northeastern

boundary line and hence on what land was to be conveyed.

When exposed to the light of evidence that plaintiff did not call to the Court's attention – in violation of G.L. c. 184 § 15, which required plaintiff to verify that no material facts have been omitted from the complaint – it is apparent that this suit, including the motion for lis pendens, is nothing more than a naked play to impair defendants' title and thereby improve plaintiff's negotiating leverage for the contract plaintiff wishes it had made. In essence, by this suit, plaintiff seeks to make it impossible for defendant to do anything with the real estate other than to negotiate with plaintiff over additional terms (including the purchase of additional land or an easement) that plaintiff needs for its hoped-for residential development. This represents a gross misuse of judicial process, where plaintiff seeks to use litigation and the lis pendens procedure to secure an unbargained-for and unpaid-for right to become the sole and exclusive buyer for the land at issue during the pendency of this suit.

Facts

A.   The Access Issue

In January 2001, plaintiff and defendant signed a purchase and sale agreement for land in Ashland owned by defendant. The agreement reveals plaintiff's intent to use the land "for residential development." Paragraph 4 of the agreement provides that defendant may convey a deed subject to easements, restriction, and reservations of record, if any, so long as they "do not materially interfere with the of [sic] said premises for residential development." The complaint alleges, indeed emphasizes, plaintiff's purpose in wanting to buy the site was for residential development. Comp. ¶¶ 9, 11, 14.

The land in question has frontage on an existing way, known as Tri Street, located in the southwestern corner of the proposed development (Comp. Ex. A, Halcomb Aff. ¶5).

During the permitting period, plaintiff informed defendant that plaintiff "need[s] to acquire additional land [from defendant on Lot 11] to gain access to the residential portion of the property" from Sewall Road (Halcomb Aff. Ex. E),[1] a road connected to Lot 11 but not to the portion of Lot 11 that the purchase and sale agreement identifies as the land to be conveyed (Halcomb Aff. ¶ 15; compare Comp. Ex. A with Halcomb Aff. Ex. E). Consequently, on October 31, 2001, plaintiff made an offer for additional land to connect up to Sewall Road, which defendant declined to accept (Halcomb Aff. ¶ 13 & Ex. E).

Defendant had thought that plaintiff's interest in connecting to Sewall Road was to gain a secondary means of access to the site, perhaps for emergency vehicles. Id. ¶ 13. However, in 2003, plaintiff advised defendant that plaintiff could not get any access into the site whatsoever from Tri Street because the part of the site fronting on Tri Street is wetlands (Halcomb Aff. ¶ 14 & Ex. G). Plaintiff told defendant that the only possible way plaintiff could get access to the site would be through Sewall Road (Halcomb Aff. ¶14).

Connecting to Sewall Road is complicated because, among other things, (a) there are five large radio antenna towers on the additional land in Lot 11 that plaintiff would have to cross in order to connect to Sewall Road,[2] (b) space on the towers is leased to third parties, and (c) as a practical matter, if not a legal matter, the tower lessees would need to consent to the sale or use of the additional land for plaintiff's hoped-for access to Sewall Road (Halcomb Aff. ¶¶ 16-17). To the best of defendant's knowledge, the tower lessees have not consented to such a sale (Halcomb Aff. ¶ 17). Hence, even if plaintiff had made an attractive offer to defendant

---

[1] The parties' correspondence has sometimes referred to Sewall Road as Sewall Street.

[2] These antenna towers are 550 feet tall, equivalent to the height of a 55 story building, each anchored with at least 12 guy wires tied into concrete blocks of approximately 5 tons embedded in the ground (Halcomb Aff. ¶ 16).

for the purchase of an easement or additional land, and it has not, defendant would not have been in a position to accept it (Halcomb Aff. ¶ 18). Needless to say, nothing in the purchase and sale agreement obligates defendant to help plaintiff resolve its access problems or to sell plaintiff any additional land in, or easement over the remainder of, Lot 11, much less any land to connect up with Sewall Road.

