UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP.<br><br>Plaintiff,<br><br>vs.<br><br>METRO-BOSTON BROADCASTING, INC.,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  NO. 04-11531-RGS<br>)<br>)<br>)<br>)<br>)<br>) |

**SUPPLEMENTAL MEMORANDUM OF FAFARD REAL ESTATE & DEVELOPMENT CORP. IN OPPOSITION TO DEFENDANT METRO-BOSTON'S SPECIAL MOTION TO DISMISS**

Pursuant to the Court's Order dated July 19, 2004, Plaintiff Fafard Real Estate & Development Corp. ("Fafard") respectfully submits this Supplemental Memorandum in Opposition to Defendant Metro-Boston's Special Motion to Dismiss.

A supplemental memorandum is necessary to respond specifically to the factual inaccuracies asserted by Metro-Boston. First, it is untrue that the boundary of the land to be sold to Fafard was uncertain. The parties *expressly* agreed, in writing, to the boundary lines of the property. Second, it is untrue that Fafard refused to close without access via Sewell Street. Fafard *never* insisted on Sewell Street access as a condition of the closing, but was interested in purchasing *additional* acreage from Metro-Boston (for additional consideration), that included Sewell Street.

Fafard was, and is today, ready willing and able to close—even without access to the property via Sewell Street. To the contrary, it is Metro-Boston that is unprepared to

close, and it is Metro-Boston that has failed to fulfill *its* obligations under the P&S Agreement.

Metro-Boston *never* filed a new subdivision plan with the Land Court. Metro-Boston *never* cured easements and restrictions that interfered with Fafard's proposed use. And Metro-Boston *never* provided to Fafard certain corporate documentation that is necessary to close. Indeed, Fafard commenced this action for these exact reasons and to enforce Metro-Boston's obligations under the P&S Agreement.

## ARGUMENT

### I. The Boundary Lines of The Property To Be Sold Were Expressly Agreed Upon In The P&S Agreement.

Metro-Boston's contention that the boundary of the property to be sold was "unresolved," is incorrect. Subdivision Plan 16849 is incorporated into the P&S Agreement. The plan shows that all of Lots 6B and 12, and that a portion of Lot 11 will be sold to Fafard. The plan contains a line drawn through the lower, right-hand portion of Lot 11, demarcating the portion of that Lot subject to the sale. See Affidavit of Janice Hannert ("Hannert Aff. ¶ __) ¶ 4, submitted herewith, and Exhibit 1 thereto. Metro-Boston admits this. See Affidavit of Mary Heller Halcomb ¶ 22. *This is the land Fafard agreed to purchase*. Id. Absolutely nothing in the P&S Agreement or elsewhere indicates that the line drawn on the plan showing the portion of Lot 11 to be sold was only a "proposed" boundary. Thus, because P&S Agreement *expressly and explicitly* demarcates the portions of Metro-Boston's land to be sold to Fafard, the P&S Agreement should be enforced according to its terms. See Rogaris v. Albert, 431 Mass. 833, 835 (2000) (court gives full effect to terms expressed by parties in a purchase and sale

2

agreement; "terms stated by the parties will be taken in the plain and ordinary sense unless otherwise indicated by the contract").

Moreover, Metro-Boston and Fafard <u>never</u> discussed that the boundary of the land to be sold from Lot 11 would be anything other than the line drawn on Subdivision Plan 16849, attached to the P&S Agreement. Hannert Aff. ¶ 5. Fafard was <u>never</u> told and <u>never</u> believed that it was purchasing anything other than the land described in the P&S Agreement. <u>Id.</u> Metro-Boston <u>never</u> told Fafard (orally or in writing) that it intended to convey to Fafard only the portion of Lot 11 zoned residential. <u>Id.</u> And neither Metro-Boston nor Fafard conditioned the sale on whether Lot 11 (or any portion of Lot 11) was zoned residential or industrial. <u>Id.</u> ¶ 6. In short, there was never any indication (either orally or in writing) that Metro-Boston was to convey to Fafard anything other than the portion of Lot 11 that is explicitly depicted in Exhibit A to the P&S Agreement.[1]

As the buyer, the P&S Agreement granted Fafard the *option*, but not the *obligation*, "to petition the Ashland Town Meeting to straighten the Zoning boundary line between residential and industrial on Seller's land." <u>See</u> P&S Agreement ("Buyer **may** petition the Ashland Town Meeting…") (emphasis added). <u>Nothing</u> in the P&S Agreement conditioned the sale of the land on Fafard's petition of the Town Meeting. <u>See</u> Hannert Aff., Exhibit 1. And <u>nothing</u> in the P&S Agreement required Fafard to petition the Town Meeting to straighten the zoning line so that a boundary line could be

