UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP.<br><br>      Plaintiff,<br><br>vs.<br><br>METRO-BOSTON BROADCASTING, INC.,<br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) NO. 04-11531-RGS<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF JANICE HANNERT IN OPPOSITION
TO METRO-BOSTON'S SPECIAL MOTION TO DISMISS**

I, Janice Hannert, do hereby depose and state as follows:

1. I am a Land Planner at Fafard Real Estate Development Corporation ("Fafard"). Fafard is a real estate development company located in Ashland, Massachusetts. I have been employed with Fafard since 1987. I have been the primary contact between Fafard and Defendant Metro-Boston Broadcasting, Inc. ("Metro-Boston"), and its President Mary Heller Halcomb, with respect to the sale of the subject property.

2. I have read the Affidavit of Mary Heller Halcomb submitted in support of Metro-Boston's Special Motion to Dismiss. It contains numerous inaccuracies and mischaracterizations.

3. In late 2000, Metro-Boston agreed to sell to Fafard three parcels of land located in Ashland, Massachusetts: Lot 6B, Lot 12, and a 10-acre portion of Lot 11.

4. On January 30, 2001, Fafard and Metro-Boston executed a Purchase and Sale Agreement for the sale of those three parcels ("the P&S Agreement"). See Exhibit 1 hereto. The P&S Agreement described the land to be sold as "Those three (3) parcels of land in Ashland, Middlesex County, Massachusetts, shown as Lots 12 and 6B (9.6 Acres) and a portion of Lot 11 (10 Acres) on the Plan attached hereto and incorporated herein by reference as Exhibit A." The Plan at Exhibit A was Subdivision Plan 16849, which showed, among other parcels, Lots 6B, 12, and Lot 11. The portion of Lot 11 to be sold to Fafard was marked in Exhibit A by a line drawn on the plan. This was the land Fafard agreed to purchase. In other words, it was clear in the P&S Agreement which land Metro-Boston agreed to sell to Fafard.

5. Ms. Halcomb contends that Fafard and Metro-Boston had not resolved "the northeast boundary line," (*i.e.* the portion of Lot 11 to be sold to Fafard), and that the boundary line drawn on Subdivision 16849, Exhibit A to the P&S Agreement was only a "proposed boundary." This is untrue. Metro-Boston and Fafard never discussed the boundary of the land to be sold from Lot 11 being anything other than the line drawn on Subdivision Plan 16849, attached to the P&S Agreement. Fafard was never told and never believed that it was purchasing anything other than the land described in the P&S Agreement. Metro-Boston never told Fafard (orally or in writing) that it intended to convey to Fafard only the portion of Lot 11 zoned residential.

6. In addition, the sale of a portion of Lot 11 to Fafard was never contingent on whether Lot 11 (or any portion of Lot 11) was zoned residential or industrial. Moreover, the sale of a portion of Lot 11 to Fafard was never contingent on Fafard's petitioning the Ashland Town Meeting to straighten the zoning line. The P&S Agreement did not require Fafard to petition the Town Meeting and did not condition the sale of Lot 11 on Fafard's petition.

7.   In fact, whether Lot 11 (or any portion of Lot 11) is zoned industrial is not relevant to Fafard's plans to develop the land for residential use. Fafard can (and regularly does) purchase land zoned "industrial" that it intends to develop for residential use. Thus, Fafard was (and is today) ready, willing, and able to close on the property regardless of whether Lot 11 is zoned residential or industrial.

8.   Ms. Halcomb also contends that Fafard refused to close unless and until Metro-Boston granted Fafard access to the land from Sewell Street. This is also untrue.

9.   After Fafard and Metro-Boston executed the P&S Agreement, Fafard learned that the access to the land from Tri-Street was unusable because of wetlands on the site. Fafard still had access to the land through Adams Road, but Fafard *preferred* a second point of entry. A second point of entry was <u>not required</u> by Fafard. Fafard never conditioned closing on a second point of entry, or insisted that Metro-Boston provide Fafard with another entry point.

