UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11531-RGS

FAFARD REAL ESTATE & DEVELOPMENT CORP.

v.

METRO-BOSTON BROADCASTING, INC.

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION
TO RECONSIDER SPECIAL MOTION TO DISMISS and other motions

November 24, 2004

STEARNS, D.J.

Fafard Real Estate & Development Corporation (Fafard) is suing Metro-Boston Broadcasting, Inc. (Metro-Boston) seeking specific performance of a Purchase and Sale (P & S) Agreement involving land (the Property) that Fafard proposed to develop for residential use. The suit was filed in the Massachusetts Superior Court, and then removed by Metro-Boston to the federal district court on diversity grounds. Metro-Boston maintains that Fafard's suit is a "groundless" attempt to interfere with Metro-Boston's ability to convey the Property to another buyer. Metro-Boston is particularly incensed by a memorandum of lis pendens recorded on the Property by Fafard, which it views as a malicious clouding of title undertaken to leverage concessions in negotiations regarding an easement over other land owned by Tower Sites, a Metro-Boston affiliate. Metro-Boston moves for reconsideration of the court's previous denial of a special motion to dismiss brought pursuant to G.L. c. 184, § 15(c). Fafard, for its part, moves to dismiss the counterclaim brought by Metro-Boston accusing Fafard of abuses of legal process.

## BACKGROUND

The facts as alleged in Fafard's Verified Complaint, Metro-Boston's counterclaim, and the supporting affidavits submitted by both parties, are as follows. On January 30, 2001, Fafard and Metro-Boston executed a P & S Agreement under which Fafard was to acquire three parcels of land (Lot 6B, Lot 12, and a 10-acre portion of Lot 11) owned by Tower Sites in Ashland, Massachusetts.[1] The parties understood that Fafard intended to develop the Property for residential use. The agreed purchase price was $339,000. Fafard paid a $39,000 deposit.

The P & S Agreement obligated Metro-Boston to convey to Fafard "a good and clear record and marketable title." The Agreement expressly excepted certain encumbrances, including "easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the said premises for residential development." In addition, Metro-Boston was required to provide Fafard with a new subdivision plan to permit the preparation of a deed accurately identifying the Property. The sale was contingent on Fafard's ability to obtain all necessary permits for the development.

The P & S Agreement set out two deadlines: Fafard was to obtain the necessary permits and approvals by January 30, 2002, while the closing was to take place "thirty (30) days after receipt of all permits, or by February 28, 2002, whichever is earlier." The February 2002 closing date was extended by agreement numerous times. The last

---

[1] Tower Sites is a Texas limited partnership. Metro-Boston is the general partner of Tower Sites. Metro-Boston is a Texas corporation that shares with Tower Sites a principal place of business in Dallas, Texas.

negotiated extension expired on May 21, 2004.[2] The multiple extensions of the closing date involved Fafard's desire to acquire an alternative access route to the Property. By way of explanation, when the parties entered into the P & S Agreement, Fafard planned to build a record access road over frontage bordering on Tri Street in Ashland. (The main entrance to the Property is through Adams Road to the south). The plan came to naught when Fafard learned that the chosen portal sat in the middle of a protected wetland. In the fall of 2001, Janice Hannert, the Land Planner at Fafard, contacted Mary Halcomb, the President of Metro-Boston, to explain that Fafard was looking for an access route leading to Sewall Road (a/k/a Sewell Street), a public way adjacent to property owned by Metro-Boston, and wished to purchase an additional portion of Lot 11 for that purpose. On October 30, 2001, Hannert made a formal offer to purchase the desired parcel.

While the record is silent as to the status of the offer during the intervening two years, on May 19, 2003, Hannert sent a fax to Halcomb stating that Fafard "needed written confirmation" that the "land we have under agreement is available for our use as joint access." Halcomb, for her part, was concerned that the sale of additional land from Lot 11 or the granting of an overlying easement would be objected to by Tower Sites' lessees. "The portion of Lot 11 that is not covered by the purchase and sale agreement has five large radio antenna towers on it, each 550 feet high, equivalent to 55 stories in height. Each tower is tethered and supported by at least 12 guy wires that tie into 5-ton concrete blocks embedded in the ground." Halcomb Aff. ¶ 16. "[A] new road would need to be

