UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & <br> DEVELOPMENT CORP. <br><br> Plaintiff, <br><br> vs. <br><br> METRO-BOSTON BROADCASTING, <br> INC., <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )  NO.  04-11531-RGS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**TRIAL MEMORANDUM**

Pursuant to the Order dated December 15, 2004, the Fafard Real Estate and

Development Corp. ("Fafard") and Metro-Boston Broadcasting, Inc. ("Metro-Boston")

respectfully submit this Trial Memorandum in advance of a trial in the above-captioned

matter on February 14, 2005.

I.     **PROPOSED WITNESS LIST**

    A.     Plaintiff's Proposed Witnesses:

        1.   Janice Hannert
            Fafard Real Estate & Development
            290 Eliot Street
            Ashland, MA  01721

        2.   Richard Terrill
            Fafard Real Estate & Development
            290 Eliot Street
            Ashland, MA  01721

        3.   Paul Beattie, Esq.
            Fafard Real Estate & Development
            290 Eliot Street
            Ashland, MA  01721

4.  Mary Heller Halcomb
    Metro-Boston Broadcasting, Inc.
    8411 Preston Road
    Dallas, TX  75225

5.  Christopher Egan
    58 Commonwealth Avenue
    Boston, MA

B.  <u>Defendant's Proposed Witnesses:</u>

1.  Janice Hannert
    Fafard Real Estate & Development
    290 Eliot Street
    Ashland, MA  01721

2.  Mary Heller Halcomb
    Metro-Boston Broadcasting, Inc.
    8411 Preston Road
    Dallas, TX  75225

3.  Dan Bremser
    Hancock Survey Associates
    Marlborough, MA

4.  Paul Beattie
    Fafard Real Estate & Development
    290 Eliot Street
    Ashland, MA  01721

In addition, if the issue of damages on Metro-Boston's counterclaim is to be included in the Phase I trial (see discussion below regarding a possible phasing of the trial), then defendant reserves the right add the following to its witness list with respect to the subject of recoverable attorneys' fees:

5.  Kenneth R. Berman
    Nutter McClennen & Fish LLP
    World Trade Center West
    155 Seaport Boulevard
    Boston, MA 02210

## II.    ESTIMATED LENGTH OF TRIAL

The estimated length of trial will depend on whether the Court bifurcates any claims or issues for trial.

The parties have discussed two possible ways in which the Court could bifurcate the trial. Plaintiff has filed a motion to hold a jury-waived trial on Fafard's claim for specific performance (Phase I) separately from Metro-Boston's counterclaims (Phase II). If the case is bifurcated in this fashion, plaintiff believes the Phase I trial will take one to two days to try and the Phase II trial will take four to five days to try, while defendant estimates the Phase I trial will take four to five days and the Phase II trial will take another four to five days to try.

Following a discussion between counsel, Defendant filed a motion to hold a Phase I jury-waived trial on liability on both Fafard's complaint for specific performance and Metro-Boston's counterclaim, to be followed by a Phase II trial on damages on Metro-Boston's counterclaim if liability is established in Phase I. Fafard has assented to the relief requested in this motion. If the case is bifurcated in this fashion, plaintiff believes the Phase I trial will take four days to try and the Phase II trial will take one day to try, while defendant estimates the Phase I trial will take four to five days and the Phase II trial will take one to two days to try.

## III.    STIPULATED OR ADMITTED FACTS

The parties have agreed to the following stipulated or admitted facts:

1.       In the late 1990s, Fafard and Metro-Boston began discussing the sale of residential land in Ashland, Massachusetts.

2.      On or about October 18, 2000, Fafard sent an offer to purchase real estate in Ashland, Massachusetts, owned by Tower Sites Limited Partnership, a partnership of which Metro-Boston is general partner.  On or about December 5, 2000, Fafard sent a revised offer to purchase real estate in Ashland, Massachusetts.

3.      During their discussions before signing a written agreement, the parties had available to them a 1979 unrecorded plan of land drawn by McCarthy & Sullivan Engineering ("1979 McCarthy Plan").  The 1979 McCarthy Plan showed a zoning line in the southwest portion of Lot 11, which divided Lot 11 into a residentially-zoned portion to the southwest and an industrially-zoned portion to the northeast.

4.      On January 31, 2001, Fafard and Metro-Boston signed a purchase and sale agreement ("P&S Agreement").

5.      Exhibit A to the P&S Agreement shows a hand-drawn saw-toothed line through the lower southwest portion of Lot 11.

6.      After signing the P&S Agreement, Fafard and Metro-Boston discussed the possibility of providing Fafard with an additional means of access to the property from Sewall Street, over other land owned by Metro-Boston.  The parties discussed the possibility of Fafard either buying additional land from Metro-Boston, or buying an easement over the additional land, in order to obtain a means of access to Sewall Street.

7.      On or about October 31, 2001, Fafard sent an offer to purchase to Metro-Boston, for approximately five additional acres of land in Lot 11.

8.      On January 30, 2002, Fafard and Metro-Boston signed an extension of the P&S Agreement which extended the deadline for permits and approvals until April 30, 2002, and the closing date until May 31, 2002.

9.      On March 27, 2002, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until July 31, 2002, and the closing date until August 31, 2002.  Metro-Boston signed the extension on April 4, 2002.

10.     On July 24, 2002, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until December 31, 2002, and the closing date until January 31, 2003.  Metro-Boston signed the extension on July 25, 2002.

11.     On December 12, 2002, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until May 31, 2003, and the closing date until June 30, 2003.  Metro-Boston signed the extension on December 20, 2002.

12.     On May 20, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until August 31, 2003, and the closing date until September 30, 2003.  Metro-Boston signed the extension on May 29, 2003.

13.     On August 28, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until September 15, 2003, and the closing date until September 15, 2003.  Metro-Boston signed the extension on August 21, 2003.

14.     On September 11, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until October 1, 2003, and the closing date until November 1, 2003.  Metro-Boston signed the extension on September 12, 2003.

15.     On September 29, 2003, Fafard and Metro-Boston signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until October 15, 2003, and the closing date until November 15, 2003.

16.     On October 14, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until October 17, 2003, and the closing date until October 17, 2003.  Metro-Boston signed the extension on October 15, 2003.

17.     On October 14, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until October 27, 2003, and the closing date until December 1, 2003.  Metro-Boston signed the extension on October 17, 2003.

18.     On October 23, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until November 3, 2003, and the closing date until November 3, 2003.  Metro-Boston signed the extension on October 24, 2003.

19.     On October 30, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until November 7, 2003, and the closing date until November 7, 2003.  Metro-Boston signed the extension on November 3, 2003.

20.     At some point, Metro-Boston discovered a discrepancy between the zoning line depicted on the 1979 McCarthy Plan and other maps.

21.     Metro-Boston informed Fafard of the discrepancy.

22.    On November 6, 2003, Fafard and Metro-Boston signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until November 14, 2003, and the closing date until November 14, 2003.

23.    On November 7, 2003, Fafard sent Metro-Boston a letter concerning title issues.

24.    On or about November 7, 2003, Fafard and Metro-Boston had a conference call regarding the property.

25.    On November 12, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until November 21, 2003, and the closing date until November 21, 2003. Metro-Boston signed the extension on November 12, 2003.

26.    On November 19, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until December 3, 2003, and the closing date until December 3, 2003. Metro-Boston signed the extension on November 20, 2003.

