UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP. | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) NO. 04-11531-RGS ) ) |
| METRO-BOSTON BROADCASTING, INC., | ) ) ) |
| Defendant. | ) ) |

### MOTION IN LIMINE OF PLAINTIFF FAFARD REAL ESTATE & DEVELOPMENT CORP. TO EXCLUDE EVIDENCE PERTAINING TO CERTAIN AFFIRMATIVE DEFENSES OF METRO-BOSTON

Plaintiff Fafard Real Estate & Development Corp. ("Fafard") respectfully moves for an order, in limine, excluding all evidence tending to show that Fafard and Defendant Metro-Boston Broadcasting, Inc. ("Metro-Boston") never had a "meeting of the minds" as to an essential term of the Purchase and Sale Agreement ("P&S Agreement"), *i.e.* the northeast boundary line, and all evidence purporting to show that enforcement of the P&S Agreement is barred by the statute of frauds. As grounds for this motion, Fafard states that Metro-Boston has admitted agreement on all material terms, and the doctrine of ratification bars any claim of mutual mistake.

Metro-Boston asserts three related affirmative defenses to Fafard's claim for specific enforcement: (1) that the parties never had a "meeting of the minds" as to an essential term of the P&S Agreement, (2) that the P&S Agreement is void for its failure to set forth all essential terms; and (3) that the statute of frauds bars enforcement of the P&S Agreement because the boundary of the property to be sold is not adequately

described in the P&S Agreement. Metro-Boston also asserts a defense based on Fafard's alleged breach of the P&S Agreement respecting an obligation to report to Metro-Boston on the status of Fafard's efforts to obtain permits.

But, as shown below, evidence respecting each of these defenses must be excluded. Metro-Boston <u>admits</u> that the parties did, in fact, have a "meeting of the minds" respecting the northeast boundary line and all other essential terms of the contract. Evidence tending to show that the P&S Agreement does not "precisely and formally" describe the property to be conveyed, *i.e.* that the contract is unenforceable by the statute of frauds, also must be excluded for the same reason: Metro-Boston <u>admits</u> that the line drawn on the P&S Agreement through Lot 11, identifying the portion of Lot 11 to be conveyed, was intended to represent, and did, in fact, represent, a zoning line shown on a contour plan prepared by the engineering firm, McCarthy & Sullivan. And finally, Metro-Boston <u>admits</u> that, even after learning of a discrepancy between the McCarthy plan and other maps, Metro-Boston ratified the contract and affirmed its obligations thereunder.

Significantly, eliminating evidence pertaining to these related defenses will leave open exactly <u>one issue of fact for trial on Fafard's specific performance claim</u>: whether Fafard had informed Metro-Boston that it was not willing to go forward with the transaction without access via Sewell Street, *i.e.* whether Fafard was ready, willing and able to perform.

## BACKGROUND

In this action, Fafard seeks specific performance of a purchase and sale agreement for the sale of real property in Ashland, Massachusetts ("P&S Agreement"). In the

2

section entitled "Description," the P&S Agreement states: "Those three (3) parcels of land in Ashland, Middlesex County, shown as Lots 12 and 6B (9.6 Acres) and a portion of Lot 11 (10 Acres) on the Plan attached hereto and incorporated herein by reference as Exhibit A. For title see Certificate # 194923 and 189907 Middlesex South District of Land Court." See Tab A hereto, Deposition of Mary Heller Halcomb, at Exhibit 8 thereto.[1] Exhibit A to the P&S Agreement is a photocopy of "Subdivision Plan of Land in Ashland" and shows, among other things, Lots 12, 6B and all of Lot 11. On Exhibit A to the P&S Agreement is a hand-drawn, sawtooth line through the lower right hand portion of Lot 11 (*i.e.* the southwest portion) and crosshatch marks through that portion of Lot 11 below the sawtooth line and all of Lot 12 and Lot 6B. Id.

In defense of enforcement, Metro-Boston claims that the "purchase and sale agreement is void for its failure to set forth all essential terms" and that the "parties never had a meeting of the minds on all essential terms of an agreement." See Metro-Boston's Answer and Counterclaim, Fifth Affirmative Defense and Sixth Affirmative Defense. Metro-Boston considers these defenses to be one in the same, *i.e.* that "[t]he missing essential term **was an agreement on what constituted the northeast boundary of the land to be conveyed** ... The hand-drawn saw-tooth line in the P&S Agreement was not intended to be the actual boundary line of the property to be conveyed..." See Defendant's Answers to Plaintiff's Interrogatories, at Interrogatory No. 9, at 9 (emphasis added), attached hereto at Tab B.

