Mary Heller Halcomb

1

1    Volume:    I

2    Pages:    1 to 207

3    Exhibits:  1 to 42

4            CONTAINS CONFIDENTIAL PORTIONS

5        UNITED STATES DISTRICT COURT

6        DISTRICT OF MASSACHUSETTS

7    Civil Action No. 04-11531-RGS

8    - - - - - - - - - - - - - - - - - - - - - - - x

9    FAFARD REAL ESTATE & DEVELOPMENT CORP.,

10              Plaintiff,

11      v.

12    METRO-BOSTON BROADCASTING, INC.,

13              Defendant.

14    - - - - - - - - - - - - - - - - - - - - - - - x

15

16        DEPOSITION OF MARY HELLER HALCOMB

17          Tuesday, February 1, 2005

18              10:15 a.m.

19            Hanify & King

20          One Beacon Street

21          Boston, Massachusetts

22

23    Reporter:  Lisa A. Moreira, RMR/CRR

24

Mary Heller Halcomb

15

1    property this property near Sewall Street?

2        A.  Yes.

3        Q.  Do you recall when you first discussed the

4    possibility of selling real estate to Fafard?

5        A.  I don't remember the exact time, but

6    sometime in mid- to late '90s, maybe '96, '97.

7        Q.  Okay.  And did that discussion center on

8    this real estate that is the subject of this

9    lawsuit?

10       A.  In part.

11       Q.  And what other part was discussed?

12       A.  Initially she asked about the entire Tower

13   Site.

14       Q.  "She" being Janice Hannert?

15       A.  Janice Hannert, I'm sorry.

16       Q.  Do you recall what the gist of that

17   communication was?

18       A.  Well, she asked was our Tower Site for sale,

19   and I said yes, and she asked for the offering

20   documents, so I sent it to her.

21       Q.  Were you using a broker to list the Ashland

22   property?

23       A.  No.

24       Q.  Let me show you a document.

Mary Heller Halcomb

16

1          MR. UPTON:  Would you mark this as the

2    first exhibit, please.

3              (Exhibit No. 1, Document Bates MB00009

4              through MB00011, marked for

5              identification)

6      Q.  If you could take a moment, Ms. Halcomb, and

7    review what we've marked as Exhibit 1.  Let me know

8    when you've had a chance to do that.

9      A.  (Witness reviews document) Yes.

10     Q.  Is Exhibit 1 a copy of a letter that you

11    sent to Janice Hannert on April 15th of 1998?

12     A.  I believe it is.

13     Q.  Do you recall whether the two pages attached

14    to this letter that we've marked as Exhibit 1

15    accompanied the letter when you sent it to Ms.

16    Hannert?

17     A.  I don't remember that.

18     Q.  Do you have any recollection of what you

19    sent Ms. Hannert with this letter we've marked as

20    Exhibit 1?

21     A.  No, but clearly it says I'm enclosing the

22    information concerning the title description.  This

23    describes the title.

24     Q.  And by "this," you're referring to the

Mary Heller Halcomb

17

1    second page of Exhibit 1?

2        A.   Yes.  And the other page is certainly a map

3    that I have in our file, so they certainly could be

4    included.

5        Q.   The letter begins with the phrase, "As we

6    discussed."  Do you have a recollection of a

7    discussion with Ms. Hannert that preceded your

8    sending of this letter?

9        A.   Vaguely.

10       Q.   Tell me what you can recall of the

11   discussion.

12       A.   I can recall that she was not interested in

13   the entire Tower Site, that she was only interested

14   in the residential land.  And so that was the reason

15   for the submission of this information.

16       Q.   Had you provided Ms. Hannert with the

17   listing document or marketing document that you

18   referenced before you sent this letter of April 15,

19   1998?

20       A.   Yes.

21       Q.   With reference to the third page of the

22   document, this plan, can you tell me at the time you

23   sent this letter in April of 1998 what was your

24   understanding as to what land was zoned residential?

Mary Heller Halcomb

18

1    A.  Lot 12 was all zoned residential, and this

2  little X right here.  Are you seeing where I'm

3  pointing?

