ANS*

DA 2-8-05

BY: CMG

FILED
IN CLERKS OFFICE

2005 FEB -4 P 4:34

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP., )<br>)<br>Plaintiff/Defendant-in Counterclaim )<br>)<br>vs. )<br>)<br>METRO-BOSTON BROADCASTING, )<br>INC., )<br>)<br>Defendant/Plaintiff-in-Counterclaim ) | Civil Action No. 04-11531 RGS |

## DEFENDANT'S MOTION TO AMEND ANSWER
[ORAL ARGUMENT REQUESTED]

Pursuant to Fed. R. Civ. P. 15(a), defendant Metro-Boston Broadcasting, Inc. (referred to as "Tower Sites") moves to amend its answer by adding the following twelfth and thirteenth affirmative defenses:

### Twelfth Defense

Plaintiff breached the purchase and sale agreement by notifying defendant, in words or substance, on at least three occasions in May 2004, that it was unwilling to go forward with the closing of the purchase without obtaining rights of access over additional land owned by defendant, that defendant was under no obligation to give. If plaintiff in fact was willing to close without obtaining such rights of access, plaintiff failed to give defendant seasonable notice of its supposed willingness to go forward with the closing.

### Thirteenth Defense

Plaintiff's claims are barred by plaintiff's fraud, deceit, and inequitable conduct, as more particularly set forth in the fifteen paragraphs below:

   1. On at least the following occasions, and in the following ways, plaintiff Fafard (through Janice Hannert) informed defendant ("Tower Sites") (primarily through Mary

Heller Halcomb) that Fafard needed to have a right of access to Sewall Street abutting land owned by Tower Sites that was not included in the purchase and sale agreement. On some of these occasions, Fafard made these statements in the context of explaining why it needed an extension of the purchase and sale agreement or why it was not willing to proceed with the closing of the purchase of the Locus. On other occasions, Fafard made these statements while explaining, orally, that access to Sewall Street, over other land owned by Tower Sites, was essential to Fafard's project, and that, without it, Fafard could not go forward with the purchase. Each of these statements in isolation, and all of these statements in context and totality, reasonably and foreseeably led Tower Sites to believe that, unless defendant granted Fafard rights of access to Sewall, Fafard would not close on the purchase of the Locus:

| Date | Form of Communication | Substance of Statement |
|---|---|---|
| October 31, 2001 | Fax from Hannert to Halcomb transmitting offer to purchase additional land | "We need to acquire additional land to gain access to the residential portion of the property." |
| January 17, 2002 | Telephone conversation between Hannert and Halcomb | [Hannert's version:] We (Fafard) have not been able to do much of anything of planning for the property since we determined that we needed the additional access. |
| February 21, 2002 | Message left by Hannert for Halcomb | [Hannert's version:] Fafard and Metro-Boston are at a standstill. Fafard needs additional 5 acres and access to Sewall to make Fafard's project work. |
| On or shortly before February 27, 2002 | Message left by Hannert for Halcomb | "[W]e need to get an agreement on the additional 5 acres. We need the access to get out to Sewall Street." |
| February 27, 2002 | E-mail from Hannert to Halcomb | "[W]e need to get an agreement on the additional 5 acres. We need the access to get out to Sewall Street." |
| March 21, 2002 | E-mail from Hannert to Halcomb | "I need to get a response from you on the additional 5 acres [that provide access to Sewall Street]. We cannot access the residential portion of the land without it (2 access roads will be needed)." |
| July 31, 2002 | Fax from Hannert to Dan Bremser (Tower Sites' engineer) | "We cannot access the [land under agreement] from Tri Street because of wetland buffer zones and need to access the site through Sewall Street." |

| Date | Form of Communication | Substance of Statement |
|---|---|---|
| February 12, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |
| February 26, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |
| March 19, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |
| April 16, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |
| May 7, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |
| May 17, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |
| May 20, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." |

2. In addition to the statements in the foregoing table, Fafard (through Janice Hannert) made numerous oral representations in periodic telephone calls with Tower Sites (Mary Halcomb) between October 2001 and the spring of 2004 that (a) Fafard needed to have rights of access to Sewall Street in order to do its project, (b) without such access to Sewall Street, Fafard would be unable to do the deal with Tower Sites, (c) Fafard's permits and approvals for its proposed development had been turned down by the Town of Ashland because Fafard did not have a second means of access to the property, which Fafard determined could only be provided from Sewall Street over other land owned by defendant, and (d) notwithstanding the initial denial of Fafard's permit requests, Fafard was still working on trying to get its permits.

3. Fafard made the foregoing statements for the purpose of: (a) inducing Tower Sites to extend the closing date on the purchase and sale agreement on multiple occasions, and thereby foreclosing Tower Sites from selling the property to others while the property appreciated in value, all at a time when Fafard had nothing or almost nothing at risk in light of the deposit refund provisions of the purchase and sale agreement; (b)

- 4 -

attempting to buy time to negotiate access rights to Sewall Street; and (c) inducing Tower Sites to believe that the Locus would be unsellable (either to Fafard or to any other developer) unless the buyer were also granted access rights to Sewall.

