UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| FAFARD REAL ESTATE & | ) | |
| DEVELOPMENT CORP. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO.  04-11531-RGS |
| | ) | |
| | ) | |
| METRO-BOSTON BROADCASTING, | ) | |
| INC., | ) | |
| Defendant. | ) | |

_____

**PLAINTIFF FAFARD REAL ESTATE & DEVELOPMENT CORP.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Federal Rule of Civil Procedure 52, Plaintiff Fafard Real Estate & Development Corp. respectfully submits the following proposed findings of fact and conclusions of law.

**PROPOSED FINDINGS OF FACT**

**A.  Fafard has Met its Burden to Establish its Case for Specific Performance.**

1.     Tower Sites, Ltd. ("Tower Sites") is a Texas limited partnership and is the record owner of registered land in Ashland, Massachusetts, consisting of Lots 6B, 9, 10, 11, 12.  Halcomb direct/Trial Trans. Day 3, at 4:6 – 11.

2.     Metro-Boston Broadcasting, Inc. ("Metro-Boston") is a Texas corporation and is the general partner of Tower Sites.  Mary Heller Halcomb is the President of Metro-Boston.  Halcomb direct/Trial Trans. Day 3, at 3:25 – 4:2.  Halcomb also owns forty five percent of Metro-Boston stock and has a partnership interest in Tower Sites.

Halcomb direct/ Trial Trans. Day 3, at 4:3 – 14.  In addition, Tower Sites owns real estate in Texas. Halcomb direct/ Trial Trans. Day 3, at 4:15 – 18.

3.      Fafard Real Estate & Development Corp. ("Fafard") is a real estate development company located in Ashland, MA.  See Complaint ¶¶ 1, 7; Answer & Counterclaim ¶¶ 1, 7.

4.      Metro-Boston tried for years to sell its Ashland property, but found no buyers.  Halcomb direct/Trial Trans. Day 3, at 8:5 – 7.  Metro-Boston had identified Fafard as the most likely buyer for the property "due to their strong presence and success in this area," and worked for years to sell the land to Fafard.  Halcomb direct/Trial Trans. Day 3, at 8:8 – 13; Trial Exhibit 4.

5.      In the mid-to-late 1990s, however, Fafard was not terribly interested in purchasing Metro-Boston's Ashland property, in part because of a town sewer moratorium.  Hannert direct/ Trial Trans. Day 1, at 66:4–17.  There was no particular urgency on either Fafard's part or Metro-Boston's part with respect to the sale of this land.  Hannert direct/Trial Trans. Day 1, at 68:14–21.  Nevertheless, the parties continued to discuss a potential land sale.  Hannert direct/Trial Trans. Day 1, at 67:17 – 68:13.

6.      On March 7, 2000, Metro-Boston faxed an offer to Fafard for the sale of "9.6 acres noted in Lot 12 and 6B, zoned residential [and] approx. 10 acres in Lot 11, zoned residential."  See Trial Exhibit 109.  In the offer letter to Hannert, Halcomb wrote,

> This offer is 'as is, where is', with no contingencies or approvals to be sought, etc.  Clean title will be delivered at the sale.  The only detail to be considered would be the straightening of the boundary line dividing the residential from the Industrial land.  This straightening would be beneficial to all concerned.  We may have to have an easement for one guy wire, located in the residential section of Lot 11, unless this is eliminated by the new boundary line.

> The Tower Sites, Ltd. Group would gladly accept $339,000 for the approximately 19 acres.

See Trial Exhibit 109.

7.     At that time, Fafard was not interested in an "as is, where is" offer from Metro-Boston.  Fafard normally conditioned its land contracts on receipt of permits, "or at least having an opportunity to review what [Fafard] could anticipate what would be approved by the town."  Hannert direct/ Trial Trans. Day 1, at 69:19 – 70:1.

8.     In October 2000, Fafard made an Offer to Purchase to Metro-Boston to purchase Lots 6B, 12 and the ten-acre portion of Lot 11.  Fafard offered a price of $339,000.  Hannert direct/ Trial Trans. Day 1, at 70:2–11.

9.     Halcomb understood that Fafard was offering Metro-Boston a delayed closing to obtain its permits, and that Fafard could declare the contract void and walk away if it was unsuccessful in obtaining the permits it sought.  Halcomb direct/ Trial Trans. Day 3, at 7:6 – 12; 8:14 –19; Trial Exhibit 4.  Halcomb also understood that Fafard's deposit was refundable, and that Tower Sites would be able to retain all of Fafard's due diligence and engineering work should that take place.  Halcomb direct/ Trial Trans. Day 3, at 7:13 –15; Trial Exhibit 4.

10.     In addition, Halcomb believed that the purchase price of $339,000 would net Tower Sites a substantial profit.  Halcomb direct/ Trial Trans. Day 3, at 8:20 – 22.  In an October 18 memorandum to the Tower Sites' investors, in which Halcomb summarized Fafard's offer, Halcomb wrote that Fafard's "purchase price of $339,000 represents a substantial profit to us.  Our basis in the property was approximately $100,000."  See Trial Exhibit 4.

11.     On January 31, 2001, Metro-Boston and Fafard signed a Purchase and Sale Agreement ("P&S Agreement").  See Trial Exhibit 7.  Richard Terrill, the Chief Financial Officer of Fafard, signed on behalf of Fafard and Mary Halcomb, as President of Metro-Boston, signed on behalf of Metro-Boston.  Terrill direct/Trial Trans. Day 3, at 108:4 – 6.

12.     The P&S Agreement conditioned closing on Fafard's receipt of permits and set a permitting deadline of January 30, 2002, and a closing deadline of February 28, 2002.  See Trial Exhibit 7. After signing the P&S Agreement, Fafard began its due diligence, including performing a title search, preparing a chapter 21E environmental report and flagging the wetlands.  Hannert direct/ Trial Trans. Day 1, at 72:25 – 73:6.

13.     After flagging the wetlands, Fafard discovered that one of the two proposed means of access onto the site, Tri Street, was unusable because of wetlands. The discovery of wetlands did not affect Fafard's willingness to go forward with its purchase of the land.  Terrill direct/Trial Trans. Day 3, at 108:10 – 16.  A road could still be built across the other point of access to the property, Adams Road.  Hannert direct/ Trial Trans. Day 1, at 73:7–73:23.  Fafard also had other alternatives to access the property, which included buying a house on Tri Street to gain access.  Fafard also could develop a 40B residential development with a waiver from the Town of Ashland.  Terrill direct/Trial Trans. Day 3, at 108:17 – 109:11.

14.     Fafard also explored accessing the property through Sewell Street.  Terrill direct/Trial Trans. Day 3, at 108:18 – 19.  In October 2001, Fafard made an offer to Metro-Boston to purchase additional land in Lot 11, to the northeast of the land under the P&S Agreement, which would connect Sewell Street, a street that came into Metro-

Boston's property in Lot 11, to the portion of Lot 11 already under agreement with Fafard ("October 2001 Offer to Purchase"). See Trial Exhibit 10; Hannert direct/ Trial Trans. Day 1, at 73:24 – 74:10. Fafard offered $100,000 for the additional five acres of land and included with its offer a sketch of the land sought to be purchased. See Trial Exhibit 10.

15.     In addition, Fafard offered to pay for the entire development of a joint access road connecting Sewell Street to the residential portion of Lot 11 Fafard already had under agreement with Metro-Boston. See Trial Exhibit 27.

16.     Metro-Boston did not reject Fafard's offer, and, in fact, was favorably disposed towards Fafard's plans, but Halcomb told Fafard that she would need to clear Fafard's proposal with her other buyer who was interested in purchasing the Tower Sites' industrial land. Hannert direct/ Trial Trans. Day 1, at 77:17 – 76:1; Halcomb direct/Trial Trans. Day 3, at 9:17 – 20; Trial Exhibit 11. Over the course of the next twenty months, Halcomb continually represented to Fafard that she was working with another buyer for her industrial property (whose identity changed over time) to develop a "master plan" of land transfer, but that she was confident Fafard would be able to obtain the access and additional land it desired. See Trial Exhibits 12, 24, 27; Hannert direct/Trial Trans. Day 1, at 77:18 – 78:5, 78:24 – 79:4, 79:20 – 80:3, 83:5 – 16, 84:15 – 85:2, 84:24 – 85:2, 85:25 – 86:9; Halcomb direct/Trial Trans. Day 3, at 10:6 – 8, 18:11 – 17. Fafard forwarded sketches of the land and proposed road to Halcomb and waited for Halcomb to get back to it regarding its offer. Id.; Trial Exhibits 13, 14, 15, 36, 38. During this time, through August 2003, the parties executed five extensions of the P&S Agreement while Halcomb continued to work on her "master plan." See Trial Exhibits 17, 23, 30, 33, 40.

Halcomb never told Fafard that it was not possible to grant it access from Sewell Street. Halcomb direct/Trial Trans. Day 3, at 10:9 – 11.

17.    In the Spring of 2003, Halcomb was notified that the Town of Ashland would be installing sewer lines on Metro-Boston's property.  Halcomb cross/Trial Trans. Day 3, at 96:18 – 23.

