12-076-05

## COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT
CIVIL ACTION
No. BACV2001-00496

ROBERT M. PIERCE and RICHARD J. PIERCE

vs.

BETSY G. CLARK & others[1]

## FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT

### FINDINGS OF FACT

After a trial without jury conducted on January 3, 4, 5, 7, 10, 11, 2005[2] and based upon all the credible evidence, including exhibits admitted a trial, drawing such fair inferences as I find to be reasonable, and resolving questions of credibility where they occur, I find the following material facts:

The Parties

The plaintiffs, Robert M. Pierce and Richard J. Pierce ( "Pierces") are brothers and reside in Dennis, Massachusetts. The defendant, Betsy G. Clark ("Clark") resides in Washington, D.C. and the defendant, Cindy Lee Caldwell Cordeiro ("Caldwell") resides in Hyannis, Massachusetts. The defendant, Ross Joly ("Joly") resides in Yarmouthport, Massachusetts and the defendant, Joly McAbee & Weinert, LLC ("Joly McAbee & Weinert") is a Massachusetts Limited Liability

---

[1]Cindy Lee Caldwell Cordeiro, Ross A. Joly and Joly, McAbee & Weinert, LLC.

[2]Closing arguments were heard on February 14, 2005.

24

Company with its usual place of business in Yarmouthport, Massachusetts.

The Property

The property which is the subject of this action is located in Brewster, Barnstable County, Massachusetts, being the land and improvements as bounded, described and shown as Lot #1 and Lot #2, totaling 5.155 acres, more or less, on the "Subdivision Plan of Land in Brewster, Mass." dated April 2, 1993, by Schofield Brothers, registered professional engineers and land surveyors, on Land Court Plan 42026A3, being a portion of the premises conveyed by deed of Marguerite L. Gammons to Robert S. Clark and Betsy G. Clark, dated February 6, 1989 and recorded at the Barnstable County Registry of Deeds at Book 6638, Page 58, being the subject of a Land Court Registration Case #43349. (Ex.30). ("Property").  Clark used the Property as a farm and had received an agricultural tax exemption from the Town of Brewster under the provisions of G.L. c.61A.  On January 18, 2000, the Town of Brewster voted to release the Town's right of first refusal to purchase the Property under M.G.L.A. c. 61A. (Ex.7).

Conduct of the Parties

In 1998, the Pierces sought to purchase land in Barnstable county on which they could each build a single-family home with a detached garage and workshop.  Robert Pierce has an MBA in finance and is a licensed real estate broker.  Richard Pierce is a licenced real estate salesperson.  The Pierces are each employed as marine engineers on oceangoing vessels which requires them to be away from their homes for extended periods of time.  In August, 1998, a real estate broker from McAbee Real Estate, Inc., Kathy McAbee, first showed the Pierces the

2

Property. Fillmore McAbee was the principal and broker of record of McAbee Real Estate, Inc.[3] Until October, 2000, Caldwell was a licensed salesperson working at McAbee Real Estate, Inc. and had previously obtained the listing from Clark to sell the Property. Thereafter, on October 16, 2000, after McAbee Real Estate, Inc. stopped actively selling real estate, Caldwell started working at Joly McAbee & Weinert and continued to serve as Clark's real estate salesperson. After joining Joly McAbee & Weinert, Caldwell had prior real estate sales pending which were later completed and all brokers fees realized were paid to McAbee Real Estate, Inc. In October, 2000, Joly McAbee & Weinert came into existence as a new legal entity and was not a successor of interest of McAbee Real Estate, Inc. Joly is the principal and broker of record registered with the Massachusetts Board of Registration of Real Estate Brokers of Joly McAbee & Weinert. From October, 2000 to September, 2001, Caldwell continued to discuss issues concerning the sale of the Property with Fillmore McAbee and never discussed the sale of the Property with Joly or anyone working at Joly McAbee & Weinert.

Prior to making an offer to purchase the Property, the Pierces took a number of steps to determine whether the Property would be suitable for their plans to each build a residence containing at least five bedrooms along with a detached garage and workshop. Those efforts included speaking with officials of the Town of Brewster, getting estimates concerning the cost of installing utilities, and walking the land with an architect and engineer. (Exs. 34, 35). The Pierces never engaged the services of an architect or engineer and did not have plans drawn or specifications prepared for the proposed dwellings they intended to erect on the Property.

---

[3]A stipulation of Dismissal with prejudice as to former defendants Fillmore McAbee and McAbee Real Estate, Inc. was filed with this Court on May 26, 2004.

