UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **FAFARD REAL ESTATE &** | ) |
| DEVELOPMENT CORP., | ) |
| | ) |
| Plaintiff/Defendant-in Counterclaim | ) |
| | ) |
| vs. | ) |
| | ) |
| METRO-BOSTON BROADCASTING, | ) |
| INC., | ) |
| | ) |
| Defendant/Plaintiff-in-Counterclaim | ) |

Civil Action No. 04-11531 RGS

_____)

<u>DEFENDANT'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW</u>

Pursuant to Fed. R. Civ. P. 52, defendant and plaintiff-in-counterclaim Metro-Boston

Broadcasting, Inc. ("Metro-Boston"), as general partner of **Tower Sites Limited Partnership**

**("Tower Sites")** submits the following proposed findings of fact and rulings of law.  As a result

of the Court's allowance of a Motion to Bifurcate filed by plaintiff Fafard Real Estate and

Development Corp. ("Fafard"), the trial was limited to Fafard's claim for specific performance

and Tower Sites' defenses to that claim, reserving to a later trial Tower Sites' counterclaims for

abuse of process, intentional interference with advantageous business relations, and violation of

G.L. c. 93A.

As a result, **the only issues now before the Court are:**

(1)     Did Fafard prove that Fafard and Tower Sites made a valid agreement for the

purchase and sale of Tower Sites' land in Ashford?

(2)     If so, did Fafard prove that, on May 21, 2004, it was ready, willing, and able to

perform under the agreement?

      (3)      If so, did Fafard prove that it objectively manifested to Tower Sites its readiness, willingness, and ability to perform under the agreement?

If the answer to any of these questions is no, then judgment on the complaint must enter for Tower Sites. If the answer to all of these questions question is yes, then the next issues to be decided are:

      (4)      Was Tower Sites excused from performing under the purchase and sale agreement on May 21, 2004?

      (5)      Is Fafard otherwise barred from enforcing the purchase and sale agreement because of one or more of Tower Sites' defenses?

If the answer to any of these questions is yes, then judgment on the complaint must enter for Tower Sites.

With the issues so framed, Tower Sites proposes the following findings of fact and conclusions of law.

<u>PROPOSED FINDINGS OF FACT</u>

<u>The Parties</u>

      1.      **Metro-Boston is the general partner of Tower Sites. (Trial Memorandum, Stipulated or Admitted Facts, ¶ 2 ("Agreed Facts")). Metro-Boston is a Texas corporation and Tower Sites is a Texas limited partnership. (Metro-Boston's Counterclaim, ¶ 2 ("Counterclaim"); Fafard's Answer to Counterclaim, ¶ 2). Metro-Boston and Tower Sites have their principal places of business in Dallas, Texas. (<u>Id.</u>). Tower Sites owns land in Ashland, Massachusetts. (<u>Id.</u>; Agreed Facts ¶ 2).**

2.      Tower Sites is **not** a real estate company, and is not in the business of developing property.  (Tr. 3 at  30, 39).**[1]**  In her capacity as president of Metro-Boston and principle of Tower Sites, Mary Heller Halcomb has had little to no experience in selling real estate.  (Id. at 30).

3.      Fafard is a **Massachusetts** corporation with its principal place of business in Ashland, Massachusetts.  (Counterclaim, ¶ 3; **Fafard's Answer to Counterclaim, ¶ 3).  Fafard is a large, sophisticated real estate development company that has done over 1,000 real estate transactions in Massachusetts, including a number of transactions in Ashland.  (Tr. 1 at 9; Tr. 3 at 20, 35, 109).**

4.      **Richard Terrill is Senior Vice President and Chief Financial Officer at Fafard. (Fafard's Initial Disclosures, § I(b)).  Janice Hannert is a Land Planner at Fafard.  (Id. at § I(a)).  Paul Beattie is Fafard's in-house counsel.  (Tr. 1 at 5, 27, 48; Tr. 3 at 111).**

Tower Sites' Real Estate

5.      The land **owned** by Tower Sites in Ashland, Massachusetts consists of three separate but abutting lots – Lot 6B, Lot 11, and Lot 12.  (Ex. 7, at Ex. A; attachments to Ex. 108; Tr. 3 at 32-33).  T**hese** three parcels comprise about 40-50 acres.  (Id.).  Part of this land is zoned industrial, and part is zoned residential.  (Tr. 3 at 32-33).  A portion of Tower Sites land was the subject of a Purchase and Sale Agreement between Towers Sites, as seller, and Fafard, as buyer (the "P&S Agreement").  For ease of reference, the part of the land covered by the P&S Agreement will be referred to as the "Locus."

6.      Lot 6B was part of the Locus.  (Ex. 7, at Ex. A; attachments to Ex. 108).  It fronts on Tri Street on the southwestern side of the Locus.  (Id.).  It is a relatively small lot.  (Id.).  It is

---

**[1]** **The trial transcript is referred to as "Tr. X at Y" where X is the day number and Y is the page number.**

contiguous to Lot 12, also part of the Locus, which is considerably larger in size and which lies to the northeast of Lot 6B.  (Id.).  The southwest corner of Lot 12 has frontage on Tri Street. (Id.).  In addition, Adams Street, which runs in an east-west direction, dead ends on the eastern side of Lot 12.  (Attachments to Ex. 108).  Lot 6B and Lot 12 are, and at all material times have been, zoned residential.  (Tr. 3 at 32-33).  Though zoned residential, Lot 6B and  Lot 12 are undeveloped sites.  (Id. at 31).

7.      Lot 11 lies to the northeast of, and shares a long common border, with Lot 12. (Ex. 7, at Ex. A; Ex. 3).  Lot 11 is a relatively large lot, and appears to be the largest of the three lots owned by Tower Sites.  (Id.).  Lot 11 does not have any frontage per se on a public way. (Id.).  However, Sewall Road,[2] a street running in an east-west direction, ends at the northwest side of Lot 11 and provides access into and egress from Lot 11.  (Exs. 3, 85).

8.      Lot 11 is used as a site for five radio transmission towers or antennas, each 550-feet tall, equivalent to the height of a fifty-five story building.  (Tr. 3 at 30-31; Ex. 85).  Each tower is supported by a network of guy wires tied into massive concrete anchors embedded in the earth.  (Tr. 3 at 30-31).  Each tower has three sets of guy wires, spaced 120 degrees apart.  (Ex. 85).  Each tower also has an extensive grounding system, consisting of copper wires radiating out underground from the tower in spoke-like fashion for roughly 350 feet.  (Tr. 3 at 31; Tr. 4 at 17-18).  Each tower also has a protective glass sheath that helps facilitate the AM signal.  (Tr. 3 at 31).  The sheath is fragile and can be easily damaged.  (Id.).

9.      Tower Sites leases the radio transmitter towers to radio stations.  (Tr. 3 at 92).

---

[2]  **This public way is alternatively referred to as both "Sewall Road" and "Sewall Street."**

10.    Currently, Lot 11 is zoned industrial.  (Exs. 120, 121).  The zoning boundary line that separates the industrial zone from the residential zone runs along, and is the same line as, the property boundary line that separates Lot 11 from Lot 12.  (Id.).

11.    The parties' disagree, however, over when the zoning boundary line became the same line as the property line.

12.    It is Fafard's contention that, at one time, the zoning boundary line was located entirely within Lot 11, to the northeast of the Lot 11-Lot 12 property boundary line, as represented by a saw-tooth or zigzag shaped line shown in a 1979 drawing prepared by the engineering firm of McCarthy & Sullivan (the "1979 McCarthy Plan").  (Ex. 3).  **The 1979 McCarthy Plan showed a zoning line in the southwest portion of Lot 11, dividing Lot 11 into a residentially-zoned portion to the southwest and an industrially-zoned portion to the northeast. (**Exs. **3 and 122; Agreed Facts ¶ 3).**

13.    Fafard claims that this zoning line did not officially move to the property line until after May 2001, when the Ashland Town Meeting passed an amendment to Ashland's zoning by-law, which described the Ashland zoning maps by explicitly referencing the original 1971 zoning map, a 1998 revised zoning map, and a 2001 revised zoning map.  (Ex. 123).

14.    It is Tower Sites' contention that since at least 1998, the zoning boundary line was the same as the Lot 11-Lot 12 property boundary line, as shown in the 1998 revision to the official Ashland zoning map, as well as in the 2001 revision to the official Ashland zoning map.

15.    The credible evidence supports Tower Sites' contention and establishes that, since at least 1998, the zoning boundary line was the same as the Lot 11-Lot 12 property boundary line.  This is so for at least the following reasons:

a. **Mass. Gen. Laws 40A §4 makes the official zoning map of a town a part of the town's zoning ordinance. In other words, the map is as much a part of the ordinance as the text.**

b. **The only Ashland zoning maps in evidence are those dated 1998 and 2001. (Exs. 120, 121). They recite that they are official zoning maps of the Town of Ashland and are certified by the Ashland Town Clerk. (Id.). They both show** the zoning boundary line was the same as the Lot 11-Lot 12 property boundary line. (Id.).

c. In 1998, Fafard's engineering department prepared a conceptual site plan, Scheme A (Ex. 113), showing a possible residential development on the Tower Sites property. Fafard's plan showed the zoning boundary line being the same as the Lot 11-Lot 12 property boundary line. (Id.). It contains the notation "INDUSTRIAL" on the Lot 11 side of the boundary line, and the notation "RESIDENTIAL A" on the Lot 12 side of the boundary line. (Id.). For Fafard's engineering department to have developed this plan in 1998, it would have had to have relied on a source that Fafard considered reliable enough at the time as indicating the location of the zoning boundary.

d. The only evidence favorable to Fafard's position on this issue is the post-May 2001 amendment to the text of the Ashland zoning by-law, which expressly refers to the 1998 and 2001 zoning map revisions as two of the three maps comprising the official zoning maps of Ashland. (Ex. 123). Fafard interprets this textual amendment to mean that, until this textual language was adopted, the 1998 and

2001 zoning map revisions had no force or effect. The more logical interpretation is that this textual amendment was made (a) to correct an error appearing in the text of the by-law, which for some reason had not, until that point, mentioned the 1998 and 2001 revisions to the map, (b) to acknowledge the validity of the 1998 and 2001 revisions to the map, and (c) to make that section of the by-law consistent with zoning changes that had been made over the years and which had already been reflected in the 1998 and 2001 zoning maps. To credit Fafard's interpretation would be to subscribe to the implausible view that from 1971 until sometime after May 2001, the Ashland Town Meeting never once rezoned any property within the town, and never intended to do so until it corrected this particular textual reference to refer expressly to the 1998 and 2001 zoning map revisions. To credit Fafard's interpretation would also mean that the 1998 amendment never had any effect, since the 1998 revisions would have been immediately superseded or supplanted by the 2001 map when the post-May 2001 vote was cast. If this were so, there would have been no need whatsoever to refer to the 1998 map amendment: in the post-May 2001 vote, the Town Meeting only would have needed to reference one zoning map, the May 2001 zoning map.

e.      Given that zoning maps are relied on by developers, builders, buyers, sellers, and lenders, it is not likely the Town of Ashland would have published an official zoning map in 1998 if that map did not reflect how the Ashland Town Meeting had established the various zoning districts within the town up to that point.

f.      There is no evidence in the record of any inaccuracy or negligence in the drawing of any zoning district in the 1998 map or any conflict between the 1998 map and

any textual description in the by-law of the location of zoning districts. Absent

such evidence, the 1998 zoning map is prima facie evidence and, on this record,

uncontested evidence of how the Town Meeting had located the various zoning

districts of the Town as of that point in time. There is no evidence of any changes

to the location of the zoning districts after 1998, insofar as the Locus is

concerned.