B.  The Northeastern Boundary Line Issue

The land covered by the purchase and sale agreement did not consist entirely of existing parcels with defined boundaries but included a *portion* of Lot 11 with a boundary that had not been fixed by any subdivision plan or recorded drawing. The document described the land as:

> Lots 12 and 6B (9.6 acres) and *a portion of lot 11* (10 acres) on the Plan attached ... as Exhibit A.

Comp. Ex. A ¶ 2 (emphasis added). The plan to which the document referred contained a hand-drawn saw-tooth shaped line running through Lot 11, representing the northeastern boundary of the property to be conveyed (Comp. Ex. A). This boundary line was unaccompanied by any description of metes and bounds, statement of angles or measurements, references to monuments, or any other reference data that would enable someone to locate the boundary line on the face of the earth or to distinguish with reasonable particularity the land defendant was to convey from the land defendant would retain.

Because the purchase and sale agreement did not fix the location of the northeastern boundary line by reference to anything in existence at the time, the transaction could not have been consummated without someone creating – in plaintiff's words – a "plan to deed off of" (Halcomb Aff. ¶ 16 & Ex. B). In its complaint, plaintiff describes this as a "new subdivision plan [that] was necessary in order to prepare a deed that accurately identified the property being sold." Complaint ¶ 13. In fact, one of plaintiff's claims is that defendant breached the

agreement by not creating such a subdivision plan, and seeks a judgment compelling defendant "to prepare, file, and obtain approval of a new subdivision plan identifying the property to be sold." Complaint ¶ 33.[3]

The issue of where to locate the northeastern boundary line has never been resolved. Among other things, plaintiff had advised defendant both before and after signing the agreement that plaintiff wanted to buy so much of Lot 11 as was zoned residential and therefore wanted to locate the northeastern boundary line along a zoning line supposedly running through Lot 11 (Halcomb Aff. ¶ 22). At the time the agreement was signed, defendant was aware of a 1979 unrecorded contour plan prepared by McCarthy & Sullivan Engineers – not referenced in the purchase and sale agreement – that shows a saw-tooth shaped zoning line running through what is apparently now Lot 11, purporting to divide residential land on the south from industrial land on the north (id. & Ex. H). To the naked eye, the zoning line on the 1979 plan has different angles from the line shown on the drawing attached to the purchase and sale agreement, although the two lines bear some loose resemblance to one another (id.). However, the plaintiff apparently never wanted a saw-tooth boundary line, for Exhibit B to the purchase and sale agreement provides that plaintiff "may petition the Ashland Town Meeting to straighten the Zoning Boundary line between residential and industrial zone [sic] on Seller's land."

---

[3] It is difficult to find where the purchase and sale agreement supposedly assigns the responsibility of preparing such a subdivision plan to defendant. In paragraph 5 of the agreement, there is an incomplete sentence that perhaps plaintiff might argue imposes this obligation on defendant, but a considerable amount of parol evidence would be necessary to draw this conclusion. The incomplete sentence states in its entirety: "New Subdivision of Plan 16849 provided by Seller [sic]." By contrast, Exhibit B to the Purchase and Sale Agreement contains a permitting condition, which makes buyer's obligation contingent on securing "all necessary ... permits (including but not limited to subdivision approval)" and states that "[a]ll permits and approvals shall be secured at Buyer's expense" with "Buyer [to] give quarterly reports during term of Agreement as to status of permits and approvals sought."

After the parties signed the agreement, defendant discovered that the zoning line actually ran along the border of Lot 11 and Lot 12, and did not divide Lot 11 at all (Halcomb Aff. ¶ 24). After defendant advised plaintiff of what defendant had discovered, plaintiff told defendant that plaintiff wanted additional time to look into this (Halcomb Aff. ¶ 25).