---

[1] Ms. Halcomb's statement that it was her "understanding" that the hand-drawn line that demarcates the northeast boundary "might or might not end up being the boundary line" should be given no weight. Metro-Boston does not contend and indeed, there is no evidence to suggest, that the P&S Agreement is anything other than the fully integrated agreement of the parties. Indeed, the P&S Agreement expressly states that it "sets forth the entire contract between the parties." <u>See</u> Exhibit 1 to Hannert Affidavit, ¶ 27. Thus, its terms "may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations." <u>Sound Techniques, Inc. v. Hoffman</u>, 50 Mass. App. Ct. 425, 429 (2000). Where an agreement is both integrated and unambiguous, then the parties are bound by the plain terms of their written contract. <u>Hiller v. Submarine Signal Co.</u>, 325 Mass. 546 (1950).

determined. Id. Fafard's *decision* not to avail itself of this option did not prevent the closing from taking place. See Hannert Aff. ¶ 7. Indeed, Fafard had determined that it was not necessary to petition the Town Meeting, and Fafard was ready to close on the property *regardless* whether it was zoned industrial or residential. Id. In any event, whether Lot 11 or any portion of Lot 11 was zoned residential or industrial is entirely *irrelevant* because the boundary line expressly demarcated in the P&S Agreement is clear and is not conditioned on zoning or any other contingency. See Hannert Aff., Exhibit 1.

## II. Fafard Was (and Is) Ready, Willing, and Able to Close on the Property; Fafard Never Conditioned Closing on Access Via Sewell Street.

Metro-Boston's second argument -- that Fafard insisted on Sewell Street access as a condition of the closing -- is equally unsupported. In fact, the evidence demonstrates just the opposite: Fafard had fulfilled its obligations and was ready to close on May 21, 2004, but Metro-Boston did not fulfill obligations under the P&S Agreement necessary to convey the property to Fafard. Hannert Aff. ¶ 13.

As a threshold matter, however, it is untrue that Fafard purported to condition closing on the receipt of access to Lot 11 via Sewell Street. Hannert Aff. ¶ 8. Because of the presence of wetlands in the area of one of two entry ways onto the subject property (Tri Street), Fafard was interested in purchasing from Metro-Boston a *separate* parcel of land that would provide an *additional* entry point to the portion of Lot 11 being purchased by Fafard. Hannert Aff. ¶ 9. Fafard learned that Sewell Street, which abuts a different portion of Lot 11 than Fafard was purchasing, could be developed into an entry point to the property. Id. ¶ 10. Therefore, in October 2001, Fafard made a *separate* offer to purchase for $100,000 from Metro-Boston a *separate* parcel of land comprising five

4

acres of Lot 11, including Sewell Street.  See Hannert Aff. ¶ 10, and Exhibit 2 thereto. *That offer was an entirely separate transaction from the P&S Agreement.*  Fafard never insisted that Metro-Boston accept Fafard's offer.  Hannert Aff. ¶ 11.  Fafard never threatened to back out of the P&S Agreement if Metro-Boston refused to sell the additional land to Fafard.  Id.  And Fafard never attempted to or purported to condition the closing under the P&S Agreement on receiving access via Sewell Street.  Id.  Fafard remained ready, willing and able to close on the property without access via Sewell Street.  Hannert Aff. ¶ 11.

Nevertheless, because Metro-Boston never fulfilled *its* obligation under the P&S Agreement, Fafard was compelled to bring this action to enforce Metro-Boston's obligations under the P&S Agreement.  First, because Fafard was purchasing only a portion of Lot 11 from Metro-Boston, Metro-Boston was obligated to file a new subdivision plan with the Land Court.  This obligation is express in the P&S Agreement.  See Hannert Aff., Exhibit 1, ¶ 5 ("New Subdivision Plan 16849 provided by Seller.").  *Metro-Boston failed to carry out this obligation.*  Hannert Aff. ¶ 15.

Second, Metro-Boston was also required to convey good and clear record and marketable title, and clear all easements, restrictions and other encumbrances of record that interfered with Fafard's proposed residential use.  See Hannert Aff., Exhibit 1, ¶ 4. *Metro-Boston also failed to carry out this requirement.*  In a letter dated November 7, 2003, *nearly three years after the execution of the P&S Agreement*, Fafard identified numerous encumbrances and restrictions that remained on the property and reminded Metro-Boston of its obligations.  See Hannert Aff. ¶ 16, and Exhibit 3 thereto.  Metro-Boston responded that it could, and would, clear title and resolve the remaining items

5

necessary for the closing. Id. ¶ 17. However, despite those representations, Metro-Boston did not clear title. Metro-Boston also failed to provide to Fafard certain corporate documentation that is necessary for closing. Despite reminders, Metro-Boston never provided the documents.