10.   Fafard was aware, however, that Sewell Street, which provides a point of access to a portion of Lot 11 (but not the portion to be sold to Fafard) was (and still is) used by several abutters to access their land. Therefore, in the fall of 2001, Fafard inquired from Metro-Boston as to the potential to purchase five additional acres of land that would include Sewell Street, so Fafard could develop that road for access to its portion of Lot 11. On October 20, 2001, Fafard submitted a <u>separate</u> Offer to Purchase five additional acres of land from Metro-Boston for $100,000. <u>See</u> Exhibit 2 hereto.

11.   Metro-Boston did not accept Fafard's offer, but continued to work to provide Fafard access via Sewell Street throughout 2002 and 2003. Upon information and belief, at that time, Metro-Boston was negotiating to sell the parcel of land that included Sewell Street to a third party, and Metro-Boston was trying to strike a deal that would also allow Fafard Sewell

3

Street access. In fact, Fafard offered to pay for half of the development of the road. Fafard never insisted on exclusive access. Upon information and belief, that deal was never consummated. Nevertheless, Fafard remains interested in purchasing the land agreed upon the P&S Agreement, even without access via Sewell Street. Fafard never insisted on Sewell Street as a condition of the closing.

12.     As of today, Fafard is ready to close on the property. There is nothing that Fafard needs to do or to provide to Metro-Boston in order to close.

13.     On the other hand, Metro-Boston has not fulfilled its obligations under the P&S Agreement.

14.     First, because Metro-Boston agreed to sell only a portion of Lot 11 to Fafard, it was necessary that Metro-Boston file with the Land Court a new subdivision plan for Plan 16849, which would demarcate the portion being sold to Fafard. A new plan was necessary to prepare a deed for closing. Therefore, it was necessary that Metro-Boston file a new subdivision plan with the Land Court.

15.     However, Metro-Boston never filed a new subdivision plan with the Land Court, despite numerous requests by Fafard to so do. Several of Fafard's requests to Metro-Boston to file the plan can be found at Exhibit B to the Affidavit of Mary Heller Halcomb. Moreover, upon information and belief, Metro-Boston never performed the surveying and engineering work necessary to obtain such a plan. Therefore, Metro-Boston had not done what Fafard needed it to do, and what it was required to, to close on the property.

16.     Second, Metro-Boston failed to take the steps necessary to cure numerous easements and restrictions that materially interfered with the Fafard's use of premises for residential development. Fafard also continually reminded Metro-Boston of its obligation under

the P&S Agreement to cure and remedy such easements and restrictions. For example, on November 7, 2003, *nearly three years* after Fafard executed the P&S Agreement, I sent a letter to Ms. Halcomb that identified several easements, restrictions and other encumbrances of record that remained on the property. See Exhibit 3 hereto. This letter also identified several corporate documents necessary for closing that Metro-Boston had never provided to Fafard.

17.     The items in the letter of November 7, 2003, were discussed in a conference call on November 11, 2003, in which both Ms. Halcomb and I participated. I informed Ms. Halcomb that Fafard was ready to close on the property. I also walked through the items in the November 7 letter that Fafard needed from Metro-Boston in order to close on the property. In response, Ms. Halcomb told me Metro-Boston would clean title, and that none of the items would be problem for Metro-Boston to resolve. Ms. Halcomb told me she would speak with her counsel and surveyor and let me know how long it would take to finalize the closing items.

18.     However, despite these representations, Metro-Boston did not fulfill its obligations. Metro-Boston failed to clean title, and upon information and belief, never took the steps necessary to do so. Metro-Boston also never provided Fafard with corporate documents that were necessary for closing.

19.     Metro-Boston's failure to fulfill its obligations under the P&S Agreement have caused great frustration to Fafard. Indeed, the reason Fafard brought this lawsuit was to enforce the terms of the P&S Agreement and compel Metro-Boston to perform.

Signed under the pains and penalties of perjury this 2nd day of August 2004.

_____
Janice Hannert

410992

5