---

[2]On January 30, 2002, the parties agreed to extend the permits and approvals date to April 30, 2002, and to extend the closing date until May 31, 2002. The parties were unable to close on May 31, 2002, and thereafter, agreed to extensions of the closing date on a periodic basis through and until May 21, 2004.

sufficient to accommodate the daily traffic of a large residential development, would need to be adequate to handle emergency vehicles entering and exiting from the same point of access/egress, would probably need to be engineered and built to town specifications, and could well need approval under the subdivision control law." Halcomb Aff. ¶ 17. Halcomb felt she was "not in a position to have Tower Sites agree to sell more land in Lot 11 to Fafard, or to sell Fafard an easement, for the creation of such a road without, at a minimum, making sure that the tower lessees consent to such an arrangement."[3]

Metro-Boston argues that by injecting an unbargained for access condition into the deal, Fafard relieved it of any obligation to proceed with the closing. Fafard, for its part, maintains that it at all times was (and remains) ready and willing to close on the sale, with or without the Sewall Road access. Hannert states in her affidavit that

> after Fafard and Metro-Boston executed the Purchase and Sale Agreement, Fafard learned that the access to the land from Tri Street was unusable because of wetlands on the site. Fafard still had access to the land through Adams Road, but Fafard preferred a second point of entry. A second point of entry was not required by Fafard. Fafard never conditioned closing on a second point of entry, or insisted that Metro-Boston provide Fafard with another entry point. . . . Fafard inquired from Metro-Boston as to the potential to purchase five additional acres of land that would include Sewall Street, so Fafard could develop that road for access to its portion of Lot 11. On October 20, 2001, Fafard submitted a separate Offer to Purchase five additional acres of land from Metro-Boston for $100,000. Metro-Boston did not accept Fafard's offer.

See Hannert Aff. ¶¶ 9-11.

Metro-Boston did not attend the closing at the Middlesex South Registry of Deeds

---

[3] Halcomb further attested that "to the best of my knowledge, the tower lessees have never consented to such an arrangement. Further, even if the tower lessees were to give their consent, Fafard has never offered Tower Sites an attractive enough price for any additional land in, or easement over Lot 11." Id. at ¶ 17 and 18.

4

on May 21, 2004. Rather, Halcomb sent Richard Terrill, the President of Fafard, a letter stating that Metro-Boston's board of directors had instructed her to grant no further extensions on the Purchase and Sale Agreement and that the transaction "should be considered terminated."[4] On June 2, 2004, Fafard filed its Complaint seeking specific performance both with respect to the preparation of the subdivision plan and conveyance of the Property, and damages for breach of contract.[5] On July 8, 2004, the case was removed to the federal district court where Fafard obtained the endorsement of its lis pendens. Metro-Boston then moved for a special dismissal arguing that Fafard's Complaint was frivolous. After the court denied the motion to dismiss, Metro-Boston counterclaimed against Fafard alleging abuse of process, intentional interference with advantageous business relations, and a violation of G.L. c. 93A, § 11. It also sought to

---

[4]Significant portions of the parties' briefs are devoted to a dispute over the location of Lot 11's northern border. In the P & S Agreement, the northeastern boundary was shown as a hand-drawn sawtooth-shaped line superimposed over a copy of the recorded plan. After signing the P & S Agreement, Halcomb discovered that the zoning line actually coincided with the existing boundary between Lot 11 and Lot 12. Metro-Boston argues that whereas Fafard was looking to purchase that part of Lot 11 that was zoned residential, and whereas the boundary line as drawn was inaccurate, "the parties never had a meeting of the minds on an essential term of the agreement." Memorandum in Support of Special Motion to Dismiss, at 1. Fafard responds that the sale "was never contingent on whether Lot 11 (or any portion of Lot 11) was zoned residential or industrial. Whether Lot 11 (or any portion of Lot 11) is zoned industrial is not relevant to Fafard's plans to develop the land for residential use. Fafard can (and regularly does) purchase land zoned 'industrial' that it intends to develop for residential use." Hannert Aff. ¶¶ 6 and 7. Neither party raised this disagreement at oral argument in any dispositive fashion, presumably in recognition of the factual nature of the dispute.

[5]Fafard maintains that Metro-Boston breached the Purchase and Sale Agreement by failing to file a new subdivision plan and take the steps necessary to give Fafard a clear and marketable title. It seems clear, however, that under the Purchase and Sale Agreement, Metro-Boston had 30 days from the date of the closing to remove any defects in title.

renew its special motion to dismiss by way of a motion for reconsideration.