27.    December 1, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until December 10, 2003, and the closing date until December 10, 2003. Metro-Boston signed the extension on December 2, 2003.

28.    On December 8, 2003, Fafard and Metro-Boston signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until December 19, 2003, and the closing date until December 19, 2003.

29.     On December 17, 2003, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until January 9, 2004, and the closing date until January 9, 2004. Metro-Boston signed the extension on December 18, 2003.

30.     On January 5, 2004, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until January 16, 2004, and the closing date until January 16, 2004. Metro-Boston signed the extension on January 8, 2004.

31.     On January 14, 2004, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until January 30, 2004, and the closing date until January 30, 2004. Metro-Boston signed the extension on January 15, 2004.

32.     On January 27, 2004, Fafard and Metro-Boston signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until February 17, 2004, and the closing date until February 17, 2004.

33.     On February 11, 2004, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until March 4, 2004, and the closing date until March 4, 2004. Metro-Boston signed the extension on February 12, 2004.

34.     On February 26, 2004, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until March 25, 2004, and the closing date until March 25, 2004. Metro-Boston signed the extension on March 2, 2004.

35.    On March 19, 2004, Fafard and Metro-Boston signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until April 23, 2004, and the closing date until April 23, 2004.

36.    On April 16, 2004, Fafard signed an extension of the P&S Agreement, which extended the deadline for permits and approvals until May 21, 2004, and the closing date until May 21, 2004. Metro-Boston signed the extension on April 20, 2004.

37.    In May 2004, Fafard sent Metro-Boston at least three requests, by fax, to sign another extension of the P&S Agreement.

38.    Metro-Boston signed no further extensions to the P&S Agreement after the extension it signed on April 20, 2004.

### IV.    JOINT LIST OF EXHIBITS

The parties agree the following exhibits are deemed admitted and need not be independently offered at trial:

| | | |
|---|---|---|
| 1 | | Drawing – Sketch Plan, Sewell Street Property in Ashland, MA [Hannert Ex. 14] (FA00125) |
| 2 | | Standard Form – Purchase and Sale Agreement (unexecuted with handwritten notes) [Beattie Ex 6] (FA00287-294) |
| 3 | 11/29/79 | Drawing – contour Plan of Land in Ashland, Mass, by McCarthy & Sullivan Engineering. [Hannert Ex. 18] (FA00509); [Halcomb Ex. 2] |
| 4 | 10/18/00 | Memorandum from Mary Heller Halcomb to MBBI Shareholders, dated regarding "Update of Activity regarding the Ashland, Mass. Tower Site." [Halcomb Ex. 5] (MB 00170) |
| 5 | 12/5/00 | Fax containing Offer to Purchase, from Fafard to Metro-Boston, dated December 5, 2000. [Halcomb Ex. 6] [Beattie Ex. 7] (FA 00515-517) |
| 6 | 12/21/00 | Mary Halcomb fax to Janice Hannert re: Rider Offer to Purchase (notes) [Beattie Ex. 8] (FA00518-20) |
| 7 | 1/30/01 | Standard Form Purchase and Sale Agreement between Metro-Boston and Fafard Real Estate [Hannert Ex. 17] (FA00059-65); [Halcomb Ex. 8] |
| 8 | 8/7/01 | Paul Beattie fax to William Bonaccorso re: attached Title Commitment for Sewell Road, Ashland, MA [Beattie Ex. 11] |

| | | (FA00036-43) |
|---|---|---|
| 9 | 10/30/01 | Offer to Purchase Real Estate [Terrill Ex. 2] |
| 10 | 10/31/01 | Fax cover sheet from Fafard to Metro-Boston transmitting Offer to Purchase Real Estate by Fafard to Metro-Boston dated October 31, 2001. [Hannert Ex. 4] (FA 00044-46); [Halcomb Ex. 9] (MB 00022-24) |
| 11 | 11/08/01 | Memo from Hannert to HAF et al. (FA 00029) |
| 12 | 11/30/01 | Email from Janice Hannert to Mary Heller Halcomb, dated November 30, 2001. [Halcomb Ex. 10] [Hannert Ex. 30] (FA 00304-05) |
| 13 | 12/19/01 | Email from Janice Hannert to Mary Heller Halcomb. [Halcomb Ex. 11] (MB00026) |
| 14 | 12/19/01 | Faxed memo from Janice Hannert to Mary Heller Halcomb, attaching sketch of land. [Halcomb Ex. 12] (FA 00055-56) |
| 15 | 1/08/02 | Memo from Janice Hannert to Mary Heller Halcomb (FA 00273) |
| 16 | 1/22/02 | Fax cover from Janice Hannert to Mary Heller Halcomb re forms for access of the property and extension of Purchase and Sale Agreement |
| 17 | 1/30/02 | Extension of P&S Agreement signed on January 30, 2002, by Fafard and Metro-Boston, which extended the deadline for permits and approvals until April 30, 2002, and the closing date until May 31, 2002. [Hannert Ex. 9] |
| 18 | 1/30/02 | Permission for Access of Property [Halcomb Ex. 13] (MB00028) |
| 19 | 2/27/02 | Email from Janice Hannert to Mary Heller Halcomb [Hannert Ex. 6] (FA 00302) |
| 20 | 3/14/02 | Consulting Services Contract between Tower Sites and Hancock Survey Associates, Inc., dated March 14, 2002 and signed by Tower Sites on March 15, 2002. [Halcomb Ex. 14] (MB00121-122) |
| 21 | 3/14/02 | J. Dan Bremser/Hancock Survey letter to Mary Halcomb/Tower Sites serving as Proposal for consulting services [Halcomb Ex. 15] (MB00175-176) |
| 22 | 3/21/02 | Janice Hannert email to Mary Halcomb concerning the additional 5 acres in Ashland [Hannert Ex. 6] (FA00302) |
| 23 | 3/27/02 | Extension of P&S Agreement signed on March 27, 2002, by Fafard and Metro-Boston, which extended the deadline for permits and approvals until July 31, 2002, and the closing date until August 31, 2002. [Hannert Ex. 9] |
| 24 | 3/27/02 | Email from Mary Heller Halcomb to Janice Hannert. [Halcomb Ex. 17] (FA 00300), or [Hannert Ex. 19] |
| 25 | 4/3/02 | Email from Mary Heller Halcomb to Janice Hannert. [Halcomb Ex. 16] (FA 00026) |
| 26 | 4/3/02 | Fax from Janice Hannert to Mary Heller Halcomb re signed extension for purchase and sale agreement [Hannert Ex. 10] |
| 27 | 4/15/02 | Tower Sites, Ltd., Memorandum from Mary Heller Halcomb to Calvert C. Collins, Hank Pool, Michael A. Jordan, regarding "Update on Sale of Properties in Ashland, Mass." [Halcomb Ex. 18] (MB 00168-169) |
| 28 | 4/30/02 | Email from Mary Heller Halcomb to Janice Hannert. [Halcomb Ex. |