In a related defense, Metro-Boston contends that the statute of frauds bars enforcement of the P&S Agreement. See Metro-Boston Answer and Counterclaim,

---

[1] Relevant portions of the deposition transcript and exhibits to the deposition of Mary Heller Halcomb are attached hereto at Tab 1.

3

Fourth Affirmative Defense ("Plaintiff's complaint is barred by the statute of frauds in that **there is no written agreement fixing the location of an essential boundary line**.") (emphasis added). More specifically, Metro-Boston claims that "the land to be conveyed was depicted by an imprecisely and informally drawn saw-tooth shaped line on a poor and nearly illegible copy of a land plan, inadequate for the purpose of identifying the boundary line." See Tab B, Defendant's Answers to Plaintiff's Interrogatories, at Interrogatory No. 8, at 8.

## ARGUMENT

### A. Metro-Boston Has Admitted a "Meeting of the Minds" on all Essential Contract Terms and Admitted that the "Sawtooth Line" on the P&S Agreement Defined the Land to be Conveyed.

Fafard and Metro-Boston first began discussing the sale of land to Fafard in the mid to late 1990s. See Tab 1, Deposition of Mary Heller Halcomb ("Halcomb Dep.") at 15:3-6. On April 15, 1998, Mary Heller Halcomb, the President of Metro-Boston,[2] sent a letter to Janice Hannert, a land planner with Fafard, regarding the proposed sale of land. In that letter, Ms. Halcomb enclosed "the title description of the two parcels zoned residential land: 1. 9.6 acres in lot 12 and 6B; [and] 2. approx. 10 acres in Lot 11, zoned residential." See Halcomb Dep. at 16:12-13, and Ex. 1 thereto.

Ms. Halcomb **admits** that she based her understanding as to what portion of Lot 11 was zoned residential on a 1979 contour plan of land prepared by McCarthy & Sullivan Engineering ("the 1979 McCarthy plan"):

> Q: [With reference to Metro-Boston's April 15, 1998 letter to Fafard] ... [w]hat was your understanding as to what land was zoned residential?

---

[2] Ms. Halcomb, the President of Metro-Boston, was the individual at Metro-Boston who negotiated the P&S Agreement and who executed the P&S Agreement, and all extensions thereto.

4

> A: Lot 12 was all zoned residential, and this little X right here. ... This little X is also residential.
>
> Q: That would be the X that has the arrow leading into above the entry "Charles A. Horn, Trustee of Middlesex Realty Trust?
>
> A: That's right. **Now, in addition, we were also utilizing the only map that we had ever been given at the closing when we purchased the land in 1987, and this was large map drawn to scale by McCarthy & Sullivan, and that was the only what we called accurate map to describe the property. I also gave the map to Janice Hannert [of Fafard].**

See Halcomb Dep. at 17:21 – 18:15 (emphasis added).

Ms. Halcomb admits that Metro-Boston received by facsimile on December 5, 2000, an offer to purchase from Fafard. See Halcomb Dep. at 34:23-35:11, and Exhibit 6 thereto. Ms. Halcomb further **admits** that Fafard, in connection with this offer, sent Ms. Halcomb via facsimile a drawing of a plan of land which outlined the land Fafard sought to purchase by tracing the zoning line shown through Lot 11 on the 1979 McCarthy plan:

> Q: Does [Exhibit 7, the December 5, 2000 faxed plan] look like a portion of the 1979 McCarthy plan?
>
> A: It does. I mean, the drawing may not be absolutely accurate, but its very similar.
>
> ...
>
> Q: Do you see on Exhibit 7 there appears to be some shading or bold line encircling Lot 12, Lot 6B, and a portion of Lot 11? Do you see that?
>
> A: Uh-huh, yes.
>
> Q: **Do you have an understanding as to what that represents?**
>
> A: **Crudely, and certainly not definitively, it represented the basic general idea of the scope of the property that Fafard wanted to buy.**
>
> Q: **The sawtooth line dividing Lot 11, is it your understanding that the shading was intended to trace over the zoning line that appeared on the 1979 McCarthy plan?**
>
> A: **Yes, to show the residential land, which was the subject of a purchase.**

5

See Halcomb Dep. at 37:13-16; 38:9-23 (emphasis added).