4    Q.  Yes, I do.  Thank you.

5    A.  This little X is also residential.

6    Q.  That would be the X that has the arrow

7  leading into above the entry "Charles A. Horn,

8  Trustee of Middlesex Realty Trust"?

9    A.  That's right.  Now, in addition, we were

10  utilizing the only map that we had ever been given

11  at the closing when we purchased the land in 1987,

12  and this was a large map drawn to scale by McCarthy

13  & Sullivan, and that was the only what we called

14  accurate map to describe the property.  I also gave

15  that map to Janice Hannert.

16    Q.  I'm showing you a large map.  Is this the

17  McCarthy & Sullivan map that you just referenced?

18    A.  Yes, I believe it is.

19         MR. UPTON:  Could we have this marked as

20  Exhibit 2, please.

21              (Exhibit No. 2, McCarthy & Sullivan

22              map, marked for identification)

23    Q.  Do you recall when you gave a copy of what's

24  been marked as Exhibit 2 to Ms. Hannert?

Mary Heller Halcomb

19

1      A.   I gave it to her when she asked for it, so I

2  am not positive what date it is because this was

3  many years ago, but my belief is it would have been

4  at the same time I gave her the prospectus for the

5  whole project.

6      Q.   And do you see Lot 11 on Exhibit 2?

7      A.   Yes.

8      Q.   And there is a sawtooth zoning line going

9  through Lot 11 separating industrial from

10 Residential A land; is that correct?

11     A.   That's right.

12     Q.   Was it your understanding that the land in

13 Lot 11 below that zoning line on Exhibit 2 comprised

14 approximately 10 acres?

15     A.   Approximately.

16     Q.   And is that the land that you're referencing

17 in your letter of April 15, 1998, Exhibit 1, No. 2,

18 approximately 10 acres in Lot 11 zoned residential?

19     A.   It is.

20     Q.   Let's make a little room and get this out of

21 the way.

22              MR. UPTON:  Mark this as Exhibit 3.

23              (Exhibit No. 3, Agenda dated May 3,

24              1999, marked for identification)

Mary Heller Halcomb

34

1    Q.  Okay.  And Lots 12 and 6B approximately how

2  long after that, if it was after?

3    A.  It was after, and I want to say a year or

4  two, so it could have been as early as 1988, but I'm

5  not positive.  I'd really have to check on that.

6    Q.  Okay.

7    A.  I'm glad you brought that to my attention.

8  I'd forgotten.  It's really '86 that the major part

9  was.

10    Q.  Okay.  As best you can recall, Lots 12 and

11  6B were purchased somewhere in the late '80s?

12    A.  Something like that.

13    Q.  Now, you reference continuing to work with

14  Fafard to refine a few details of the offer in

15  Exhibit 5.  Do you have any recollection as to what

16  details you wanted to work to refine?

17    A.  I don't at this time.

18        MR. UPTON:  If you could mark this as

19  the next exhibit, please.

20        (Exhibit No. 6, Document, Bates FA

21        00515 through FA 00517, marked for

22        identification)

23    Q.  Ms. Halcomb, if you could take a moment to

24  review what we've marked as Exhibit 6 and let me

Mary Heller Halcomb

35

1    know when you've had a chance to do that, please?

2        A.  (Witness reviews document) Okay.

3        Q.  Ms. Halcomb, Exhibit 6 appears to be a fax

4    cover sheet dated December 5, 2000 from Janice

5    Hannert to you with what appears to be an offer -- a

6    one-page offer to purchase real estate following it

7    and a rider following that.

8                Do you have a recollection of having

9    received a copy of this document or some version of

10   it around December 5th of 2000?

11       A.  Yes.

12       Q.  The remarks area on the fax cover sheet, the

13   first page, reads in part, "Please find a revised

14   offer for your Ashland property which incorporates

15   the items we discussed."

16               Can you tell me, does a review of

17   Exhibit 6 refresh your memory as to the terms of the

18   offer that you were going to seek to refine with

19   Fafard?

20       A.  Two terms were -- because of the zigzag

21   line, Janice felt that would be difficult to put a

22   housing development in, and that that might need to

23   be straightened.  And the second item was the fact

24   that we had at least one or more large guy wires

Mary Heller Halcomb

36

1    that were coming from the towers into this property,

2    and she felt those might need to be moved.