4. Fafard and Tower Sites had signed the purchase and sale agreement in January 2001, calling for a closing no later than February 28, 2002. At Fafard's request, the parties extended the closing date on at least 24 occasions, with the last such extension expiring on May 21, 2004.

5. Fafard contends that, at some point in either 2001, 2002, or 2003, Fafard determined that it did not need to obtain a right of access to Sewall Street to go forward with the purchase of the Locus and that it was willing to close on the purchase of the Locus without obtaining rights of access to Sewall Street.

6. From the time Fafard first informed Tower Sites in 2001 that it needed access to Sewall Street and continuing through May 21, 2004, Fafard never informed Tower Sites that it was ready, willing, and able to go forward with the purchase of the Locus without obtaining a right of access to Sewall Street.

7. If, at any time before May 21, 2004, Fafard determined that it did not need to obtain a right of access to Sewall Street to go forward with the purchase of the Locus or that it was ready, willing, and able to go forward with the purchase without resolving the issue of access to Sewall Street, then the foregoing statements by Fafard misrepresented Fafard's intentions and state of mind. Tower Sites reasonably and foreseeably relied on such statements to its detriment by, among other things, assenting to extensions of the closing date under the purchase and sale agreement and failing to pursue other opportunities for the property.

8. In May 2004, Fafard sent Tower Sites three written requests to extend the purchase and sale agreement to a date beyond May 21, 2004, stating in each request, in the context of explaining what Fafard needed for a closing, that Fafard needed a resolution of the issue of access to Sewall Street. If, at any time before May 21, 2004, Fafard determined that it did not need to obtain a right of access to Sewall Street to go forward with the purchase of the Locus or that it was ready, willing, and able to go forward with the purchase without resolving the issue of access to Sewall Street, then Fafard had an obligation to disclose those facts to Tower Sites, and to do so seasonably.

Fafard made no such disclosure to Tower Sites.

9. As a reasonably foreseeable result of Fafard's statements in May 2004 to the effect that Fafard needed a resolution of the issue of access to Sewall Street (in the context of requesting an extension and explaining what Fafard needed for a closing), and in reliance on these and similar statements that Fafard had made over the course of three years as particularized above, Tower Sites justifiably concluded that Fafard was not willing or able to close on the purchase of the Locus and consequently Tower Sites did not appear at the registry of deeds on May 21, 2004 to close on the purchase of the Locus.

10. On May 21, 2004, Fafard appeared at the Middlesex South Registry of Deeds for approximately an hour and fifteen minutes ostensibly to close on the purchase of the Locus.

11. Fafard appeared at the Middlesex South Registry of Deeds on May 21, 2004 without telling Tower Sites of its intent to do so, without expecting or believing that Tower Sites would appear, and without any realistic expectation that a closing would in fact take place.

12. The purchase and sale agreement between Fafard and Tower Sites did not specify any time of day at which the closing of the purchase would take place. In appearing at the Middlesex South Registry of Deeds on May 21, 2004, Fafard unilaterally selected a time of day to appear, without notifying Tower Sites of the time, or making any arrangement with Tower Sites as to the time of day, for a closing.

13. Fafard's appearance at the Middlesex South Registry of Deeds on May 21, 2004 was a sham. It was undertaken to manufacture evidence of Fafard's supposed readiness, willingness, and ability to close on the purchase of the Locus for the purpose of bringing this lawsuit.

14. Had Fafard notified Tower Sites of its intent to appear at the registry of deeds for a closing, Tower Sites would also have appeared at the registry of deeds and exercised a right reserved in the purchase in sale agreement to extend the closing date for 30 days to enable Tower Sites: (a) to prepare whatever documents the agreement might have required Tower Sites to prepare, (b) to cure or eliminate whatever title encumbrances the agreement might have required Tower Sites to eliminate or cure, (c) to resolve unresolved issues about the location of the northeastern boundary line of the Locus, and (d) to take

whatever other steps the agreement might have required Tower Sites to take. Under the agreement, if Tower Sites failed to do these things within the 30 day period, then the obligations of the parties to each other would be terminated without recourse. Fafard's failure to notify Tower Sites of its intent to appear at the registry deprived Tower Sites of the opportunity to follow these procedures, exercise these rights, and invoke these provisions of the agreement.

15. On account of the foregoing acts of fraud, deceit, and concealment by Fafard, the various extensions of the purchase and sale agreement that Fafard procured from Tower Sites should be deemed void and rescinded. Further, these acts of fraud, deceit, and concealment bar Fafard from claiming that it was ready, willing, and able to perform or that it made a timely tender of performance.