18.    Thereafter, Halcomb became dissatisfied with the purchase price of the land.  Halcomb expressed to Fafard that she felt the land had increased in value since the P&S was signed and sewer lines had been installed and told Fafard that she wanted new "firm funds" in place.  See Trial Exhibit 110; Halcomb direct/ Trial Trans. Day 3, at 18:1 – 5; Hannert direct/ Trial Trans. Day 1 at 87:5 – 11; Trial Trans. Day 2 at 4:3 – 12.

19.    After discussions between Richard Terrill and Halcomb in November 2003, Fafard agreed to put its deposit ($39,000, or ten percent of the purchase price) at risk and to place the deposit with Halcomb's attorney, who would be contacting Fafard. Hannert direct/Trial Trans. Day 2, at 12:11 – 13:1; Trial Exhibit 111.  Fafard also agreed to pay the real estate taxes.  Hannert direct/Trial Trans. Day 2, at 12:11 – 13:1; Trial Exhibit 111.

20.    From and after November 12, 2003, extensions executed by the parties contained a new provision making Fafard's deposit nonrefundable:  "In the event the transaction contemplated by the Agreement does not occur due to no fault of the Seller, the deposit shall be delivered to the Seller and the transaction shall terminate."  See Trial Exhibit 65; Hannert direct/Trial Trans. Day 2, at 13:2 – 15.  These extensions also extended the permits and approvals deadline and the closing deadline to the same date. See, e.g., Trial Exhibit 65.

21.    As reflected by the consolidation of the dates for the permit contingency and the closing deadline, in November 2003, Fafard waived its permit contingency and told Halcomb that it would not hold up closing to obtain its permits.  Hannert direct/Trial Trans. Day 2, at 12: 2 – 10; Terrill direct/Trial Trans. Day 3, at 111:19 – 112:1; Trial Exhibit 111.  Thus, from this point forward, Fafard "had forgone th[e] possibility" that Fafard would back out of the transaction if did not receive its permits.  Hannert direct/ Trial Trans. Day 2, 13:16 – 21.

22.    Beginning in November 2003, Fafard pushed to close the transaction. Fafard repeatedly asked Metro-Boston about the status of any title issues and for the Land Court survey, which was necessary in order for Metro-Boston to transfer title to Fafard. See Trial Exhibits 64, 70, 72, 81, 111, Hannert direct/ Trial Trans. Day 2, at 15:14 – 20, 18:10 – 17, 19:1 – 9.  As Fafard waited for the new Land Court survey, Fafard sent numerous fax requests for extensions to Metro-Boston indicating it was "ready to close" on the property.  See Trial Exhibits  87, 88, 90, 93, 94, 95, 97; Hannert direct/ Trial Trans. Day 2, at 18:10 – 17.

23.    Despite repeated requests by Fafard between December 2003 and April 2004, by May 2004, Metro-Boston did not provide Fafard with the new survey for the land transfer and ultimately became entirely unresponsive.  In May 2004, Fafard sent Metro-Boston three separate faxes indicating it was "ready to close" on the property.  See Trial Exhibits 94, 95, 97.  Fafard also repeatedly called Metro-Boston.  Metro-Boston, however, never returned any of the phone calls from Fafard.  Hannert direct/Trial Trans. Day 2, at 23:5 – 9; Halcomb direct/Trial Trans. Day 3, at 23:24 – 24:2.

24.     On May 21, 2004, the parties' last extension of the P&S Agreement was set to expire.  Thus, when no response from Metro-Boston was forthcoming on May 21, 2004, Richard Terrill directed Paul Beattie, Fafard's in house legal counsel, to go to the Registry of Deeds "to protect the agreement."  Beattie direct/ Trial Trans. Day 1, at 15:4–14; Terrill direct/Trial Trans. Day 3, at 112:15 – 113:3.  Beattie went to the Registry ready to close on the property.  Terrill direct/Trial Trans. Day 3, at 114:3 – 12.  Beattie brought a certified check in the amount of the purchase price, a list of title encumbrances that had to be addressed, and paper to prepare closing adjustments.  Beattie direct/ Trial Trans. Day 1, at 15:4–15-16:6; Trial Exhibit 105.

25.     At the Registry, Beattie paged Metro-Boston for an hour, and, when no party responded, Beattie completed the form available at the Registry entitled, "Certification of Failure of One Party to Appear After Paging for Title Passing/Closing." Beattie direct/ Trial Trans. Day 1, at 16:18-23; Trial Exhibit 107.

26.     Had Metro-Boston appeared at the Registry on May 21, 2004, Beattie would have reviewed their documentation, including the new Land Court plan, prepared closing adjustments and "done everything in [his] power to do -- to perform a normal closing, a normal acquisition."  Beattie direct/Trial Trans. Day 1, at 60:16 – 21.  Beattie had full authority to tender Fafard's check and close that day had Metro-Boston appeared. Beattie direct/Trial Trans. Day 1, at 60:22 – 24.

27.     At this time, Fafard "wanted to purchase the land.  There is no question about that."  Terrill direct/Trial Trans. Day 3, at 112:23 – 113:2.

28.     At 6:00 p.m., EST, on May 21, 2004, after the close of business hours on the east coast, Halcomb faxed to Fafard a letter informing Fafard that Metro-Boston

8

would not grant any additional extensions and declaring the P&S Agreement terminated. See Trial Exhibit 98. Halcomb knew it was too late in the day for Fafard to be at the Registry to close the transaction. Halcomb direct/Trial Trans. Day 3, at 24:6 – 21.

29.     The following business day, on Monday, May 24, 2004, Halcomb both received and accepted an Offer to Purchase from Carruth Capital Lots 9, 10, 11, and 12 for $2.8 Million. See Trial Exhibit 99.

**B. Metro-Boston's defense that the parties never had a meeting of the minds as to the location of the northeast boundary line of the property to be conveyed is unsupported by the evidence.**

30.     At the time the parties signed the P&S Agreement, the parties had no misunderstanding about what land would be conveyed to Fafard. Halcomb direct/Trial Trans. Day 3, at 8:23 – 25.

31.     During ongoing discussions regarding the potential sale of Metro-Boston's real estate to Fafard, Halcomb sent Janice Hannert, a Land Planner with Fafard, a copy of a 1979 contour plan of land, prepared by McCarthy and Sullivan Engineering ("the 1979 McCarthy plan."). See Trial Exhibit 3; Hannert direct/Trial Trans. Day 1, at 67:3–16.

32.     The 1979 McCarthy plan is drawn to scale, and shows Lots 12 and 6B, and Lot 11, and as well as other lots of land in Ashland, Massachusetts. See Trial Exhibit 3. Through the lower-right hand portion of Lot 11 is sawtooth line which divides Lot 11 between "Residential A" in the lower half and "Industrial" zoning in the upper or northern portion. Id.

33.     Halcomb represented to Hannert that the portion of Lot 11 below the sawtooth line consists of approximately ten acres of land and was zoned Residential. Halcomb cross/Trial Trans. Day 3, at 38:12 – 17.

34.     The 1979 McCarthy plan also shows locations for five radio towers. Bremser direct/Trial Trans Day 4, at 15:16 – 16:1.  The 1979 McCarthy plan is "not an 'as-built' plan" with respect to the towers, and their guy wires and anchors, but shows the proposed locations of the towers, guy wires and anchors.  Id.  The five radio towers, as proposed and shown on the McCarthy plan, appear in the "Industrial" zoned portion of Lot 11 shown on the 1979 McCarthy Plan.  See Ex. 3.

35.     On April 15, 1998, Halcomb sent a letter to Fafard enclosing information concerning the land that Metro-Boston proposed to convey to Fafard.  The letter described the land as the following,

1.  9.6 acres noted in Lot 12 and 6B; [and]

2.  approx. 10 acres in Lot 11, zoned residential[.]

See Trial Exhibit 108.

36.     As the parties negotiated a purchase, on December 5, 2000, Fafard faxed Metro-Boston a revised Offer to Purchase.  See Trial Exhibit 5.  The December 5 faxed Offer to Purchase contained four pages:  a cover sheet, a one-page Offer to Purchase, a Rider to the Offer to Purchase, and a small sketch of the land to be sold.  See Trial Exhibits 5, 106; Hannert direct/Trial Trans. Day 1, at 70:12–71:14.  Hannert prepared the sketch by taking a reduced sized copy of the 1979 McCarthy plan and outlining in highlighter the area Fafard intended to make part of the offer.  Hannert testified as follows:

Q:     Now, who prepared the original of the plan, that front page of this December 5th offer?

A:     I would have prepared it.

Q:     And what did you do to prepare that plan?

A:    Basically, to take the McCarthy plan and to outline the area we were intending to purchase.

Q:    How did you determine what the northeast boundary, that sawtooth line, was?

A:    As previously discussed in the previous letters, it was necessary to subdivide the larger Lot 11 into the portion that we were buying, approximately 10 acres, and I took the area shown on the McCarthy plan and included it herein.

Q:    The tracing that you did in orange highlighter on that page, what were you tracing?