On November 30, 1998, through Caldwell, the Pierces made an offer to purchase the Property which contained a number of contingencies that was accepted by Clark. (Ex. 2). Together with the offer, the Pierces paid a deposit in the amount of $1,000 to Clark's agent, McAbee Real Estate, Inc. In December, 1998, the Pierces and Clark initially entered into a Purchase and Sale Agreement with an Addendum, where Clark agreed to sell the Property to the Pierces for $438,000, with an additional $123,500 to be paid if Clark constructed a road and installed water on the Property. Upon signing the Purchase and Sale Agreement of December, 1998, the Pierces had paid a total deposit in the amount of $21,900 to McAbee Real Estate, Inc. The December 1998 purchase and sales agreement used the standard Greater Boston Real Estate Board form, contained a sales price of $438,000, a closing date of April 16, 1999 and contained the provision that "time is of the essence." (Ex.4).

Between the execution of the December, 1998 purchase and sale agreement and February, 1999, Clark installed a road with water and drainage on the Property. The Pierces and Clark entered into a new purchase and sale agreement with an Addendum utilizing the standard Greater Boston Real Estate Board form dated February 15, 1999 intending to supercede the December, 1998 purchase and sale agreement.[4] ("Agreement") (Ex. 6). Under the terms of the new

---

[4]The Agreement dated February 15, 1999 utilized the Greater Boston Real Estate Board standard form which contained paragraph 12, Buyer's Election to Accept Title: The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the Seller shall, unless the SELLER has previously restored the premises to their former condition, either (a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or (b) if a holder of a mortgage on said premises shall not permit the insurance

4

Agreement, Clark agreed to sell the Property to the Pierces for the total amount of $561,500 which reflected the cost of the new road construction. Paragraph 4 concerning conveyance by a Quitclaim Title Deed was deleted from the Agreement as paragraph 2 of the Addendum made the sale of the Property contingent on the Seller (Clark) obtaining a Land Court Decree so that the Property would acquire registered Land Court title. The Addendum provided that the closing date for the transfer of title to the Property would be automatically extended in three (3) month increments on up to eight (8) occasions in order to provide Clark with additional time to obtain a Final Land Court Decree. Under this Agreement the Pierces' $21,900 deposit was acknowledged, McAbee Real Estate, Inc. was to receive $17,500 as a broker's fee, the closing date was scheduled for April 16, 1999 and the Agreement contained the provision that "time is of the essence." At the time of the execution of both the December, 1998 and February 15, 1999 purchase and sale agreements, the Pierces were represented by Attorney Herb Roberts and Clark was not represented by counsel.

At the time Clark and the Pierces entered in the Agreement, Clark, together with her husband Robert Clark, had previously filed a petition for registration of the Property with the Land Court. At the time they signed the Agreement, the Pierces knew that Clark's husband, Robert Clark, was deceased and that the Land Court Registration process had been ongoing for possibly as long as ten years. The closing date for the Agreement was automatically extended pursuant to paragraph five (5) of the Addendum on eight (8) occasions. As a result of the

---

proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration. (emphasis added)

5

automatic extensions, the final closing date was to have been April 16, 2001.

From February, 1999 through August, 2000, Clark retained the services of Attorney Joseph D'Elia to work on the Land Court registration case.[5]  During the same time period, while represented by counsel, the Pierces spoke with representatives of the Town of Brewster, Caldwell, the Land Court, and, on a number of occasions, called Attorney D'Elia directly regarding the status of the Land Court registration.  In addition, the Pierces made several trips to the Land Court in Boston to check on the progress of the registration process.  In late August or early September, 2000, Attorney D'Elia resigned his representation of Clark in the Land Court registration case.  Thereafter, in September, 2000, on behalf of Clark, Caldwell facilitated the engagement of replacement counsel, Attorney John Creney.  During October, 2000, Attorney Creney reviewed Attorney D'Elia's file and agreed to take over the Land Court registration case for Clark.

On October 19, 2000, on behalf of the Pierces, Attorney Charles Sabatt wrote to Attorney Creney requesting a three month extension of the April 16, 2001 closing date.  (Ex. 9).[6]  Becoming impatient, Clark denied this request for an extension and expressed concern to Caldwell about the Pierces' financial ability to purchase the Property.  Caldwell assured Clark the Pierces were qualified buyers and had the financial ability to complete the purchase of the Property.  Caldwell informed the Pierces that Clark was becoming impatient and that real estate values were increasing on Cape Cod.  On February 14, 2001, Attorney Sabatt sent a letter to

---

[5] Clark had previously retained the services of Attorney Paul Killeen concerning the Land Court registration case.

[6] Attorney Charles Sabatt succeeded Attorney Roberts in representing the Pierces.