The Negotiations, The Zoning Boundary Mistake, And The Purchase And Sale Agreement

16.     The residentially zoned **portion** of Tower Sites' property is undeveloped. (Tr. 3 at

38-39). Not being a real estate developer like Fafard, Tower Sites was not in a **position** to put

the land to valuable use and sought to sell it. (Id.).

17.     At least as early as 1997, Tower Sites and Fafard had entered into discussions

concerning the sale of Tower Sites' residentially zoned property in Ashland, Massachusetts to

Fafard. (Ex. 116). In those discussions, Fafard had asked Tower Sites whether it was interested

"in selling just the residential portion," and Tower Sites replied that it was. (Id.). Tower Sites

was interested in keeping the more valuable (at least to Tower Sites) industrially zoned parcel

and perhaps selling it to someone else. (Id.; Tr. 3 at 38-39).

18.     On April 15, 1998, Ms. Halcomb sent a letter to Ms. Hannert, in which Ms.

Halcomb identified the property proposed to be sold by Tower Sites to Fafard as the parcels

"zoned residential," specifically identifying Lot 12, Lot 6B, and "approx. 10 acres in Lot 11,

zoned residential." (Ex. 108).

19.     At the time, Fafard was not particularly interested in going forward with a

purchase of the property because residential developments needed to be served by a sewer line

and the Town of Ashland had placed a moratorium on the installation of new sewer lines. (Tr. 1

at 65-66).

20.    Negotiations between the parties picked up again in 2000.  In March 2000, Ms. Halcomb wrote to Ms. Hannert regarding the "Residential Land Sales Agreement" in which Ms. Halcomb discussed Tower site's interest in selling Fafard the residential land, again referring to Lot 11 as having a "residential section."  (Ex. 109).  Although Tower Sites had offered the land to Fafard for $400,000, Fafard had insisted on paying only $339,000 for the land because the land had no sewer line and Ashland still had a sewer moratorium.  (Tr. 3 at 35).

21.    Tower Sites had agreed to the $339,000 initially on the condition that Fafard buy the land on an "as is, where is" basis, without contingencies.  (Ex. 109).  However, Fafard would not accept Tower Sites' condition.  Fafard explained to Tower Sites that Fafard never buys land without contingencies, and that Fafard would not buy the land unless Fafard were assured that it had everything it needed to proceed with its planned residential development.  (Tr. 1 at 69-70).  Believing that Fafard was the only party who would buy this land, Tower Sites accepted Fafard's price and Fafard's conditions.  (Tr. 3 at 35).

22.    It was the parties' intention that the property line separating the land Tower Sites would keep from the land Tower Sites would convey to Fafard would be the same as the zoning boundary line.  When the parties discussed the land to be sold, the parties had consulted the 1979 McCarthy & Sullivan Plan to inform them about the land to be included in the sale.  **(Exs. 3 and 122; Tr. 2 at 107-109; Tr. 3 at 9, 17; Agreed Facts ¶ 3)**.  Both parties understood and intended that the land to be purchased was only the land that was zoned residential, and both parties believed that the 1979 McCarthy & Sullivan Plan accurately showed the zoning boundary between residential and industrial land as running through Lot 11, represented by the saw-tooth or zigzag line.  (*See* Finding Nos. 12, 17 and 18 above).

23.     When the purchase and sale agreement was drafted and signed, it described the land to be conveyed as Lots 12 and 6B (9.6 acres) and a portion of Lot 11 (10 acres) as shown on a plan attached to the agreement.  (Ex. 7 ¶ 2).  The plan attached to the agreement was a photo-reduced copy of a land plan with a hand-drawn saw-tooth line cutting across a portion of Lot 11 and hand-drawn cross-hatching.  (Ex. 7, at Ex. A).  This hand-drawn saw-tooth line was intended to be a rough approximation of where the parties believed the zoning line existed between industrial and residential on Lot 11 as shown on the 1979 McCarthy & Sullivan Plan.  (Tr. 1 at 46; Tr. 3 at 43-44).  Both parties understood that the hand-drawn saw-tooth line did not represent where the actual property line would ultimately exist.  (Id.).

24.     There is a dispute of fact over what land the parties intended to include in the conveyance.  It is Fafard's position that the parties intended to include the portion of Lot 11 to the southwest of the saw-tooth line as shown on the 1979 McCarthy & Sullivan drawing, regardless of how that land was zoned and of where the zoning boundary line was.  It is Tower Site's position that the parties intended to include only the portion of Tower Site's land that was zoned residential, that the property line was to be the same as the zoning line, and that the saw-tooth line was used in the purchase and sale agreement to represent graphically what the parties both believed at the time was the approximate location of the existing zoning line.

25.     For at least the reasons below, the credible evidence supports Tower Sites' position and establishes that the parties intended to include only the portion of Tower Sites' land that was zoned residential, and that the parties were operating under the mutual belief that the saw-tooth line on Lot 11, as depicted in the 1979 McCarthy & Sullivan Plan, was the location of the zoning line:

a.   **The correspondence and discussions before the agreement was signed show that the parties were only bargaining over a sale of residentially zoned land. (Exs. 108, 109, 116; Tr. 3 at 38-43).**

b.   **Fafard was a developer of residential land, and intended to cr**eate a residential development on the property. (Tr. 2 at 31-32; Tr. 3 at 94, 118-119).

c.   **Tower Sites needed the industrial land for its radio tower business. (Tr. 3 at 38-39). The industrial land was more valuable to Tower Sites. (Id. at 39). The zoning classification of land can affect value, and the price that the parties agreed upon was premised on the understanding that the land to be conveyed was zoned for residential use.**

d.   **The purchase and sale agreement contained a clause giving Fafard the right to petition the Town of Ashland to straighten the zoning boundary line. 9Ex. 7 , at Ex. B). This was an obvious reference to the saw-tooth or zigzag line. It would not have made sense to include such a clause in the agreement if, after a straightening of the zoning line, the land to be conveyed was still going to be defined by the saw-tooth or zigzag line. In fact, it was Fafard's understanding that, if the zoning line were straightened, it would be to create a more usable area for Fafard's residential development, which could only happen if the property line and the zoning line were the same line. (Tr. 2, at 108-11).**
Indeed, both parties intended that the straightened zoning line, wherever that ended up being placed, would also be the property boundary line of the land being

sold to Fafard, such that Fafard would be buying only residentially zoned land.
(Tr. 3 at 9, 39-40, 120).

26.    **Fafard and Metro-Boston signed the P&S Agreement on January 31, 2001.  (Ex. 7; Agreed Facts ¶ 4).**

27.    **To address Fafard's insistence that Fafard not be obligated to purchase the property unless Fafard knew that it could do the residential development it planned for the site, the P&S Agreement contained a generous contingency that relieved Fafard from the agreement, without penalty, if Fafard did not obtain all the permits and approvals it needed for the development it planned.**  (Ex. 7, at Ex. B).  **The P&S Agreement gave Fafard a one year period, i.e. until January 31, 2002, to obtain its permits and approvals.**  (Id.).  **Although the P&S Agreement obligated Fafard to submit quarterly reports to Tower Sites regarding its progress in obtaining permits, it did not obligate Fafard to pursue any specific permits or approvals or to proceed with any specified level of diligence.**  (Id.).  **It did, however,** contain a non-exhaustive list of the types of permits and approvals Fafard would need to obtain, such as subdivision approval, building permits, sewer extension and **connection** permits, water connection permits, and an order of conditions.  (Id.).  Obtaining these permits and approvals was described in the P&S Agreement as a "contingency of the sale." (Id.).

28.    These provisions gave Fafard the functional equivalent of an option to purchase the property, an option for which Tower Sites received no consideration other than Fafard's promise to pay the purchase price if Fafard exercised its option and elected to go forward with the purchase.

29.    **The P&S Agreement was drafted by Fafard's in-house counsel Paul Beattie.**
(Tr. 1 at 5).  Tower Sites was not represented by counsel during the negotiation and drafting of

the P&S Agreement.  (Tr. 3 at 44).

30.    The purchase price under the P&S Agreement was $339,000.00.  (Ex. 7, ¶ 7).  It called for Fafard to post a $33,900.00 in escrow with its own attorney Mr. Beattie.  (Ex. 7, ¶¶ 7, 20).

31.    The P&S Agreement contains a paragraph under which Tower Sites, if it is unable to give clean title or otherwise perform in accordance with the provisions of the P&S Agreement, may give written notice to Fafard at or before the time of performance to obtain an automatic 30-day extension of the time for performance.  (Ex. 7, ¶ 10).  If at the expiration of this 30-day period Tower Sites is still unable to give clean title or otherwise deliver possession of the property in conformance with the provisions of the P&S Agreement, Tower Sites is relieved from performing, without either party having recourse to the other, except that Fafard would then have the option of paying full price and taking whatever title Tower Sites could then deliver.  (Id. at ¶¶ 11-12).

32.    One issue the parties **anticipated** was the possibility that guy wires extending from the radio towers on Lot 11 might extend onto the Locus.  (Ex. 112).  The parties understood that, if there were any such guy wires, certain precautions and protective measures would have to be taken to ensure that the conveyance did not interfere with the existing tower operations.  (Tr. 2 at 108; Tr. 3 at 10, 40-41).  Accordingly, the P&S Agreement required Fafard to "locate existing guy wire [on] plan and determine whether easement or relocation is necessary."  (Ex. 7, at Ex. B).