Given these facts, the parties' never had a meeting of the minds on the location of the northeastern boundary line. Was the boundary line supposed to be precisely as hand drawn on the plan attached to the purchase and sale agreement, even though that line did not demarcate the residential zone from the industrial zone? Was the boundary line supposed to conform to the saw-tooth zoning line shown on the 1979 contour plan, even though that line was also not the real zoning line? Was the boundary line supposed to be wherever the real zoning line happened to be, which would exclude most if not all of Lot 11 given that the zoning line in fact runs along the boundary of Lot 11 and Lot 12? Was the boundary line supposed to be some other reconfigured zoning line – not yet in existence – based on plaintiff's contemplated request to the Ashland town meeting to straighten the zoning line, as plaintiff had the right to request in the purchase and sale agreement?

These questions remain unanswered. However, from plaintiff's proposed lis pendens memorandum,[4] plaintiff evidently believes it bargained for the right to purchase so much of Lot 11 as is zoned residential, even though the Ashland zoning map reveals that little or no portion of Lot 11 is zoned residential.

C.   The Time For Performance Issue

Exhibit B to the purchase and sale agreement purported to condition plaintiff's

---

[4] Plaintiff's proposed memorandum of lis pendens describes the land at issue as "Lots 6B, 12, and that portion of Lot 11 zoned 'Residential,' Sewall Road, Ashland,... Massachusetts."

obligation to purchase on plaintiff's receipt of permits and approvals "with conditions, if any, as are satisfactory to the Buyer" on or before January 31, 2002. The agreement further called for "[c]losing to occur thirty (30) days after receipt of all permits or February 28, 2002 whichever is earlier" and for plaintiff to submit quarterly reports to defendant on the status of plaintiff's permitting efforts.

Plaintiff was not, and has never been, ready or willing to close. In total, the parties signed at least 25 written extensions of the closing date, all of which were initiated by Fafard (Halcomb Aff. ¶ 8 & Ex. A). For example, in 2002, the year in which the original deadline expired, the parties executed at least four written extensions of the closing date (Halcomb Aff. Ex. A). In one extension signed in December 2002, the parties extended the closing date to June 30, 2003 (id.), after plaintiff explained to defendant that additional time was needed to obtain permits (Halcomb Aff. ¶ 9). In frustration, defendant handwrote onto the extension that the closing had been delayed for two years (id. Ex. A).

On May 19, 2003, with about a month to go before the June 30, 2003 (extended) closing date, plaintiff wrote a fax to defendant stating that "the Tri Street access is unusable" (Halcomb Aff. ¶ 14 & Ex. G). The fax transmitted a drawing showing a possible connection to Sewall Road, requested "written confirmation ... that this access is available for [plaintiff's] use as joint access," which defendant declined to provide, and requested an extension of the closing date to December 31, 2003 "for the due diligence period" (id. Ex. G). Although defendant did not agree to the lengthy extension plaintiff requested, plaintiff nonetheless made at least 15 extension requests in 2003 and defendant agreed to 14 of them (Halcomb Aff. Exs. A, B & C).

On November 6, 2003, plaintiff faxed another extension request to defendant (Halcomb

Aff. Ex. B). In the fax transmittal sheet that accompanied the proposed extension, plaintiff admitted that the reason plaintiff sought another extension was to get some information about the boundary line and to get some time to resolve plaintiff's access issues:

> I have been trying to get a copy of the plan which you mentioned where the property line has been straightened out.... We also need an answer to the access issue.... The Tri Street access is unusable so we need to access the property from Sewall Street as joint access with other adjacent owners....
> We are ready to close on this property but need to obtain approval to access through Sewall Street and the update of the property line.
> Please find an extension of the Purchase and Sale Agreement for your Ashland property until we can obtain these items.

The parties signed the extension, extending the closing date to November 14, 2003 (Halcomb Aff. Ex. A).