### III. The Special Motion to Dismiss is A Procedural Device that is Unavailable to a Defendant in Federal Court.

Two brief responses to the arguments raised by Metro-Boston in its Reply Brief are warranted. *First*, Metro-Boston draws an improper analogy to G.L. c. 231, § 60B, the medical malpractice tribunal statute. The special motion to dismiss is not a "gatekeeping" statute, like G.L. c. 231, § 60B, and other such statutes which have been held to apply in federal court. Nor is the medical malpractice tribunal statute a procedural dismissal mechanism that conflicts with the federal rules. It is a screening statute that results a imposition of a bond requirement on plaintiff's asserting questionable claims, providing defendants with security for the costs and attorneys' fees that the statute also provides for in the case of a defense verdict. Failure to demonstrate a viable claim at the medical malpractice tribunal hearing does not result in dismissal. Only the failure to post the resulting bond subjects the action to dismissal. Thus, Feinstein v. Mass. Gen. Hosp., 643 F.2d 880 (1st Cir. 1981), is inapposite.

By contrast, the special motion to dismiss, essentially a hybrid of a Rule 12 motion to dismiss and a Rule 56 motion for summary judgment, is not a gatekeeping statute intended to control insurance premium costs or provide security for a prevailing defendant's attorneys' fees and costs. It is a procedural device for the expeditious termination of frivolous suits. Indeed, it sets forth a unique dismissal standard, not found in federal rules, placing the burden on the defendant to prove, through affidavits or other

6

competent evidence, that the action is frivolous, devoid of reasonable factual support, devoid of any arguable basis in the law, or subject to dismissal based on a valid legal defense. See G.L. c. 184, § 15(c). Thus, just like the Massachusetts anti-SLAPP statute,[2] it directly conflicts with Federal Rule of Civil Procedure 12, which adopts a different dismissal standard: a determination that the plaintiff's complaint, on its face, fails states a claim upon relief can be granted. The special motion to dismiss must therefore be considered a procedural law, and not available in this federal forum. See Hanna v. Palmer, 380 U.S. 460, 463-65 (1965).

*Second*, Metro-Boston improperly accuses Fafard of cherry-picking portions of the lis pendens statute that are applicable in federal court. This is not the case. The comprehensive statutory scheme of c. 184, § 15 is not undermined by limiting the defendant to a motion to dissolve the lis pendens or a motion to dismiss pursuant to Rule 12. Indeed, the statute itself contemplates that the special motion dismiss can be heard at the time the court hears a motion to dissolve. The addition to the statute of the special motion to dismiss clause did not supplant the provision for a motion to dissolve a lis pendens. As Metro-Boston admits, both a motion to dissolve and a Rule 12 motion to dismiss remain available to a defendant in federal court. And either, if granted, will effectively remove any cloud on title. Indeed, the purpose of the special motion to dismiss is not to clear a cloud on title but, rather, to grant a defendant a *procedural* mechanism to dismiss a lawsuit.

---

[2] It is notable also that the special motion to dismiss adopts a nearly identical dismissal standard as the Massachusetts anti-SLAPP statute, G.L. c. 231, § 59H. Compare G.L. c. 184, § 15(c) (special motion granted where action is frivolous because it is devoid of any reasonable factual support, devoid of any arguable basis in the law, or subject to dismissal based on valid legal defense, such as the statute of frauds) with G.L. c. 231, § 59H (dismissal where non-moving party shows moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in the law and moving party's acts caused actual injury to responding party). Both statutes, moreover, impose an automatic stay of discovery upon the filing of the motion to dismiss.

## CONCLUSION

Although the question of whether a special motion to dismiss is procedural or substantive is an interesting issue of first impression, Metro-Boston's failure to meet its high burden under Massachusetts G.L. c. 184, § 15(c) to demonstrate that this action is "frivolous," as defined in that statute makes it unnecessary for this Court to decide the issue. Fafard is now, and has always been, ready, willing and able to close on the property. And because Fafard has otherwise satisfied all the requirements of Mass. G.L. c. 184, § 15(c), a lis pendens shall issue.

REQUEST FOR ORAL ARGUMENT

Respectfully submitted,

FAFARD REAL ESTATE
DEVELOPMENT CORP.

By its attorneys,

*Halye Sug*
Jeffrey J. Upton (BBO#552221)
Halye A. Sugarman (BBO#646773)
HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108-3107
(617) 423-0400

DATED: August 3, 2004
410997

CERTIFICATE OF SERVICE

I, Halye A. Sugarman, certify that on August 3, 2004, I served a copy of the foregoing Supplemental Memorandums in Opposition to Defendant's Special Motion Dismiss, by hand on:

>Kenneth Berman
>Nutter McClennan & Fish, LLP
>World Trade Center West
>155 Seaport Boulevard
>Boston, MA  02110

*Halye Sug*
Halye A. Sugarman