Motion for Reconsideration of the Special Motion to Dismiss

Metro-Boston moves for reconsideration of the court's denial of its special motion to dismiss. By way of background, in 2002 the Legislature amended G.L. c. 184, § 15(c) (effective January 31, 2003), to permit a party on whose property a memorandum of lis pendens has been recorded to bring a special motion to dismiss where the claim or action supporting the lis pendens is frivolous. It is worth stressing that the motion to dismiss is directed to the claim or action and not the lis pendens itself. The motion will be allowed if the court finds that the underlying claim is devoid of any reasonable factual support or arguable basis in law, or is vulnerable to a valid legal defense.

As grounds for reconsideration, Metro-Boston recycles the same argument that it made in support of the original motion – that "plaintiff's unequivocal notice to defendant that plaintiff needed to work out an access issue to Sewall Road before closing, which defendant was under no obligation to resolve – excused defendant from performing as seller under the purchase and sale agreement as a matter of law." In opposition, Fafard filed an affidavit from Janice Hannert, stating that Fafard wanted, but never needed, access to Sewall Road, and was willing to close with or without reaching an agreement on the access issue. Metro-Boston complains that Hannert's affidavit fails to "explain away" the May 19, 2003 fax in which Hannert told Halcomb that Fafard needed written confirmation that it would have access to Sewall Street, as well as a November 6, 2003 fax in which Hannert stated to Halcomb that "[w]e are ready to close on this property but need to obtain approval to access through Sewall Street . . . ." According to Metro-Boston,

6

Hannert's affidavit raises the "legal question" whether a buyer who imposes unbargained-for conditions on a sale of real estate, but who has the undisclosed intent to close on the property even if these conditions are not met, can enforce a purchase and sale agreement against an unwitting seller. If the dispute could be accurately framed in this way, the answer would surely be "no," and Metro-Boston would be entitled to a dismissal. The questions at issue, however, are whether Hannert's communications, in the context of the parties' negotiations, were intended to impose a condition precedent (access to Sewall Street) to the closing, or simply constituted extraneous bargaining for the purchase of a separate easement or acreage in Lot 11 to accomplish that purpose (and were understood as such by Metro-Boston). These are questions that can only be answered by a finder of fact after appropriate discovery.

Motion to Amend Lis Pendens; Further Motion to Dismiss Lis Pendens

Metro-Boston also argues that Fafard's memorandum of lis pendens should be dissolved because: (1) the lis pendens memorandum does not sufficiently describe the land affected by this action, as required by G.L. c. 184, § 15(a); and (2) the Verified Complaint did not reveal all material facts, as required by G.L. c. 184, § 15(b).

In its August 17, 2004 motion for the endorsement of the lis pendens, Fafard described the impacted land as follows:

> [t]he property so affected is that certain plot, piece or parcel of land in Ashland, MA, known and numbered as Lots 12, 6B, and <u>ten (10) acres of Lot 11</u>, which land is shown on a plan of land recorded in the Middlesex Registry of Deeds as Plan #16849 of 1981, and is more fully described in a deed recorded with the Middlesex South Registry of Deeds in Book 936, Page 51.

(Emphasis added). Metro-Boston argues, and accurately so, that the description fails to

7

sufficiently identify which ten acres of Lot 11 are in dispute.[6] See Sutherland v. Aolean Dev. Corp., 399 Mass. 36, 38 (1987) (a lis pendens memorandum should not cover "more land . . . than the subject matter of the action asserts an interest in."). Fafard maintains that the description is sufficient as the memorandum tracks the language of the P & S Agreement. Nevertheless, Fafard seeks to amend the lis pendens memorandum by adding the following qualifying language to the "ten (10) acres of Lot 11" specification: "which is property that stands in the name of Tower Sites, Ltd." This too appears imprecise as Tower Sites owns other property in and around Lot 11. At the hearing, Fafard offered to further cure the memorandum by appending the subdivision plan depicting the precise metes and bounds of the portion of Lot 11 that was the subject of the P & S Agreement. This amendment the court would deem sufficient.[7]

Motion to Dismiss Counterclaims

Metro-Boston asserts three counterclaims against Fafard: abuse of process; intentional interference with advantageous business relations; and violation of the Massachusetts unfair and deceptive trade practices act, G.L. c. 93A. Each of these causes of action is based on Fafard's filing of the underlying lawsuit. On these claims, the table turns. "We must accept the allegations of the [counterclaim] as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the

---

[6]Metro-Boston argues that this problem is rooted in the fact that the parties' "never resolved the issue of where the actual property line (through Lot 11) would be located." Halcomb Aff. ¶ 26.