| | | 19] (FA 00299) |
|---|---|---|
| 29 | 7/17/02 | Email from Janice Hannert to Mary Heller Halcomb. [Halcomb Ex. 20] |
| 30 | 7/24/02 | Extension of P&S Agreement signed on July 24, 2002, by Fafard and on July 25, 2005 by Metro-Boston, which extended the deadline for permits and approvals until December 31, 2002, and the closing date until January 31, 2003. [Hannert Ex. 9] |
| 31 | 7/31/02 | Janice Hannert fax to Dan Bremser/Hancock Survey re: attached plan which shows the Sewell Street Property in Ashland [Hannert Ex. 8] (FA00297-298) |
| 32 | 12/12/02 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding extension for purchase and sale agreement [Hannert Ex. 10] |
| 33 | 12/12/02 | Extension of P&S Agreement signed by Fafard on December 12, 2002, by Metro-Boston on December 12, 2002, which extended the deadline for permits and approvals until May 31, 2003, and the closing date until June 30, 2003. [Hannert Ex. 9] |
| 34 | 1/14/03 | Proposed Purchase of Portion of Property Located in Ashland, Middlesex County, Massachusetts together with Building, Equipment and Towers thereon, from Perspective Broadcasting (Bradford Bleidt, President) to Mary Heller Halcomb, President, Metro-Boston Broadcasting, Inc. CONFIDENTIAL. [Halcomb Ex. 22] (MB 00186-191) |
| 35 | 5/19/03 | Fax from Fafard to Metro-Boston, enclosing sketch plan. [Halcomb Ex. 23] (MB 00041-42) |
| 36 | 5/19/03 | Fax from Fafard to Metro-Boston, enclosing plan from Benchmark Engineering. [Halcomb Ex. 24] (MB 00057) |
| 37 | 5/19/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding sketch showing connection between residential land and Sewell Street [Hannert Ex. 10] |
| 38 | 5/19/03 | Sketch Plan, Sewell Street Property in Ashland, Massachusetts by Benchmark Engineering. [Halcomb Ex. 21] (MB 00302) |
| 39 | 5/20/03 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding extension of purchase and sale agreement [Hannert Ex. 10] |
| 40 | 5/20/03 | Extension of P&S Agreement signed by Fafard on May 20, 2003, and by Metro-Boston on May 29, 2003, which extended the deadline for permits and approvals until August 31, 2003, and the closing date until September 30, 2003. [Hannert Ex. 9] |
| 41 | 5/29/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding extension of purchase and sale agreement [Hannert Ex. 10] |
| 42 | 8/11/03 | Letter from Hancock Associates (acting on behalf of Tower Sites, Ltd.) to Bryan Manter, Haley and Ward, cc to Mary Heller Halcomb, regarding "Easement ASH\248-109." [Halcomb Ex. 25] (MB00177-178) |
| 43 | 8/21/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding extension of purchase and sale agreement [Hannert Ex. 10] |
| 44 | 8/21/03 | Extension of P&S Agreement signed by Fafard on August 21, 2003, |

| | | |
|---|---|---|
| | | and by Metro-Boston on August 218, 2003, which extended the deadline for permits and approvals until September 15, 2003, and the closing date until September 15, 2003. [Hannert Ex. 9] |
| 45 | 8/27/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding extension for purchase and sale agreement [Hannert Ex. 10] |
| 46 | 9/11/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding extension for purchase and sale agreement [Hannert Ex. 10] |
| 47 | 9/11/03 | Extension of P&S Agreement signed by Fafard on September 11, 2003, and by Metro-Boston on September 12, 2003, which extended the deadline for permits and approvals until October 1, 2003, and the closing date until November 1, 2003. [Hannert Ex. 9] |
| 48 | 9/26/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding purchase and sale agreement [Hannert Ex. 10] |
| 49 | 9/29/03 | Extension of P&S Agreement signed by Fafard and Metro-Boston on September 29, 2003, which extended the deadline for permits and approvals until October 15, 2003, and the closing date until November 15, 2003.  [Hannert Ex. 9] |
| 50 | 10/14/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding purchase and sale agreement [Hannert Ex. 10] |
| 51 | 10/14/03 | Extension of P&S Agreement signed by Fafard on October 14, 2003, and on October 15, 2003, by Metro-Boston, which extended the deadline for permits and approvals until October 17, 2003, and the closing date until October 17, 2003.  [Hannert Ex. 9] |
| 52 | 10/14/03 | Extension of P&S Agreement signed by Fafard on October 14, 2003, and on October 17, 2003 by Metro-Boston, which extended the deadline for permits and approvals until October 27, 2003, and the closing date until December 1, 2003.  [Hannert Ex. 9] |
| 53 | 10/23/03 | Extension of P&S Agreement signed by Fafard on October 23, 2003, and by Metro-Boston on October 24, 2003, which extended the deadline for permits and approvals until November 3, 2003, and the closing date until November 3, 2003.   [Hannert Ex. 9] |
| 54 | 10/23/03 | Fax cover sheet with enclosed extension, from Fafard to Metro-Boston. [Halcomb Ex. 27] (MB00069-70) |
| 55 | 10/30/03 | Extension of P&S Agreement signed by Fafard on October 30, 2003, and by Metro-Boston on November 3, 2003, which extended the deadline for permits and approvals until November 7, 2003, and the closing date until November 7, 2003. [Hannert Ex. 9] |
| 56 | 10/30/03 | Fax cover from Janice Hannert to Mary Heller Halcomb regarding engineering plans and short extension for purchase and sale agreement [Hannert Ex. 10] |
| 57 | 10/30/03 | Fax cover sheet with enclosed extension, from Fafard to Metro-Boston.  [Halcomb Ex. 28] (MB00072-73) |
| 58 | 10/31/03 | Bremser email to Janice Hannert regarding final easement plans from Alpha [Hannert Ex. 20] (FA00005-7) |
| 59 | 11/6/03 | Extension of P&S Agreement signed by Fafard and Metro-Boston on November 6, 2003, which extended the deadline for permits and |

| | | |
|---|---|---|
| | | approvals until November 14, 2003, and the closing date until November 14, 2003. [Hannert Ex. 9] |
| 60 | 11/6/03 | Fax cover sheet with enclosed extension, from Fafard to Metro-Boston. [Halcomb Ex. 29] (MB 00077-78) |
| 61 | 11/6/03 | Janice Hannert fax cover sheet to Mary Halcomb regarding obtaining copy of plan where property line has been straightened out. [Hannert Ex. 11] (FA00266) |
| 62 | 11/7/03 | Janice Hannert fax cover sheet to Mary Halcomb re: ready to close on property but need to resolve access issue out to Sewell Street, clean title [Hannert Ex. 12] (FA00066) |
| 63 | 11/7/03 | Janice Hannert email to Dan Bremser concerning that he does not have a plan showing any proposed lot line changes [Hannert Ex. 21] (FA00002) |
| 64 | 11/7/03 | Janice Hannert letter to Mary Halcomb re: completed review of title for property at Sewell Road, Ashland, MA [Hannert Ex. 27] [Beattie Ex. 4] (FA00031-32); [Halcomb Ex. 30] (MB00080-81) |
| 65 | 11/12/03 | Extension of P&S Agreement signed by Fafard and Metro-Boston on November 12, 2003, which extended the deadline for permits and approvals until November 21, 2003, and the closing date until November 21, 2003. [Hannert Ex. 9] |
| 66 | 11/12/03 | Fax cover sheet with enclosed extension, from Fafard to Metro-Boston. [Halcomb Ex. 31] (MB 00084-85) |
| 67 | 11/19/03 | Extension of P&S Agreement signed by Fafard on November 19, 2003, and by Metro-Boston on November 20, 2003, which extended the deadline for permits and approvals until December 3, 2003, and the closing date until December 3, 2003. [Hannert Ex. 9]; [Halcomb Ex. 32] (MB 00087) |
| 68 | 11/19/03 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding short extension for purchase and sale agreement [Hannert Ex. 10] |
| 69 | 12/1/03 | Extension of P&S Agreement signed by Fafard on December 1, 2003, and by Metro-Boston on December 2, 2003, which extended the deadline for permits and approvals until December 10, 2003, and the closing date until December 10, 2003. [Hannert Ex. 9] |
| 70 | 12/1/03 | Fax cover sheet with enclosed extension from Fafard to Metro-Boston. [Halcomb Ex. 34] (MB 00091-92) |
| 71 | 12/8/03 | Extension of P&S Agreement signed by Fafard and Metro-Boston on December 8, 2003, which extended the deadline for permits and approvals until December 19, 2003, and the closing date until December 19, 2003. [Hannert Ex. 9] |
| 72 | 12/8/03 | Fax cover sheet with extension enclosed from Fafard to Metro-Boston. [Halcomb Ex. 35] (MB 00093-94) |
| 73 | 12/8/03 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding status of Sewell Street, ready to close as soon as survey and title issues are done; short extension [Hannert Ex. 10] |
| 74 | 12/8/03 | Mary Halcomb fax to Janice Hannert re: attached fully executed |

| | | Extension for Purchase and Sale Agreement - to 12/19/03 [Hannert Ex. 25] (FA00100-1) |
|---|---|---|
| 75 | 12/17/03 | Extension of P&S Agreement signed by Fafard on December 17, 2003, and by Metro-Boston on December 18, 2003, which extended the deadline for permits and approvals until January 9, 2004, and the closing date until January 9, 2004. [Hannert Ex. 9] |
| 76 | 12/17/03 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding short extension for purchase and sale agreement [Hannert Ex. 10] |
| 77 | 12/29/03 | Fax from J. Dan Bremser, Hancock Survey Associates, to Mary Heller Halcomb regarding "9528A-Tower Sites, Ltd." (Halcomb Ex. 37) (MB 00133-34) |
| 78 | 1/5/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding short extension for purchase and sale agreement [Hannert Ex. 10] |
| 79 | 1/5/04 | Extension of P&S Agreement signed by Fafard on January 5, 2004, and by Metro-Boston on January 8, 2004, which extended the deadline for permits and approvals until January 16, 2004, and the closing date until January 16, 2004. [Hannert Ex. 9] |
| 80 | 1/14/04 | Extension of P&S Agreement signed by Fafard on January 14, 2004, and by Metro-Boston on January 15, 2004, which extended the deadline for permits and approvals until January 30, 2004, and the closing date until January 30, 2004. [Hannert Ex. 9] |
| 81 | 1/14/04 | Fax cover sheet with extension enclosed from Fafard to Metro-Boston. [Halcomb Ex. 36] (MB 00102-103) |
| 82 | 1/14/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding status of Sewell Street, process on survey and title issues; short extension [Hannert Ex. 10] |
| 83 | 1/27/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding extension for purchase and sale agreement [Hannert Ex. 10] |
| 84 | 1/27/04 | Extension of P&S Agreement signed by Fafard and Metro-Boston on January 27, 2004, which extended the deadline for permits and approvals until February 17, 2004, and the closing date until February 17, 2004. [Hannert Ex. 9] |
| 85 | 2/5/04 | Sketch Plan in Ashland, MA, prepared by Hancock Associates for Tower Sites, Ltd. [Halcomb Ex. 38] (MB00174) |
| 86 | 2/11/04 | Extension of P&S Agreement signed by Fafard on February 11, 2004, and by Metro-Boston on February 12, 2004, which extended the deadline for permits and approvals until March 4, 2004, and the closing date until March 4, 2004. [Hannert Ex. 9] |
| 87 | 2/12/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding extension for purchase and sale agreement; ready to close on property [Hannert Ex. 10] |
| 88 | 2/26/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding extension for purchase and sale agreement; ready to close on property [Hannert Ex. 10] |

| 89 | 2/26/04 | Extension of P&S Agreement signed by Fafard on February 26, 2004, and by Metro-Boston on March 2, 2004, which extended the deadline for permits and approvals until March 25, 2004, and the closing date until March 25, 2004. [Hannert Ex. 9] |
|----|---------|---|
| 90 | 3/19/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding purchase and sale agreement; ready to close on property [Hannert Ex. 10] |
| 91 | 3/19/04 | Extension of P&S Agreement signed by Fafard and Metro-Boston on March 19, 2004, which extended the deadline for permits and approvals until April 23, 2004, and the closing date until April 23, 2004. [Hannert Ex. 9] |
| 92 | 4/16/04 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb regarding additional extension; ready to close on property [Hannert Ex. 10] |
| 93 | 4/16/04 | Extension of P&S Agreement signed by Fafard on April 16, 2004, and by Metro-Boston on April 20, 2004, which extended the deadline for permits and approvals until May 21, 2004, and the closing date until May 21, 2004. [Hannert Ex. 2] |
| 94 | 5/7/04 | Fax cover sheet from Janice Hannert, Fafard, to Mary Heller Halcomb, Metro-Boston. [Hannert Ex. 3] |
| 95 | 5/17/04 | Fax cover sheet from Janice Hannert, Fafard, to Mary Heller Halcomb, Metro-Boston. [Hannert Ex. 3] |
| 96 | 5/19/04 | Agenda, Stockholder Meeting of Metro-Boston Broadcasting, Inc. [Halcomb Ex. 39] (MB 00165-67) |
| 97 | 5/20/04 | Fax cover sheet from Janice Hannert, Fafard, to Mary Heller Halcomb, Metro-Boston. [Hannert Ex. 3] |
| 98 | 5/21/04 | Mary Halcomb letter to Richard Terrill re: instructions by Board of Directors to not grant any additional extension for the Purchase and Sale Agreement dated 1/30/01 [Beattie Ex. 2] (FA00035); [Halcomb Ex. 41] (MB00120) |
| 99 | 5/24/04 | Offer to Purchase, from Carruth Capital, LLC to Metro-Boston. CONFIDENTIAL [Halcomb Ex. 40] (MB 00192-194) |
| 100 | 6/24/04 | Affidavit of Mary Heller Halcomb |
| 101 | 7/28/04 | Letter from Joseph Jenkins to Mary Halcomb enclosing Purchase and Sale Agreement between Tower Sites, Ltd. And Egan Communications, LLC, dated August 2, 2004. CONFIDENTIAL [Halcomb Ex. 42] (MB00191-235) |
| 102 | 9/23/04 | Richard Terrill letter to Christopher Egan/FRE Building Co. re: concept plan for 15 single family house lots [Terrill Ex. 5] |
| 103 | 1/31/05 | Correction to Affidavit of Mary Heller Halcomb |

## V.    **LIST OF EXHIBITS TO BE OFFERED AT TRIAL**

The parties set forth the following List of Exhibits to be Offered at Trial, as to

which a party reserves the right to object:

| A | | Map of Town of Ashland (sheet # 14) [Hannert Ex. 31] (FA 00507) |
|---|---|---|
| B | | Ashland subdivision rules and regulations |
| C | | Ashland zoning map or maps in effect during 2001 – 2004 (as they pertain the land in question) |
| D | | Portion of Ashland zoning ordinance setting forth dimensional requirements in residential zones (as in effect from 2001 to 2004) |
| E | | Summons |
| F | | Fafard's motion for lis pendens |
| G | | Memorandum of lis pendens as recorded by Fafard |
| H | | Sketch of land [Hannert Ex. 28] (FA00050) |
| I | 7/28/90 | Survey, Subdivision of Lot 7 as Shown on Ld. Ct. # 18649A, Ashland, Mass., by McCarthy & Sullivan Engineering [Hannert Ex. 26] |
| J | 05/23/97 | Memo from Hannert to HAF et al. (FA 00243) |
| K | 4/15/98 | Letter from Metro-Boston to Fafard regarding "Residential Land." [Halcomb Ex. 1] (MB 00009) |
| L | 5/12/98 | Drawing – "Scheme A" Sewell Street Property in Ashland, MA [Hannert Ex. 15] (FA00276) |
| M | 5/18/98 | Drawing – "Scheme B" Sewell Street Property in Ashland, MA [Hannert Ex. 16] (FA00278) |
| N | 5/3/99 | Agenda of Annual Stockholders and Directors Meeting, Metro-Boston Broadcasting, Inc. [Halcomb Ex. 3] (MB 00173) |
| O | 3/7/00 | Letter from Metro-Boston to Fafard regarding "Residential Land Sales Agreement, 9.6 acres noted in Lot 12 and 6B, zoned residential; approx. 10 acres in Lot 11, zoned residential." [Halcomb Ex. 4] (MB 00020) |
| P | 10/16/00 | Offer to Purchase Real Estate [Beattie Ex. 5] (FA00512) |
| Q | 11/29/00 | Memo from Hannert to RT et al. (FA 00257) |
| R | 12/5/00 | Sketch of land, fax line dated [Halcomb Ex. 7] (MB 00127) |
| S | 1/7/02 | Janice Hannert memo to HAF, RT, JMcL, PJB timeline of contacts re: Sewell St. – Commercial [Hannert Ex. 5] (FA00022-25) |
| T | 8/28/03 | Letter from Metro-Boston to Fafard. [Halcomb Ex. 26] (MB 00054) |
| U | 11/07/03 | Certificate of Failure of One Party to Appear after paging for title passing/closing [Terrill Ex. 1] (FA 00505) |
| V | 11/19/03 | Fax cover sheet from Janice Hannert to Mary Heller Halcomb with handwriting of Ms. Halcomb [Hannert Ex. 9] and [Halcomb Ex. 32] (MB 00087). |
| W | 11/20/03 | Janice Hannert memo to RT, JMcL, PJB re: extension to 12/3/03 [Hannert Ex. 23] (FA00253) |

| X | 11/20/03 | Janice Hannert memo to RT, JMcL, PJB re: extension to 12/3/03 (with handwritten notes) [Hannert Ex. 24] (FA00506a) |
| Y | 11/21/03 | Fax cover sheet from Paul Beattie, Fafard, to Metro-Boston. [Halcomb Ex. 33] [Beattie Ex. 1) (MB 00089) |
| Z | 5/21/04 | Certification of Failure of One Party to Appear After paging for Title Passing/Closing [Beattie Ex. 3] (FA00033-34) |
| AA | 5/21/04 | Copy of check to Metro-Boston in the amount of $305,100.00 [Beattie Ex. 3] (FA 0034) |
| BB | 6/2/04 | Verified Complaint [Terrill Ex. 3] |
| CC | 6/3/04 | Memorandum of Lis Pendens [Beattie Ex. 9] |

VI.    **FORSEEABLE ISSUES OF LAW**

    A. Plaintiff's Foreseeable Issues of Law:

        1. Plaintiff's Claim for Specific Performance

           (a) Interpretation of Contract

Where a contract is ambiguous, "the court cannot subvert its plain meaning."

Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970).  A contract that is

unambiguous must be "enforced according to its terms."  Id.  See also Citation Ins. Co. v.

Gomez, 426 Mass. 379, 381 (1998) (citing Cody v. Connecticut Gen. Life Ins. Co., 387

Mass. 142, 146 (1982) (where a contract is unambiguous, the court "construe[s] the

words of [a contract] in their usual and ordinary sense").

Where there is ambiguity in a contract, or the meaning of a contract is not plain,

extraneous evidence is admissible, but only "to explain significance of terms used or to

show relations and methods of parties in light of which their written words are to be

interpreted."  Petricca Constr. Co. v. Commonwealth, 13 Mass. App. Ct. 981, 982 (1982)

(citing Levin v. Century Indemnity Co., 279 Mass. 256, 258 (1932).  See also Kobayeshi

v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496 (1997) (if a contract term is

ambiguous, evidence that explains or "elucidates the meaning of an ambiguous contract

term" is admissible for that purpose). Parol evidence is not admissible, however, to vary,

contradict or broaden a final agreement. See Kobayashi v. Orion Ventures, Inc., 42

Mass. App. Ct. 492, 496 (1997).

(b) <u>Performance of Obligations in Purchase and Sale Agreement</u>.

Where a purchase and sale agreement sets forth certain obligations to be

performed by the seller, such as to clean title or to prepare a survey for a new Land Court

subdivision plan, the seller has an implied obligation to exercise good faith and

reasonable efforts to fulfill such obligations. See Lafond v. Frame, 327 Mass. 364, 366-

368 (1951); Lynch v. Andrew, 20 Mass. App. Ct. 623 (1985). See also Hastings v. Gay,

55 Mass. App. Ct. 157 (2002) (escape clause in purchase and sale agreement "will not

apply to void an agreement where the seller's inability to convey good and clear title was

the result of his own fault or collusion").

Although the law generally requires that, when performance under a contract for

the purchase and sale of real estate is concurrent, one party cannot put the other in default

unless he is ready, able and willing to perform and has manifested this by some offer of

performance, the law does not require such party to tender performance if the other party

has shown that he cannot or will not perform. Lafayette Place Assoc. v. Boston Redev.

Auth., 427 Mass. 509, 519, 694 N.E.2d 820, 827 (1998); Leigh v. Rule, 331 Mass. 664,

668, 121 N.E.2d 854, 857 (1954). Fafard expects the evidence in this case to be

undisputed that, as of the closing deadline as last extended by the parties, Fafard was

ready, able and willing to perform. Fafard sent multiple faxes stating "We are ready to

close." When Metro-Boston refused to return telephone calls or respond to

correspondence during May of 2004, as the closing deadline was approaching, Fafard, to

18

protect its rights by creating a record of its readiness, willingness and ability to perform, appeared at the registry of deeds with a check for the purchase price. Fafard knew at the time, however (and Metro-Boston has admitted), that Metro-Boston was not ready or able to close because it had not yet prepared, filed or obtained Land Court approval of a subdivision plan dividing Lot 11 into two parcels, as required under the terms of the Purchase and Sale Agreement and as necessary in order to convey title to registered land. Because Metro-Boston had indicated that it was not able to perform, Fafard was not required, as a matter of law, to tender performance to Metro-Boston, by scheduling a time and place for the closing or otherwise, before declaring it in default.

(c) Mistake of Fact in Contracting.

A "mistake" is a belief that is not in accord with the facts. See Restatement (Second) Contracts § 151. The term "mistake" refers to an erroneous belief. Id. cmt. a. "The belief need not be an articulated one, and a party may have a belief as to a fact when he merely makes an assumption with respect to it, without being aware of alternatives." Id.

A mistake by parties to a contract does not void the contract. Nor does a mistake make a contract automatically voidable. A mistake by both parties at the time of contracting makes the contract voidable, but only where (1) the mistake goes to a basic assumption upon which the contract was made, and (2) the mistake has a material effect on the agreed exchange of performances. If these criteria are met, then the contract is voidable, but only by the adversely affected party, unless he bears the risk of mistake. See Restatement (Second) Contracts § 152(1). See also Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629 (1975).

However, even if a contract may be voidable because of a mutual mistake, if the parties reaffirm their intent to perform under the contract after learning of the mistake, the opportunity to void the contract is deemed waived and the contract is no longer voidable. Parties to a voidable contract may waive their right to void the contract by ratifying the contract, through their words, actions, or silence. See Dorn v. Astra USA, 975 F. Supp. 338, 393 (D. Mass. 1997) (ratification of voidable contract may exist where the party intentionally accepts benefits under contract; remains silent for a period of time after having opportunity to avoid it; or recognizes the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it); See, e.g., In re Boston Shipyard Co., (1st Cir. 1989 (where a contract is voidable because of duress, but the party "does not contest within a reasonable time the document allegedly executed under duress, the contract or release may be ratified and affirmed"). See also American Airlines, Inc. v. Cardoza-Rodriquez, 133 F.3d 111, 120 (1st Cir. 1998) (noting that a voidable contract may be "ratified by subsequent conduct"). Execution of an amendment to the contract extending the time for performance, after discovery of a mistake, constitutes ratification.

  2. Defendant's Counterclaims:

    (a) Proof of Damages.

An essential element of Metro-Boston's counterclaims is damages. See NEC Electronics, Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861, 867 (D. Mass. 1989) (summary judgment where plaintiff in c. 93A case argued only "unspecified monetary damages for alleged sales loss"); Tech Plus, Inc. v. Ansel, 59 Mass. App. Ct. 12, 18-19 (2003) (citing Restatement (Second) Torts § 766 *cmt. t* (the intentional interference with advantageous relations "cause of action is for pecuniary loss");

Morochnick v. Quigley, 17 Mass. App. Ct. 1035 (1984) (holding that "actual damage is a necessary element of a claim of intentional interference with an advantageous business relationship"); Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760 (1986) (damage essential element of abuse of process); Chemawa Country Club, Inc. v. Wnuk, 9 Mass. App. Ct. 506, 510 (1980) (plaintiff must prove "harm and damages" resulting from an intentional interference with advantageous business relations).  See also Massachusetts G.L. c. 93A, § 11 (unfair business practices claim exists where, in part, party "suffers any loss of money or property, real or personal").

However, the fact that the plaintiff incurs attorneys' fees in connection with its counterclaims does not constitute proof of damages.  Under the well known American Rule, each party is responsible for his own attorneys' fees.  See Mutual Fire, Marine and Inland Ins. Co. v. Costa, 789 F.2d 83, 88 (1st Cir. 1986) (citing Chartrand v. Riley, 354 Mass. 242, 243-44 (1968) ("The general rule in Massachusetts, as elsewhere, is that a prevailing party in an ordinary two-party lawsuit is awarded only costs and not attorney's fees."); Mailhiot v. Liberty Bank & Tr. Co., 24 Mass. App. 525, 530 (1987) (general rule is that "counsel fees are not a proper heading of damages"). See also Restatement (Second) Torts § 914(a) ("The damages in a tort case do not ordinarily include compensation for attorney fees or other expenses of the litigation.").

In the context of a claim for interference with advantageous business relations, an exception to the American Rule exists whereby attorneys' fees are recoverable by the plaintiff, but only where "the natural consequence of a defendant's tortious conduct or a defendant's breach of contract is to cause the plaintiff to become involved in litigation with a *third party*, [then] the attorneys' fees associated with *that litigation* are recoverable

from the defendant." Mutual Fire, Marine and Inland Ins. Co. v. Costa, 789 F.2d 83, 88

(1st Cir. 1986), citing Restatement (Second) Torts § 914 (emphasis in original). Thus,

only where the plaintiff is compelled to engage in litigation with a third party in order to

protect his rights, are his counsel fees recoverable as damages. See, e.g., M.F. Roach Co.

v. Town of Provincetown, 355 Mass. 731 (1969) (attorneys' fees were held recoverable

where the plaintiff was forced, because of the tortious interference of the defendant, to

sue a third party in order to protect his rights under a contract). There is no basis to

award a plaintiff as damages the attorneys' fees incurred in connection with his

underlying intentional interference suit.

　　　Nor is there any basis to find that attorneys' fees constitute damages in an abuse

of process suit or claim under Massachusetts General Laws c. 93A, § 11. See Broadway

Management Services, Ltd. v. Cullinet Software, Inc., 652 F. Supp. 1501, 1503-04 (D.

Mass. 1987) (the fact that a party will have to spend time *and money* to defend a legal

action does not prove an ulterior purpose for filing the legal action, for the purposes of an

abuse of process claim); See also Bonofiglio v. Commercial Union Ins., Co., 412 Mass.

612, 613 (1992) (a party must first be a "prevailing party" under 93A before it can

awarded attorneys' fees); Martha's Vineyard Auto Village, Inc. v. Newman, 30 Mass.

App. Ct. 363, 369 (1991) (citing Jet Line Servs., Inc. v. American Employers Ins. Co.,

404 Mass. 706, 718 (1989) ("Under § 11, a [business] plaintiff must be entitled to relief

in *some other respect* to be entitled to an award of attorneys' fees") (emphasis added).

　　　Plaintiff is obligated to bring the Court's attention the case of American Velodur

Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460 (1985), in which the Appeals Court

upheld an award of attorneys' fees to the plaintiff on a claim for abuse of process in a

divorce case. However, American Velodur is distinguishable from the instant counterclaim in that the defendant in that case had both defaulted and had been severely sanctioned for failure to comply with discovery obligations. The plaintiff wife also was awarded damages for her mental suffering and distress and harassment by the defendant. Thus, in light of the egregious conduct of the defendant, the court found no error in awarding the plaintiff her attorneys' fees in connection with her abuse of process claim. To the contrary, in this case, there is no such misconduct on the part of the Plaintiff which would justify such an award.

### B. Defendant's Foreseeable Issues of Law:

#### 1. Plaintiff's Claim For Specific Performance

##### (a)    Readiness, Willingness, and Ability To Perform

Plaintiff and defendant appear to disagree over what plaintiff must show to establish its readiness, willingness, and ability to perform. It is defendant's position that plaintiff, as buyer, must objectively manifest to the seller its readiness, willingness, and ability to perform before the time for performance. Leigh v. Rule, 331 Mass. 664, 668 (1954) ("The general rule is that when performance under a contract is concurrent one party cannot put the other in default unless he is ready, able, and willing to perform *and has manifested this by some offer of performance*"); Simpson v. Vasiliou, 29 Mass. App. Ct. 699, 703 (1991) ("To place the seller in default, the buyer was required, before the deadline for performance, to manifest that he was ready, able and willing to perform by setting a time and place for passing papers *or making some other concrete offer of performance*").

Plaintiff understands defendant's position to be that, if plaintiff appears at the registry of deeds with a check for the purchase price on the day the agreement calls for a closing, then such appearance is a sufficient manifestation of plaintiff's readiness, willingness, and ability to close. It is defendant's position that such appearance is not a sufficient manifestation of plaintiff's readiness, willingness, and ability to close, at least under the facts of this case, because: (a) in the days leading up to the extended date for performance, plaintiff had repetitively requested extensions of the date for performance to resolve an issue concerning access to the property, and, over nearly a three year period, had consistently informed defendant that it would not be able to do the transaction without resolution of the access issue, (b) plaintiff never informed defendant that the access issue had been resolved or that plaintiff would be willing to do the transaction without resolving the access issue, (c) plaintiff never informed defendant of its intent to appear at the registry of deeds for a closing of the transaction, (d) the purchase and sale agreement did not contain a time of day for the closing, (e) plaintiff failed to establish a time of day for the closing. Schilling v. Levin, 328 Mass. 2, 5 (1951) (where buyer had manifested intention not to appear for closing and "*[n]o change of purpose on his part was ever communicated to the [seller,]* [t]he appearance of the [buyer] at the registry of deeds on July 15 without notice to the plaintiffs was a sham and had no effect on the rights of the parties"). See Gentile Bros., Corp. v. Rowena Homes, Inc., 352 Mass. 584, 587, 589 (1967) (when seller told buyer that seller would not show up at registry for closing on agreed-upon day for performance, buyer had right to rely on seller's statement and was not in breach for not appearing at registry); M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960) (where seller told buyer that seller wanted to

negotiate an alternative arrangement and that seller was not willing to close until such an alternative arrangement was made, buyer was not obliged to appear at closing or tender performance and was not in breach for failing to do so "in the absence of seasonable notice [from seller] that performance was to take place" on date called for by agreement). Leigh v. Rule, 331 Mass. 664, 668 (1954) (performance is excused if the other party has shown he will not perform); Kattor v. Adams, 323 Mass. 686, 688-89 (1949) (buyer's stated unwillingness to go forward with purchase transaction unless seller included three additional acres not covered by purchase and sale agreement "was a breach of the agreement which excused the [sellers] from any further performance or offer of performance"); Beach & Claridge Co. v. American Steam Gauge & Valve Manuf. Co., 202 Mass. 177, 183-84 (1909) (buyer's statement to defendant that buyer would not go forward with purchase unless certain contingencies happened that were not provided for in the parties' agreement "was a breach by the [buyer] of its agreement, which operated to excuse the [seller] from any further performance or offer of performance"). See also Lafayette Place Assoc. v. Boston Redev. Auth., 427 Mass. 509, 520 (1998) ("To place a seller in default, a buyer must manifest that he is ready, able, and willing to perform *by setting a time* and place for passing papers or making some other concrete offer of performance"). Cf. Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969) (where party to land purchase agreement informed other party of its unwillingness to perform on terms required by contract, party did not "accrue rights under the contract" and could not hold other party in breach).

Defendant is obliged to call the Court's attention to a decision that, on the surface appears to lend some support to plaintiff's position, but which is distinguishable and in

fact supports defendant's position. In <u>Bucciero v. Drinkwater</u>, 13 Mass. App. Ct. 551 (1982), the buyer and seller disagreed over the amount of a tax adjustment that plaintiff was required to pay at closing. The day before the closing, the buyer informed the seller of its intention to appear at the closing and pay the lower amount, and the seller informed the buyer that, in light of the buyer's unwillingness to pay the higher amount, the seller would not attend the closing. The next day, the buyer appeared at the closing prepared to pay the higher amount, without having told the seller of the change in the buyer's position. The seller did not attend the closing. The Court held that the buyer was entitled to specific performance because the disagreement between the buyer and seller only pertained to an honest difference of opinion over the meaning of a clause in the agreement, the disagreement did not go to the essence of the agreement, <u>id.</u> at 555, and, by the time of the closing, the buyer had abandoned its interpretation. Notably, the buyer had informed the seller of the buyer's intention to appear at the closing, but the seller – knowing of the buyer's intent to appear – chose not to appear. By contrast, in this case, the buyer and seller did not have a disagreement over the meaning of a peripheral term in the agreement. Rather, the buyer had expressed its intention not to go forward with the transaction at all unless the buyer resolved its access issue. Further, the buyer gave no notice of its intention to appear at the registry to close the transaction. Thus, defendant had no reason to appear at the registry.

(b)   <u>Lack Of Agreement On The Northeastern Boundary Line</u>

There is an issue over whether the parties had a meeting of the minds on the location of the boundary of the property to be conveyed. The plaintiff claims that the property boundary was to be as shown in a drawing attached to the purchase and sale

agreement, regardless of where the zoning boundary was (between residential and industrial land). The defendant claims that the property boundary was to be the same as the zoning boundary, and that the line shown in the drawing attached to the purchase and sale agreement merely approximated what the parties then believed was the existing zoning line. Before there can be a contract, there must be a meeting of the minds on all essential terms. Conos v. Sullivan, 250 Mass. 376, 378 (1924). In a land purchase contract, the boundaries of the land to be conveyed are essential terms. Michelson v. Sherman, 310 Mass. 774, 777 (1942) ("location of the boundary line between the land sold and the land kept by the defendants was an essential element of the ... contract").

Further, "[w]here there has been a mistake between the parties as to the subject matter of a contract, there has been no 'meeting of the minds,' and the contract is voidable at the election of the party adversely affected." LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58 (1986). The evidence will show that both parties were mistaken as to the existence of the location of the zoning line, and that this was a material fact affecting what land was to be sold to Fafard and what land was to be retained.

(c)    Statute Of Frauds

In deposition, plaintiff's witnesses have acknowledged that the ostensible boundary line shown on the purchase and sale agreement was only intended by plaintiff to be an approximation of the land to be sold and that the actual boundary had to be fixed by a land survey to be approved by the Ashland Planning Board and the Land Court.

Any promise involving real property is enforceable only if that promise meets the requirements of the statute of frauds. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 709 (1992). To satisfy the statute of frauds, the writing "must contain directly, or by

implication, all of the essential terms of the parties' agreement." <u>Simon v. Simon</u>, 35

Mass. App. Ct. 705, 709 (1994). In the absence of a mutual mistake permitting

reformation, the omission of an essential term, not supplied by reasonable implication,

renders the memorandum insufficient." <u>Id.</u>

      The boundaries of land to be conveyed are essential terms and must be fixed by

the written memorandum. <u>Michelson v. Sherman</u>, 310 Mass. 774, 777 (1942) ("location

of the boundary line between the land sold and the land kept by the defendants was an

essential element of the ... contract"); <u>Sherer v. Trowbridge</u>, 135 Mass. 500, 502 (1883)

(writing must "describ[e] the boundaries with sufficient certainty"). If it is impossible

from the written memorandum "to lay out on the land the boundaries of the lots to be

conveyed, ... the agreement is unenforceable because of uncertainty." <u>Knowles v. L.D.</u>

<u>Griswold Land Co.</u>, 252 Mass. 172, 175 (1925). Further, where a land purchase

agreement contemplates that the boundaries will ultimately be determined by a plan to be

approved by a public board or authority, the written agreement is too indefinite to be

enforced, even if the agreement describes the land by metes and bounds and by reference

to lots shown on a tentative plan. <u>Id.</u> While parol evidence is admissible to ascertain the

meaning of words used in an agreement, it cannot be used to supply deficiencies in a

written memorandum under the statute of frauds. <u>Michelson v. Sherman</u>, 310 Mass. 774,

777-78 (1942) (even though parties orally agreed on location of boundary line and even

though such boundary line would have been the natural and obvious division of the land,

the written memorandum did not fix the location of the boundary line and hence contract

was unenforceable). See also <u>Whelan v. Sullivan</u>, 102 Mass. 204, 206 (1869) (where

piece of land to be conveyed was part of larger tract, and where memorandum did "not,

either in itself, or by reference to any other writing, contain the means of describing or identifying the boundaries of the piece to be conveyed," statute of frauds rendered contract unenforceable; parol evidence cannot be taken to complete the memorandum); Klein v. Brodie, 167 Mont. 47, 48 (1975) (where buy-sell agreement gave approximate description of land to be conveyed "but the exact boundary was to be determined by a survey," agreement was unenforceable under statute of frauds); Plantation Land Co. v. Bradshaw, 232 Ga. 435 (1974) (where written agreement described land by reference to attached plat "and the property being outlined in red thereon," the contract did not meet the requirements of the statute of frauds because "a determination of the exact boundaries of the ... acres to be sold cannot be made, either from the plat alone or in conjunction with the contract").

(d)    Mistake

The evidence will establish that the parties labored under a mistake of fact at the time of contracting. Specifically, the parties believed that the agreement covered only so much of defendant's land as was zoned residential, while harboring a mistaken belief as to the location of the zoning boundary line.

The parties seem to be in agreement that "[w]here there has been a mistake between the parties as to the subject matter of a contract, there has been no "meeting of the minds," and the contract is voidable at the election of the party adversely affected." LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58 (1986). The plaintiff contends, without supporting authority, that the "execution of an amendment to the contract extending the time for performance, after discovery of a mistake, constitutes ratification." In this instance, the extension that the parties signed after learning about the mistake was

signed, in part, to try to resolve the issue of the location of the boundary line. Under such circumstances, where the parties minds never met due to the mistake, id., there can be no contract to ratify. The extension is, more or less, a standstill agreement, giving the parties some time to try to resolve open issues and see if they can reach agreement and establish a meeting of the minds.

(e) <u>Unclean Hands</u>

Defendant will offer evidence that in the three and half year period between the signing of the purchase and sale agreement in 2001 and the expiration of the last extension in 2004, plaintiff – a very sophisticated and experienced real estate development company – had sought and obtained 24 extensions of the purchase and sale agreement. During this period, plaintiff had been telling defendant things such as: (a) the plaintiff needed to have a second means of access to the property over other land owned by defendant, and was unprepared to close until a suitable arrangement were made for plaintiff to have such rights of access; (b) plaintiff's permit applications had been turned down by the town of Ashland because plaintiff did not have the second means of access; and (c) plaintiff was diligently pursuing its permits, notwithstanding that its initial permit requests had been turned down. Defendant granted the extensions in reliance on these statement, but notified plaintiff of defendant's desire to close the transaction as soon as possible as the price had been determined on the assumption the closing would take place within a year after the agreement had been signed. During the 24 extensions, the land appreciated in value due to the construction, at municipal expense, of a sewer line through the property. In entering into this contract, plaintiff did not have any money at risk to speak of, as plaintiff's deposit was held by its own counsel, and the agreement had

very liberal provisions enabling plaintiff to terminate the agreement. (Defendant was unrepresented by counsel in entering the agreement. The agreement was drafted by plaintiff's in-house counsel.)

Defendant's evidence will show that, during these extensions, defendant did not make diligent good faith efforts to put itself into a position to close the transaction, but delayed the transaction in the hope of improving the contract and benefiting from the escalation of the property's value while having no money at risk. Further, defendant is now claiming that it did not really need a second means of access to the property, but simply preferred a second means of access, being ready, willing, and able to close without it, even though defendant never disclosed this to plaintiff. On May 21, 2004, after having submitted three written requests for a 25th extension of the closing date, claiming that plaintiff still needed to resolve the access issue, plaintiff unilaterally, and without notice to defendant, went to the registry of deeds ostensibly to close on the transaction, even though – because plaintiff had said nothing to defendant – had no realistic expectation or reason to believe that defendant would be there.

These and other facts reveal what defendant believes to be plaintiff's inequitable conduct and unclean hands, affording defendant a complete defense. See Lundgren v. Gray, 41 Mass. App. Ct. 451 (1996) (plaintiff seeking specific performance must himself be free from blame); Hawthorne's Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 208 (1993) (specific performance is an equitable remedy which should not be granted when the requesting party has engaged in conduct "savored with injustice touching the transaction."); Chute v. Quincy, 156 Mass. 189, 191 (1892) ("specific performance may be refused ... where there has been ... unfair conduct").

2.  Defendant's Counterclaim

    (a)    Quantum Of Knowledge Required To Prove Intentional Interference With Advantageous Business Relations

Tower Sites has asserted a counterclaim against Fafard alleging, among other things, intentional interference with advantageous business relations. Fafard claims that to be liable, Fafard must have known of a specific contemplated business transaction, and must have intended to interfere with it. Tower sites claims that, for Fafard to be liable, it is sufficient that Fafard was aware generally of the potential or opportunity for Tower Sites to engage in a business transaction and that Fafard acted to prevent the opportunity from ripening or to prevent Tower Sites from engaging in such a business transaction.

Massachusetts' courts have not fully developed the requirements for what must be proved as to the tortfeasor's state of mind in an interference with advantageous relations claim, as distinguished from an interference with contract claim. "[C]ases have been imprecise on the elements of the tort[]" of interference with prospective or advantageous business relations. United Truck Leasing v. Geltman, 406 Mass. 811, 813 (1990). While the Massachusetts appellate courts have yet to make clear whether the tortfeasor must have knowledge of specific prospective opportunities, or whether it is sufficient that the tortfeasor simply have knowledge of the likelihood of prospective opportunities and an intent to prevent such opportunities from ripening, the Restatement (Second) of Torts § 766B suggests there is no requirement the tortfeasor know of a specific prospective opportunity. It is sufficient if the tortfeasor acts for the purpose simply of preventing such an opportunity from developing:

> The relations protected against intentional interference by the rule stated in this Section [766B] include any prospective contractual relations, except those leading to contracts to marry . . . , if the potential contract would be of pecuniary value to

the plaintiff. Included are interferences with the prospect of obtaining employment or employees [or] the opportunity of selling or buying land . . . . The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract.

Restatement (Second) of Torts § 766B *comment c* (1979) (emphasis added).

Respectfully submitted,

FAFARD REAL ESTATE &              METRO-BOSTON
DEVELOPMENT CORP.,                BROADCASTING, INC.

By its attorneys,                 By its attorneys,

_____           _____
Jeffrey J. Upton (BBO #552221)    Kenneth R. Berman (BBO # 040320)
Halye A. Sugarman (BBO#646773)    Erik Bartenhagen (BBO #640003)

HANIFY & KING                     Nutter McClennen & Fish LLP
Professional Corporation          World Trade Center West
One Beacon Street                 155 Seaport Boulevard
Boston, MA  02108                 Boston, MA  02210
(617) 423-0400                    (617) 439-2000

Dated: February 7, 2005
422699

33