Ms. Halcomb further **admits** that she and Ms. Hannert of Fafard intended that Metro-Boston would convey to Fafard the ten-acre portion of Lot 11 which appeared below the sawtooth, or zigzag, residential/industrial zoning line shown on the 1979 McCarthy plan (in addition to all of Lot 12 and Lot 6B):

> Q: Do you recall when you gave a copy of what's been marked as Exhibit 2 [the 1979 McCarthy plan] to Ms. Hannert?
>
> A: ... [My] belief is it would have been at the same time I gave her the prospectus for the whole project.
>
> Q: And do you see Lot 11 on Exhibit 2?
>
> A: Yes.
>
> Q: And there's a sawtooth line going through Lot 11 separating industrial from Residential A land; is that correct?
>
> A: That's right.
>
> Q: **Was it your understanding that the land in Lot 11 below that zoning line on Exhibit 2 comprised approximately 10 acres?**
>
> A: **Approximately.**
>
> Q: **And is that the land you're referencing in your letter of April 15, 1998, Exhibit 1, No. 2, approximately 10 acres in Lot 11 zoned residential?**
>
> A: **It is.**

See Halcomb Dep. at 18:23 -19:19 (emphasis added), and Exhibit 2 thereto.

Ms. Halcomb also **admits** that, on Exhibit A to the P&S Agreement, which is the photocopied Subdivision Plan of Land in Ashland, the parties drew by hand a sawtooth line through Lot 11 and *that line was intended to represent the zoning line on the 1979 McCarthy plan*:

6

> Q: Directing your attention, Ms. Halcomb, to Exhibit 8, is Exhibit 8 a true, accurate and complete copy of a purchase and sale agreement that you executed as president of Metro-Boston Broadcasting, Inc., the general partner of Tower Sites, Ltd.?
>
> A: I believe it is.
>
> Q: With respect to what's been designated as Exhibit A within Exhibit 8, a subdivision plan of land in Ashland, to you see that page?
>
> A: Yes.
>
> Q: Do you know who prepared Exhibit A?
>
> A: Fafard.
>
> Q: **And is it your understanding that the sawtooth line crossing Lot 11 in Exhibit A is intended to represent the zoning line separating industrial from Residential A land on the 1979 McCarthy plan?**
>
> A: Yes. We clearly discussed that this is just a handdrawn diagram and this was not accurate. **It represented the McCarthy & Sullivan drawing.**
>
> Q: **And the land that you understood to be the subject of this purchase and sale agreement was Lot 12, Lot 6B, and that portion of the land that was designated as Residential A in Lot 11 on the 1979 McCarthy plan?**
>
> A: **Yes.**

See Halcomb Dep. at 40:5 – 41:7 (emphasis added), and Ex. 8 thereto.

Thus, Metro-Boston **admits** that parties intended, and had a mutual understanding, that the northeast boundary of the property *would be the zoning line shown on the 1979 McCarthy plan*. Metro-Boston **admits** that that the parties intended to convey that portion of Lot 11 which is demarcated by a zoning line on the 1979 McCarthy plan. Metro-Boston **admits** that the sawtooth line drawn on Exhibit A to the P&S Agreement represented the zoning line through Lot 11 shown on the McCarthy plan, and that the parties intended the sawtooth line drawn on Exhibit A to the P&S Agreement

7

to represent the zoning line through Lot 11 shown on the McCarthy plan. Thus, Metro-Boston has admitted a "meeting of minds" as to the northeast boundary of the property and as to all essential terms of the contract. For these reasons, evidence that the parties never had a "meeting of the minds" as to the northeast boundary, or an essential term of the P&S Agreement, is properly excluded from trial.[3]

In addition, Metro-Boston's **admission** that the parties intended to convey the portion of Lot 11 to the southwest of the zoning line as shown through Lot 11 on the 1979 McCarthy plan and Metro-Boston's **admission** that the parties intended the hand-drawn line through Lot 11 in Exhibit A to the P&S Agreement to represent the zoning line on the McCarthy plan gives reason to exclude any evidence that the P&S Agreement has a statute of frauds problem. It is well settled that evidence showing that parties considered "two or more papers [to be] so connected in [their] minds [that the parties] adopted all of them as indicating their purpose" can be used to overcome a statute of frauds defense. See Tzitzon Realty Co. v. Mustonen, 352 Mass. 648, 652-63 (1967).[4]

As stated in Nicholson v. Weld,

> The connection between different papers, so that they may be considered together and their sufficiency [for statute of frauds purposes] be

---

[3] Metro-Boston can be expected to argue that the language in the rider, Exhibit B to the P&S Agreement that Fafard "may petition the Ashland Town Meeting to straighten the Zoning boundary line between residential and industrial zone on Seller's land" is evidence of a failure of the parties to have a meeting of minds. This argument fails for two reasons: First, the fact that the P&S Agreement granted Fafard *an option* to petition the Town Meeting does make the Agreement ambiguous or otherwise constitute evidence that the parties never had a meeting of minds as to the northeast boundary. And second, in any event, this option became irrelevant after Metro-Boston uncovered the zoning line discrepancy between the 1979 McCarthy plan and other maps, which showed no zoning line through Lot 11.

[4] It is Fafard's position that the P&S Agreement is unambiguous, and can be enforced according to its terms. However, assuming that P&S Agreement is ambiguous as to what parcels of land the parties intended to convey, Fafard respectfully submits that the Court can consider parol evidence, including the admissions of the Defendant, for the purposes of explaining the what the parties meant by the sawtooth line drawn through Lot 11 on Exhibit A to P&S Agreement—that is, to explain that the parties intended the sawtooth line on the P&S Agreement to represent the zoning line shown through Lot 11 on the 1979 McCarthy plan. See Tzitzon Realty Co. v. Mustonen, 352 Mass. 648, 652-63 (1967)

8

> determined by the contents of all of them may be proved by oral evidence, at least so far as it is the result of that evidence to establish the fact that all of the different papers which are so to be considered together were brought to the attention of both parties, and were linked together in their minds, so that the parties themselves may have been found to have adopted all the papers as the expression of their purpose.

See Nickerson v. Weld, 204 Mass. 346, 356 (1910). Therefore, parol evidence is admissible to "ascertain[] precisely what was in the minds of the parties and so construing the language they used" in a purchase and sale agreement. Id. Thus, because Metro-Boston has **admitted** that the parties intended the sawtooth line on the P&S Agreement to represent the zoning line on the McCarthy plan, any evidence tending to show a statute of frauds problem, *i.e.* that the "informally drawn saw-tooth shaped line" on Exhibit A to the P&S Agreement is too imprecise to satisfy the statute of frauds, is properly excluded from trial.

### B. Metro-Boston's Ratification of the P&S Agreement Bars Introduction of Any Evidence of Uncertainty in the P&S Agreement and Any Evidence that the Parties Intended to Convey Only "Residential" Land.

As an additional, but related, defense, Metro-Boston claims that a discrepancy between the zoning line on 1979 McCarthy plan (upon which the P&S Agreement was based) and other maps, which was uncovered in late 2003, is evidence of uncertainty as to what land was to be sold. See Tab B, Defendant's Answers to Plaintiff's Interrogatories, at Interrogatory No. 9, at 9.

On this point, the law is clear that where parties uncover some reason that may make a contract voidable (such as a mutual mistake), the parties nevertheless may ratify the contract by their words or actions, or even by silence. See Dorn v. Astra USA, 975 F. Supp. 338, 393 (D. Mass. 1997) (ratification of voidable contract may exist where the party intentionally accepts benefits under contract; remains silent for a period of time

after having opportunity to avoid it; or recognizes the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it); See, e.g., In re Boston Shipyard Co., (1st Cir. 1989) (where a contract is voidable because of duress, but the party "does not contest within a reasonable time the document allegedly executed under duress, the contract or release may be ratified and affirmed"). See also American Airlines, Inc. v. Cardoza-Rodriquez, 133 F.3d 111, 120 (1st Cir. 1998) (noting that a voidable contract may be "ratified by subsequent conduct").

Metro-Boston **admits** this is exactly what happened in this case: After Metro-Boston uncovered a discrepancy in late 2003 between the 1979 McCarthy plan (upon which the P&S Agreement was based) and other maps, Metro-Boston continued to execute extensions of the P&S Agreement -- through May 21, 2004. See, e.g., Halcomb Dep. Exs. 32, 34, 35; and 36 (signed extensions). See also Metro-Boston's Answer and Counterclaim at ¶ 21 (admission that the parties signed "Extension[s] for Purchase and Sale Agreement" ... the effect of which was to extend the time for performance under the closing [sic] and that the last such document extended the time for performance through May 21, 2004.").

Thus, after uncovering a discrepancy, Metro-Boston **never** expressed any desire or intention to back out of, or to void, the P&S Agreement as a result of that discrepancy. Instead, Metro-Boston continued to agree to mutual extensions of the closing date, in writing. By these actions, Metro-Boston ratified the original P&S Agreement and ratified the original "meeting of the minds" between Fafard and Metro-Boston to convey the ten acre portion of Lot 11 as shown on the 1979 McCarthy plan and as drawn on Exhibit A to the P&S Agreement. Thus, Metro-Boston affirmed its intention to convey to Fafard Lots

10

12 and 6B, and the ten acre portion of Lot 11 below, or to the southwest of, the zoning line through Lot 11 shown on the 1979 McCarthy plan and as represented on Exhibit A to the P&S Agreement. Therefore, Metro-Boston's ratification of the P&S Agreement provides a further reason to exclude all evidence respecting a lack of "meeting of the minds" between the parties as to the northeast boundary line, or any other essential term of the P&S Agreement.

Similarly, all evidence respecting Metro-Boston's contention that the parties intended to convey only the "residentially zoned" land in Lot 11 must be excluded. In late 2003, Metro-Boston uncovered a discrepancy between the 1979 McCarthy plan and other plans regarding what, if any, portion of Lot 11 was zoned residential. But, as stated above, Metro-Boston <u>never</u> sought to back out of the P&S Agreement or declare it void because of a zoning line issue. Rather, after uncovering the discrepancy, Metro-Boston executed multiple extensions of the P&S Agreement, thereby ratifying the intentions of the parties to convey the southwest portion of Lot 11 as shown on the P&S Agreement and as based on the 1979 McCarthy plan, *regardless of the actual zoning in Lot 11*. For these reasons, any evidence tending to show that Metro-Boston and Fafard intended to convey only "residentially zoned" land must be excluded.

As a final note, Metro-Boston's ratification of the P&S Agreement also provides grounds to exclude <u>all</u> evidence pertaining to Metro-Boston's Eleventh Affirmative Defense, that is, evidence tending to show that "Fafard breached its obligation, set forth in the P&S Agreement, to report to defendant on the status of plaintiff's efforts to obtain permits." <u>See</u> Metro-Boston's Answer & Counterclaim, Eleventh Affirmative Defense. As stated above, Metro-Boston continued to execute extensions of the P&S Agreement,

thereby ratifying the contract and its terms, and waiving any objection to Fafard's alleged breach. For this reason, evidence pertaining to Fafard's efforts to obtain permits should be excluded from trial.

## CONCLUSION

For the foregoing reasons, Fafard respectfully requests an order precluding any evidence regarding the following:

(1) evidence that the parties never had a "meeting of the minds" as to an essential term of the contract, including the northeast boundary;

(2) evidence that the P&S Agreement is void for its failure to set forth all essential terms;

(3) evidence that the P&S Agreement is barred by the statute of frauds, including any evidence that the boundary of the property to be sold is not adequately described in the P&S Agreement or that there is no agreement fixing the location of an essential boundary line;

(4) evidence that the parties intended to convey only the "residentially-zoned" portion of Lot 11; and

(5) evidence that Fafard breached its obligation, set forth in the P&S Agreement, to report to defendant on the status of plaintiff's efforts to obtain permits.

Respectfully submitted,

FAFARD REAL ESTATE &
DEVELOPMENT CORP.,

By its attorneys,

_____
Jeffrey J. Upton (BBO #552221)
Halye A. Sugarman (BBO#646773)

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108
(617) 423-0400

Dated: February 7, 2005
422756

## CERTIFICATE OF SERVICE

I, Halye A. Sugarman, certify that on February 7, 2004, I served a copy of the foregoing Motion in Limine, by hand on:

Kenneth Berman
Nutter McClennan & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02110

_____
Halye A. Sugarman

13