3            And our discussion and our agreement was

4    that if she decided relocation was necessary, that

5    she would pay for that.

6            MR. UPTON:  Could we mark this as the

7    next exhibit, please.

8            (Exhibit No. 7, Map, Bates MB00127,

9            marked for identification)

10   Q.  Ms. Halcomb, staying for a moment with

11   Exhibit 6, I'll just note for the record that the

12   fax cover sheet reads, in part, number of pages

13   including cover sheet four, and Exhibit 6 was taken,

14   again I'll represent to you, from Fafard's files and

15   only consisted of these three pages, not four.

16           Exhibit 7, I will represent to you, was

17   produced by your counsel, and directing your

18   attention to the fax line across the top of the

19   page, December 5, 2000 Fafard phone number -- fax

20   number, Page 4, can you tell me, is this the fourth

21   page of Exhibit 6 and the plan that is referenced at

22   the top of the second page of Exhibit 6?  And

23   specifically I'm referring to towards the top of the

24   page where the offer to purchase real estate reads,

Mary Heller Halcomb

37

1   "This property herein referred to is identified as

2   follows:  Those three parcels of land in Ashland,

3   Middlesex County, off Tri Street known as Lots 12

4   and 6B (9.6 acres) and a portion of Lot 11 (10

5   acres) on plan attached hereto and incorporated by

6   reference"?

7       A.  It looks like it should be.

8       Q.  Do you recognize what we've marked as

9   Exhibit 7?

10      A.  Well, you know, I have seen this document

11  before.  We supplied it to you.  I mean, it looks

12  like the same one.

13      Q.  Does this look to you like a portion of the

14  1979 McCarthy plan?

15      A.  It does.  I mean, the drawing may not be

16  absolutely accurate, but it's very similar.

17      Q.  Do you recall whether a plan such as Exhibit

18  7 was attached to the December 5, 2000 fax that was

19  sent to you by Janice Hannert?

20      A.  I don't recall.

21      Q.  Did you retain a copy of the December 5,

22  2000 offer to purchase real estate that was sent to

23  you by Janice Hannert?

24      A.  I submitted everything I had to you, so if I

Mary Heller Halcomb

38

1  had it, you would have it.

2      Q.  Do you have any recollection as to whether

3  that was among the files that you produced to your

4  counsel?

5      A.  I don't know.  I know I submitted the signed

6  one.  I don't know about this one.

7      Q.  When you say you submitted the signed one --

8      A.  The signed purchase and sale agreement.

9      Q.  Okay.  Do you see on Exhibit 7 there appears

10  to be some shading or a bold line encircling Lot 12,

11  Lot 6B, and a portion of Lot 11?  Do you see that?

12      A.  Uh-huh, yes.

13      Q.  Do you have an understanding as to what that

14  represents?

15      A.  Crudely, and certainly not definitively, it

16  represented the basic general idea of the scope of

17  the property that Fafard wanted to buy.

18      Q.  The sawtooth line dividing Lot 11, is it

19  your understanding that the shading was intended to

20  trace over the zoning line that appeared on the 1979

21  McCarthy plan?

22      A.  Yes, to show the residential land, which was

23  the subject of a purchase.

24      Q.  Can you turn back to Exhibit 1, please, if

Mary Heller Halcomb

40

1      MR. UPTON:  If you could mark this as

2  the next exhibit, please.

3      (Exhibit No. 8, Purchase and sale

4      agreement, marked for identification)

5      Q.  Directing your attention, Ms. Halcomb, to

6  Exhibit 8, is Exhibit 8 a true, accurate, and

7  complete copy of a purchase and sale agreement that

8  you executed as president of Metro-Boston

9  Broadcasting, Inc., the general partner of Tower

10  Sites Limited?

11      A.  I believe it is.

12      Q.  With respect to what's designated as Exhibit

13  A within Exhibit 8, a subdivision plan of land in

14  Ashland, do you see that page?

15      A.  Yes.

16      Q.  Do you know who prepared Exhibit A?

17      A.  Fafard.

18      Q.  And is it your understanding that the

19  sawtooth line crossing Lot 11 in Exhibit A is

20  intended to represent the zoning line separating

21  industrial from Residential A land on the 1979

22  McCarthy plan?

23      A.  Yes.  We clearly discussed this is just a

24  handdrawn diagram and this was not accurate.  It

Mary Heller Halcomb

41

1    represented the McCarthy & Sullivan drawing.

2    Q.  And the land that you understood to be the

3    subject of this purchase and sale agreement was Lot

4    12, Lot 6B, and that portion of the land that was

5    designated as Residential A in Lot 11 on the 1979

6    McCarthy plan, Exhibit 2?

7    A.  Yes.

8           MR. UPTON:  All right.  This might be a

9    good time to take a short break.

10          MR. BARTENHAGEN:  Sure.

11          (Recess taken)

12          MR. UPTON:  Let's mark this as the next

13   exhibit, please.

14          (Exhibit No. 9, Fax, Bates MB00022

15           through MB00024, marked for

16           identification)

17   Q.  Have you had a moment to look at what we've

18   marked as Exhibit 9, Ms. Halcomb?

19   A.  Yes.

20   Q.  Do you recognize this document?

21   A.  Yes.

22   Q.  And is this a fax that you received from

23   Janice Hannert on or around October 31st of 2001?

24   A.  I believe so.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP.,     Plaintiff,     vs.     METRO-BOSTON BROADCASTING, INC.,     Defendant, | ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 04-11531-RGS |

### DEFENDANT METRO-BOSTON BROADCASTING, INC.'S
### ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, Defendant and Plaintiff-in-Counterclaim Metro-Boston Broadcasting, Inc. ("Metro-Boston" or "Tower Sites")[1] responds to Plaintiff's and Defendant-in-Counterclaim's first set of interrogatories as follows.

### General Objections

1.     Metro-Boston objects to the interrogatories to the extent they call for the disclosure of information protected by the attorney-client privilege, work product immunity doctrine, or other statutory or common law privilege against disclosure. Metro-Boston will only respond with non-privileged information. In the event any protected document is disclosed, such disclosure is inadvertent and does not constitute a waiver of any privilege or protection from discovery.

2.     Metro-Boston objects to the interrogatories to the extent they seek disclosure of confidential financial or business information. Metro-Boston will produce confidential

---

[1] Metro-Boston is the general partner of Tower Sites Limited Partnership ("Tower Sites").

information only upon the execution of a mutually satisfactory confidentiality stipulation and protective order.

3.     Metro-Boston objects to Plaintiff's Definitions and Instructions on the ground that strict adherence to them would render the interrogatories unduly prolix and confusing and would impose obligations on Metro-Boston in excess of those imposed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts. In responding to the interrogatories, Metro-Boston will accord the language of each question its plain and ordinary meaning and will otherwise comply with its obligations under the Federal and Local Rules.

4.     Metro-Boston objects to the definitions of "The Property" and "P&S Agreement" to the extent that they imply that the there was a meeting of minds as to which portion of Lot 11 was intended to be covered by the P&S Agreement. Nothing herein shall be deemed a waiver of any position or argument Metro-Boston may take with respect thereto.

<u>Responses</u>

Subject to and without waiving the foregoing general objections, Metro-Boston responds to the interrogatories as follows:

<u>INTERROGATORY NO. 1</u>:

State the name, occupation, employer, business address, and residential address of the person signing under oath the answers to these interrogatories; and identify each person who has participated in or provided information for answering these interrogatories, and for each such person identify the interrogatory (or interrogatories) that the person had information concerning and the substance of the information provided.

- 2 -

## ANSWER TO INTERROGATORY NO. 1:

Mary Heller Halcomb, Metro-Boston Broadcasting, Inc., 8411 Preston Road, Dallas, TX 75225. She may be contacted through Metro-Boston's counsel. These answers were also prepared with the assistance of counsel to the extent permitted by law.

## INTERROGATORY NO. 2:

State the entire basis for your denial in Paragraph 17 of your Answer to Fafard's allegation "that Metro-Boston failed to take any steps necessary to provide Fafard with a new subdivision plan."

## ANSWER TO INTERROGATORY NO. 2:

Metro-Boston does not understand what is meant by the term "*entire* basis," inasmuch as a single fact that is contrary to the allegation will support a denial of the allegation. In this instance, there are a number of facts contrary to the allegation. For example, Metro-Boston hired Hancock Survey Associates, Inc. ("Hancock") in 2002 to develop an accurate survey map of the property (including the correct placement of guy wires, grounding systems, and the new sewer lines) and to review the latest zoning and setback requirements of the Town of Ashland, all with an eye toward facilitating a subdivision plan. Hancock later produced a Sketch Plan of a portion of the Property and the surrounding property owned by Metro-Boston dated December 17, 2003 for this purpose. In the course of Hancock's work, Hancock discovered a discrepancy with respect to the location of the zoning boundary line that had formed a part of the discussions between Metro-Boston and Fafard with respect to the identification of the property to be sold. Metro-Boston called this discrepancy to Fafard's attention, but Fafard did not resolve this discrepancy with Metro-Boston. Metro-Boston also worked with Fafard with respect to identifying the location for the installation of a sewer line, which was later installed by the Town of Ashland. Finally, the P&S Agreement was unclear

- 3 -

about what responsibility, if any, Metro-Boston had with respect to the development of a new subdivision plan. Fafard had told Metro-Boston that Fafard was going to apply for approval for its new proposed subdivision on the parcel, and only Fafard would have known where it wanted to locate the road for its new subdivision and where it wanted to lay out the internal lot lines within the subdivision. Indeed, the P&S Agreement stated that it was conditioned upon Fafard obtaining approvals for its project. If Fafard was going to apply for subdivision approval, Fafard and its engineers would have had to prepare the subdivision plan for the project that Fafard wanted to develop.

INTERROGATORY NO. 3:

State the entire basis for your denial in Paragraph 23 of your Answer to Fafard's allegation that "Metro-Boston never took any steps necessary to cure the easements, restrictions and encumbrances of record on the Property identified by Fafard in a letter to Metro-Boston dated November 7, 2003."

ANSWER TO INTERROGATORY NO. 3:

Metro-Boston did not understand what was meant by a "step[] necessary to cure the easements, restrictions and encumbrances of record" identified in the letter. If the allegation meant that Metro-Boston had not removed, from the record title to the property, the identified easements, restrictions, and encumbrances, then the allegation, had it been so stated, would have been admitted. But "a step necessary to cure" could have meant, for example, making a determination as to the relative ease or difficulty of removing the identified easements, restrictions, and encumbrances from the record title to the property, assessing the need to do so, considering the timetable that would have needed to have been followed, and conferring with others toward these ends. Metro-Boston took these steps.

- 4 -

INTERROGATORY NO. 4:

Identify and describe each and every communication between you and Fafard that supports your allegation in Paragraph 9 of your counterclaim that Fafard notified Metro-Boston "that Fafard needed access to the Property before Fafard would close the transaction."

ANSWER TO INTERROGATORY NO. 4:

There were faxes from Fafard (Janice Hannert) and telephone conversations with Fafard (Janice Hannert) in which Fafard explained that it needed access to Sewall Road for its planned subdivision project because it could not access the property through Tri Street, as the Tri Street frontage was wetlands. At least one or two times after the parties executed the P&S Agreement, Fafard had sent Metro-Boston an offer to purchase additional land that would have provided a connection to Sewall Road. Metro-Boston did not accept these offers. Later, in at least one fax to Metro-Boston, Fafard said that it would "like" to purchase addition land, but that it "need[ed]" access to Sewall, and that it needed to confirm this access in writing. In another telephone conversation between Ms. Hannert and Mary Heller Halcomb, Ms. Hannert told Ms. Halcomb that Fafard's approvals for its proposed project either had been turned down because Fafard did not have access to Sewall Road, or that Fafard would be turned down unless Fafard could get primary ingress to and egress from the site through Sewall Road. Fafard also sent numerous faxes to Metro-Boston, copies of which have already been produced, in which Fafard requested extensions of the closing date for the transaction. In those faxes, Fafard made statements indicating the context of these extension requests. In these statements, Fafard identified three things that it "needed": (a) clean title, (b) a plan to deed off of, and (c) resolution of the access issue to Sewall Road. In the context of these extension requests and the course of dealings between the parties, Metro-Boston understood Fafard to be saying that Fafard needed these three things before the closing and that this was

- 5 -

why Fafard was requesting an extension of time for the closing. Between the time that this

access issue first surfaced and the time that Fafard filed this lawsuit, Fafard never told Metro-

Boston that it would buy the land without having access to Sewall. Metro-Boston furnishes this

summary of its communications with Fafard on this topic without waving its objection that an

identification and description of "each and every communication" on this topic would be

unduly burdensome and expensive to provide in an answer to interrogatory, as the

communications were numerous and there are more efficient and less expensive discovery

methods for obtaining this information, including production of the written communications,

which has occurred, and deposing Mary Heller Halcomb.

INTERROGATORY NO. 5:

Identify and describe each communication or act by Fafard which you contend
"interfer[ed] with [Metro-Boston's] ability to convey the property to others," as alleged in
Paragraph 11 of your Counterclaim, including in your answer the date of the communication or
act; the form of the communication (i.e., orally or in writing) or act; the substance of the
communication or act; the identity of the person making the communication or performing the
act; and the identity of all other persons receiving or witnessing the communication or act.
Please also include in your answer the identity and description of each and every document
provided by Metro-Boston to a prospective purchaser or by a prospective purchaser to Metro-
Boston.

ANSWER TO INTERROGATORY NO. 5:

Metro-Boston is not aware of any communications, in the traditional sense, that would

have been an interference. Metro-Boston is, however, aware of *acts* of interference, as

distinguished from traditional communications. Those acts include filing this lawsuit and

recording a notice of lis pendens at the land registry, after having notified Metro-Boston of

Fafard's unwillingness to close the transaction without access to Sewall Road, and never

having rescinded or countermanded that notice before the P&S Agreement expired. The effect

- 6 -

of recording such a notice is to prevent any sale of the property and to render title to the

property unmarketable and uninsurable so long as this lawsuit is pending.

## INTERROGATORY NO. 6:

Do you contend that Metro-Boston has now, or had at any time since January 30, 2001, a prospective purchaser for the Property with whom Fafard interfered? If the answer is "yes," please identify the prospective purchaser and each and every communication between you and that purchaser, including in your answer the date of the communication; the form of the communication (i.e., orally or in writing); the substance of the communication; the identity of the person making the communication; and the identity of all other persons receiving or witnessing the communication.

## ANSWER TO INTERROGATORY NO. 6:

Yes.  Perspectives Broadcasting, Inc., Carruth Capital, LLC, Mega Communications,

LLC, and Egan Communications, LLC.  Metro-Boston furnishes this response without waiver

of its objection that (a) a more complete answer to this interrogatory would be unduly

burdensome and expensive, given the needs of the case and the availability of other, less

expensive, and more efficient discovery mechanisms, including the deposition of Mary Heller

Halcomb, and (b) the interrogatory, in part, calls for discovery of information that is neither

relevant to the subject matter nor likely to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 7:

Identify and describe each communication between Metro-Boston and any "potential buyers" for the Property, as alleged in Paragraph 12 of your counterclaim, including in your answer the date of the communication; the form of the communication (i.e., orally or in writing); the substance of the communication; the identity of the person making the communication; and the identity of all other persons receiving or witnessing the communication.

## ANSWER TO INTERROGATORY NO. 7:

Metro-Boston objects to this interrogatory on the grounds that (a) answering it would be

unduly burdensome and expensive, given the needs of the case and the availability of other,

- 7 -

less expensive, and more efficient discovery mechanisms, including the deposition of Mary

Heller Halcomb, and (b) the interrogatory, in part, calls for discovery of information that is

neither relevant to the subject matter nor likely to lead to the discovery of admissible evidence.

INTERROGATORY NO. 8:

State the entire basis for your Fourth Affirmative Defense that "Plaintiff's complaint is
barred by the statute of frauds as there is no written agreement fixing the location of an
essential boundary line."

ANSWER TO INTERROGATORY NO. 8:

Metro-Boston does not understand what is meant by the term *"entire* basis" in the

context of this question.  Treating the question as asking for a summary of the basis for the

statute of frauds defense, the land covered by the P&S Agreement did not consist entirely of

existing parcels with defined boundaries but included a portion of Lot 11 with a boundary that

had not been fixed by any writing or memorandum constituting, comprising, setting forth, or

incorporating a survey plan, survey, scaled drawing, description of metes and bounds,

statement of angles or measurements, references or monuments, or any reference data that

would enable someone to locate the boundary line on the face of the earth or to distinguish

with reasonable particularity the land Metro-Boston was to convey to Fafard from the land

Metro-Boston would retain.  Instead, the land to be conveyed was depicted by an imprecisely

and informally drawn saw-tooth shaped line on a poor and nearly illegible copy of a land plan,

inadequate for the purpose of identifying the boundary line.


INTERROGATORY NO. 9:

State the entire basis for your Fifth Affirmative Defense that "[t]he purchase and sale
agreement is void for its failure to set forth all essential terms."

- 8 -

ANSWER TO INTERROGATORY NO. 9:

Metro-Boston does not understand what is meant by the term *"entire* basis" in the context of this question. Treating the question as asking for a summary of the basis for this affirmative defense, see Metro-Boston's answer to Interrogatory No. 8 above. In addition, this affirmative defense is another way of pleading that the parties never had a meeting of the minds on all essential terms, and that the written P&S Agreement did not contain all essential terms. The missing essential term was an agreement on what constituted the northeastern boundary of the land to be conveyed. It was the intention of the parties to convey either the land that was then zoned residential or land that would have been put into the residential zone through a straightening of what was then believed, actually mistakenly believed, to be a crooked zoning boundary line. The parties had mistakenly thought that the zoning boundary line was as shown in a certain drawing, depicting the line as running in a zig-zag through Lot 11. The hand-drawn saw-tooth line in the P&S Agreement was not intended to be the actual boundary line of the property to be conveyed, because it did not even track what the parties mistakenly believed to be the zoning line and because the P&S Agreement reserved the right to seek to have the zoning line, and hence the intended boundary line, straightened. After the P&S Agreement was signed, Metro-Boston discovered that the actual zoning boundary was not what the parties had previously thought, but that it in fact ran along the existing (straight) property boundary between Lot 11 and Lot 12. These facts created an irresolvable uncertainty as to what land was to be conveyed. Among the possible choices were (a) so much of the land as was actually zoned residential, which was Metro-Boston's intent but which Fafard now denies was its intent (after having taken an inconsistent position in this lawsuit), (b) the land to the southwest of a previously drawn line that both parties at the time mistakenly believed was

- 9 -

the zoning line, or (c) the hand-drawn saw-tooth line in the P&S Agreement, which does not

coincide with either the actual zoning line or the line that the parties mistakenly thought was

the actual zoning line, but which is the line that Fafard now says was its intent (after having

taken an inconsistent position in this lawsuit).

## INTERROGATORY NO. 10:

State and describe with specificity the entire basis for your contention in Paragraph 13
of your Counterclaim that Metro-Boston has been "damaged" by the alleged actions of Fafard.

## ANSWER TO INTERROGATORY NO. 10:

Metro-Boston does not understand what is meant by the term *"entire* basis,*"* inasmuch

as a single instance of damage can support, or be a basis for, the allegation, even though there

might be multiple instances of damage.  This having been said, as a result of Fafard having

instituted this litigation and having sought and obtained a lis pendens, Metro-Boston has had to

incur legal fees to defend this suit and to attempt to restore its title to a state of marketability

and insurability.  In addition, Metro-Boston has been damaged by not being able to sell the

Property and surrounding property to a third party purchaser, and its inability to receive

consideration for the Property and surrounding property has resulted in the loss of use of the

purchase money proceeds.

## INTERROGATORY NO. 11:

Identify any and all individuals that were, on or after January 30, 2001, retained,
commissioned, hired or otherwise employed (whether as an employee, consultant,
representative, agent or independent contractor) by Metro-Boston having anything to do with
the Property or Fafard's offer to purchase additional real property from Metro-Boston,
including but not limited to engineers and land surveyors. For each such individual, state the
specific nature and substance of that individuals' involvement, and the dates when his
involvement began and ended (if applicable).

ANSWER TO INTERROGATORY NO. 11:

Metro-Boston hired Hancock Survey Associates, Inc. in 2002 to develop an accurate

survey map of the Property (including the correct placement of guy wires, grounding systems

and the new sewer lines), to review the latest zoning and setback requirements of the Town of

Ashland, and to consult with Metro-Boston concerning the proposed roadway access to the

Property from Sewall Road. Metro-Boston furnishes this response without waiver of its

objection that this interrogatory is overbroad and seeks the discovery of information that is

neither relevant nor likely to lead to the discovery of admissible evidence.

INTERROGATORY NO. 12:

Identify and describe with particularity each and every communication you had,
whether internal at Metro-Boston, or with any other individual (including but not limited to
Fafard, the tower lessees, engineers or land surveyors), concerning any offer by Fafard to
purchase real property from Metro-Boston (other than the Property subject to the P&S
Agreement), including in your answer the date of the communication; the form of the
communication (i.e., orally or in writing); the substance of the communication; the identity of
the person making the communication or performing; and the identity of all other persons
receiving or witnessing the communication.

ANSWER TO INTERROGATORY NO. 12:

In general, Mary Heller Halcomb on behalf of Metro-Boston communicated orally

with its investors, tower site lessees, potential buyers, and consultant Hancock Survey

Associates, Inc. concerning Fafard's offer to purchase real property from Metro-Boston (other

than the Property subject to the P&S Agreement), the general substance of which was that

there was a proposed offer by Fafard to purchase additional land from Metro-Boston for access

through Sewall Road to allow Fafard to develop multi-unit residential apartments. Metro-

Boston furnishes this response without waiver of its objection that a more complete answer to

this interrogatory would be unduly burdensome and expensive, given the needs of the case and

- 11 -

the availability of other, less expensive, and more efficient discovery mechanisms, including the deposition of Mary Heller Halcomb.

As to objections,

*Erik Bartenhagen*

Kenneth R. Berman (BBO #040320)
Erik P. Bartenhagen (BBO #640003)
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

### Certificate Of Service

I certify that I served this document on opposing counsel by hand on January 12, 2005.

*Erik Bartenhagen*

Erik P. Bartenhagen

1388850.2

## VERIFICATION

I, Mary Heller Halcomb, state under the pains and penalties of perjury in my capacity as President of Metro-Boston Broadcasting, Inc. that the foregoing answers are true to the best of my knowledge, information, and belief.

Mary Heller Halcomb
President, Metro-Boston Broadcasting, Inc.

Dated: January 12, 2005

1388850.2

- 12 -

**TOWER SITES LTD.**
**8411 Preston Road, Suite 870**
**Dallas, Texas 75225**
**214/ 691-2545**



April 15, 1998

Fafard Company
Ms. Janis Hannert
290 Elliott Street
Ashland, MA. 01721

RE: Residential Land

Dear Janis:

As we discussed, I am enclosing the information concerning the title description of the two parcels of zoned residential land:

1. 9.6 acres noted in lot 12 and 6B
2. approx. 10 acres in Lot 11, zoned residential

Please note that the land will have to be subdivided along the zoning boundary in Lot 11, and we will need to retain an easement for, I believe, one guy wire which is located on a residential section of Lot 11.

We look forward to receiving your offer. We may have to leave town the afternoon of Thursday, April 16, therefore, we hope to receive a communication from you before we travel.

Sincerely,

Mary Heller Halcomb
President
Metro-Boston Broadcasting, Inc.
Managing Partner

MB00009

MB00010

with **quitclaim covenants**

of Dallas, Texas 75381

~~declaration~~

## Description and encumbrances, if any]

Two certain parcels of land located in Ashland, in the County of Middlesex, Commonwealth of Massachusetts, bounded and described as follows:

Lot 12, shown on a plan entitled "Subdivision of Lot 7 as shown on Land Court Plan No. 16849D, said plan is filed with Certificate of Title No. 161201.

Lot 6B as shown on Land Court Plan #16849B, said plan is filed with South Middlesex Registry of Deeds in Book 371, Page 521 with Certificate 55625.

For my title see Certificate of Title No. 194913 filed in the Land Registration Office of the Middlesex South District Registry of Deeds in Book 1101, Page 43.

Subject to any and all outstanding real estate taxes due to the Town of Ashland.



MB00011