## GROUNDS FOR THIS MOTION

As grounds for this motion, Tower Sites states:

1. The foregoing proposed amendments articulate additional legal theories that arise from evidence that Tower Sites will offer in all events under certain of its existing affirmative defenses, specifically: the third (failure of conditions precedent), seventh (exclusive remedy), eighth (unclean hands), ninth (waiver), and tenth (estoppel) defenses. The proposed thirteenth defense is pleaded in detail because of Rule 9's requirement that all averments of fraud be pleaded with particularity.

2. Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). This rule is to be liberally applied for "[i]f the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, the [party] ought to be afforded an opportunity to test his claim on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962).

3. Tower Sites is acting in good faith and without undue delay in seeking this amendment. This action has been expedited for discovery and trial. As a result of rolling document productions over the last two months and depositions in the last week or two, Tower

Sites has uncovered evidence supporting these amendments, including (i) newly discovered documentary evidence of Fafard's representations to Tower Sites and, importantly, the context of Fafard's representations, (ii) deposition testimony in which Fafard employees attempt to characterize what they meant by their representations, which, if true, would permit or require the fact-finder to conclude that Fafard's statements to Tower Sites were misrepresentations and fraudulent acts of concealment, and (iii) deposition testimony concerning Fafard's actions and intentions with respect to its appearance at the registry of deeds on May 21, 2004.

3. The proposed affirmative defenses are intrinsically related to the subject matter of this case, and thus no "radical remaking of the case" is contemplated by this motion to amend. See Grant v. New Group Boston, Inc., 55 F.3d 1, 6 (1st Cir. 1995). The proposed affirmative defenses arise out of the same conduct, transaction, or occurrences that are the subject of the original answer.

4. The proposed affirmative defenses allegations are so intertwined with the defenses pleaded in the original answer that, if this amendment were not made at this time, Tower Sites would in all likelihood be permitted to amend its answer at or after trial in accordance with Fed. R. Civ. P. 15 (b) (amendments to conform to the evidence) and 54(c) (every final judgment shall grant a party the relief to which it is entitled, even if such relief was not demanded in the party's pleadings).

5. Fafard cannot credibly assert a futility objection to this motion. A proposed amendment can only be considered futile if it is frivolous or advances a claim or defense that is "legally insufficient on its face." Medeiros v. Murray, 639 F. Supp. 10 (D. Mass. 1986). In other words, the opposing party would have to show that the proposed amendment "would serve no legitimate purpose." Judge v. City of Lowell, 160 F.3d 67, 79 (1st Cir. 1998). See also Davis

v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir.), cert. denied, 448 U.S. 911 (1980) ("Unless a proposed amendment may clearly be seen to be futile because of substantive or procedural consideration, conjecture about the merits of the litigation should not enter into the decision whether to allow amendment.").

6. Legal support for these proposed affirmative defenses may be found in the following cases, among others: Gentile Bros., Corp. v. Rowena Homes, Inc., 352 Mass. 584, 587, 589 (1967) (when seller told buyer that seller would not show up at registry for closing on agreed-upon day for performance, buyer had right to rely on seller's statement and was not in breach for not appearing at registry); M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960) (where seller told buyer that seller wanted to negotiate an alternative arrangement and that seller was not willing to close until such an alternative arrangement was made, buyer was not obliged to appear at closing or tender performance and was not in breach for failing to do so "in the absence of seasonable notice [from seller] that performance was to take place" on date called for by agreement); Schilling v. Levin, 328 Mass. 2, 5 (1951) ("The appearance of the [buyer] at the registry of deeds on July 15 without notice to the plaintiffs was a sham and had no effect on the rights of the parties"); Fanger v. Leeder, 327 Mass. 501, 505 (1951) (misrepresentation of state of mind could be basis for an action of deceit); Kattor v. Adams, 323 Mass. 686, 688-89 (1949) (buyer's stated unwillingness to go forward with purchase transaction unless seller included three additional acres not covered by purchase and sale agreement "was a breach of the agreement which excused the [sellers] from any further performance or offer of performance"); Beach & Claridge Co. v. American Steam Gauge & Valve Manuf. Co., 202 Mass. 177, 183-84 (1909) (buyer's statement to defendant that buyer would not go forward with purchase unless certain contingencies happened that were not provided for in the parties'

agreement "was a breach by the [buyer] of its agreement, which operated to excuse the [seller] from any further performance or offer of performance").

METRO-BOSTON BROADCASTING, INC.

By its attorneys,

*/s/ Erik Bartenhagen*
Kenneth R. Berman (BBO #040320)
Erik P. Bartenhagen (BBO #640003)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

Dated: February 4, 2005

## Local Rule 7.1 Certificate

I certify that on February 4, 2005, I conferred with counsel for plaintiff in a good faith attempt to narrow or resolve the issues presented by this motion.

*/s/ Erik Bartenhagen*
Erik P. Bartenhagen

## Certificate Of Service

I certify that I served this document on opposing counsel by hand on February 4, 2005.

*/s/ Erik Bartenhagen*
Erik P. Bartenhagen

1401355.1

- 10 -