A:    I was outlining Lot 6B, Lot 11, and a portion of Lot 11 which at that time we believed to be residential.

Q:    How did you determine where to put the line across Lot 11?

A:    By following the McCarthy plan.

Q:    Following what in the McCarthy plan?

A:    The zoning line as shown on the McCarthy plan.

Q:    What happened next with respect to this December offer that you sent to Tower Sites?

A:    It was accepted and sent back to us.

Hannert direct/ Trial Trans. Day 1, at 71:15 – 72:13; See also Trial Exhibit 106.

37.    After Metro-Boston signed and faxed back the December 5 offer, Paul Beattie prepared the Purchase and Sale Agreement.  Beattie direct/Trial Trans. Day 5:21 – 25.

38.    Exhibit A to the P&S Agreement is a copy of a Land Court Subdivision Plan of Land in Ashland, Plan 16849.  It shows, among other things, Lots 12, 6B and all of Lot 11.  Exhibit A also shows a hand-drawn, sawtooth-shaped (or zigzag) line through lower, right-hand (i.e. southwest) portion of Lot 11, drawn by Beattie.  Below the

11

sawtooth line and throughout Lots 12 and 6B are handdrawn cross-hatch lines, also drawn by Beattie.  See Trial Exhibit 7; Beattie direct/ Trial Trans. Day 1, at 6:1 – 5.

39.    In drawing the sawtooth and cross-hatched lines through Lot 11 as Exhibit A, Beattie relied on the December 5, 2000 Offer to Purchase, which contained the highlighted sketch of land prepared by Hannert using a small scaled version of the 1979 McCarthy plan.  Beattie direct/ Trial Trans. Day 1, at 6:6 – 21; Trial Exhibit 106.  The Subdivision Plan of Land 16849 was "an excellent starting point to start from, [because] it was a plan that the engineers would utilize to prepare the new subdivision plan, which would be used for a conveyance of land from Metro-Boston to Fafard Real Estate & Development Corp."  Beattie direct/ Trial Trans. Day 1, at 6:22 – 7:11.

40.    Halcomb, and hence, Metro-Boston, understood that Metro-Boston was to convey to Fafard Lot 12, Lot 6B, and the portion of Lot 11 demarcated "residential" and denoted below the zigzag, Industrial/ Residential A zoning line shown on the 1979 McCarthy plan.  Halcomb direct/trial Trans. Day 3, at 9:3 – 6; Halcomb cross/Trial Trans., Day 3, at 37:25 – 38:17.

**C. Metro-Boston's defense that the parties operated under a mistake of fact as to the zoning in Lot 11 is estopped by evidence that the parties, after learning of the new zoning line, reaffirmed their intent to proceed and ratified the original contract.**

41.    In the fall of 2003, Halcomb was informed by Dan Bremser, a professional land surveyor with Hancock Associates (retained by Metro-Boston), that the zigzag residential/industrial zoning line through Lot 11 as shown on the 1979 McCarthy plan differed from the zoning line shown on the Town of Ashland zoning maps.  Specifically, Bremser informed Halcomb that all of Lot 11 was zoned industrial.  Halcomb direct/Trial Trans. Day 3, at 100:20 – 101:20.

42.     The Ashland Zoning Map in effect in the fall of 2003 had been adopted by a vote of the Ashland Town Meeting in May 2001, replacing the prior zoning map, which had been prepared in 1979.  See Trial Exhibit 123.  Bremser, however, never compared the 1979 McCarthy plan to the Ashland zoning map in effect in January of 2001, when the P&S Agreement was signed.  Bremser cross/Trial Trans. Day 4, at 32:18 – 22.

43.     Halcomb relayed the zoning information she received from Bremser to Hannert.  Halcomb direct/Trial Trans. Day 3 at 100:24 – 101:12.  Halcomb was concerned that Fafard would back out of the deal after learning that all of Lot 11 was zoned industrial.  But Fafard never said anything to that effect to Halcomb, and Hannert told Halcomb that Fafard could "probably do something industrial" with the land as an alternative.  Halcomb direct/Trial Trans. Day 3, at 20:16 – 22:6. 73.

44.     Fafard always wanted to purchase the land.  Terrill direct/Trial Trans. Day 3, at 112:23 – 24.

45.     In November 2003, the parties added a new provision to their extensions to the P&S Agreement, making Fafard's deposit non-refundable should the transaction fail to close "due to no fault of the Seller."  See Trial Exhibit 65.  This provision was added after the parties learned that the Residential/Industrial zoning line shown through Lot 11 on the 1979 McCarthy plan may not have been correct, or had changed since the P&S Agreement was signed.  Halcomb direct/Trial Trans. Day 3, at 17:21 – 25.

**D.  Metro-Boston's defense that Halcomb was unsophisticated and unrepresented by counsel during the P&S Agreement negotiations and that Halcomb did not know it was Metro-Boston's obligation to prepare a new subdivision plan for Land Court approval to subdivide Lot 11 in order to convey a portion of Lot 11 to Fafard is unsupported by the evidence.**

46.    In addition to serving as the President of Metro-Boston and having a partnership interest in Tower Sites, Halcomb also holds numerous other business interests, including Heller Securities, a former NASD broker/dealer that is now an investment or holding company used by Halcomb to hold title to her other business interests.  Halcomb direct/ Trial Trans. Day 3, at 4:18 – 5:2.  In addition, Halcomb also owns and runs Foxmoor Corporation, which, among other things, operates a jewelry business and holds limited partnership interests for Halcomb's benefit.  Halcomb direct/ Trial Trans. Day 3, at 5:3 – 10.  Halcomb personally manages the operations of Metro-Boston, Tower Sites, Heller Securities and Foxmoor.  Halcomb direct/ Trial Trans. Day 3, at 5:11 – 17.

47.    In conducting these various businesses, Halcomb on occasion has employed attorneys and on occasion has consulted an attorney before signing a contract. Halcomb direct/Trial Trans. Day 3, at 5:18 – 6:1.  With respect to the P&S Agreement, Halcomb did not consult an attorney because "it seemed like a straightforward contract." Halcomb direct/Trial Trans. Day 3, at 6:6 – 14.

48.    Indeed, Halcomb understood Fafard's October 2000 Offer to Purchase and summarized its contents for her shareholders.  In a memorandum, Halcomb wrote,

> Great News!  Attached you will find an offer to purchase from the Fafard Real Estate and Development Corp. in Ashland, Ma. [sic]  You will remember that this is the company with whom I have worked for several years to sell them on our land.  The reason why movement on this property has been so slow is due to the fact that there is no sewer or water connection permits, or any of the various State, Federal or local permits which are needed to build a housing subdivision…
>
> Rider: Closing is delayed for a year to allow the Buyer to attempt to obtain all of the necessary permits and allowances needed for development of the site.  In the event, [sic] Buyer does not obtain all that he seeks, he can declare the contract void.  He does lose his engineering studies and permit

work which is extremely costly.  Fafard has advised me that this type of
Offer to Buy is standard in their office and after the full and very costly
engineering work has been completed on a site and is presented, they have
not been turned down.  I believe this is a good calculated risk we must
take.  Fafard has always been the most likely Buyer due to their strong
presence and success in this area.

See Trial Exhibit 4.

49.    Moreover, Halcomb understood and informed Hannert in a letter that the
land sale would involve "9.6 acres noted in Lot 11 and 6B [and] approx. 10 acres in Lot
11, zoned residential."  Halcomb further wrote to Hannert that Lot 11 would need "to be
subdivided along the zoning boundary in Lot 11…," thus acknowledging her
understanding that the land would need to be subdivided in order to make possible the
transfer of a portion of Lot 11 to Fafard.  See Trial Exhibit 108.

50.    Paul Beattie, Fafard's in-house legal counsel, prepared the P&S
Agreement using the Greater Boston Real Estate Board Standard Form of Purchase and
Sale Agreement.  Beattie direct/ Trial Trans. Day 1, at 5:24-25; 6:4-5; 7:19-22.   Beattie
added to the existing boilerplate language a second sentence in Section 5 of P&S
Agreement in order to alert Metro-Boston to its obligation to prepare a new Land Court
plan of Plan 16849, necessary because this conveyance involved the sale of a portion of a
Lot of registered land.  Beattie direct/ Trial Trans. Day 1, at 7:12-25.   Section 5 of the
P&S Agreement provides, "PLANS:  If said deed refers to a plan necessary to be
recorded therewith the SELLER shall deliver such plan with the deed in form adequate
for recording.  New Subdivision of Plan 16849 provided by Seller."  See Trial Exhibit 7.
The first sentence is boilerplate in the Greater Boston Real Estate Board Standard Form.
By adding the second sentence, Beattie intended:

It is a direction.  It is a help, really, an aid to the seller to remind them, one, this was their obligation; but two, the preparation of a Land Court subdivision plan is a long-term assignment.  It is something that takes a while to prepare, and it is basically alerting the seller that they have an obligation that is going to take some time to prepare.

Beattie direct/Trial Trans. Day 1, at 8:7 – 18.

51.     In November 2003, Halcomb and Beattie had a conversation about the new Land Court plan.  Beattie direct/ Trial Trans. Day 1, at 9:20 – 10:25.  In a phone call to Beattie, Halcomb expressed concern that the new Land Court survey, when prepared, may not show exactly 19.6 acres because Halcomb needed to provide for "guy wires and tower services."  Id.  Beattie told Halcomb, "If indeed there are issues that we have to address that gives us a slight bit less than 19.6 acres, perhaps we can live with that.  On the other hand, if there is a major deviation from 19.6 acres, we will have to talk."  Beattie direct/ Trial Trans. Day 1, at 10:19 – 24.  Beattie and Halcomb also discussed Halcomb's preparation of the survey, and Beattie understood from this call that Halcomb would prepare the new survey for the Land Court necessary to divide Lot 11, and that he and Halcomb would likely have discussions after it was prepared.  Beattie direct/ Trial Trans. Day 1, at 12:2 – 25; 13:3 – 10.

52.     After the phone call with Halcomb, Beattie faxed Halcomb a confirmatory note which stated, "Purchaser is in receipt of the Extension of our Purchase and Sale Agreement for the Ashland land to December 3, 2003 with the additional hand-written language.  To confirm, the required Land Court Subdivision Plan to be provided by Seller will indicate the acreage to be deeded to Buyer (19.6 Acres +/-) and acknowledge the Zoning boundaries."  See Trial Exhibit 104; Beattie direct/Trial Trans. Day 1, at 11: 2 – 9.  On an extension executed November 20, 2003, Halcomb handwrote, "Parties

acknowledge that a survey or land defined plan needs to be constructed acknowledging the zoning boundaries."  See Trial Exhibit 67.

53.     Halcomb also acknowledged in a phone call in early November 2003 with Rick Terrill and Janice Hannert that the Land Court Survey was "an outstanding item" and that she "would respond" to it.  Hannert direct/Trial Trans. Day 2, 9:25 – 11:19

54.     Finally, Halcomb discussed the preparation of a new survey and Land Court plan with Metro-Boston shareholders during a shareholder meeting on March 19, 2004.  See Trial Exhibit 96.  The meeting's Agenda provides, in relevant part,

> Hancock and Associates have been hired and have developed a cursory initial draft to utilize with both potential buyers first.  Since the land is Land Court property, it will be necessary to have a complete survey with accurate boundaries submitted to the Town before transfer of title in fee can be made. … After the Primary Buyer and the tenants are satisfied with the easement proposal, determine the price for the Easement for the residential land, complete the survey and land court approval and execute a new contract for the sale of this land.

See Trial Exhibit 96.

**E.  No evidence supports Metro-Boston's defense that Fafard intended to "warehouse" the property and keep it off the market and that Fafard was unwilling to close unless Metro-Boston would also convey Sewell Street access.  To the contrary, the evidence demonstrates that Metro-Boston intentionally ignored requests from Fafard to prepare for a closing in an effort to let Fafard's contract expire and free up Metro-Boston to enter into a more lucrative contract.**

55.     Between January 2002 and August 2003, Metro-Boston and Fafard executed only five extensions of the P&S Agreement.  See Trial Exhibits 17, 23, 30, 33, 40.  During that time, Fafard had made an offer for additional acreage and access, and was waiting to hear from Metro-Boston as to whether it would accept Fafard's offer.  See Trial Exhibit 10; Hannert direct/ Trial Trans. Day 1, at 79:20 – 80:3, 83:5 – 16.  During 2002 and early 2003, Halcomb was tied up with her other business interests, often

traveling overseas to China, and did not visit Boston until late 2002.  See Trial Exhibits 11, 12, 19, 22, 24, 25, 27, 28; Halcomb direct/Trial Trans. Day 3, at 11:21 – 12:15. Halcomb continued to represent to Fafard that she was working on a "master plan" with her other buyer for the industrial site -- whose identity kept changing.  Hannert direct/ Trial Trans. Day 1, at 77:17 – 78:5; Halcomb direct/Trial Trans. Day 3, at 10:6 – 8, 18:11- 17; Trial Exhibits 24, 27, 28.  Thus, Fafard continued to wait for a response from Halcomb.  Hannert direct/ Trial Trans. Day 1, at 79:20 – 80:3.

56.    Halcomb testified that Fafard told her it had applied for and been turned down for permits.  Halcomb cross/Trial Trans. Day 3, at 48:3 – 6.  But at no time did Fafard tell Halcomb that Fafard had been "turned down" respecting their development of the property.  Hannert direct/Trial Trans. Day 2, at 24:17 – 21.  Contrary to Halcomb's trial testimony, Halcomb stated in her interrogatory responses, "In another telephone conversation between Ms. Hannert and Mary Heller Halcomb, Ms. Hannert told Ms. Halcomb that Fafard's approvals for its proposed project either had been turned down because Fafard did not have access to Sewell Road or that Fafard would be turned down unless Fafard could get primary ingress to and egress from the site through Sewell Road." Trial Trans. Day 4, at 2:4 – 22 (emphasis added).

57.    Moreover, after Fafard agreed to waive its permit contingency and place its deposit at risk in November 2003, Fafard began pressing for a closing.  See Trial Exhibits 64, 70, 72, 81, 111, Hannert direct/ Trial Trans. Day 2, at 15:14 – 20, 18:10 – 17, 19:1 – 9.  Fafard requested from Metro-Boston the status of title issues and Halcomb told Fafard that she had an attorney working on the title issues.  Hannert direct/ Trial Trans. Day 2, at 18:18 – 21.  Fafard also requested the new Land Court plan, and in

January 2004 Halcomb responded that her engineer (Hancock Associates) was working on a sketch which would be available in a few days.  Hannert direct/ Trial Trans. Day 2, at 15:14 – 20, 18:10 – 17; Trial Exhibit 111.  Thus, the parties executed an extension of the P&S Agreement.  <u>See</u> Trial Exhibit 111.

58.    Halcomb received the sketch from Hancock Associates in January 2004, but did not provide a copy of the sketch to Fafard, or provide Fafard any other plan of the land.  Halcomb direct/ Trial Trans. Day 3 at 12:15 – 23; Hannert direct/ Trial Trans. Day 2, at 18:22 – 25.  At this point, Hancock Associates had developed a "proposed scheme of land transfer" and Halcomb and Hancock Associates were discussing "how to best sell this concept" to Fafard.  <u>See</u> Trial Exhibit 77.

59.    On December 8, 2003, Hannert sent a fax to Halcomb requesting an extension, and on the fax cover sheet wrote, "I tried to call you today about the status of Sewell Street.  We are ready to close as soon as the survey and title issues are done."  <u>See</u> Trial Exhibit 72.  Thereafter, Fafard sent numerous fax requests to Metro-Boston in which Fafard indicated that it was "ready to close" on the property.  <u>See</u> Trial Exhibits 87, 88, 90, 93, 94, 95, 97.  During this time, Fafard remained interested in obtaining Sewell Street access and would wait for a response from Halcomb on its offer (Halcomb had never rejected the offer), but because Fafard waived its permit condition, Fafard was not holding up a closing on receipt of permits.  Terrill direct/Trial Trans., Day 3, at 111:19 – 112:3; Hannert direct/Trial Trans. Day 2, at 17:12 – 23.

60.    In May 2004, Fafard sent three separate fax requests to Halcomb to execute another extension.  <u>See</u> Trial Exhibits 94, 95, 97.  Hannert also placed numerous phone calls to Halcomb throughout May 2004.  Halcomb ignored Fafard's fax requests.

Halcomb also never responded to Hannert's phone calls.  Hannert direct/Trial Trans. Day 2, at 23:5 – 9; Halcomb direct/Trial Trans. Day 3, at 23:24 – 24:2.

61.    When, on May 21, 2004, as the parties' last extension of the P&S Agreement was set to expire, Halcomb still had not responded to Fafard's phone calls and faxes, Rick Terrill directed Paul Beattie to go the Registry of Deeds with good funds and ready to close on the property, "to protect the agreement."  Beattie direct/ Trial Trans. Day 1, at 15:4–14; Terrill direct/Trial Trans. Day 3, at 112:15 – 113:3, 114:3 – 12.

62.    Discovery in this case revealed that the real reason Metro-Boston did not return any phone calls to Fafard was because Metro-Boston was preparing to enter into an agreement with Chris Egan and his company, Carruth Capital, LLC, to sell its land to that entity.  Indeed, Fafard's final extension expired on Friday, May 21, 2004, and only at that point did Halcomb consider herself free to accept an offer from Egan's company. Halcomb direct/Trial Trans. Day 3, at 29:1 – 7; Trial Exhibit 93.

63.    The very next business day, on Monday, May 24, 2004, Carruth Capital made an offer to purchase Lots 9, 10, 11 and 12 for $2.8 Million.  See Trial Exhibit 99. Halcomb, on behalf of Tower Sites, accepted Egan's offer that same day.  Id.

64.    Unbeknownst to Fafard, throughout May 2004 (prior to the expiration of Fafard's extension and when Halcomb was ignoring Fafard's phone calls and faxes) Halcomb already was negotiating with Chris Egan regarding sale of Tower Sites' industrial and residential land in Ashland, Massachusetts.  Egan was Tower Sites' most recent buyer in a long series of potential buyers.  Halcomb direct/Trial Trans. Day 3, at 18:15 – 17.

65.     In mid-May 2004, Egan and Halcomb discussed a purchase price for Tower Sites' residential and industrial land. Halcomb also told Egan that Fafard's last extension would expire May 21, 2004. Halcomb direct/Trial Trans. Day 3, at 28:3 – 8. As Halcomb testified:

Q:     Well, had you discussed the purchase price terms with anyone, either Mr. Egan or anyone representing Carruth Capital, prior to May 24th of 2004?

A:     Yes, the week before.

Q:     Had you indicated to -- who were you dealing with at Carruth Capital?

A:     Chris Egan and an associate of his. I can't remember his name.

Q:     Had you indicated to Mr. Egan that an offer of $2.8 million, of which $140,000 was to be paid at the execution of a purchase and sale agreement, was an offer that Tower Sites Limited was prepared to accept?

A:     Well, initially I told him no, we were -- everybody knew we were under contract with Fafard, and that this is what the problem was. And, of course, they were party to the drawings and the whole situation, and I said, "It is contingent upon access to Sewall. They have to have it. They cannot do it without it. They've told me over and over and over. And if you're not going to grant that, then our investors obviously aren't going to go that way, either, because it's going to hamper us ever selling that Tower Site. That was never part of the deal. We don't have to do that.

Q:     And when was it that you had that discussion or those discussions with Mr. Egan?

A:     Probably the week before, the last few days before.

Q:     Last few days before what?

A:     Before this May 21st.

Q:     You mean May 24th?

A:     I mean 24th.

Q:     Did you tell Mr. Egan prior to May 24th that a portion of Lot 11 was under agreement with Fafard?

A:    Oh, yes, of course.

Q:    Did you tell Mr. Egan when the last extended deadline for closing was to expire?

A:    Yes.

Q:    When did you tell him that?

A:    I told him it was May 21st.

Q:    When did you tell him it was May 21st?

A:    Oh, the last few days before that.  You know, around that same time.

Halcomb direct/Trial Trans. Day 3, at 26:8 – 28: 5.

66.    Thus, Egan was informed of Fafard's contract and its deadline, and in fact, would have agreed to purchase Tower Sites' land, less the land under agreement to Fafard, for $1.8 Million.  Halcomb direct/Trial Trans. Day 3, at 18:18 – 23.

67.    Halcomb did not, prior to the expiration of the extension, notify Fafard that Metro-Boston would not agree to any further extensions.  Instead, Halcomb consulted an attorney in May 2004:

Q:    Why did you wait until the day the extension expired to notify Mr. Terrill that no further extensions would be forthcoming?

A:    I mean, that's -- I usually got their requests for extensions the day before they were going to request another extension.  You know, we were batting it back and forth, what could we do, but clearly the board said, you know, "There's no way we're going to run off our potential big buyers for the Tower Site if you have to give them access through Sewall, which means all this huge traffic, and this was never part of the deal.  We don't have to do this."  I consulted an attorney, and they said you don't have -- I'm not going to say anything.  Anyway, it was not part of the deal.

Halcomb direct/Trial Trans. Day 3 at 22:23 – 23:12.

68.    On July 28, 2004, Egan and Halcomb executed a P&S Agreement.  See Trial Exhibit 101.

22

**F. Metro-Boston's defense that Fafard did not tender performance and never notified Metro-Boston that it would be at the Registry of Deeds on May 21 is not viable because the evidence demonstrates that tender by Fafard would have been a useless act because Metro-Boston had not yet prepared a new survey to obtain Land Court approval of Lot 11 subdivision.**

69.     In order to transfer title to a portion of a lot of registered land, such as a portion of Lot 11, the Land Court requires that a new plan be prepared and submitted to the Land Court engineering department for approval.  Beattie direct/ Trial Trans. Day 1, at 8:19–9:7.  This new plan must show the encumbrances, and "requires various mathematical calculations on angles, acreage, on meets [sic] and bounds, all of which are taken into consideration by the engineering department of the Land Court of the Commonwealth in order to approve or disapprove a new Land Court subdivision plan."  Beattie direct/ Trial Trans. Day 1, at 8:19 – 9:7.  It is not possible to convey less than an entire lot of registered land without going through the Land Court approval process for a new subdivision.  Beattie direct/ Trial Trans. Day 1, at 9:17 – 19.

70.     Metro-Boston knew that it was required to prepare new survey for the Land Court in order subdivide the portion of Lot 11 that would be conveyed to Fafard.  See Trial Exhibits 96, 108.  And indeed, Halcomb had discussed Metro-Boston's preparation of a new Land Court survey with Paul Beattie in November 2003.  Beattie understood from their conversation that he would see the new survey before it was submitted for Land Court approval so he and Halcomb could discuss whether there was a "major" or "minor deviation" from the 19.6 acres as set forth in the P&S Agreement.  Beattie direct/ Trial Trans. Day 1, at 9:20 – 10:24, 12:2 – 25, 13:3 – 10.

71.     Moreover, on January 5, 2004, Hannert spoke with Halcomb on the telephone.  Hannert inquired about the survey for the new Land Court plan, and Halcomb

responded to Hannert she expected to get something from her engineer that week.  At this point, the plan "was the largest outstanding issue" to be resolved for a closing.  Hannert direct/ Trial Trans. Day 2, at 18:10 – 17; Trial Exhibit 111.  In a fax on December 8, 2003, Hannert wrote to Halcomb, "I tried to call you today about the status of Sewell Street.  We are ready to close as soon as the survey and title issues are done."  See Trial Exhibit 73.

72.    Throughout the early part of 2004, Fafard continued waited to hear from Halcomb regarding her sketch from her engineer and the Land Court survey and title issues "so that [Fafard] could close on the property."  Hannert direct/Trial Trans. 19:1 – 9.  On January 14, 2004, Hannert sent Halcomb another extension, and in the fax cover sheet again wrote, "I tried to call you today about the status of Sewell Street.  Is there any progress on the survey and title issues?"  See Trial Exhibit 81.

73.    Thus, both Paul Beattie and Hannert expected to see the new survey before it was submitted for Land Court approval.  Although Halcomb received a draft sketch (not the new survey plan) from Hancock Associates in January 2004, she never sent it to Fafard – despite Hannert's repeated requests.  Hannert direct/Trial Trans. Day 2, at 18:22 – 25, 19:1 – 9.

74.    Beattie did not inform Metro-Boston that he would be at the Registry because he believed Metro-Boston was not ready to close on May 21, as Beattie had not yet seen the Land Court survey that he had discussed with Halcomb in November 2003.  Beattie direct/Trial Trans. Day 1, at 16:18 – 17:4, 17:24–18:3.

75.    Indeed, the reason Fafard had not closed by May 21, 2004, was because Fafard did not have a survey plan or any title information from Metro-Boston.  Terrill direct/Trial Trans. Day 3, at 113:4 – 8.

### G.  No evidence supports Metro-Boston's contention Fafard would have refused to go forward with the transaction absent Sewell Street.

76.    Fafard waived its permit condition in November 2003.  See Trial Exhibits 65, 111.  Thus, from that point forward Fafard "put [its] deposit money at risk and agreed that we were not waiting on permits, [and] Sewell Street … was not something that [Fafard] was conditioning the closing on in terms of the residential portion of the property."  Hannert direct/Trial Trans. Day 2, at 19:22 – 20:9.  Fafard discussed with Halcomb that it was ready to close without permits but was still interested in Sewell Street.  Hannert direct/ Trial Trans. Day 2, at 20:10 – 14.  Moreover, despite Halcomb's testimony, Hannert never told Halcomb that Fafard needed "primary access" through Sewell Street.  Hannert direct/Trial Trans. Day 2, at 24:8 – 16.

77.    Indeed, Fafard was always interested in purchasing Metro-Boston's property.  According to Richard Terrill, " [Fafard] knew that there was value in [the property].  [Fafard] had it under agreement for $339,000.  So from [Fafard's] standpoint it was kind of a no-brainer.  [Fafard was] going to buy it one way or another."  Terrill direct/Trial Trans. Day 3, at 110:1 – 15.  See also Trial Exhibit 111.  Indeed, Fafard had spent a "significant" amount of money on the transaction, including the title search, flagging wetlands, and preparing the Chapter 21E report, plus the nonrefundable $39,000 deposit.  Hannert direct/ Trial Trans. Day 2, at 13:22 – 14:5.  Fafard "would not have put that much money on a piece of property that [it] did not intend to finalize and close on."  Id.

78.    While Fafard agreed to place the deposit money in escrow with Metro-Boston's attorney, this did not occur because Metro-Boston's attorney never contacted Fafard.  Hannert direct/Trial Trans. Day 2, at 12:14 – 13:1; Hannert redirect/Trial Trans. Day 2, at 119:6 – 13:1.  Moreover, while Fafard agreed to pay the real estate taxes, Metro-Boston never calculated the amount payable or billed Fafard for same.  Hannert redirect/Trial Trans. Day 2, at 119:14 – 120:1.

**H.    Metro-Boston's defense to specific performance on the grounds that Fafard never identified any guy wires on the property fails because the evidence shows that no new, accurate survey plan was ever presented to Fafard from which Fafard could locate such guy wires.**

79.    During negotiations regarding the potential sale of Metro-Boston's land to Fafard, Halcomb sent Fafard the 1979 McCarthy plan, which was later relied upon by the parties to draft the P&S Agreement.  Hannert direct/Trial Trans. Day 1, at 67:3 –16.  The McCarthy plan, however, is "not an 'as-built' plan" with respect to the towers, and their guy wires and anchors, but shows the proposed locations of the towers, guy wires and anchors.  Bremser direct/Trial Trans Day 5, at 15:17 – 16:1.

80.    During the contract negotiations, Halcomb told Fafard about the potential that at least one tower guy wire was located on the land Fafard was to purchase.  In a letter dated April 1998, Halcomb wrote that Metro-Boston would "need to retain an easement for, I believe, one guy wire which is located on a residential section of Lot 11." See Trial Exhibit 108.  Thus, prior to entering into the P&S Agreement, the parties "realized … that there was at least one guy wire on th[e] property [Fafard was to purchase] and maybe more."  Halcomb cross/Trial Trans. Day 3, at 40:20 – 23.

81.    Reflecting this understanding, the Rider to the P&S Agreement provided in relevant part, "Buyer will locate existing guy wire on plan and determine whether

easement or relocation is necessary." <u>See</u> Trial Exhibit 7.  Halcomb had proposed

language shifting the cost of relocation to Fafard, but Fafard rejected that language and it

was not included in the final P&S Agreement.  <u>See</u> Trial Exhibits 6, 7.

82.    Metro-Boston, however, never provided Fafard with a sketch of the land,

new Land Court survey, or plan which accurately depicted the guy wires.  Hannert

direct/Trial Trans. Day 2, at 18:22 – 24.  Thus, Fafard could not "locate existing guy wire

on plan and determine whether easement or relocation is necessary" as set forth in the

P&S Agreement Rider because Fafard did not have the plan from Metro-Boston on which

it would locate such guy wire.  Beattie redirect/ Trial Trans. Day 1, at 61:25 – 62:9.

## PROPOSED CONCLUSIONS OF LAW

1.    "The object of the court is to construe contracts as a whole, in a reasonable

and practical way, consistent with its language, background and purpose."  <u>USM Corp. v.</u>

<u>Arthur D. Little Sys., Inc.</u>, 28 Mass. App. Ct. 108, 116 (1989).

2.    A contract that is unambiguous must be "enforced according to its terms."

<u>Coll v. PB Diagnostic Systems, Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995) (quoting

<u>Freelander v. G&K Realty Corp.</u>, 357 Mass. 512, 513 (1970)).

3.    Where contract language is unambiguous, the court must "construe the

words of the [contract] in their usual and ordinary sense."  <u>Gateway Group Advantage,</u>

<u>Inc. v. McCarthy</u>, 300 F. Supp. 2d 236, 241 (D. Mass. 2003) (quoting <u>Citation Ins. Co. v.</u>

<u>Gomez</u>, 426 Mass. 379, 381 (1998)).  <u>See also</u> <u>Am. Home Assurance Co. v. Fore River</u>

<u>Dock & Dredge, Inc.</u>, 321 F. Supp. 2d 209 (D. Mass. 2004) ("Absent ambiguity, the

terms of a [contract] are given their plain and ordinary meaning."); <u>Cody v. Connecticut</u>

<u>Gen. Life Ins. Co.</u>, 387 Mass. 142, 146 (1982) (where a contract is unambiguous, the

court "construe[s] the words of [a contract] in their usual and ordinary sense"); <u>Suffolk Constr. Co. v. Lanco Scaffolding Co.</u>, 47 Mass. App. Ct. 726, 729 (1999) ("In interpreting a contract, the court must construe all words that are plain and free from ambiguity according to their usual and ordinary sense.").   Indeed, the words of an unambiguous contract should be enforced, even where enforcement may seem unfair or inequitable.  <u>See</u> <u>Siegel v. Shaw</u>, 337 Mass. 170, 174 (1958) ("The written agreement controls.  We do not think we should change the rules of construction of written agreement, especially those affecting the transfer of real estate, to try to fit the equities of a particular case.").

4.     "[A]n ambiguity is not created merely because an imaginative reader devises a way to split hairs.  Nor is [a contract] ambiguous simply because its terminology sparks a controversy between two parties, each of whom advocates an interpretation contrary to the other." <u>Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.</u>, 338 F.3d 42, 47 (1st Cir. 2003).  A contract is ambiguous where its terms are "inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." <u>Suffolk Constr. Co. v. Lanco Scaffolding Co.</u>, 47 Mass. App. Ct. 726, 729 (1999), quoted in <u>Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.</u>, 338 F.3d 42, 47 (1st Cir. 2003).

5.     Where a contract is ambiguous, "the court cannot subvert its plain meaning." <u>Freelander v. G. & K. Realty Corp.</u>, 357 Mass. 512, 516 (1970).  The court "must determine the meaning from the intent of the parties upon consideration of the words in question, the entire instrument, and the surrounding circumstances." <u>City of Haverhill v. George Brox, Inc.</u>, 47 Mass. App. Ct. 717, 720 (1999).  Moreover, "justice,

common sense and the probable intention of the parties are guides to construction of a

written instrument." Id. (quoting Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701

(1964)).

6.     Moreover, the existence of ambiguity in a contract "does not enable a

party to contend that the minds never met." Bucciero v. Drinkwater, 13 Mass. App. Ct.

551, 554 (1982) (quoting Benjamin Foster Co. v. Commonwealth, 318 Mass. 190, 196

(1945)).

7.     Where there is ambiguity in a contract, or the meaning of a contract is not

plain, extraneous evidence is admissible "to explain significance of terms used or to show

relations and methods of parties in light of which their written words are to be

interpreted." Petricca Constr. Co. v. Commonwealth, 13 Mass. App. Ct. 981, 982 (1982)

(citing Levin v. Century Indemnity Co., 279 Mass. 256, 258 (1932). See also Am. Home

Assurance Co. v. Fore River Dock & Dredge, Inc., 321 F. Supp. 2d 209 (D. Mass. 2004)

("If a contractual term is ambiguous, then consideration of parol evidence is

appropriate."); Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496 (1997) (if

a contract term is ambiguous, evidence that explains or "elucidates the meaning of an

ambiguous contract term" is admissible for that purpose); USM Corp. v. Arthur D. Little

Sys., Inc., 28 Mass. App. Ct. 108, 116 (1989) (extrinsic evidence can be used in

construction of ambiguous contract and in "resolving uncertainties in applying the terms

of the written contract to the subject matter").

8.     Parol evidence is not admissible, however, to vary, contradict or broaden a

final agreement. See Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496

(1997). Nor may parol evidence be used to "create ambiguity where otherwise none

exists." Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) (quoting Rey v. Lafferty, 990 F.2d 1379, 1385 (1st Cir. 1993)). Moreover, "even when courts allow parol evidence, the words themselves remain the most important evidence of intention." Am. Home Assurance Co. v. Fore River Dock & Dredge, Inc., 321 F. Supp. 2d 209 (D. Mass. 2004).

9.      A contract should be interpreted "so as to make it a valid and enforceable undertaking rather than one of no force and effect." Finn v. McNeil, 23 Mass. App. Ct. 367, 372, 502 N.E.2d 557 (1987) (quoting Shayeb v. Holland, 321 Mass. 429, 432, 73 N.E. 2d 731 (1947)). See also Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 518 (1998) (same). "A construction rendering a contract valid and enforceable is preferred to one which makes it void or its performance impossible or meaningless." Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 411 Mass. 39, 52 (1991) (quoting Berger v. Siegel, 329 Mass. 74, 77-78 (1952)).

10.      "[E]ven if an aspect of an agreement is informal, obscure, difficult of satisfactory interpretation, and the subject of dispute by the parties as to its meaning, a court should so far as reasonably practicable give a construction which appears to have been the intention of the parties." Finn v. McNeil, 23 Mass. App. Ct. 367, 372, 502 N.E.2d 557 (1987) (quoting Bray v. Hickman, 263 Mass. 409, 412, 161 N.E. 612 (1928)). See also Starr v. Fordham, 420 Mass. 178, 192 (1995) (quoting Shane v. Winter Hill Fed. Sav. & Loan Ass'n, 397 Mass. 479, 483 (1986)) (court should construe a contract, "to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties").

11.    Thus, a court will "decline to adopt a construction of a contract that will render it illegal where a reasonable alternative is available." Lowney v. Genrad, Inc., 925 F. Supp. 40, 48 (D. Mass. 1995) (declining to adopt plaintiff's interpretation of retirement agreement because to do would violate ERISA).  Contracts "generally will not be interpreted so as to render them illegal." Dorn v. Astra USA, 975 F. Supp. 388, 392 (D. Mass. 1997) (citing Conservation Law Found. of New England v. Andrus, 623 F.2d 712, 715 (1st Cir. 1979)).

12.    In order to satisfy the statute of frauds, a contract for the sale of real property must "contain a description of the land sufficient for purposes of identification when read in the light of all the circumstances of ownership of the property by the vendor." Harrington v. Dodge, 200 Mass. 357, 359, 86 N.E.2d (1909).  Where there is any ambiguity in a memorandum, the Court can rely on parol evidence to explain, or translate, the memorandum.  See Blackston Realty LLC v. FDIC, 244 F.3d 193 (1st Cir. 2001) (Massachusetts law permits introduction of parol evidence regarding circumstances of the parties' dealings in order to resolve any ambiguities in a contract for the sale of land); Cohen v. Garelick, 344 Mass. 654, 657 (1962) (noting that statute of frauds does not bar reference to outside circumstances to resolve an ambiguity in contract for sale of land); Michelson v. Sherman, 310 Mass. 774, 776 (1942) (parol evidence can be used to translate words used in contract for sale of land).

13.    Moreover, evidence showing that the contracting parties considered "two or more papers [to be] so connected in [their] minds [that the parties] adopted all of them as indicating their purpose" can be used to overcome a statute of frauds defense.  See Tzitzon Realty Co. v. Mustonen, 352 Mass. 648, 652-63 (1967).  See also Clark, 240

Mass. at 217-18 (where there is at least "some evidence" that different papers "were connected in the minds of the parties so that they adopted all the papers as indicating their purpose," the Court can consider such papers as so connected that taken together they constitute a memorandum sufficient to satisfy the statute of frauds); Nickerson v. Weld, 204 Mass. 346, 356 (1910) (oral evidence can be used to show the connection between different papers, linked together in the minds of the parties, so that they may be considered together to determine sufficiency for statute of frauds purposes).

14.     The fact that some uncertainty exists in contracting does not necessarily make an agreement not binding on the parties, even with respect to the sale of land. Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 518 (1998). See also Town of Franklin v. Wyllie, 443 Mass. 187, 193-94 (2005) (finding offer to purchase real estate binding and enforceable, even where purchase price was an issue left open, subject to certain contingencies, that would be determined by specified formula).

15.     For example, in Moore v. Galante, the parties contracted for the sale of real estate, specifically a house lot that existed on a larger piece of registered land owned by the sellers. See 14 Mass. L. Rptr. 264, No. 12 (March 25, 2002) (Botsford, J.). The sellers were to retain the balance of the registered land and intended to create a residential subdivision on their remaining property. In "Exhibit A" to the purchase and sale agreement, the parties attached an unrecorded plan which depicted the land to be conveyed. In addition, because the sellers had not yet obtained approval of their subdivision plan, the parties included an "exchange option" in the purchase and sale agreement, which, if exercised by the sellers, would allow the parties to "swap" a portion of each other's land. The parties attached as "Exhibit B" to their agreement a plan

purporting to show the boundaries of the buyer's property, should the sellers exercise their exchange option. In relevant part, the language of the purchase and sale agreement provided,

> The BUYER acknowledges that the SELLER plans to subdivide other premises owned by the SELLER adjacent to the premises to be conveyed to the BUYER. If at any time prior to December 11, 2005, the SELLER shall obtain the necessary final approvals to subdivide their adjacent property, then the BUYER and SELLER agree that upon ten (10) days' written notice from the SELLER to the BUYER:
>
> (a) The BUYER shall convey to the SELLER, for consideration of $1.00, the area necessary to make the premises conform to the boundaries shown on Exhibit "B" attached hereto and entitled "Plan of Land 'B'"; and
>
> (b) The SELLER shall convey to the BUYER, for consideration of $1.00, the area necessary to make the premises conform to the boundaries shown on Exhibit 'B' attached hereto and entitled 'Plan of Land 'B'"
>
> The BUYER acknowledges that the location of the boundaries shown on Exhibits 'A' and 'B' may change during the approval process…

After the closing, the sellers obtained subdivision approval and exercised their exchange option, but attempted to force the buyers to exchange land different from that described in Exhibits A and B to the purchase and sale agreement, called "Revised Exhibit B". The buyers refused to comply with the "Revised Exhibit B" option, which would have decreased their acreage. In seeking to enforce the exchange option, the sellers argued that the option unambiguously provided that the parties agreed to exchange land at a future date, and that the land might not "exactly match" the exhibits in the agreement. On the other hand, the buyers argued the clause was ambiguous, and that if sellers exercised the exchange option, they were obligated to convey the boundaries in accordance with "Exhibit B."

The Court disagreed with the sellers and found the contract ambiguous because of an inconsistency:  on the one hand, the agreement was explicitly clear that if the exchange option is exercised, the parties will take all necessary steps to ensure that the buyer's lot conforms to the plan set out in "Exhibit B," however, on the other hand, the agreement also contained language regarding possible changes to the boundaries in Exhibits A and B.  Notwithstanding this inconsistency, the Court did not find that the purchase and sale agreement failed as a matter of law.  Rather, the Court agreed with the buyer's position, thereby adopting an interpretation of the contract which "ma[de] it a valid and enforceable undertaking rather than one of no force and effect."  Id., citing Finn v. McNeil, 23 Mass. App. Ct. 367, 375 (1987) and Lafayette Place Assoc. v. Boston Redevelopment Auth., 427 Mass. 509, 519 (1998).  If, on the other hand, the sellers' interpretation of the agreement prevailed, the agreement would fail under the statute of frauds.  In rejecting the seller's argument that the agreement unambiguously allowed the seller to change the boundaries, the Court explained that the contract language, "The BUYER acknowledges that the location of the boundaries as shown on Exhibits A and B may change during the approval process" cannot control or affect the exchange option "since it allows for post-execution boundary provisions that were inherently incapable of being identified at the time of execution."  Id.  Judge Botsford upheld the contract and granted summary judgment in favor of the buyers.

16.     A "mistake" is a belief that is not in accord with the facts.  See Restatement (Second) Contracts § 151.  The term "mistake" refers to an erroneous belief. Id. cmt. a.  "The belief need not be an articulated one, and a party may have a belief as to

a fact when he merely makes an assumption with respect to it, without being aware of alternatives." Id.

17.     A mistake by parties to a contract does not void a written contract.  Nor does a mistake make a contract automatically voidable.  A mistake by both parties at the time of contracting makes the contract voidable, but only where (1) the mistake goes to a basic assumption upon which the contract was made, and (2) the mistake has a material effect on the agreed exchange of performances.  If these criteria are met, then the contract is voidable, but only by the adversely affected party, unless he bears the risk of mistake. See Restatement (Second) Contracts § 152(1).  See also Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629 (1975).

18.     A party bears the risk of mistake when it is expressly allocated to him by the agreement or the party is aware at the time of contracting "that he has only limited knowledge with respect to the facts to which the mistake relates" but he treats his limited knowledge as sufficient.  See Restatement (Second) Contracts § 154.  The Court may also allocate risk to a party where "it is reasonable in the circumstances to do so." Id.  For example, in a case where a vendor contracts to sell farm land, the seller of such farm land "cannot avoid the contract upon the later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming and the effect on the agreed exchange is material."  See Restatement (Second) Contracts § 154 cmt. a.  "In such case a court will ordinarily allocate the risk to the seller so that he is under a duty perform regardless of the mistake." Id.

19.     Even if a contract is voidable because of a mutual mistake, where the parties reaffirm their intent to perform under the contract after learning of the mistake, the opportunity to void the contract is deemed waived.  "The power of a party to avoid a contract for mistake … is lost if after he knows or has reason to know of the mistake … he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance."  Restatement (Second) Contracts § 380(2).  Moreover, the "power of a party to avoid a contract for … mistake is lost if after he … knows or has reason to know of a …mistake he does not within a reasonable time manifest to the other party his intention to avoid it.  The power of the party to avoid a contract for … mistake is also lost if the contract has been so far performed or the circumstances have otherwise so changed that avoidance would be inequitable and if damages will be adequate compensation."  See Restatement (Second) Contract § 381(2).

20.     Moreover, execution of an amendment to a contract extending the time for performance, after discovery of a mistake, constitutes ratification or affirmance of the original contract, thereby waiving the opportunity for the complaining party to void the contract on such grounds.  See e.g., B&R Development, Inc. v. Rogers, 561 S.W.2d 639 (Tx. Ct. App. 1978) (buyer of real estate sued seller after learning of mistake or misrepresentation in amount of acreage to be sold; court held buyer not entitled to damages for mistake or misrepresentation because he affirmed and ratified the contract by renewing and extending notes for balance of purchase price after learning of mistake in acreage); Hogh v. Ferguson, 171 P. 804 (Cal. Dist. Ct. App. 1918) (parties exchanged properties, plaintiffs took back mortgage on property conveyed to defendants; plaintiff

sued to foreclose on mortgage and defendant alleged fraudulent misrepresentations regarding irrigation of land; court affirmed judgment in favor of plaintiff, in part, because defendant had sought extensions of time to make payments on mortgage after living on property for several months and being made aware of the fraud); Thweatt v. McLeod, 56 Ala. 375 (1876) (after learning of mistake in amount of acreage to be sold, buyer not entitled to rescind where parties modified the contract after learning of the mistake; court held that buyer "must have intended an affirmance of the original contract").

21.     The law generally requires that, when performance under a contract for the purchase and sale of real estate is concurrent, one party cannot put the other in default unless he is ready, able and willing to perform and has manifested this by some offer of performance.  However, the law does not require such party to tender performance if the other party has shown that he cannot or will not perform.  Lafayette Place Assoc. v. Boston Redev. Auth., 427 Mass. 509, 519, 694 N.E.2d 820, 827 (1998); Leigh v. Rule, 331 Mass. 664, 668, 121 N.E.2d 854, 857 (1954).  Thus, when the time for performance has arrived, but one party has demonstrated his inability to perform by failing to satisfy conditions set forth in the contract, the other party's obligation to tender performance is excused.  See, e.g., M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258-59 (1960) (buyer relieved of obligation to tender performance where seller indicated through his words and conduct that he was unable to perform on agreed-upon date and extended date; seller's conduct "reasonably led" buyer to believe that seller "was not yet ready to negotiate or perform"; buyer not obligated to tender because "it had been made clear that any tender by [buyer] would have been useless"); LeBlanc v. Molloy, 335 Mass. 636, 367-68 (1957) (buyer not obligated to tender performance where seller had indicated its

unwillingness to perform unless buyer agreed to extend time for sellers to vacate premises); Vander Realty Co. v. Gabriel, 334 Mass. 267, 271 (1956) (buyer of real estate not obligated to tender performance because seller had not tarred roadway as required by purchase and sale agreement; buyer had not waived contingency and seller had demonstrated inability to perform); Leigh v. Rule, 331 Mass. 664, 668 (1954) (in action to recover deposit for purchase of real estate, plaintiff excused from tendering performance where, on day performance was due, seller remained in occupation at premises thus she was "unable … to give plaintiffs full possession of the premises, free from all tenants, in accordance with the terms of the agreement"); Limpus v. Armstrong, 3 Mass. App. Ct. 19 (1975) (buyer of real estate not obligated to tender performance where seller entered into "an inconsistent agreement with another" for the sale of the same land).  See also Lese v. Lawson, 118 A.D. 254, 103 N.Y.S. 303 (App. Div. 1907) (buyer of real estate sought specific performance; tender excused where seller had contracted to convey property free from encumbrances and on closing date an inheritance tax remained unpaid and constituted encumbrance; plaintiff buyer did not appear at closing "very probably because he knew that the defendant could not make a conveyance [free] from encumbrance;" and because of tax encumbrance seller "was not [on the closing date] in a position to comply with his contract").

22.    Where a buyer of real estate indicates his intention to perform and appears at the Registry of Deeds with good funds ready to close the transaction, the buyer has satisfied his obligation to tender performance and the seller is in default for failing to appear and offering whatever title it could deliver.  See Pierce v. Clark, Case No. BACV

2001-00496, Findings of Fact, Rulings of Law and Order for Judgment, Lawyers Weekly

No. 12-076-05 (March 19, 2005) (Rufo. J.) (copy attached hereto as Exhibit A).

23.     Where a purchase and sale agreement sets forth certain obligations to be

performed by the seller, such as to clean title or to prepare a survey for a new Land Court

subdivision plan, the seller has an implied obligation to exercise good faith and

reasonable efforts to fulfill such obligations.  See Lafond v. Frame, 327 Mass. 364, 366-

368 (1951) (escape clause permitting seller to back out if unable to provide good title "is

no protection to an owner who is not acting in good faith and does not intend to carry out

the agreement"; here, seller made no attempt to discharge mortgage, seller therefore not

acting in good faith and thus not protected by escape clause ).  See also Gentile Bros.,

Corp. v. Rowena Homes, Inc., 352 Mass. 584, 590 (1967) (escape clause that obligations

of parties shall cease if seller unable to give clean title "affords no protection to a seller

who is not acting in good faith and does not intend to carry out the agreement"; seller

here failed to act in good faith in discharging attachments on property); Hastings v. Gay,

55 Mass. App. Ct. 157 (2002) (escape clause in purchase and sale agreement "will not

apply to void an agreement where the seller's inability to convey good and clear title was

the result of his own fault or collusion"; moreover, seller was first obligated to afford

buyer opportunity to accept title defects at original or extended closing date, before seller

could invoke benefit of escape clause).

24.     Where a contingency or condition in a purchase and sale agreement exists

for the benefit of one party, that party may waive the contingency.  See Bossi v. Whalen,

19 Mass. App. Ct. 966, 967, 473 N.E.2d 1167 (1985) (provision making sale subject to

buyer's receipt of mortgage was "inserted in the contract for the benefit of the buyers and

could be waived by them"); DeFreitas v. Cote, 342 Mass. 474, 477, 174 N.E.2d 371 (1961) (language in purchase and sale agreement that sale was subject to buyer's receipt of G.I. loan "was a condition inserted for the benefit of the buyer and as such could be waived by the buyer").

25.     Specific performance of real estate contracts is appropriate "in the absence of significant equitable reasons for refusing such relief." Raynor v. Russell, 353 Mass. 366, 367-68, 231 N.E.2d 563 (1967). "Mere increase in the value of the property, which did not result from action of the defendant after the breach, is not the type of change in circumstances over time which would make an order of specific performance inequitable." Costello v. Pet, Inc., 17 Mass. App. Ct. 382, 388, 458 N.E.2d 790 (1984).

26.     Moreover, the court will grant specific performance for a purchase where there is evidence that the seller understood the purchase and sale agreement and any extensions thereto and there is no evidence of inequitable conduct or dishonesty by the purchaser. Kaplan v. Bessette, 357 Mass. 233, 257 N.E.2d 926 (1970).

27.     The general rule in Massachusetts entitles a landowner "to mandatory equitable relief to compel removal of a structure significantly encroaching on his land, even though the encroachment was unintentional or negligent and the cost of removal is substantial in comparison to any injury suffered by the owner of the lot upon which the encroachment takes place." Peters v. Archambault, 361 Mass. 91, 92 (1972). See, e.g., Ottavia v. Savarese, 338 Mass. 330, 336 (1959) (granting mandatory injunction requiring defendant remove supporting beams that encroached on plaintiff's property, where construction of beams was "intentional, open trespass"). "The readiness to grant injunctions [to remove encroachments] derives from the historic notion that land is

unique and that money is an inadequate substitute." <u>Franchi v. Boulger</u>, 12 Mass. App. Ct. 376, 379 (1981). Moreover, the law "simply does not sanction … private eminent domain." <u>Goulding v. Cook</u>, 422 Mass. 276, 277 (1996) (ordering defendant to remove septic system on neighbor's land and pay damages).

28.     There is a limited, narrow exception to the rule that a defendant must remove encroachments where the encroachment was made innocently and the cost of removal is greatly disproportionate to the injury suffered, or where the "substantial rights of the owner may be protected" without the injunction. <u>Capodilupo v. Vozzella</u>, 46 Mass. App. Ct. 224, 226 (1999). <u>See also</u> <u>Franchi v. Boulger</u>, 12 Mass. App. Ct. 376, 379 (1981) ("limited exception where the encroachment is de minimus"). These so-called "exceptional cases" are rare, and "depend[] very much on the particular facts and circumstances disclosed" in the case. <u>Goulding v. Cook</u>, 422 Mass. 276, 277 n. 3 (1996) Moreover, in "exceptional" cases, the courts "draw the line at permanent physical occupations amounting to a transfer of a traditional estate in land." <u>Id.</u> at 277. Where injunctive relief is denied under these circumstances, the encroaching defendant must pay damages. <u>Ottavia v. Savarese</u>, 338 Mass. 330, 336 (1959).

29.     A buyer is not required to accept a deed on terms different from those stated in a purchase and sale agreement. <u>See</u> <u>Gentile Bros., Corp. v. Rowena Homes, Inc.</u>, 352 Mass. 584, 589 (1967) (buyer not obligated to accept deed where seller had not discharged two attachments; seller could not fulfill obligation to convey clear title and buyer "not obligated to accept a deed on terms different from those stated in the agreement").

30.    Registered land "is protected to a greater extent than other land from unrecorded and unregistered liens, prescriptive rights, encumbrances and other burdens." Peters v. Achambault, 361 Mass. 91, 93 (1972).

Respectfully submitted,

FAFARD REAL ESTATE &
DEVELOPMENT CORP.,

By its attorneys,

/s/ Halye A. Sugarman
_____
Jeffrey J. Upton (BBO #552221)
Halye A. Sugarman (BBO#646773)

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

Dated: April 4, 2005
426955

## CERTIFICATE OF SERVICE

I, Halye A. Sugarman, certify that on April 4, 2005, I served a copy of the foregoing Proposed Findings of Fact and Conclusions of Law, by hand on:

Kenneth Berman
Nutter McClennan & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02110

/s/ Halye A. Sugarman
_____
Halye A. Sugarman