6

Attorney Creney wherein he expressed concern about completion of the Land Court registration process in a timely fashion, accused Clark of dilatory conduct, and threatened future legal action. (Ex. 12). Clark was disturbed about the content of Attorney Sabatt's letter and directed that all future conversations regarding the Property be directed to Attorney Creney. Other than at the time of the signing of the Agreement in February, 1999, the Pierces had no direct contact with Clark.

In February, 2001, the Pierces understood that the Land Court registration case might not be completed by the extended closing date of April 16, 2001 and decided to retain Attorney Lester Murphy, a real estate attorney. Attorney Sabatt continued to represent the Pierces along with Attorney Murphy. In February and March, 2001, the Pierces, with Attorney Murphy, assessed the status of the Land Court Registration case by, among other things, speaking to Attorney Creney, Land Court Examiner William Crowell, and Land Court Examiner Edmond Williams. On April 6, 2001, at the request of the Pierces, Clark agreed to extend the closing date for the Agreement from April 16, 2001 to May 18, 2001. (Ex. 15). At the time she granted the extension of the closing date, Clark knew the value of the Property had significantly increased.

On April 11, 2001, Richard Pierce, for himself and as power of attorney for Robert Pierce, executed a Limited Power of Attorney naming Attorney Murphy as their attorney-in-fact, granting him the power to effectuate the purchase of the Property. (Exs. 16, 33). At no time prior to May 18, 2001 did the Pierces or Attorney Murphy make the existence of the Power of Attorney known to Attorney Creney, Clark or Caldwell. Attorney Murphy did not disclose to anyone that he could or would act in the Pierces' stead at the scheduled closing on May 18, 2001.

In April, 2001, Clark informed Attorney Creney that Clark's husband, Robert Clark, one

of the petitioners in the Land Court registration case, had died in November, 1996. Knowing that Robert Clark's death created an automatic Massachusetts Estate Tax lien on the Property, Attorney Creney sent a copy of Robert Clark's death certificate to the Land Court on April 30, 2001. (Ex. 22). On April 17, 2001, Land Court Examiner Edmond Williams wrote to Attorney Creney indicating that the Land Court judge in the registration case would sign a "draft" Order for Decree for the Property if "a few minor items" were addressed. (Ex. 17). In correspondence to the Land Court dated April 26, 2001, with a copy sent to Attorney Murphy, Attorney Creney submitted the requested additional information to Mr. Williams relative to obtaining a draft Order for Decree. (Ex. 21).

On April 25, 2001, Attorney Murphy wrote to Attorney Creney advising that he was preparing for a closing on May 18, 2001 and that he would keep Attorney Creney advised of his efforts. (Ex. 20). At that time, both Attorney Murphy and Attorney Creney understood there would not be a Final Decree from the Land Court by the May 18, 2001 closing date. Attorney Murphy ordered a title rundown, obtained a municipal lien certificate from the Town of Brewster, inquired about outstanding Agricultural taxes, and arranged with the Pierces and Fleet Bank for the Pierces' funds to be available to him knowing the Pierces were scheduled to be working "at sea" as marine engineers at the time of the scheduled closing. (Ex. 36). In January, 2001, at their request, Caldwell had provided the Pierces with a list of potential lending institutions and the Pierces eventually borrowed $250,000 from Fleet Bank in April, 2001 in connection with the anticipated purchase of the Property.

Attorney Murphy placed telephone calls to Attorney Creney during the first two weeks of May, 2001 without response. Attorney Creney was out of the country on a ten day vacation from

8

May 7, 2001, until his return on May 17, 2001 and had no contact with Clark or Attorney Murphy during this time period. On May 15, 2001, unable to reach Attorney Creney, Attorney Murphy had a brief conversation with Caldwell and followed up with a letter requesting, among other things, a thirty (30) day extension of the May 18, 2001 closing date. (Ex. 25). By facsimile, Attorney Murphy sent a copy of his letter to Caldwell to Attorney Creney on May 15, 2001 indicating the Pierces had made funds in the amount of the purchase price available to him and that the "Pierces were ready, willing and able to purchase the property as soon as Clark completed her obligations under the Agreement." (Ex. 24). Also by facsimile, Caldwell sent a copy of Attorney Murphy's letter to Clark on May 15, 2001 and she informed Fillmore McAbee as to the contents of Attorney Murphy's letter. Filmore McAbee advised Caldwell to keep working with Attorney Creney regarding the sale of the Property.

Attorney Murphy acknowledged that his May 15, 2001 letter contained two errors. The first was in the second paragraph where he stated that the Agreement was contingent upon Clark obtaining an Order for Decree when, in fact, a Final Decree was required under the Agreement. The second error was the claim that Attorney Creney had not filed a motion to sever lots 1 and 2 from lot 3 so as to permit an Order for Decree to issue in the Land Court Registration case when, in fact, Attorney Creney had previously filed the required motion. On May 17, 2001, the Land Court issued an Order for Decree (No. 43349) in the Land Court Registration case. (Ex. 53). That same day, May 17, 2001, Attorney Creney spoke to Land Court Examiner Edmond Williams and learned that the Land Court had issued the Order for Decree. Attorney Murphy also learned the Order for Decree had issued on May 17, 2001.

On May 17, 2001, Attorney Murphy spoke to Attorney Creney by telephone to inquire

9

whether Clark was prepared to close the next day, May 18, 2001 at 10:00 a.m. Creney's response was that he did not have a deed and that he could not reach his client, Clark. There was no further discussion as to how the Pierces would take title to the Property or whether the Pierces would elect to take such title Clark could deliver at the time of the scheduled closing on May 18, 2001. Attorney Murphy requested a further extension of the Agreement and inquired about whether any amounts were due the Commonwealth as a result of the estate tax lien created by the death of Clark's husband, Robert Clark. Attorney Creney replied he was without authority from Clark to grant a further extension and did not have any information regarding the estate tax lien. During the course of the telephone conversation, Attorney Murphy did not tell Attorney Creney he would appear at the Barnstable Registry of Deeds at 10:00 a.m. on May 18, 2001. Attorney Murphy told Attorney Creney that he did not know what he would do and Attorney Creney ended the conversation by saying, "I guess you'll have to do what you have to do."

Attorney Murphy did not speak to Attorney Creney again until after 10:00 a.m. on May 18, 2001. Notwithstanding his efforts, Attorney Creney was unable to make direct contact with Clark on May 17, 2001. Clark, after getting an answering machine message from Attorney Creney, assumed that his call was for a request for an extension of the closing. Thereafter, Clark sent Attorney Creney a facsimile through Caldwell from her home in Washington, D.C. at 3:12 a.m. on May 18, 2001 opposing any further extension of the Agreement. In her facsimile to Attorney Creney, Clark indicated that the Pierces would have to pay an additional $200,000 over the purchase price contained in the Agreement in order to purchase the Property. (Ex. 40). Prior to the May 18, 2001 closing date, Clark had discussions with Caldwell concerning the increase in value to the Property and ordered a present market value appraisal of the Property from Davis

10

Appraisals. The Davis appraisal indicated that Lots 1 and 2 on the Property had increased in value to $400,000 each. (Ex. 42).

On May 18, 2001, at 10:00 a.m., Attorney Murphy appeared at the Barnstable County Registry of Deeds. Attorney Murphy paged Clark and her counsel without response on three occasions. Before departing, Attorney Murphy wrote in the Barnstable County Registry of Deeds "default book" that he had appeared at 10:00 a.m. on May 18, 2001 and as attorney for the Pierces he was ready, willing and able to tender performance and purchase the Property. (Ex. 38). Neither Clark nor her attorney were present at the Barnstable County Registry of Deeds on May 18, 2001, and, since that time, Clark has refused to transfer title to the Property to the Pierces.

Five hours after his appearance at the Barnstable County Registry of Deeds, Attorney Murphy faxed a letter to Attorney Creney dated May 18, 2001 at 3:28 p.m. (Ex. 26). In his letter, Attorney Murphy never mentioned his appearance at the Barnstable County Registry of Deeds, but again requested an extension of the Agreement and indicated that his clients "are ready, willing and able to purchase the property as soon as your client is able to tender clear title." Prior to 10:00 a.m., May 18, 2001, Attorney Murphy never informed Attorney Creney, Clark or Caldwell, orally or in writing, that he, on behalf of the Pierces, would elect to take such title Clark could deliver at the time of the scheduled closing on May 18, 2001. Prior to 10:00 a.m., May 18, 2001, the Pierces never informed Attorney Creney, Clark or Caldwell, orally or in writing, that they would elect to take such title Clark could deliver at the time of the scheduled closing on May 18, 2001. On July 20, 2001, Attorney Murphy notified the Pierces that Attorney Creney had sent him a facsimile stating: "Not to be the bearer of bad news, but Mrs. Clark tells

11

me (in writing) that she has had an updated appraisal performed, and that the new price for her Brewster property is now $825,000." (Ex. 29).

Sometime in April, 2001, Mr. Jay Merchant, a neighbor to the Property, spoke to Clark and expressed an interest in purchasing the Property. Clark directed Mr. Merchant to Caldwell who informed him the Property was currently under a purchase and sale agreement. Prior to May 18, 2001, Caldwell received an offer to purchase the Property from Mr. Merchant and informed Clark about the offer. On May 18, 2001, Caldwell had further discussions with Mr. Merchant, however Clark took no further action in response to Mr. Merchant's offer to purchase the Property. (Ex. 43).

After the Pierces commenced this action, Caldwell had discussions with Attorney Creney and Fillmore McAbee in August, 2001 concerning the manner of returning the Pierces' $21,900 deposit paid under the Agreement. (Exs. 41,49). Caldwell never discussed any issues pertaining to the sale of the Property at any time with Joly as it was her understanding that any pending real estate sales she had under agreement at the time she began working at Joly McAbee & Weinert in October, 2000 remained with her prior employer, McAbee Real Estate, Inc. Joly did not became aware of the sale of the Property until after receipt of a G.L. c.93A letter from the Pierces' counsel on July 8, 2002. (Ex. 46). Prior to that time, the Pierces never spoke to Joly about the Property.

The Pierces introduced evidence from a construction estimator that suggested the delay in purchasing the Property from May 18, 2001 to present has increased their anticipated construction costs by a combined total of $231,000. The Court does not credit this evidence as all calculations of increased construction costs lacked certainty and were not based on any drawn

12

plans or written specifications for the Pierces' proposed residences and detached garages. Accordingly, the Pierces amount of suggested damages is rejected as the Court finds this amount to be purely speculative and not proven to a reasonable certainty by sufficient or substantial evidence.

On August 2, 2001, the Pierces filed this action alleging Clark breached her contractual obligations seeking specific performance and damages against Clark (Count I); alleging tortious interference with a contractual relationship against Caldwell, Joly and Joly McAbee & Weinert (Count II); and alleging violations of G.L. c. 93A by Caldwell, Joly and Joly McAbee & Weinert (Count III).  Count IV alleging a private right of action for violations of G.L. c. 112 §87RR and 87AAA against Caldwell, Joly and Joly McAbee & Weinert was dismissed with prejudice by the Court at the close of all of the evidence without objection from the Pierces.

## RULINGS OF LAW

### Count I: Breach of Contract against Clark

Clark argues that the Pierces, or Attorney Murphy acting under power of attorney from the Pierces, have not demonstrated that they were ready, willing, and able to perform under the terms and conditions of the Agreement. "The general rule is that when performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested some offer of performance." *Lafayette Place Associates v. Boston Redevelopment Auth.*, 427 Mass. 509, 519 (1998), quoting *Leigh v. Rule*, 331 Mass. 664, 668 (1954); *Frostar Corp. v. Malloy*, 63 Mass. App. Ct. 96 ( 2005).  Even if a potential buyer notifies the seller of the buyer's intention to perform on the closing date and appears at the

13

registry of deeds on the closing date with the required consideration, "there may not be the 'readiness to perform' that is a necessary condition of placing the defendant [seller] in breach." *Lafayette Place Associates*, 427 Mass. at 520, quoting *Mayer v. Boston Metro. Airport, Inc.*, 355 Mass. 344, 350 (1969). In order for a seller to be in default, the buyer must manifest that he is "ready, able, and willing to perform by setting a time and place for passing papers or making some other concrete offer of performance." *Lafayette Place Associates*, 427 Mass. at 520. "The weight of authority in this country is that the financial ability of a prospective buyer of property is a material issue in his action for damages against a repudiating defendant for breach of an agreement to sell that property for an established price," *Kanavos v. Hancock Bank & Trust Co.*, 395 Mass. 199, 202 (1985).

For instance, in *Bucciero v. Drinkwater*, the buyer and seller had a disagreement over the payment of real estate taxes the day before the expected closing date. 13 Mass. App. Ct. 551, 552 (1982). The conflict could not be resolved during a meeting between the buyer and seller and the seller's attorney conveyed that it was pointless to meet the next day. *Id* at 553. After the meeting, the buyer changed his mind and arrived at the closing with certified checks for the purchase price and for the full amount of the taxes due. *Id*. The Appeals Court found the seller in default and demanded specific performance noting that the by arriving at the closing with full payment, the buyer was "ready, willing and able to purchase the property." *Id*.

In *Hastings v. Gay*, the Appeals Court found that the buyer was ready, willing, able to pay the agreed upon purchase price on the closing date where the buyer "presented admissible, probative evidence in the form of his own deposition testimony that he had sufficient funds available in his various bank accounts to pay cash for the property, or alternatively, that he had

14

sources available from which he readily could have borrowed the available funds." 55 Mass.
App. Ct. 157, 165 (2002). Similarly, in *LeBlanc v. Molloy*, the Court found that the buyer was
ready, willing, and able to perform when the buyer merely sent a notice letter to the sellers
notifying them that the buyer was ready, willing, and able to perform and of the time and location
of the closing. 335 Mass. 636, 637 (1957). The *LeBlanc* court held that the buyer was not
required to actually tender the purchase price to hold the seller in default. *Id.* at 638. Similarly,
in *Rutanen v. Ballard*, 424 Mass. 723, 734-735 (1997), the Court set a low threshold for a buyer
to meet his burden. The *Rutanen* court held that the buyer was ready, willing, and able to
perform where a trustee of the buyer testified that he had an oral commitment from a bank where
the buyer routinely did business to provide funds for the purchase price.

In the instant case, there is sufficient evidence that the Pierces were ready, willing, and
able to accept whatever title Clark could provide on the date of the closing. Most importantly,
the Pierces provided credible evidence at trial that they borrowed $250,000 from Fleet Bank in
connection with the anticipated purchase of the property and had made arrangements with Fleet
Bank to make sufficient funds available to Attorney Murphy to consummate the purchase. See
*Kanavos*, 395 Mass. at 202. Additionally, on April 25, 2001, Attorney Murphy notified Attorney
Creney that he was preparing for the closing on May 18, 2001 and both attorneys understood that
there would not be a Final Decree from the Land Court by the closing date. On May 15, 2001,
just three days before the closing, Attorney Murphy told Attorney Creney that the Pierces had
funds in the amount of the purchase price and were ready, willing, and able to perform on the
closing date. See *Hastings*, 55 Mass. App. Ct. at 165; *LeBlanc*, 335 Mass. at 637. On May 17,
2001, the day before the closing, Attorney Creney informed Attorney Murphy that he did not

15

have deed and could not reach Clark, but ended the conversation by saying that, "I guess you'll [Murphy] have to do what you have to do." Both Attorney Creney and Attorney Murphy knew that the Land Court had issued an Order for Decree for the Property on May 17, 2001.

Finally, on May 18, 2001, the day of the closing, Attorney Murphy appeared at the Barnstable Registry of Deeds at the agreed upon time with Power of Attorney from the Pierces. When Clark or her representative did not appear, Murphy wrote in the "default book" that he appeared at the agreed upon time and as attorney for the Pierces, he was ready, willing, and able to tender performance and purchase the Property. For these reasons, there is ample probative evidence that the Pierces were ready, willing, and able to perform on the specified closing date. By not appearing on the specified date and time for the closing and not offering whatever title she could deliver, Clark was in default of the Agreement.

Clark further argues that if the Pierces were ready, willing, and able to perform, the Pierces' election to purchase the property under paragraph 12, had to come *prior to the delivery of the deed*. (emphasis added) Clark contends that neither the Pierces nor their attorney acting under power of attorney, ever informed Clark or her attorney of their decision to take whatever title to the Property that Clark was able to tender. Clark argues the Pierces' failure to make such an election prior to the delivery of a deed bars their recovery. Construing the "Buyer's Election Clause" contained in paragraph 12 of the Agreement, Clark was required to afford the Pierces the opportunity to accept title as Clark could deliver *at the date set for performance*, which was, at a minimum, a title less than a Final Decree from the Land Court. See *Hastings v. Gay*, 55 Mass. App. Ct. 157, 163 (2002)(sellers required to afford buyer opportunity provided by paragraph 12 to accept such title as they could deliver *either at original or at the extended date set for*

16

*performance*)(emphasis added). The language contained in paragraph 12 of the Agreement is clear and unambiguous. Clark's contention that the Pierces, or their attorney acting under power of attorney, had to make an election to accept whatever title Clark could provide prior to the delivery of the deed is clearly erroneous. Where there is no ambiguity in contract, it must be enforced according to its terms. *Freelander v. G.&K. Realty Corp.*, 357 Mass. 512 (1970).

There is no evidence that Clark or her representative afforded the Pierces the opportunity to purchase the property in accordance with paragraph 12 on the date set for performance of the Agreement. In fact, Clark concedes that neither she nor her representatives were present at the closing. By not appearing at the closing, neither Clark nor her representatives could have given the Pierces the opportunity to elect to purchase the property in accordance with paragraph 12 of the Agreement. Significantly, the Agreement included a "time is of the essence" clause, an enforceable provision strictly limiting each party to a rigid closing date. *Owen v. Kessler*, 56 Mass. App. Ct. 466, 469 (2002). Consequently, Clark breached paragraph 12 of the Agreement. "A judge generally has considerable discretion with respect to granting specific performance, but it is usually granted in disputes involving the conveyance of land." *McCarthy v. Tobin*, 429 Mass. 84, 89 (1999). "It is well-settled law in this Commonwealth that real property in unique and that money damages will often be inadequate to redress a deprivation of an interest in land." *Greenfield Country Estates Ass'n, Inc. v. Deep*, 423 Mass. 81, 88 (1996). Therefore, I find it is appropriate in this case to specifically enforce the Agreement between the Pierces and Clark.

Count II: Interference with Contract by Caldwell, Joly and Joly, McAbee & Weinert

In order to succeed on a claim of unlawful interference with a contract relationship, plaintiff must prove that: "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Draghetti v. Chmielewski*, 416 Mass. 808, 816 (1994). Massachusetts courts have looked to a serious of factors set forth in the Restatement (Second) of Torts § 767 when determining whether a defendant's conduct in intentionally interfering with a contract of another is improper. *Dowd v. Iantosca*, 27 Mass. App. Ct. 325, 334 (1989). These factors include: (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interest in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties. Restatement (Second) of Torts § 767.

The Pierces contend that Caldwell intentionally interfered with the Agreement they had with Clark by being the substantial causative factor in Clark's decision not to appear at the closing to complete the sale of the Property. They urge the Court to infer that Caldwell was a substantiative causative factor due to a variety of reasons: (a) Caldwell's failure to inform Clark she had an obligation to appear at the closing, (b) Caldwell's failure to call the Pierces and Clark in the days preceding the closing date, (c) conversations Caldwell had with Mr. Jay Merchant, a prospective buyer of the property in April, 2001, (d) receiving an offer from Mr. Merchant while

18

the Property was under agreement with the Pierces, (e) Caldwell's statements to the Pierces that the Property had increased in value since the date of the Agreement, and (f) that Clark was growing impatient with requests for extensions to the closing date. However, inferences "must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture." *Continental Assur. Co. v. Diorio-Volungis*, 51 Mass. App. Ct. 403, 409 (2001), quoting *Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 438 (1992). The Pierces presented no substantive probative evidence that Caldwell induced Clark not to complete the sale of the Property pursuant to the Agreement. Accordingly, based on the record before this Court, the Pierces have failed to establish by a fair preponderance of the credible evidence, that Caldwell intentionally interfered with their contract with Clark.

The Pierces contend Joly and Joly, McAbee & Weinert are vicariously liable for Caldwell's conduct as she was affiliated with them as of the extended closing date, May 18, 2001. The principles of vicarious liability apply only where the agent has committed a wrongful act. *Elias v. Unisys Corporation*, 410 Mass 479, 481 (1991). As a matter of law, the Pierces cannot maintain a cause of action against Joly and Joly, McAbee & Weinert for interference with their contract with Clark. For all these reasons, Caldwell, Joly and Joly, McAbee & Weinert are entitled to judgment on Count II of the Pierces' complaint.

### Count III: G.L. c.93A Claims

On May 23, 2002, the Pierces' counsel filed a Motion for Leave to Amend their Complaint to add G. L. c. 93A claims against defendants Caldwell, Joly and Joly, McAbee & Weinert. The proposed amended complaint was signed by Pierces' counsel, dated May 23,

19

2002 and attached to the Motion for Leave as an exhibit. On June 7, 2002, the Court granted the Pierces' request to amend their complaint and sent a notice to that effect to counsel for the Pierces and Clark. On the same day, June 7, 2002, the Court took the signed amended complaint previously attached as an exhibit and filed it as the newly amended complaint in this action. The notice sent by the Court to the parties dated June 10, 2002 indicated that the Motion for Leave to Amend the Complaint had been allowed but did not mention the amended complaint had been filed. On July 1, 2002, the Pierces, through counsel, sent Chapter 93A demand letters to each of the newly named defendants. (Ex. 46). On July 16, 2002, Caldwell's counsel responded to the Pierces' 93A demand letter and on July 26, 2002, counsel for Joly and Joly, McAbee & Weinert answered with a response. (Exs. 47,51). It appears neither counsel for Caldwell, Joly and Joly, McAbee & Weinert nor the Pierces were aware when they wrote response letters on behalf of their clients that the amended complaint had been filed by the Court. Thereafter, defendants Caldwell, Joly and Joly, McAbee & Weinert filed answers to the amended complaint where the defense of failure to comply with the statutory scheme of G.L. c. 93A was properly raised.

At the close of all of the evidence, Caldwell, Joly and Joly, McAbee & Weinert filed Motions to Dismiss the Pierces' Chapter 93A claims based, among other things, upon a failure to comply with the jurisdictional prerequisite to filing a consumer claim, specifically the 30-day demand letter. In response, at the close of all the evidence, the Pierces have moved under Mass. R. Civ. P. 15 (a) to amend their amended complaint to cure the alleged 30-day demand letter defect.

The amended complaint was filed by the court without knowledge of Pierces's counsel prior to the thirty day time period, however the purpose of notice under Chapter 93A has been

20

accomplished in this case   There has been no showing of prejudice to the defendants who have had the opportunity to respond to the Pierces' 30-day demand letter as well as the opportunity to answer and litigate the substance of the Pierces' Chapter 93A claims during the course of a six day trial   The court finds no inappropriate conduct on the part of the Pierces or their counsel concerning the filing of the amended complaint and absent a showing of prejudice to the defendants, denies Caldwell, Joly and Joly, McAbee & Weinert's Motion to Dismiss the Chapter 93A claims.

The Massachusetts Consumer Protection Act, G.L. c. 93A (Chapter 93A) prohibits unfair methods of competition and unfair or deceptive acts or practices.[7] Often used in combination with other common law and statutory claims, chapter 93A offers plaintiffs strong remedies, such as treble damages and attorneys' fees.

The subject matter jurisdiction requirement under chapter 93A, §2 mandates that the defendant be engaged in "trade or commerce."[8] A consumer may bring a 93A action under section nine; a business may bring a 93A action under section eleven.

A plaintiff in a section nine action must meet the statutory definition of "person" in G.L. c. 93A, § 1(a). Chapter 93A § 1(a) defines "person" as follows: "natural persons, corporations,

---

[7] G.L. c. 93A is modeled after the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). State law requires that regulations promulgated under and interpretations of chapter 93A be guided by federal law.

[8] G.L. c. 93A § 1(b) states, "'trade' and 'commerce' shall include the advertising, the offering for sale, rent or lease . . . or distribution of any services and any property, tangible or intangible, real, personal, or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth."

21

trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." See *Bretton v. State Lottery Commission*, 41 Mass. App. Ct. 736 (1996), rev. denied, 424 Mass. 1103 (1997) (The State Lottery Commission, a statutorily created entity, is not a "person" subject to the provisions of 93A). In order to bring suit under section nine, the plaintiff must not be engaged in the conduct of any trade or commerce. The "person" need not have suffered a loss of money or property. Chapter 93A, § 9(1) requires only that the plaintiff be "injured" and that the act complained of occurred primarily and substantially in Massachusetts. Any invasion of a legal right or interest is an injury. *Leardi v. Brown*, 394 Mass. 151 (1985); *Clegg v. Butler*, 424 Mass. 413, 418 (1997)

In determining what constitutes "unfair or deceptive acts or practices" the courts shall be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)). G.L. c. 93A, § 2(b). The attorney general may make rules and regulations interpreting the phrase "unfair or deceptive acts or practices." G.L. c. 93A, §2 (c). The Supreme Judicial Court has looked to federal regulations in interpreting chapter 93A. The court must consider, "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) citing *Federal Trade Comm. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972), citing 29 Fed. Reg. 8325, 8355 (1964). In deciding questions of unfairness under G.L. c. 93A the court must, focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making

a G.L. c. 93A fairness determination." *Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 42-43 (1995).

The Pierces contend Caldwell, Joly and Joly, McAbee & Weinert violated Chapter 93A by inducing Clark to break her contract with them. Specifically, they allege Caldwell acted unfairly and deceptively by advising Clark not to appear at the scheduled closing in order to sell the Property at a higher price. Regarding Joly and Joly, McAbee & Weinert, the Pierces allege these defendants acted unfairly when they failed to properly supervise Caldwell. Unfairness must be determined from all the circumstances. *Martin v. Factory Mutual Research Corp.*, 411 Mass. 621 (1988). Inasmuch as the Court has determined that Caldwell, Joly and Joly, McAbee & Weinert did not engage in conduct amounting to interference with Clark's contractual obligations to the Pierces, the Pierces Chapter 93A claims must fail as Chapter 93A does not transform alleged interferences with contractual obligations into deceptive trade practices. The Pierces have not demonstrated the defendants engaged in conduct that was immoral, unethical, oppressive, or unscrupulous. For these reasons, Caldwell, Joly and Joly, McAbee & Weinert are entitled to judgment on Count III of the Pierces' complaint.

23

## ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby **ORDERED** that judgment enter in favor of the plaintiffs, Robert M. Pierce and Richard J. Pierce against defendant Betsy G. Clark on Count I of the complaint and that the defendant, Betsy G. Clark be and hereby is **ORDERED** to convey the Property to the plaintiffs under the provisions of the Agreement dated February 15, 1999 within thirty (30) days of the final judgment.

It is further **ORDERED** that judgment enter in favor of defendants Caldwell, Joly and Joly, McAbee & Weinert on Counts II and III of the complaint.

Robert C. Rufo
Justice of the Superior Court

March 18, 2005

A true copy, Attest:

Clerk
asst.

24