33.    **Although the P&S Agreement stated that it "sets forth the entire contract between the parties" (Ex. 7, ¶ 27), it provided a date, but no time of day, for the closing. (Ex. 7).**

**The Access Issue And Fafard's Multiple Extension Requests**

34.    For Fafard to build its desired residential development, it needed to subdivide the

land and build a road through the **property.**  (Tr. 2 at 36-38; Tr. 3 at 122).  Because subdivision

rules for the Town of Ashland placed limits on the length of dead end streets.  (Tr. 2 at 36-38),

Fafard determined that, to do its planned residential development, it needed to build a through

road over the land to connect to the system of public ways at two points, and thereby avoid the

Ashland dead-end limitations.  (Tr. 3 at 122).  By building a through road, Fafard would thereby

create more frontage, which in turn would enable Fafard to create more buildable lots.  (Tr. 1 at

122-123).  Fafard's intent to build a through road across the property with two access points is

evidenced in two concept plans created by Fafard in 1998, both of which show proposed roads

connecting to Adams Road to the east and Tri Street to the southwest.  (Exs. 113 and 114).

Adams Road and Tri Street are the only two public ways that touch the Locus.  (Id.).

35.    Sometime in 2001, after the P&S Agreement was signed, Fafard learned that it

could not build a road into the property from Tri Street because the portion of the property

abutting Tri Street consisted of wetlands that could not be disturbed.  (Tr. 2 at 38; 41-42, 78).

Because Fafard needed to have two means of access into the property for its planned subdivision,

Fafard reviewed the plans of the locus and surrounding property and identified Sewall Road as

the only other possible way of obtaining a second means of access.  (Tr. 3 at 127).

36.    Sewall Road is a public way that connects to Tower Sites' property at the

northwest corner of Lot 11.  (Ex. 3).  It does not connect to the Locus.  (Id.).  It could only have

been used as a means of access by building a road across Tower Sites' industrial property on Lot

11 between the Locus and Sewall Road.  (Id.; Tr. 2 at 40; Tr. 3 at 129).  This would have

required Fafard to work out an agreement for either an easement or acquisition of additional land

in Lot 11 between the Locus and Sewall Road.  (Tr. 2 at 40; Tr. 3 at 129).

37.     **To that end, on October 31, 2001, Ms. Hannert faxed Ms. Halcomb an offer from Fafard to purchase an additional 5 acres in Lot 11 in order to connect the Locus to Sewall Road.  (Ex. 10).  The offer included a rough, hand-drawn sketch of the portion of Lot 11 Fafard was proposing to buy from Tower Sites.  (Id.).  On the fax cover sheet, Ms. Hannert told Ms. Halcomb: "We need to acquire additional land to gain access to the residential portion of the property."  (Id.).**

38.     Fafard's offer for additional land was unacceptable to Tower Sites.  Tower Sites found Fafard's proposed price to be too low.  (Ex. 12).  Tower Sites was also concerned that Fafard's proposal would interfere with the operation of the radio antenna towers, would be contrary to the interests of the tower lessees, would create engineering issues, and would impair the value and marketability of the industrial land.  (Id.; Tr. 3 at 49-51).  Nonetheless, in the spirit of being helpful, Tower Sites was willing to try to explore ways to address Fafard's expressed need for access to Sewall Road in a manner that would not be detrimental to Tower Sites' interests in Lot 11 and the interests of the tower lessees.  Accordingly, in November 2001, Tower Sites asked Fafard for "specific information regarding exactly where would Sewall Rd. be placed through the Industrial tract."  (Ex. 12).

39.     For its part, Fafard was not quick to respond with the information Tower Sites had requested.  In January 2002, Fafard provided "a larger plan of the additional area" it wanted to acquire, but no specifics.  (Ex. 15).  It did, however, reiterate that Fafard "need[ed] access through the frontage out to Sewall Street but not the actual frontage" (Id.), meaning that it needed to be able to connect a road from the Locus to Sewall Road.  During a phone call with Ms. Halcomb on January 17, 2002, Ms. Hannert told Ms. Halcomb that Fafard "had not been

able to do much of anything of planning for the site since [Fafard] determined that [Fafard]
needed the additional access." (Ex. 111).

40.    On January 22, 2002, Fafard asked Tower Sites to extend the time under the P&S
Agreement for Fafard to finish getting the permits and approvals it needed and to close on the
purchase. Tower Sites agreed to the extension. (Ex. 17). This was supposed to have been what
Fafard had earlier described as "a short extension." (Ex. 14).

41.    On February 27, 2002, Fafard sent an e-mail to Tower Sites stating that Fafard
"need[ed] to get an agreement on the additional 5 acres. We need the access to get out to Sewall
Street." (Ex. 19). On March 21, 2002, as Fafard's extended deadline to obtain permits and
approvals (Ex. 17) was coming up, Ms. Hannert wrote another e-mail to Tower Sites and said: "I
need to get a response from you on the additional 5 acres. We can not access the residential
portion of the land without it (2 access roads will be needed)." (Ex. 19).

42.    By these e-mails and its other communications with Tower Sites, Fafard meant to
convey a sense not simply of importance, but of essentialness, about Fafard's need to get access
to Sewall Road. Fafard knew that Tower Sites was eager to close on the property by virtue of
Tower Sites having shortened the extension periods requested by Fafard on numerous occasions
(Exs 17, 40, 44, 49, 51-52, 55, 65), inserting handwritten language into the extension agreements
stating that **if F**afard is able to obtain permits prior to the extended deadlines closing could take
place at an earlier date (Ex. 30), and writing on the extension agreements that "time is of the
essence" and that "buyer agrees to pursue the permits with due diligence." (Exs. 33 and 40).
Knowing of Tower Sites' eagerness to close, and knowing that Tower Sites understood that
Fafard could basically walk away from the P&S Agreement without penalty, it is a fair inference
that, in part, these e-mails and communications were meant to gain some negotiating leverage

over Tower Sites with respect to Sewall Road by inducing Tower Sites to believe that unless Tower Sites agreed on an arrangement to give Fafard access to Sewall Road, Fafard would not go forward with the purchase of the Locus.

43.    These e-mails and similar statements by Fafard had the effect Fafard desired.  In the spring of 2002, Tower Sites, at its own expense and without any obligation to do so (Tr. 3 at 55), retained the engineering firm of Hancock Survey Associates ("Hancock") to explore ways in which a connecting road could be laid out between the Locus and Sewall Road over Lot 11. (Exs. 20, 21).  Tower Sites would not have taken this step unless it believed that it would lose Fafard as a buyer for the Locus if Tower Sites did not come up with a way to give Fafard access to Sewall Road.

44.    Fafard was aware of the effect that its statements had on Tower Sites.  On July 31, 2002, Ms. Hannert had faxed Daniel Bremser from Hancock a drawing of the Locus, intending to give him information that he could use for finding a way to provide Fafard with access to Sewall Road.  (Ex. 31).  To reinforce the essential nature of Sewall Road access, Fafard told Bremser (knowing Bremser had been retained by Tower Sites) that Fafard "can not access [the Locus] from Tri Street because of wetland buffer zones and need[s] to access the site through Sewall Street."  (Id.).

45.    On May 19, 2003, after procuring a few more extensions of the P&S Agreement from Tower Sites, Ms. Hannert sent Tower Sites a fax (Ex. 35) with "a sketch showing the connection between the [Locus] and Sewall Street."  The sketch was intended to respond to Tower Sites request from the fall of 2001, a year and a half earlier, for more specific information about the precise location of the proposed connecting road over Lot 11 that Fafard said it needed. (Ex. 12).  However, the sketch was essentially unhelpful, as it was nothing more than a

professionally drawn version of the hand-drawn sketch that Fafard had initially provided, and did not address any of Tower Sites' previously expressed concerns.  (Exs. 14, 15).

46.    In its May 19, 2003 fax, Fafard told Tower Sites that Fafard "need[ed] written confirmation from [Tower Sites] that this access [to Sewall Road] is available for our use as a joint access.  We would also like to obtain additional acreage if it is available but that is a separate issue."  (Ex. 35).  By this message, Fafard intended to reinforce in Tower Sites mind not simply that Fafard had a need for access to Sewall Road, but that Fafard would not go forward with the purchase of the Locus unless Tower Sites granted Fafard at least an easement – a writing granting Fafard "use as a joint access" – to Sewall Road.  This was in contrast to purchasing additional land in Lot 11, which Fafard indicated was desirable but not essential.

47.    On November 6, 2003, after obtaining a number of additional extensions of the P&S Agreement from Tower Sites, and with an extension about to expire that very day, Fafard sent Tower Sites a fax (Ex. 60), stating that Fafard "need[s] an answer to the access issue.  Attached is another copy of the sketch showing the location where we need to access the property.  The Tri Street access is unusable so we need to access the property from Sewall Street as joint access with other adjacent owners. . . .  We are ready to close on the property but need to obtain approval to access through Sewall Street and the update of the property line."  By this fax, Fafard was still communicating to Tower Sites its unwillingness to close on the purchase of the Locus in the absence of an agreement giving Fafard the right to connect the Locus to Sewall Road by way of a connecting road over Lot 11.  This is the same message Fafard had been giving Tower Sites for a year and half.

48.    Thereafter, Fafard asked Tower Sites for, and Tower Sites granted, a number of additional extensions of the P&S Agreement.  On November 7, 2003 (Ex. 62), February 14, 2004

(Ex. 87), February 26, 2004 (Ex. 88), March 19, 2004 (Ex. 90), April 16, 2004 (Ex. 92), May 7, 2004 (Ex. 94), May 17, 2004 (Ex. 95), and May 20, 2004 (Ex. 97), Fafard sent extension requests to Tower Sites with a transmittal fax stating: "We are ready to close on this property. We need to resolve the access issue out to Sewall Street, need clean title … and need a plan we can deed off of."

49.     There is no dispute that Tower Sites understood this statement to mean that Fafard was not ready or willing to close unless Tower Sites' granted Fafard an easement or some other right of access to Sewall Road. (Tr. 3 at 94-95).

50.     There is a dispute about (a) what Fafard actually meant by this language and (b) what a reasonable person in Tower Sites' position would have understood Fafard to have meant. Fafard's position is that Fafard meant this language to express its unconditional readiness to close, and that a reasonable person in Tower Sites' position would have so understood this. Fafard's position is that the reference in the second sentence – to needing a resolution of the access issue to Sewall Road – was simply meant to express a desire to know whether Tower Sites would grant Fafard an easement to Sewall Road, and was not meant to express a need by Fafard to receive such an easement or to receive some other right of access to Sewall Road as a condition of the closing. Fafard's position is that this is how a reasonable person in Tower Sites' position would have understood this language. Tower Sites' position is that this language expressed Fafard's *conditional* readiness and willingness to close, that Fafard was not ready or willing to close unless Tower Sites also granted Fafard an easement or some other right of access to connect the Locus to Sewall Road, and that this is how a reasonable person in Tower Sites' position would have understood Fafard's statements.

51.     The credible evidence supports Tower Sites' position and establishes that the

language in these faxes expressed Fafard's *conditional* readiness and willingness to close, that Fafard was not ready or willing to close unless Tower Sites also granted Fafard an easement or some other right of access to connect the Locus to Sewall Road, and that this is how a reasonable person in Tower Sites' position would have understood Fafard's statements.  This is so for at least the following reasons:

a.    **If Fafard were ready and willing to close without getting an easement or some other right of access to** Sewall Road**, Fafard would have said so unequivocally and unambiguously.  Because of the strength of Fafard's consistent message to Tower Sites over a period of one and a half to two years about Fafard's need to have access to** Sewall Road**, and Fafard's need to have those rights in writing, Fafard (if it were acting honestly) would not have used this language in the May 2004 faxes if Fafard had truly changed its mind.  The language Fafard employed to express its intention – that Fafard needed to have the issue of access to** Sewall Road **resolved – was so subtle a change from the statements Fafard had used in the past that Fafard could not have intended any change in meaning.  Had Fafard changed its mind, and intended to communicate that it had changed its mind, Fafard would have stated so explicitly, rather than using language so closely resembling the statements it had made in the past.**

b.    **Fafard's statements were made in conjunction with Fafard's requests for an extension of the P&S Agreement.  Parties do not request extensions of time for performance when they are ready, willing, and able to perform.  Rather, they tell the other party unambiguously that they are ready to close, without seeking additional time for performance.  In this case,** Fafard had consistently justified

and explained its repeated extension requests on its need for access through Sewall Road. (Exs. 35, 60, 62, 87-88, 90, 92, 94-95, 97).

c.   **The other two things Fafard said it needed, in addition to resolving the issue of access to** Sewall Road**, were (a) clean title and (b) a plan to deed off of.** (Exs. 87-88, 90, 92, 94-95, 97). **These latter two things were clearly things that Fafard needed for closing and expected Tower Sites to provide. (Tr. 2 at 99; Tr. 3 at 111, 118). By including them in very the same sentence as Fafard's expressed need to resolve the issue of access to** Sewall Road**, Fafard intended to communicate its position that it needed access to** Sewall Road**, just as it needed clean title and a plan to deed off of, before it would close.**

d.   **A statement by Fafard that Fafard was "ready to close" did not mean that Fafard was unconditionally ready and willing to close. On November 6, 2003, Fafard had told Tower Sites that Fafard was "**ready to close on the property but need to obtain approval to access through Sewall Street…." (Ex. 60). In this instance, it is quite clear that, although Fafard had said it was "ready to close," Fafard's readiness and willingness to close was contingent on "obtain[ing] approval to access through Sewall Street." The next day, November 7, 2003, Fafard used very similar words to express the same thought: "We are ready to close on this property. We need to resolve the access issue out to Sewall Street." (Ex. 62). To be sure, on November 7 Fafard did not use the word "but" as Fafard had used on November 6, and Fafard said that it needed to "resolve the access issue out to Sewall Street" rather than "obtain approval to access through Sewall

- 21 -

Street."  But these word changes were too subtle to convey any change in meaning or intent from what Fafard had said on November 6.  They were just a slightly different way of saying the same thing.  Fafard's message on November 7, which Fafard consistently repeated *in hac verba* in repeated faxes to Tower Sites up to May 20, 2004, therefore had to have the same meaning and intent as Fafard's statement to Tower Sites on November 6.

e.    In cross examination, Fafard's senior vice president Richard Terrill, who was Fafard's decision maker on this transaction, admitted that Fafard's decision whether to close on the property without getting access to Sewall Road would not have been made until the "agreement was close to running out or [Fafard] didn't have an extension."  (Tr. 3 at 115).  Because (i) the evidence is so clear that, from 2001 forward, Fafard was unwilling to close without getting access to Sewall Road, (ii) Mr. Terrill admitted that a contrary decision would not have been made until the agreement was about to expire without an extension in place, (iii) it was not until May 21, 2004 when the agreement was about to expire and Fafard had failed in its effort to obtain an extension, it follows that at the time Fafard had sent Exhibits 62, 87, 88, 90, 92, 94, 95, and 97 to Tower Sites, Fafard was still neither ready nor willing to close on the property unless it had been granted access to Sewall Road.

f.    **When asked whether her May 2004 statements about the three things Fafard needed were truthful, the author of the faxes – Ms. Hannert – was unable to answer yes or no.  (Tr. 2 at 98-104).  She obviously knew what she intended when she authored the fax.  She must have understood that a "yes" answer to**

the question would undercut Fafard's position that Fafard was ready, willing, and able to close. She must also have understood that a "no" answer to the question would be evidence that Fafard had misrepresented its state of mind. Hence, she professed an inability to answer the question.

g.     On May 21, 2004, the day the P&S Agreement expired, Tower Sites wrote a letter to Fafard explaining that, because Fafard had consistently said it needed access to Sewall Road, and because Tower Sites had determined that it was unable to provide such access, Tower Sites would not extend the P&S Agreement any more and would consider the agreement to be terminated. (Ex. 98). If Fafard had not needed, but merely wanted, access to Sewall Road, one would have expected Fafard to contact Tower Sites, to explain that Tower Sites was mistaken and that Fafard was willing to close without getting access to Sewall Road, and to try to set up a new closing date. Fafard did not do that. (Tr. 1 at 47; Tr. 3 at 105-106).

52.    Even if Fafard had privately decided at some point that it would close without getting access to Sewall Road, Fafard had strategic business reasons for keeping that decision confidential and not telling Tower Sites about it until it became apparent that Tower Sites would no longer extend the P&S Agreement. There is no dispute that Fafard very much wanted, and told Tower Sites that it needed, access to Sewall Road. There is also no dispute that Fafard would not be able to get that access without Tower Sites' agreement. There is also no dispute that Tower Sites was trying in good faith to find a way to make a Sewall Road access available to Fafard, and was working hard to make all of the pieces of that puzzle come

together, for example, by trying to resolve the engineering issues, trying to obtain consent from its tower lessees, and trying to obtain consent from the parties who were interested in buying Tower Sites industrial land.  (Tr. 3 at 92-94).  Fafard very much benefited from Tower Sites doing this work.  If Tower Sites did not do this work, Fafard would have had no chance of getting access to Sewall Road.  Fafard came to realize early on that the only reason Tower Sites was doing this work was because Fafard was saying that it "needed" access to Sewall Road, thus preying on Tower Sites' insecurity that Fafard would walk away from the deal if access to Sewall Road were not included.  Indeed, Tower Sites had repeatedly let Fafard know of its impatience to close this deal, and its frustration with Fafard's repeated extension requests.  (See Finding No. 42 above).  The fact that, in the face of Tower Sites' impatience, Tower Sites was working so hard to make access to Sewall Road available was a strong indication of Fafard's leverage over Tower Sites.  Had Fafard told Tower Sites that Fafard was willing to close on the purchase of the Locus without getting access to Sewall Road, Fafard ran a significant risk of losing its leverage over Tower Sites and a significant risk that Tower Sites would cease its efforts to work out an access arrangement for Fafard and would simply move the transaction forward for closing.

53.    For these reasons, Fafard was intent on coupling the Sewall Road access issue to a closing on the purchase of the Locus for as long as it possibly could.

54.    In total, between the time the P&S Agreement was executed in January 2001 April 2004, Fafard had requested and obtained 25 extensions of the deadlines set forth in the P&S Agreement.  (See chart attached as Exhibit A, listing the date of each extension request, the date each extension request was signed by the parties, the date set for performance by each extension request, and the exhibit numbers where each extension request can be found).

55.     Moreover, during the same period of time, there are at least 20 documented instances – in Fafard's own words – of Fafard telling Tower Sites that it "needed" to have access to Sewall Road.  (See chart attached as Exhibit B, listing the date, form and substance of each statement that Fafard "needs" access through Sewall Road, and the exhibit numbers where each statement can be found).  These statements also included, at various times, Fafard's informing Tower Sites that Fafard is at a standstill and needed such access to make Fafard's project work, (Ex. 111, note of February 21, 2002), that Fafard could not get out of the Locus without access to Sewall Road (Exs. 19 and 22), that Fafard "need[s] written confirmation from [Tower sites] that this access is available for [Fafard's] use as joint access" (Ex. 35), that Fafard "cannot move forward" without access to Sewall Road (Ex. 111, note of May 27, 2003), that Fafard is ready to close "but need[s] to obtain approval to access through Sewall Street (Ex. 60), and that the purchase of a house on Tri Street was not a solution to Fafard's access problems.  (Ex. 111, note of October 16, 2003).

**Fafard's Contingency Plan And The Sham Closings**

56.     **Fafard knew it was running a risk that, by not decoupling the** Sewall Road **access issue from a closing on the purchase, Tower Sites might at some point not extend the P&S Agreement and might declare the agreement terminated on account of Fafard not being ready, willing, or able to close on the purchase of the Locus.**

57.     **Fafard had a contingency plan to address this risk.  If it ever appeared to Fafard that the deadline for performance was looming and that Tower Sites had not extended the P&S Agreement, Fafard's plan was to (a) go to the registry of deeds on the agreement's expiration date as if to close on the purchase of the property, (b) page Tower Sites, and then (c) take the position that Tower Sites was in default.  Thereafter, Fafard intended to sue Tower Sites for**

specific performance and obtain a *lis pendens* on the property, which would continue Fafard's leverage over Tower Sites and maximize Fafard's chances of working out a deal with Tower Sites to buy the property and obtain access to Sewall Road.

58.    An essential element of this plan was that Fafard would not tell Tower Sites of Fafard's intention to appear at the registry, for a disclosure would tip off Tower Sites to send a representative to the registry of deeds.  Without Tower Sites at the registry, Fafard could comfortably expect that no one would answer Fafard's page, which would strengthen Fafard's argument that Tower Sites was in default.  If Tower Sites had a representative at the registry, Fafard ran the risk that Tower Sites would answer the page, and would either (a) tender a deed (which Fafard might not have been prepared to accept) or (b) exercise its right under the P&S Agreement to extend the closing date for 30 days.

59.    Another reason this contingency plan required that Fafard not tell Tower Sites of its intention to go the registry was because Fafard would not have known, while going to the registry, whether an extension from Tower Sites was on its way.  Fafard had always faxed its extension requests to Tower Sites in Texas and had to wait for Tower Sites to fax them back. There were times Tower Sites would not return the extension agreement until the eleventh hour.  (Tr. 1 at 19).  If Fafard went to the registry in the mistaken belief that no extension was forthcoming when in fact Tower Sites was just about to send back the signed extension, and if Fafard were to have given Tower Sites notice – even last minute notice – that Fafard was going to the registry, then Fafard ran the risk that Tower Sites would either not return the extension (while Fafard would have preferred getting the extension) or that Tower Sites would return the extension but refuse all future extension requests and cease its efforts find a way to give Fafard access to Sewall Road, since Tower Sites then could have believed that Fafard would close

without getting access to Sewall Road.  Indeed, by giving Tower Sites last minute notice of

Fafard's intent to go to the registry, Fafard would have given Tower Sites reason to distrust

Fafard, as such notice could have indicated to Tower Sites that Fafard had been

misrepresenting its need for access to Sewall Road.  On the other hand, by not tipping off

Tower Sites that Fafard was on its way to the registry, Fafard would then have been in a

position to see, upon returning from the registry, whether Tower Sites had signed and returned

an extension.  If Tower Sites had returned the extension, Fafard would disregard its attempt to

declare Tower Sites in default, would not tell Tower Sites about the trip to the registry, and

would continue to deal with Tower Sites as it had in the past in a manner designed to procure

access rights to Sewall Road.  If Tower Sites had not returned the extension, Fafard would take

the position that Tower Sites was in default and would sue Tower Sites for specific

performance.

      60.     **Fafard put this contingency plan into action twice.**

      61.     **On the first occasion, the P&S Agreement had been extended to November 7,**

**2003.  (Exs. 55-56).  Although Fafard had requested a new extension, Tower Sites had not**

**sent one in.  On the afternoon of November 7, not having received a signed extension back**

**from Tower Sites,  Fafard sent Mr. Beattie to the registry for the purpose of "defaulting"**

**Tower Sites.  (Tr. 1 at 13).  Although the P&S Agreement did not state a time of day for the**

**closing, Mr. Beattie arrived at the registry at 3:30 p.m., which was the soonest he could get**

**there after Mr. Terrill told him to go to the registry to "default" Tower Sites.  (Id. at 35, 38).**

**Mr. Beattie stayed at the registry for a half hour, paged Tower Sites twice, and left.  (Id. at**

**35).  Mr. Beattie knew** that nobody from Tower Sites would be appearing.  (Id. at 14-15).

**Although Fafard had contemplated giving Tower Sites contemporaneous (not advanced) notice**

of Mr. Beattie's presence at the registry (Ex. 117), Fafard decided not to notify Tower Sites at all. (Tr. 2 at 116-17). While Mr. Beattie was at the registry, Fafard received a signed extension from Tower Sites, which Tower Sites had signed the previous day (Ex. 59), and Fafard therefore abandoned the idea of telling Tower Sites about Mr. Beattie's trip to the registry. (Tr. 2 at 116-17). Because Fafard received the signed extension, Fafard allowed Tower Sites, during that extension period and later extension periods, to keep trying to arrange for Fafard to get access to Sewall Road.

62.     **The second occasion Fafard went to the registry was on May 21, 2004, the day the parties' last extension expired. (Exs. 92-93). For two weeks before that date, Fafard had tried to get another extension from Tower Sites by faxing extension requests on May 7, May 14, and May 20. (Exs. 94-95, 97). Although Fafard had left telephone messages for Tower Sites to the effect that Tower Sites should check its fax machine for extension requests, Fafard did not say anything about an intention to close on the property if Tower Sites did not sign and return the extensions. (Tr. 3 at 102-103).**

63.     **On May 21, 2004, not having received any further extension from Tower Sites, Mr. Terrill told Mr. Beattie to go the registry to "default" Tower Sites. (Tr. 1 at 15). As it did in November 2003,** Fafard did not attempt to call, fax, or email Tower Sites to give notice that Mr. Beattie would be appearing at the registry. (Tr. 1 at 16-17; Tr. 3 at 75). Because the P&S Agreement did not set a time of day for closing, Mr. Beattie simply showed up at the registry at about 11:30 a.m., a time unilaterally chosen by Fafard without notice to Tower Sites. (Tr. 1 at 33).

64.     Fafard had no expectation that Tower Sites would appear at the registry. (Tr. 1 at 20). No one from Fafard actually believed that Tower Sites would be present at the registry, and

indeed Mr. Beattie expected that Tower Sites would <u>not</u> appear.  (<u>Id</u>.).  This is not surprising.  Up until that time, Fafard had led Tower Sites to believe that Fafard needed access to Sewall Road as part of the transaction, and had said nothing to the contrary to Tower Sites.  Indeed, Fafard's statements about needing access to Sewall Road induced Tower Sites to take no action with respect to closing on May 21, 2004.  Fafard's statement were precisely the reason why Tower Sites believed that Fafard was not ready or willing to close on May 21, 2004 and why Tower Sites had no reason to believe that Fafard would appear at the registry for a closing.

65.    As Fafard expected, Tower Sites did not appear at the registry on May 21, 2004. When Mr. Beattie arrived at the registry, he paged Tower Sites four times over the course of an hour, and then left.  (Tr. 1 at 33).

66.    Fafard's failure to tell Tower Sites of its intention to appear at the registry under these circumstances (where Fafard had asked Tower Sites for an extension at the same time as it told Fafard that it needed to resolve the access issue to Sewall Road, which by then was three years old) was prejudicial to Tower Sites.  Had Fafard made such a disclosure, and had the disclosure been done in a timely manner, Tower Sites not only would have sent a representative to the registry but, if necessary to avoid being in breach, Tower Sites would have exercised its automatic right for a 30 day extension of time to take whatever actions were required of Tower Sites to perform in accordance with the P&S Agreement.  (Tr. 3 at 106-107).  This was an important contract right because, if Tower Sites had exercised it and then, after 30 days, been unable to perform in accordance with the P&S Agreement, Tower Sites could have terminated the agreement and neither party would have had recourse against the other.  (Ex. 7, ¶ 10).  So long as Fafard was telling Tower Sites that it needed access to Sewall Road, Tower Sites did not have any reason to exercise this contract right.  This contract right would only have come into

play if (a) Fafard no longer was requiring access to Sewall Road and was otherwise ready, willing, and able to close, and (b) Fafard had so informed Tower Sites.  By going to the registry in secret, i.e. by not telling Tower Sites it was going to the registry, Fafard deprived Tower Sites of the opportunity to exercise this contract right.

67.    Later in the day on May 21, Fafard received a letter from Tower Sites (Ex. 98), stating that because Tower Sites was unable to obtain all the approvals it needed to grant Fafard access to Sewall Road, and because Fafard had consistently made it known that it needed to have access to Sewall Road, Tower Sites considered the P&S Agreement to be at an end.

68.    This letter did not prompt Fafard to tell Tower Sites that it was wrong about Fafard's need for access to Sewall Road, or to contact Tower Sites to try to schedule a closing without Sewall Road, as Fafard would have been expected to do if Fafard were truly ready and willing to close without getting access to Sewall Road. **(Tr. 1 at 47; Tr. 3 at 105-106).**  Instead, upon receipt of this letter, Mr. Terrill instructed Mr. Beattie to contact Fafard's outside counsel at Hanify & King to commence a specific performance lawsuit.  (**Tr. 1 at 47).**

69.    **When Fafard had gone to the registry on November 7, 2003 and again on May 21, 2004, it did not go for the purpose of closing on the property but only for the purpose of staking out a position in a later lawsuit.  Fafard is a sophisticated and experienced real estate development company.  It has closed on the purchase of thousands of properties.  (Tr. 1 at 9; Tr. 3 at 20, 35, 109).  Typically, when Fafard gets ready for a closing, its closing attorney Mr. Beattie does a number of things in advance of the closing, including scheduling the time and place of the closing with the seller or seller's counsel, obtaining a municipal lien certificate to see whether the municipality has a lien on the property for unpaid taxes or other assessments, preparing a closing agenda, reviewing and approving a settlement sheet or list of**

adjustments, obtaining a title insurance commitment, and conferring with the seller or the seller's attorney to iron out any problems that might be come up.  (Tr. 1 at 22-28).  Fafard did none of these things in connection with its two trips to the registry to put Tower Sites in default.  (Id.).  In fact, because doing a closing at a registry of deeds is not as convenient as closing in a private office, and because it is Mr. Beattie's preference to do closings in a private office, Mr. Beattie had never actually done a closing at a registry of deeds without first having spoken to the seller or the seller's attorney (Tr. 1 at 27-29),[3] which Mr. Beattie did not do in these two instances.

70.    Mr. Beattie's trip to the registry on May 21, 2004 was six months after a November 7, 2003 letter that Fafard had sent to Tower Sites identifying potential clouds on title.  (Ex. 64).  Obtaining clean title was so important to Fafard that Fafard made it a condition of the closing, and Fafard would not have closed on the property without getting clean title.  (Tr. 1 at 42).  There are at least two peculiar things about this November 7, 2003 letter.  First, it was based on a title report that Fafard had gotten more than two years earlier in 2001.  (Ex. 8; Tr. 1 at 42-44).  The fact that Fafard delayed more than two years in calling Tower Sites' attention to possible title defects, and that Fafard's letter of November 7, 2003 was not based on a recent title search, suggests that Fafard's sending of the letter was for tactical reasons, rather than out of a genuine desire to have all title issues resolved so that Tower Sites and Fafard would be in a position to close.  Second, the November 7, 2003 letter was sent on the same day as Fafard's first trip to the registry "to default" Tower Sites.  The timing of this letter is powerful evidence that Fafard was not ready and willing to close on

---

[3]  There is a transcription error on page 28, line 19 in volume 1 of the trial transcript.  The words "other than the seller's attorney" should read "or the seller's attorney."

November 7, 2003, since title issues that were of potential concern to Fafard had not been resolved, much less disclosed to Tower Sites in a timely enough manner for Tower Sites to have addressed them for a November 7, 2003 closing.

71.    As this evidence establishes, just because Fafard appeared at a registry of deeds and paged Tower Sites does not mean that Fafard was ready, willing, and able to close on the purchase of the property.  At most, it only evidences that Fafard was trying to create the appearance of being ready, willing, and able to close.  The fact that Fafard had delayed until November 7, 2003 before notifying Tower Sites of potential title issues indicates that Fafard was not ready or willing to close on November 7, 2003.  Given Mr. Beattie's testimony that "Fafard was just as ready, willing, and able to close on May 21, 2004, as [it was] on November 7, 2003" (Tr. 1 at 34), it follows that Fafard was not ready or willing to close on May 21, 2004 either.

72.    This conclusion is also supported by Mr. Beattie's testimony that, even by the time of trial, Fafard had not decided whether the title matters presented in Fafard's letter of November 7, 2003 were or were not acceptable to Fafard.  (Tr. 1 at 45).  In other words, Fafard had identified some potential title issues but had not made a decision whether, if those title issues were still a matter of record by the time of closing, Fafard would or would not accept a deed from Tower Sites.  Parties who are ready to close know whether a particular matter potentially affecting title, of which they are aware, is or is not acceptable.

Good Faith And Bad Faith

73.    Each party has accused the other of acting in bad faith.  Apart from the issues surrounding Fafard's secret appearances at the registry of deeds on two occasions, Tower Sites contends that Fafard succeeded in removing the property from the market at a low purchase

price based on Fafard's promise that it would close in a year's time, that Fafard fundamentally had no money at risk if it did not perform, that Fafard took advantage of Tower Sites' good nature, inexperience, and desire to help Fafard out of its access problems when Fafard sought and obtained numerous extensions of the agreement over more than a three year period, that Fafard's implicit threat of non-performance if Fafard did not get access to Sewall Road kept Tower Sites working diligently to try to find a way to provide Fafard with the access it needed, and that Fafard succeeded in delaying a sale of the property long enough to see the sewer moratorium lifted, the sewer installed, and the potential value of the property increase appreciably.  In essence, Tower Sites contends that it took all the market, financial, and liability risk associated with owning the property over a three and half year period while Fafard had nothing at risk, that Fafard delayed the transaction until the property substantially increased in potential value, and that Fafard was essentially warehousing the property with the intention of stringing Tower Sites along indefinitely until the economics of the deal became much more attractive to Fafard.

74.    **Fafard contends that Tower Sites acted in bad faith by not responding to Fafard's extension requests in May of 2004 until after the close of business on May 21, 2004, that the reason Tower Sites did not reply to Fafard's extension requests was because Tower Sites had another offer waiting in the wings, which would provide Tower Sites with more money than Fafard would have paid, and that Tower Sites was trying to engineer a termination of the P&S Agreement so that it could accept the other offer.**

75.    The credible evidence supports Tower Sites' contention and establishes that Fafard was acting in bad faith.  This is so for at least the following reasons:

a.   Fafard's pattern of delay is well documented.  Apart from Fafard's two-year delay in reporting potential title issues to Tower Sites and the number of extension requests Fafard had made in the three and half years after the P&S Agreement was signed, Fafard's extension requests followed a pattern where Tower Sites would be waiting for something from Fafard during the extension period, which Fafard would either not provide or would provide only at the last minute or in a manner that was not responsive to what Tower Sites had sought.  For instance, Tower Sites had repeatedly sought precise information from Fafard as to where Fafard proposed to locate the connecting road over Lot 11 to Sewall Road.  (Exs. 12, 24-25; Tr. 3 at 59-60).  Tower Sites made it clear that the road could not cut through the center area of Lot 11 near the towers but would need to hug the edge of the property.  (Exs. 24-25).  Despite giving Fafard permission to enter the property to make this determination (Ex. 18), Fafard never tendered a responsive plan to Tower Sites, and waited more than a year to tender an unhelpful and non-responsive drawing.  (Exs. 36, 38; Tr. 3 at 60, 66-67).

b.   For much of the time, Fafard was telling Tower Sites that it needed extensions because it was still working on permits, when in fact Fafard had not applied for permits at all.  (Tr. 2 at 114-115; Tr. 3 at 47-48, 64).  When Tower Sites inquired about Fafard's progress on permits, Fafard responded with non-specific statements to the effect that Fafard was working on it, when in fact Fafard was not working on it.  (Id.).  The P&S Agreement had called for Fafard to provide quarterly reports on its status in obtaining permits, but Fafard never provided a single status report.  (Tr. 3 at 45).

c.      In the beginning of August of 2003, with ample time remaining before the then-current extension was set to expire, Ms. Hannert wrote an internal memo to Mr. Terrill, telling him that Tower Sites was "becoming much more difficult to convince on extending the dates on this property" and asking Mr. Terrill for advice on what "to tell Mary [Halcomb] when I ask for the extension." (Ex. 111, note of August 5, 2003). Ms. Hannert's memo also said "*To some extent* we are waiting for her other party to get back to us based on the plan we sent." (Id., emphasis added). This memo reveals that Fafard's need for access to Sewall Road was only one of the reasons Fafard was seeking extensions, that Fafard had other undisclosed motives for seeking extensions, that Fafard knew it would be seeking extensions well in advance of any determination that an extension was needed to get ready for closing, and that Fafard was searching for a story to tell to Ms. Halcomb to persuade Tower Sites to go along with Fafard's extension requests, and was not being candid with Tower Sites about its motivations for seeking additional extensions.

76.    **The credible evidence does not support Fafard's contention that Tower Sites acted in bad faith by not responding sooner to Fafard's extension requests in May of 2004. By that time, Tower Sites had no reason to believe Fafard would ever take title, given Fafard's steadfast insistence on getting access to** Sewall Road**. (Tr. 3 at 98-99, 103-104). There is no bad faith in considering an offer from another buyer when it appears that the first buyer is not going to perform. There is no evidence that Tower Sites had made any promises to any other buyer with regard to the Locus before it sent its letter of May 21, 2004. (Id. at 18-19). Further, Fafard was not prejudiced by, and did not rely to its detriment on, Tower Sites'**

- 35 -

supposed delay in responding to Fafard's May, 2004 extension requests, for even if Tower Sites had sent its May 21, 2004 letter sooner, there is no evidence Fafard would have done anything differently. In all likelihood, Fafard still would have gone to the registry in secret in an effort to claim that Tower Sites was in default and to claim that Fafard was ready, willing, and able to perform.

77.    Moreover, all of the credible evidence points to Tower Sites' good faith throughout this transaction. Tower Sites did not have to hire an engineer to try to find a way to satisfy Fafard's need for access to Sewall Road. Nor did Tower Sites even need to consider whether to grant access to Sewall Road. Tower Sites could just as easily have told Fafard that access to Sewall Road was not for sale. The fact that Tower Sites worked as hard as it did and as long as it did to find a solution to Fafard's access problem is to Tower Sites' credit. It was above and beyond what Fafard had a right to expect from Tower Sites.

78.    Another factor highlighting Tower Sites' good faith and Fafard's lack of good faith is how the parties responded to the following three property-related issues that surfaced after the P&S Agreement was signed:

a.    The first issue involved a determination of what was needed to ensure that the towers on Lot 11 would not be disturbed by Fafard's development of the residential land. The P&S Agreement clearly envisioned that Fafard would have the responsibility of determining how to accommodate the guy wires of the towers, whether by relocation or easement. (Ex. 7, at Ex. B). In the three and a half years after the P&S Agreement was signed, the only party who even looked into this question was Tower Sites. (Tr. 3 at 101-102). Because Fafard had done nothing, Tower Sites hired Hancock to look into the guy wire issue.

(Tr. 4 at 19-20).  After determining that relocating guy wires would be infeasible if not impossible, Tower Sites asked Hancock to draw up a concept plan for possible easements.  (Id. at 20).  This was all work that Fafard should have done, and which Fafard had had ample time to do.

b.    The second issue involved determining the location of the northeastern boundary line of the Locus.  In the course of doing its work, Hancock discovered that the zoning line ran along the property boundary line between Lot 11 and Lot 12, and was not as shown on the 1979 McCarthy Plan as both parties had materially (but mistakenly) believed when they entered into the P&S Agreement.  (Id. at 18-19).  While this discovery would have entitled Tower Sites to walk away from the deal (see proposed rulings of law below), and despite the increase in the value of the property since the P&S Agreement was signed, Tower Sites instead asked Hancock to try to find a way to satisfy Fafard by redrawing the boundary line in a manner that would both accommodate the tower guy wires and give Fafard the same amount of land area roughly as was depicted by the zigzag line on the 1979 McCarthy Plan.  (Id. at 21-23).  For its part, Fafard took the rigid (and false) position, and still does, that the location of the zoning line and the corresponding zoning classification of the land were immaterial to the contract, and that Tower Sites was contractually bound to convey exactly the land defined by the zigzag line on the 1979 McCarthy Plan, regardless of the parties' mistaken beliefs regarding the zoning line.

c.    The third issue concerned the location of the sewer line.  When the Town of Ashland lifted its sewer moratorium and wanted to install a sewer line at municipal expense on Tower Sites' land, Tower Sites initially asked the town to work with Fafard's engineers on identifying the precise location to install the line, since Fafard was going to be buying the land.  (Ex. 115; Tr. 3 at 96-97). Fafard's engineers, however, did not get involved.  (Ex. 111; Tr. 3 at 98-99). The Town then returned to Tower Sites, who engaged Hancock to work with the Town's engineers to locate the sewer line.  (Ex. 42; Tr. 3 at 98-99).  Working together, Hancock and the Town identified where to install the sewer line, and Fafard begrudgingly signed off on the location.

## PROPOSED RULINGS OF LAW

**Fafard Was Not Ready, Willing, And Able To Close**

1.    To enforce a purchase and sale agreement as buyer, Fafard had to have been ready, willing, and able to perform, and had to manifest this objectively to the seller by an offer of performance.  **Leigh v. Rule**, 331 Mass. 664, 668 (1954) ("The general rule is that when performance under a contract is concurrent one party cannot put the other in default unless he is ready, able, and willing to perform *and has manifested this by some offer of performance*"); **Simpson v. Vasiliou**, 29 Mass. App. Ct. 699, 703 (1991) ("To place the seller in default, the buyer was required, before the deadline for performance, to manifest that he was ready, able and willing to perform by setting a time and place for passing papers or making some other concrete offer of performance.").

2.    When there is a course of conduct between the parties in which the buyer manifests to the seller an unwillingness to perform unless an extra-contractual condition is met,

the seller is excused from performance and is not in breach for failing to appear at the time and place specified in the contract for the closing. Kattor v. Adams, 323 Mass. 686, 688-89 (1949) (buyer's stated unwillingness to go forward with purchase transaction unless seller included three additional acres not covered by purchase and sale agreement "was a breach of the agreement which excused the [sellers] from any further performance or offer of performance"); Beach & Claridge Co. v. American Steam Gauge & Valve Manuf. Co., 202 Mass. 177, 183-84 (1909) (buyer's statement to defendant that buyer would not go forward with purchase unless certain contingencies happened that were not provided for in the parties' agreement "was a breach by the [buyer] of its agreement, which operated to excuse the [seller] from any further performance or offer of performance"). Cf. Gentile Bros., Corp. v. Rowena Homes, Inc., 352 Mass. 584, 587, 589 (1967) (when seller told buyer that seller would not show up at registry for closing on agreed-upon day for performance, buyer had right to rely on seller's statement and was not in breach for not appearing at registry); Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969) (where party to land purchase agreement informed other party of its unwillingness to perform on terms required by contract, party did not "accrue rights under the contract" and could not hold other party in breach).

        3.      If the buyer communicates an unwillingness to close unless an extra-contractual condition is met, and the buyer thereafter changes its mind and is willing to close without the previously stated condition, the buyer must communicate a change of purpose to the seller and tell the seller of the buyer's willingness to go forward without the previously stated condition, or else the buyer may not enforce the contract. M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960) (where seller told buyer that seller wanted to negotiate an alternative arrangement and that seller was not willing to close until such an alternative arrangement was

made, buyer was not obliged to appear at closing or tender performance and was not in breach for failing to do so "in the absence of seasonable notice [from seller] that performance was to take place" on date called for by agreement); Schilling v. Levin, 328 Mass. 2, 5 (1951) (where buyer had manifested intention not to appear for closing and "*[n]o change of purpose on his part was ever communicated to the [seller,]*" buyer may not enforce agreement).

4.    If the buyer communicates a change in purpose to the seller, the buyer must do so seasonably, i.e. sufficiently in advance of the time for performance so that the seller can also perform. M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960) (after buyer sought alternative arrangement, buyer required to give *seasonable* notice of intent to perform on date called for in agreement).

5.    When a buyer communicates an unwillingness to close unless an extra-contractual condition is met, and the buyer thereafter changes its mind and decides to close without the previously stated condition, the buyer cannot default the seller or put the seller in breach simply by showing up at the registry of deeds for the ostensible purpose of closing without giving notice to the buyer. The law regards this as a sham closing, which confers no rights on the buyer. Schilling v. Levin, 328 Mass. 2, 5 (1951) (where buyer had manifested intention not to appear for closing and "*[n]o change of purpose on his part was ever communicated to the [seller,]* [t]he appearance of the [buyer] at the registry of deeds on July 15 without notice to the plaintiffs was a sham and had no effect on the rights of the parties").

6.    Where the contract is silent as to the time of day for the closing and the buyer seeks to enforce the contract, if the buyer does not communicate a concrete offer of performance, it is incumbent on the buyer to notify the seller of a time for the closing. Failure to do so is a failure of the buyer to manifest its readiness, willingness, and ability to perform.

__Lafayette Place Assoc. v. Boston Redev. Auth.__, 427 Mass. 509, 520 (1998) ("To place a seller in default, a buyer must manifest that he is ready, able, and willing to perform *by setting a time* and place for passing papers or making some other concrete offer of performance").

      7.      **Fafard was not ready, willing, or able to perform on May 21, 2004, nor did Fafard objectively manifest a readiness, willingness, and ability to perform by some offer of performance. In the three and half years after the signing of the P&S Agreement, Fafard had consistently advised Tower Sites, in words or substance, that it needed access to** Sewall Road **and that it was unprepared to go forward with the transaction without obtaining such access. In the days leading up to May 21, 2004, the date on which the P&S Agreement expired, Fafard had repetitively requested extensions of the date for performance because, among other things, it still needed to resolve the access issue to** Sewall Road**. At no time after the access issue first arose in 2001 did Fafard tell Tower Sites that Fafard would close the transaction without getting access to** Sewall Road **or that it considered the access issue resolved. When Fafard secretly appeared at the registry on May 21, 2004, it did not go to the registry with the intent and for the purpose of closing the transaction but simply to stake out a position that Tower Sites was in default. This was a sham. Fafard never informed Tower Sites of its intent to appear at the registry for a closing of the transaction, never objectively manifested its readiness, willingness, and ability to perform by a concrete offer of performance, and failed even to establish a time of day for the closing.**

      8.      **Further, Fafard is estopped from claiming that it was ready, willing, and able to perform. An estoppel arises when there is:**

> **(1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the**

person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission.

Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass 119, 123 (1992) (citations omitted).

9.      Fafard is estopped because it represented to Tower Sites on numerous occasions, in words or substance, that it needed to have access to Sewall Road and needed assurances to that effect before closing.  Consistent with those earlier representations, when Fafard requested extensions of the purchase and sale agreement in May of 2004, it represented that it needed three things: (a) resolution of the access issue to Sewall Road, (b) clean title, and (c) a plan to deed off of, these being offered as reasons for the extension request.  In context, these statements were tantamount to a representation that Fafard was not prepared to close (hence the request for the extension) and would not be ready or willing to close until these things were taken care of to Fafard's satisfaction.  These representations were made to induce Tower Sites to (i) believe, among other things, that Fafard would not close without assurances that it would have access to Sewall Road, (ii) continue to work on a way to provide Fafard with access to Sewall Road, and (iii) agree to a later date for the closing.  As a result of Fafard's representations, Tower Sites in fact believed that Fafard was not ready to close and would not close without receiving assurances of access to Sewall Road.  Because Tower Sites determined that it could not provide such access and was under no obligation to do so, and in reliance on Fafard's representations, Tower Sites did not appear for any closing on May 21, 2004, having no reason to believe that Fafard would appear either.  Not having retracted its representations about needing access to Sewall Road, Fafard is estopped from asserting that it was ready, willing, and able to close.

10.      If Fafard was in fact ready, willing, and able to close when it sent its extension

requests to Tower Sites in May of 2004, then it misrepresented its state of mind.  When a party speaks to a particular issue, and the statement would be misleading unless there were a disclosure of additional information, the party is under a duty to disclose the additional information so as not to make its first statement misleading.  <u>Kannavos v. Annino</u>, 356 Mass. 42, 48 (1969) ("Although there may be no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge.  Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies").  Here, if Fafard were in fact ready, willing, and able to close without resolving the access issue to Sewall Road, it had a duty to say so, and not to mislead Tower Sites into believing that resolving the access issue to Sewall Road was something Fafard needed before closing.  Fafard cannot take advantage of its own misrepresentations, or its own failure to make disclosure under circumstances requiring disclosure.  <u>See</u> <u>Wasserman v. Cosmopolitan Trust Co.</u>, 252 Mass. 253, 256 (1925) (party cannot take advantage of its own fraud).

**The P&S Agreement Is Unenforceable Due To A Failure To Have A Meeting Of The Minds On All Essential Terms And Due To The Parties' Mutual Mistake Of Fact**

11.    Before there can be a contract, there must be a meeting of the minds on all essential terms.  <u>Conos v. Sullivan</u>, 250 Mass. 376, 378 (1924).

12.    In a land purchase contract, the boundaries of the land to be conveyed are essential terms.  <u>Michelson v. Sherman</u>, 310 Mass. 774, 777 (1942) ("location of the boundary line between the land sold and the land kept by the defendants was an essential element of the

... contract").

13.     "Where there has been a mistake between the parties as to the subject matter of a contract, there has been no 'meeting of the minds,' and the contract is voidable at the election of the party adversely affected." LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58 (1986).

14.     A mistake made by one party to the knowledge of the other is equivalent to a mutual mistake. Century Plastic Corp. v. Tupper Corp., 333 Mass. 531, 535 (1956).

15.     In making the P&S Agreement, both parties were mistaken as to the location of the zoning boundary separating the industrially zoned land from the residentially zoned.

16.     Fafard presses an interpretation of the P&S Agreement as calling for a conveyance of land defined by the zigzag line on the 1979 McCarthy Plan, regardless of whether that line accurately depicted the zoning boundary. That line was what the parties believed at the time was the zoning boundary. It was the intention of both parties that the only land to be conveyed was the land zoned residential, and that the zoning boundary line would serve as one of the property lines. If Fafard's interpretation of the agreement is correct, then the parties' mutual mistake about the location of the zoning line would have resulted in the making of a contract that was not intended by either party, thereby entitling Tower Sites to rescind the P&S Agreement based on the parties' mutual mistake over the location of the zoning boundary. LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58 (1986).

17.     In this case, the mistake is similar to the classic example of the sale of a specific cow, where both parties believed the cow to be barren and found out later that the cow was fertile. Sherwood v. Walker, 66 Mich. 568 (1887). Such a sale is rescindable for mutual mistake. Id. at 577-78. It would be inequitable to allow the buyer to enforce the contract and

require the seller to deliver the fertile cow.  Id.  So too here, both parties believed the land on Lot 11 was zoned residential, when in fact it was zoned industrial.  Both parties intended that Tower Sites would convey only residentially zoned land and would retain all of the industrially zoned land.  The price reflected the parties' mistaken belief as to the zoning status of the Locus.  It would be inequitable to allow Fafard to compel a conveyance of the Locus.  The parties' mutual mistake that the Locus only included residential land, and did not include industrial land, entitles Tower Sites to rescind and relieves Tower Sites from having to perform.  Id.

18.    If Fafard intended to purchase the land defined by the zigzag land on the 1979 McCarthy Plan, knowing that it did not represent the zoning boundary, or indifferent to whether it represented the zoning boundary, then Tower Sites may still rescind the P&S Agreement on the basis of mutual mistake, since a mistake made by one party (Tower Sites) to the knowledge of the other (Fafard) is equivalent to a mutual mistake.  Century Plastic Corp. v. Tupper Corp., 333 Mass. 531, 535 (1956).  This is because, at the time of contracting, Fafard knew that Tower Sites intended to convey only the residentially zoned land and knew that Tower Sites believed the zigzag line on the 1979 McCarthy Plan was the zoning boundary line.

19.    Fafard contends that Tower Sites ratified the agreement after it learned about the mistake on the 1979 McCarthy Plan.  The ratification, Fafard says, was in Tower Sites' signing of various extensions of the P&S Agreement in 2003 and 2004.

20.    There was no ratification.  Where the parties minds never met due to the mistake, there can be no contract to ratify.  LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58 (1986).  Moreover, Tower Sites' execution of contract extensions is consistent with an

intent to try to resolve open issues, including those on which the parties did not have a meeting of the minds, such as resolving the location of the boundary line. The contract extensions do not bespeak an intent to convey the land as represented by the zigzag line on the 1979 McCarthy Plan. Hoag v. Hoag, 210 Mass. 94 (1911).

Statute Of Frauds

21.    Apart from the mutual mistake concerning the location of the zoning boundary line, the P&S Agreement did not adequately describe the land to be conveyed.

22.    Any promise involving real property is enforceable only if that promise meets the requirements of the statute of frauds. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 709 (1992). To satisfy the statute of frauds, the writing "must contain directly, or by implication, all of the essential terms of the parties' agreement." Simon v. Simon, 35 Mass. App. Ct. 705, 709 (1994). "In the absence of a mutual mistake permitting reformation, the omission of an essential term, not supplied by reasonable implication, renders the memorandum insufficient." Id.

23.    The boundaries of land to be conveyed are essential terms and must be fixed by the written memorandum. Michelson v. Sherman, 310 Mass. 774, 777 (1942) ("location of the boundary line between the land sold and the land kept by the defendants was an essential element of the … contract"); Sherer v. Trowbridge, 135 Mass. 500, 502 (1883) (writing must "describ[e] the boundaries with sufficient certainty"). If it is impossible from the written memorandum "to lay out on the land the boundaries of the lots to be conveyed, … the agreement is unenforceable because of uncertainty." Knowles v. L.D. Griswold Land Co., 252 Mass. 172, 175 (1925). Where a land purchase agreement contemplates that the boundaries will ultimately be determined by a plan to be approved by a public board or

authority, the written agreement is too indefinite to be enforced, even if the agreement

describes the land by metes and bounds and by reference to lots shown on a tentative plan.  Id.

24.    In the case of the P&S Agreement, it is impossible to lay out the boundaries of

the land to be conveyed.  All parties agreed that the imprecise hand-drawn saw-tooth line on

Exhibit A to the purchase and sale agreement was not intended to show the precise boundary,

but only the approximate boundary.  While there was oral evidence that the line on Exhibit A

was supposed to represent the same saw-tooth line as was on the 1979 McCarthy Plan, there

was also credible evidence that the 1979 McCarthy Plan was itself dimensionally inaccurate

and failed to show with accuracy the locations of pertinent landmarks and monuments.  Thus,

even if the 1979 McCarthy Plan had been cross-referenced in the P&S Agreement, it could not

have served as a sufficient basis for locating the northeast boundary line and hence the

boundary separating the land to be conveyed from the land to be retained.

25.    Enforcement of the P&S Agreement is barred by the statute of frauds.  Parol

evidence, even if admissible to ascertain the meaning of words used in a written agreement,

cannot be used to supply deficiencies in a written memorandum under the statute of frauds.

Michelson v. Sherman, 310 Mass. 774, 777-78 (1942) (even though parties orally agreed on

location of boundary line and even though such boundary line would have been the natural and

obvious division of the land, the written memorandum did not fix the location of the boundary

line and hence contract was unenforceable).  See also Whelan v. Sullivan, 102 Mass. 204, 206

(1869) (where piece of land to be conveyed was part of larger tract, and where memorandum

did "not, either in itself, or by reference to any other writing, contain the means of describing

or identifying the boundaries of the piece to be conveyed," statute of frauds rendered contract

unenforceable; parol evidence cannot be taken to complete the memorandum); Klein v. Brodie,

167 Mont. 47, 48 (1975) (where buy-sell agreement gave approximate description of land to be conveyed "but the exact boundary was to be determined by a survey," agreement was unenforceable under statute of frauds); <u>Plantation Land Co. v. Bradshaw</u>, 232 Ga. 435 (1974) (where written agreement described land by reference to attached plat "and the property being outlined in red thereon," the contract did not meet the requirements of the statute of frauds because "a determination of the exact boundaries of the … acres to be sold cannot be made, either from the plat alone or in conjunction with the contract").

<u>Failure Of Condition Precedent</u>

26.    The P&S Agreement required Fafard to determine if relocation or an easement would be necessary to accommodate the tower guy wires that might have encroached onto the land described in the P&S Agreement.  Fafard did not make this determination.  (Tr. 1 at 57-58).  The evidence established that relocation of guy wires would be neither feasible nor possible, and hence either relocating the boundaries or providing an easement would be necessary.[4]  Fafard never tendered an easement or a proposed revised boundary plan, and never manifested a readiness or willingness to do so.

27.    "A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract."  <u>Massachusetts Municipal Wholesale Electric Co. v. Danvers</u>, 411 Mass. 39, 45 (1991).  "If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced."

---

[4] The contract is ambiguous as to whether the "relocation" in the P&S Agreement referred to relocating the guy wires or relocating the boundary line.  Given that it was the clear intent of the P&S Agreement to accommodate the guy wires and the towers, and that such accommodation could have been achieved through an easement, it is a plausible construction of the agreement that such accommodation could have been done through other recordable legal documentation, such as relocating the legal lot line, as opposed to a physical relocation of the guy wires.  Given that Fafard drafted this language (Tr. 1 at 56-57), the ambiguity should be resolved against Fafard.

**Id.**, **citing** 5 S. Williston, Contracts § 663 (3d ed. 1961 & Supp. 1990), Restatement (Second) of Contracts § 225 (1981).

28.     By not having determined whether an easement or relocation was necessary, Fafard failed to perform a condition precedent to the enforcement of the contract.

**Production Of Recordable Plans**

29.     Fafard contends that Tower Sites was in breach for not having delivered plans to be recorded with the deed.  Fafard asserts that this obligation rested on Tower Sites under paragraph 5 of the P&S Agreement.  (Ex. 7).  There are at least four reasons why this contention does not aid Fafard's case.

30.     First, if Tower Sites was under an obligation to deliver a plan, the time for Tower Sites to have done so would have been at the closing.  Because Fafard did not inform Tower Sites that there was going to be a closing on May 21, 2004, Tower Sites cannot be faulted for not having delivered a plan.

31.     Second, if Fafard had notified Tower Sites of a closing and if Tower Sites was not ready to deliver a plan at the time of closing, Tower Sites had the right to extend the time for delivery of such a plan for 30 days under paragraph 11 of the P&S Agreement.  Fafard effectively denied Tower Sites the opportunity to exercise that right by not informing Tower Sites of Fafard's intention to close on the May 21, 2004.

32.     Third, paragraph 5 did not unconditionally call for the delivery of a new plan. It only called for the delivery of a plan if the deed to be delivered at closing referred to a new plan.  This would only have happened if there was to be a relocation of boundary lines.  For there to have been a relocation of boundary lines, the Ashland Planning Board would have had to have approved the new boundaries, either in a new subdivision plan or in a so-called

- 49 -

perimeter plan under Mass. Gen Laws. c. 41 § 81P.  Under Exhibit B of the P&S Agreement, the obligation to secure such local approvals rested with Fafard, which Fafard had not secured. This also would have required an agreement among the parties as to where the new boundary would be located, a matter that was still in question as of May 21, 2004.

33.    Fourth, as matter of law, the party who seeks to enforce the agreement, Fafard, cannot excuse its own failure to manifest its readiness, willingness, and ability to close by pointing to a some defect in performance by Tower Sites.  If Tower Sites were not ready, willing, or able to perform, then the consequence would be that Tower Sites would have no right of action against Fafard.  This would not, however, entitle Fafard to enforce the agreement against Tower Sites if Fafard were not itself been ready, willing, and able to perform and if Fafard had not objectively manifested this by notice to Tower Sites and a concrete offer of performance.  Put another way, Fafard cannot rely on Tower Sites' alleged lack of readiness to deliver a plan at closing in order to excuse Fafard's own lack of readiness, willingness, and ability to perform.  Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969) (where neither party was ready, willing, or able to perform, neither party acquired rights under the contract).

**Bad Faith Or Unfair or Unjust Conduct As Bar To Enforcement**

34.    A party seeking specific performance must itself be free from blame.  Lundgren v. Gray, 41 Mass. App. Ct. 451, 458 (1996).  Specific performance is an equitable remedy which should not be granted when the requesting party has engaged in conduct "savored with injustice touching the transaction."  Hawthorne's Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 208 (1993).  See also Chute v. Quincy, 156 Mass. 189, 191 (1892) ("specific performance may be refused … where there has been … unfair conduct").

35.     Over the course of the transaction at issue, Fafard engaged in the sort of conduct that precludes specific performance.  Fafard sought and obtained 25 extensions of the P&S Agreement over a three and a half year period, yet failed to use the extensions of time that Tower Sites generously granted it to bring the transaction to a close.  It essentially did nothing during the extension periods, other than to provide evasive and misleading information to Tower Sites about its efforts to obtain permits and approvals, while waiting and expecting Tower Sites to resolve Fafard's access problems.  If Fafard would have closed on the transaction without getting access to Sewall, as it now claims, it certainly never communicated that willingness to Tower Sites at any time over the course of the many extension periods.  To the contrary, Fafard used its own access problems as the justification for many of its extension requests, particularly at the end of 2003 and the first half of 2004.  It did nothing to resolve boundary line issues.  It sought no permits or approvals for its project, yet disingenuously relied on the permitting and approval clause – which would have allowed it to escape the contract – as a reason for seeking extensions.  It knew that Tower Sites lacked sophistication in real estate transactions and that, for most of the time, Tower Sites was without counsel.  When the last extension was about to expire, after having made multiple statements to Tower Sites indicating its unwillingness to go forward with the transaction due to the lack of resolution on Fafard's access problems, Fafard secretly went to the registry of deeds not to close the deal but to set a trap for Tower Sites in order to posture for a specific performance suit.

36.     For all of these reasons, Fafard is not entitled to specific performance, and judgment shall enter dismissing the complaint, with costs awarded to Tower Sites.

METRO-BOSTON BROADCASTING, INC.

By its attorneys,

/s/ Erik P. Bartenhagen
Kenneth R. Berman (BBO #040320)
Erik P. Bartenhagen (BBO #640003)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

Dated:  April 4, 2005

Certificate Of Service

I certify that I served this document on opposing counsel by mail on April 4, 2005.

/s/ Erik P. Bartenhagen
Erik P. Bartenhagen

1418251.1