Thereafter, plaintiff asked defendant on at least 15 more occasions to sign additional extensions of the closing date. Many of plaintiff's extension requests contained the following statement:

> We are ready to close on this property. We need to resolve the access issue out to Sewall Street, need clean title..., and need a plan we can deed off of. (Halcomb Aff. ¶ 19 & Ex. B)

Although not under any obligation to do so, defendant signed at least 12 of these extensions. However, plaintiff did not "resolve the access issue out of Sewall Street" or reach agreement with defendant on the location of the northeastern boundary line (Halcomb Aff. ¶¶ 12, 20, 26).

The three and half year period between the signing of the purchase and sale agreement and the expiration of the last extension on May 21, 2004 was particularly frustrating for defendant. During this time, plaintiff had neither presented any engineering drawings to defendant, given defendant copies of any permit requests, nor provided the promised "quarterly reports ... as to status of permits and approvals sought," as required by Exhibit B of the purchase and sale agreement (Halcomb Aff. ¶ 6). To the extent they spoke about the

matter, plaintiff explained that it was having difficulty getting the permits it needed, while defendant told plaintiff, in substance, that defendant was losing patience with plaintiff's continual delay in closing the sale (Halcomb Aff. ¶ 9). At one point, defendant complained that plaintiff was simply warehousing the property to tie it up and prevent defendant from selling it to anyone else, and that defendant thought plaintiff would remain unready to close until the market value had sufficiently increased to make the purchase price attractive in relation to the market (id.). Defendant therefore told plaintiff that plaintiff could not count on defendants' continued willingness to extend the closing date (id.).

On May 7, 2004, two weeks before the last scheduled closing date, plaintiff faxed yet another extension request to defendant, again stating:

> We are ready to close on this property. We need to resolve the access issue out to Sewall Road, need clean title..., and need a plan we can deed off of. (Halcomb Aff. Ex. B)

Defendant did not sign this extension request (Halcomb Aff. ¶ 11). Plaintiff re-faxed this extension request to defendant on May 17 and 20, 2004, but defendant did not sign it (Halcomb Aff. ¶11 & Ex. B). Plaintiff did not otherwise communicate with defendant about closing the transaction. In particular, plaintiff said nothing to defendant about showing up at the registry of deeds on May 21, 2004 to close the transaction (Halcomb Aff. ¶ 12). On May 21, 2004, defendant notified plaintiff in writing that defendant would not grant any additional extensions to close and that defendant considered the agreement to have expired (Halcomb Aff. ¶ 11 & Ex. D). As far as defendant knows, plaintiff is still neither willing nor able to go forward with the transaction because "the access issue out to Sewall Road" – which cannot be resolved in the absence of an agreement on those issues between plaintiff and defendant and consent from the tower lessees – was never resolved and because the location of the

northeastern boundary line has still not been determined (Halcomb Aff. ¶¶ 12 & 26).

Additional facts appears as necessary in the analysis below.

## Analysis

### I. STANDARD OF REVIEW

Before the 2003 amendment to the lis pendens statute, a court was required to endorse a memorandum of lis pendens so long as the complaint asserted an interest in real estate, even if the complaint would not survive a motion to dismiss. Sutherland v. Aolian Dev. Corp., 399 Mass. 36, 40 (1987). However, this scheme created a potential for abuse, as the recording of a lis pendens memorandum permitted a plaintiff to cloud the title to defendant's real estate for the duration of the litigation regardless of the legal or factual merits of the case. Apparently to address this potential for abuse, the legislature amended the lis pendens statute making several changes.

Under the 2003 amendments, a defendant is now permitted to file a special motion to dismiss which "may be heard at the time the claimant first applie[s] for a judicial endorsement" of the lis pendens memorandum. G.L. c. 184 § 15(c). The motion to dismiss is special in several ways. Among them, the Court is required to consider the merits of the case, to consider the verified pleadings and affidavits, and to grant the motion to dismiss if the Court finds the action or claim "frivolous because (1) it is devoid of any reasonable factual support; or (2) it is devoid of any arguable basis in law; or (3) the action or claim is subject to dismissal based on a valid legal defense such as the statute of frauds." Id. If the motion is granted, the moving party is entitled to recover its costs and reasonable attorneys fees. Id.

In addition to the special motion to dismiss, the 2003 amendments imposed a new pleading requirement on plaintiffs seeking a lis pendens. The verified complaint must now

include all material facts, and plaintiff must certify under oath that "no material facts have been omitted." Id. § 15 (b). The omission of a material fact from the complaint, without more, is grounds for refusing to endorse a lis pendens memorandum.[5]

II. PLAINTIFF MAY NOT ENFORCE THE AGREEMENT – AND THIS CASE SHOULD BE DISMISSED – BECAUSE PLAINTIFF INFORMED DEFENDANT THAT PLAINTIFF WAS UNWILLING TO PERFORM WITHOUT RESOLVING THE ISSUE OF ACCESS TO SEWALL ROAD

To enforce a land purchase agreement, the buyer must show not only that it was ready, willing, and able to perform but that it "has manifested this by some offer of performance." Leigh v. Rule, 331 Mass. 664, 668 (1954). When the buyer gives notice that it does not intend to perform, or that it is unwilling to perform unless the seller and buyer can agree on new terms not addressed in the existing agreement, the seller is excused from performance. Id. (tender of performance not necessary if the other party has shown he will not perform); Kattor v. Adams, 323 Mass. 686, 688-89 (1949) (buyer's stated unwillingness to go forward with purchase transaction unless seller included three additional acres not covered by purchase and sale agreement "was a breach of the agreement which excused the [sellers] from any further performance or offer of performance"); Beach & Claridge Co. v. American Steam Gauge & Valve Manuf. Co., 202 Mass. 177, 183-84 (1909) (buyer's statement to defendant that buyer would not go forward with purchase unless certain contingencies happened that were not provided for in the parties' agreement "was a breach by the [buyer] of its agreement, which operated to excuse the [seller] from any further performance or offer of performance").

---

[5] In Matt v. Lehman Brothers Holdings, Inc., Suffolk Superior Court No. 04-02297 (Mass. Super. May 26, 2004), Judge Hinkle declined to issue a memorandum of lis pendens due to the failure of the "verified complaint to comply with the requirement in M.G.L. c. 184 § 15(b) to include all material facts." In that case, plaintiff's complaint had failed to mention that the plaintiff had asserted a counterclaim in litigation in New York, and that the counterclaim had been dismissed. See Exhibit A attached.

Plaintiff asserts in conclusory fashion that it was ready, willing, and able to purchase defendant's land. Plaintiff's complaint and motion papers fail to disclose the long and well documented history of (a) plaintiff's unwillingness and refusal to close because of plaintiff's need to acquire additional land to get access to the site from Sewall Road, (b) plaintiff's inability to resolve this access issue, and (c) plaintiff's repeated requests for extensions of the closing date to get more time to resolve this access issue. Notably, plaintiff's papers do not disclose that, in the two week period before May 21, 2004, the day on which the last extension for performance expired, plaintiff made three requests to defendant for yet another extension of the closing date because plaintiff still needed to resolve the access issue. Having made it explicit to defendant three times in two weeks that, notwithstanding its professed *readiness* to close, plaintiff was *unwilling* to close without the access issue resolved, plaintiff cannot hold defendant in breach. Leigh, *supra*; Kattor, *supra*; Beach & Claridge, *supra*.

Plaintiff says, however, that it appeared at the registry of deeds on May 21, 2004 prepared to close, but defendant did not show up. Plaintiff argues, therefore, that defendant breached for not also appearing at the registry on May 21, 2004 to close the sale. But a buyer who informs a defendant of its unwillingness to close cannot put the seller in breach by appearing for the supposed closing without seasonable notice to the seller. The law deems the buyer's appearance at the "closing" under these circumstances to be a sham, and not a manifestation of the buyer's readiness, willingness, or ability to close.

The Supreme Judicial Court faced this issue in Schilling v. Levin, 328 Mass. 2 (1951), where the buyer was unable to close for lack of financing, so notified the seller, and then – without notifying the seller – showed up at the scheduled time and place for the closing. In the later suit between the buyer and seller – the seller suing for damages and the buyer suing for

return of the deposit – the buyer claimed that the seller breached for not attending the closing, like the buyer had. The Court easily disposed of the buyer's argument and ruled for the seller, explaining that:

> on two occasions shortly before the time for performance the [buyer] through his attorney stated without qualification that he was not going to perform. *No change of purpose on his part was ever communicated to the [seller]*. The appearance of the [buyer] at the registry of deeds on July 15 without notice to the plaintiffs was a sham and had no effect on the rights of the parties.

Id. at 5 (emphasis added). See also Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969) (where party to land purchase agreement informed other party of its unwillingness to perform on terms required by the contract, party did not "accrue rights under the contract" and could not hold other party in breach); Gentile Bros., Corp. v. Rowena Homes, Inc., 352 Mass. 584, 587, 589 (1967) (when seller told buyer that seller would not show up at registry for closing on agreed-upon day for performance, buyer had right to rely on seller's statement and was not in breach for not appearing at registry); M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960) (where seller told buyer that seller wanted to negotiate an alternative arrangement and that seller was not willing to close until such an alternative arrangement was made, buyer was not obliged to appear at closing or tender performance and was not in breach for failing to do so "in the absence of seasonable notice [from seller] that performance was to take place" on date called for by agreement).

In this case, plaintiff indisputably was unwilling to go forward with the purchase because it had not resolved its access issues to Sewall Road. Without such access, the land is undevelopable, and plaintiff has no reason to purchase it. This is why plaintiff sought an extension of the closing date, hoping to use the additional time to work something out with defendant that would ultimately resolve the access issue and pave the way for plaintiff's hoped-

for development. Not having obtained the extension, plaintiff saw that its hoped-for deal would slip away unless (a) plaintiff showed up at the registry of deeds for a sham "closing" to manufacture the illusion that plaintiff was ready, willing, and able to close, and (b) brought this lawsuit to get a lis pendens, which would prevent defendant from selling its land to anyone else and force defendant to negotiate solely with plaintiff, the same as if defendant had given plaintiff another extension of the closing date that defendant was under no obligation to give. If plaintiff had been genuinely interested in closing on May 21, 2004, at a minimum it was required to give defendant seasonable notice that it changed its mind, that it was no longer requiring access to Sewall Road, and that it intended to go forward with a closing at the registry of deeds on May 21 at some specified time of day. Not having done this, plaintiff stands in no better position than the buyers in Kattor, *supra*, Beach & Claridge, *supra*, and Schilling, *supra*, all of whom notified their sellers of their unwillingness to go forward with the purchase unless the transaction was changed in a way not required by the purchase and sale agreement. Such notice relieved the seller from any obligation to convey and prevented the buyers from enforcing their agreements. If plaintiff had a genuine change of heart, the transaction perhaps could have been saved had plaintiff given defendant seasonable notice of its intention to perform as and when required by the agreement, Schilling, *supra*, M. De Matteo Constr. Co., supra, but that did not happen.[6]

---

[6] Defendant is obliged to call the Court's attention to a decision that, on a quick reading, appears to offer plaintiff some arguable hope of preserving this transaction, but on close inspection is not at all helpful to plaintiff. In Bucciero v. Drinkwater, 13 Mass. App. Ct. 551 (1982), the buyer and seller disagreed over the amount of a tax adjustment that plaintiff was required to pay at closing. The day before the closing, the buyer informed the seller of its intention to appear at the closing and pay the lower amount, and the seller informed the buyer that, in light of the buyer's unwillingness to pay the higher amount, the seller would not attend the closing. The next day, the buyer appeared at the closing prepared to pay the higher amount, without having told the seller of the change in the buyer's position. The seller did not attend the closing. The Court held that the buyer was entitled to specific performance because the disagreement between the buyer and seller only pertained to an honest difference (continued...)

III. SHOULD THE COURT CONCLUDE THAT PLAINTIFF'S CLAIM SURVIVES THE SPECIAL MOTION TO DISMISS, THE COURT SHOULD NOT ENDORSE THE MEMORANDUM OF LIS PENDENS BECAUSE PLAINTIFF FAILED TO DISCLOSE MATERIAL FACTS

Plaintiff's verified complaint fails to omit important material facts. Chief among them are that (a) plaintiff was unwilling to close the transaction without resolving the issue of how plaintiff would get access to the property through Sewall Road, (b) plaintiff had so informed defendant in the months and weeks leading up to May 21, 2004 and had never advised the defendant to the contrary, (c) plaintiff had requested numerous extensions of the closing date to get more time to try to resolve the Sewall Road access issue among other things, (d) plaintiff and defendant had never reached any agreement resolving the Sewall Road access issue, and (e) after having told defendant that the Sewall Road access issue needed to be resolved before plaintiff would close on the property, plaintiff failed to inform defendant that plaintiff would appear at the registry of deeds on May 21, 2004 to close on the property. These facts are material because they belie plaintiff's conclusory assertion that plaintiff was ready, *willing*, and able to close on the property, and they establish a valid defense, discussed above.

IV. ENFORCEMENT OF THE AGREEMENT IS BARRED BY THE FAILURE OF THE PARTIES TO HAVE A MEETING OF THE MINDS ON THE LOCATION OF THE NORTHEASTERN BOUNDARY

Before there can be a contract, there must be a meeting of the minds on all essential terms. Conos v. Sullivan, 250 Mass. 376, 378 (1924). In a land purchase contract, the

---

of opinion over the meaning of a clause in the agreement, the disagreement did not go to the essence of the agreement, id. at 555, and, by the time of the closing, the buyer had abandoned its interpretation. Notably, the buyer had informed the seller of the buyer's intention to appear at the closing, but the seller – knowing of the buyer's intent to appear – chose not to appear. The Court observed that, had the seller attended the closing, he could have put the buyer to a choice between performance or default. By contrast, in this case, the buyer and seller did not have a disagreement over the meaning of a peripheral term in the agreement. Rather, the buyer had expressed its intention not to perform at all unless the buyer resolved its access issue to Sewall Road. Further, the buyer gave no notice of its intention to appear at the registry to close the transaction. Thus, defendant had no reason to appear at the registry and put the plaintiff to a choice between performance and default.

boundaries of the land to be conveyed are essential terms. Michelson v. Sherman, 310 Mass. 774, 777 (1942) ("location of the boundary line between the land sold and the land kept by the defendants was an essential element of the ... contract").

Here, the parties' minds never met on whether the northeastern boundary of the land to be conveyed was what was shown on the drawing attached to the purchase and sale agreement or whether it was to be the zoning line that separated the residential district from the industrial district. As plaintiff's proposed memorandum of lis pendens makes clear, plaintiff intended to have a contract for the purchase of so much of Lot 11 as was zoned residential, evidently believing that the saw-tooth line on the drawing attached to the purchase and sale agreement represented the zoning boundary line and reserving the right to ask the Ashland town meeting to straighten it.[7] Because it is now apparent that the zoning line and the saw-tooth line are different, it is impossible to say that the parties' minds met on the location of the northeastern boundary line.

V.  SHOULD THE COURT CONCLUDE THAT PLAINTIFF'S CLAIM SURVIVES THE SPECIAL MOTION TO DISMISS, THE COURT SHOULD NOT ENDORSE THE MEMORANDUM OF LIS PENDENS BECAUSE THE PROPOSED MEMORANDUM DOES NOT AND CANNOT ACCURATELY DESCRIBE THE PROPERTY AT ISSUE

In Sutherland v. Aolian Dev. Corp., 399 Mass. 36, 41 (1987), the Supreme Judicial Court noted that a memorandum of lis pendens should not cover "more land ... than the subject matter of the action asserts an interest in."[8] This requirement presents a special

---

[7] Defendant believed that the northeastern boundary line was merely approximated by the drawing, and that its precise location would be worked out once it was determined where the zoning line was and whether plaintiff was successful in petitioning the Ashland town meeting to straighten the line (Halcomb Aff. ¶¶ 21-26).

[8] In Sutherland, the Court recognized an exception to this rule, not applicable in this case, where the purchase and sale agreement enables the seller to select which lots to convey from a multi-lot tract. Until the seller makes the selection, it would be appropriate for the lis pendens to cover the entire tract, but once the selection is made, the memorandum must be revised to cover only the lots selected. 399 Mass. at 41.

problem when the action asserts an interest in a *portion* of an existing lot, for the memorandum must be capable of describing the portion in dispute "in such a way that the public ... is on notice of what property is in dispute." Hy-Mare, Inc. v. O'Brien, 2001 WL 1313803, 13 Mass. L. Rptr. 681 (Mass. Super. 2001). See Keating v. Zukauskas, 1999 WL 482313, 10 Mass.L.Rptr. 258 (Mass.Super. 1999) (refusing to endorse memorandum of lis pendens where dispute concerned unspecified portion of Lot 2 near plaintiff's lot line).

Plaintiff has proposed a memorandum of lis pendens that describes the land as "Lots 6B, 12, and *that portion of Lot 11 zoned 'Residential,' Sewall Road*, Ashland,... Massachusetts." In a later part of the proposed memorandum of lis pendens, plaintiff describes the land as:

> that certain plot, piece or parcel of land in Ashland, MA known and numbered as Lots 12, 6B, and that portion of Lot 11 zoned "Residential," Sewall Street, which land is shown on a plan of land recorded in the Middlesex Registry of Deeds as Plan 16849 of 1981, and [which] is more fully described in a deed recorded with the Middlesex South Registry of Deeds in Book 936, Page 51.

This proposed memorandum does not describe the property "in such a way that the public ... is on notice of what property is in dispute." Hy-Mare, Inc. v. O'Brien, 2001 WL 1313803, 13 Mass. L. Rptr. 681 (Mass. Super. 2001). "Plan 16849" does not show what "portion of Lot 11 [is] zoned Residential." Rather, it shows Lot 11 in its entirety. Berman Aff. Ex. A. Moreover, there is no "deed recorded with the Middlesex South Registry of Deeds in Book 936, Page 51." Page 51 of Book 936 – a plan book at the land registration office of the Middlesex South Registry District of the Land Court – contains a drawing, not a deed. The drawing covers many lots, not just Lot 11, and does not show what portion, if any, of Lot 11 is zoned residential. Further, in describing the property, the proposed memorandum contains a reference to "Sewall Street," as if the land at issue either includes or has frontage on

Sewall Street. While Lot 11 fronts on Sewall Road, the portion of Lot 11 depicted in the drawing attached to the purchase and sale agreement does not. Plaintiff's proposed memorandum impermissibly covers "more land ... than the subject matter of the action asserts an interest in." Sutherland v. Aolian Dev. Corp., 399 Mass. 36, 41 (1987). In short, the land description in plaintiff's proposed lis pendens memorandum does not match the land description in the purchase and sale agreement and therefore cannot be endorsed.

### Conclusion

For the foregoing reasons, defendant's special motion to dismiss should be allowed and a hearing should be scheduled on the amount of fees and costs to be awarded to the defendants pursuant to G.L. c. 184 § 15(c). Plaintiff's motion for endorsement of lis pendens should be denied.

METRO-BOSTON BROADCASTING, INC.

By its attorneys,

/s/ Kenneth R. Berman
Kenneth R. Berman (BBO 040320)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

July 15, 2004

### Certificate Of Service

I certify that I served this document today on opposing counsel by hand.

/s/ Kenneth R. Berman
Kenneth R. Berman

July 15, 2004