[7]Metro-Boston's argument that the Verified Complaint fails to disclose all material facts is insufficiently briefed to warrant discussion.

8

law, we must deny the motion to dismiss." Vartanian v. Monsanto Company, 14 F.3d 697, 700 (1st Cir. 1994).

Fafard first maintains that Metro-Boston's abuse of process claim must be dismissed because Metro-Boston fails to allege an essential element of the claim: that process was used "to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." Quaranto v. Silverman, 345 Mass. 423, 426 (1963). "Abuse of process presupposes the use of legal action for an ulterior purpose, i.e., to achieve some end other than the apparent end of the litigation process which has been launched." Silvia v. Building Inspector of West Bridgewater, 35 Mass. App. Ct. 451, 453 (1993) (footnote omitted). Mere knowledge that a claim is groundless is not sufficient in and of itself to establish an abuse of process. "There must also be proof of an ulterior motive." Ladd v. Polidoro, 424 Mass. 196, 200 (1997). The filing of the lawsuit and the recording of the lis pendens is the process that Metro-Boston claims was abusive. It also alleges that Fafard initiated the lawsuit with the ulterior motive of gaining leverage in the negotiations for the purchase of property that was not subject to the Purchase and Sale Agreement. For purposes of a motion to dismiss, these allegations are sufficient.

"[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." Kurker v. Hill, 44 Mass. App. Ct. 184, 191

(1998). Fafard's principal argument is that the claim fails because Metro-Boston makes no allegation that it had an actual or contemplated P & S Agreement with a third party, or that Metro-Boston was in negotiations with a potential buyer. This sets the pleading bar too high. "A 'probable future business relationship from which there is a reasonable expectancy of financial benefit is also enough'" to survive the notice pleading standard of Rule 8 in an interference with advantageous relations case. Powers v. Leno, 24 Mass. App. Ct. 381, 384-385 (1987), quoting Owen v. Williams, 322 Mass. 356, 362 (1948). Fafard knew that the Property was an attractive investment (or why would it have sued to enforce the P & S Agreement?) and that Metro-Boston was willing to sell. There is no reason to suppose that property that Fafard thought desirable would not be similarly appealing to another developer, and that Fafard would not have been aware of the possibility.

Fafard's final argument that the abuse of process and interference with advantageous relations claims cannot support a claim of unfair and deceptive business acts or practices, is simply wrong. The misuse of legal process to obtain a commercial advantage has long been recognized as a violation of Chapter 93A. See Wyler v. Bonnell Motors, Inc., 35 Mass. App. Ct. 563, 567 (1993). However, the Chapter 93A claim fails to allege a loss of money or property, an essential element of a claim for damages under G.L. c. 93A, § 11. Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc., 403 Mass. 722, 730 (1989); Williams v. Resolution GGF Oy, 417 Mass. 377, 384 (1994). Nonetheless, Metro-Boston might, if successful on the Chapter 93A claim, be entitled to injunctive relief and attorney's fees. Warner-Lambert Co. v.

Execuquest Corp., 427 Mass. 46, 48-49 (1998); Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 176 (1999). See also Tech Plus, Inc. v. Ansel, 59 Mass. App. Ct. 12, 21 (2003) (a Chapter 93A plaintiff may prove a "loss of money or property" within the meaning of § 11 by showing that she was forced to incur attorney's fees and other costs in defending baseless lawsuit).

## ORDER

For the foregoing reasons, Metro-Boston's motion for reconsideration of the denial of the Special Motion to Dismiss is DENIED. Fafard's Motion to Amend the Memorandum of Lis Pendens is ALLOWED upon condition that the memorandum be amended by appending the subdivision plan. Metro-Boston's Motion to Dissolve the Lis Pendens for Want of Sufficient Identification is DENIED. Fafard's Motion to Dismiss Metro-Boston's Counterclaims is also DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE