UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11531-RGS

FAFARD REAL ESTATE & DEVELOPMENT CORP.

v.

METRO-BOSTON BROADCASTING, INC.

FINDINGS OF FACT AND RULINGS OF LAW
AFTER A TRIAL WITHOUT JURY

August 26, 2005

STEARNS, D.J.

Based on the credible testimony and the exhibits offered at trial, as well as the stipulations of the parties, I find the following facts to be true.

The Parties

1. Metro-Boston Broadcasting, Inc. (Metro-Boston), a Texas corporation, is the general partner of Tower Sites, Ltd., a Texas limited partnership. Metro-Boston and Tower Sites share a principal place of business in Dallas, Texas. Tower Sites is the owner of record of undeveloped land in Ashland, Massachusetts. Mary Heller Halcomb is the President of Metro-Boston and is a partner in Tower Sites.[1]

2. Tower Sites, as its name implies, is in the business of leasing land to commercial radio stations for the siting of broadcast antennas. Tower Sites is not in the business of developing real estate.

---

[1] To avoid confusion, I will refer to the two entities collectively as Metro-Boston, although most of the documents related to the disputed land sale refer to Tower Sites rather than Metro-Boston as the seller.

3. Fafard Real Estate & Development Corporation (Fafard) is a Massachusetts company with a principal place of business in Ashland, Massachusetts. Fafard, as its name implies, is a land developer with extensive real estate experience.

4. Richard Terrill is Senior Vice President and Chief Financial Officer of Fafard. Janice Hannert is a Fafard land planner. Paul Beattie is Fafard's in-house legal counsel.

The Parcel

5. The property owned by Metro-Boston in Ashland consists of adjoining lots – Lot 6B, Lot 11, and Lot 12, comprising some forty plus acres. The northeastern portion of the property is zoned for industrial use, while the southwestern portion is zoned residential. Halcomb had long been interested in selling the residential portion of the property and had identified Fafard as the "most likely" buyer because of its "strong presence and success" in the Ashland area.

6. On March 7, 2000, Halcomb wrote to Hannert offering to sell 9.6 acres located in Lots 12 and 6B and another 10 acres located in the lower portion of Lot 11 (collectively, the parcel), land described by Halcomb as "zoned residential." The offer was extended "as is, where is," subject to a straightening of the boundary line dividing the industrial and residential portions of Lot 11 and the granting of an easement for a guy wire supporting a radio tower located in the industrial portion of Lot 11. The asking price was $339,000.

7. The most proximate roadway to the parcel is Tri Street. Lots 12 and 6B front on Tri Street for a short distance at the southwestern corner of the parcel. Lot 6B is contiguous to Lot 12, which is much larger in size. Most of the land along Tri Street is owned by private homeowners. Adams Road terminates at the eastern side of the parcel on the southern edge of Lot 12. Lots 12 and 6B are undeveloped.

8. Lot 11 shares a border with Lot 12. Lot 11 is the largest of the three lots. Sewell Street (also known as Sewell Road or Sewall Road) connects with Lot 11 at the northwest corner of the property. The upper portion of Lot 11 is the site of five 550' high radio transmission towers. The towers are supported by a network of guy wires attached to buried concrete anchors. Each tower has three sets of guy wires spaced 120 degrees apart. Each tower also has an electrical grounding system, consisting of copper wires radiating in a spoke-like fashion over a 350' radius.

The Purchase & Sale Agreement

9. Fafard initially balked at the "as is, where is" condition. However, in October of 2000, Fafard made an offer contingent on its ability to obtain the permits necessary to develop the property. On December 5, 2000, Hannert faxed Halcomb the following rider describing the permitting contingencies.

> The Buyer and Seller agree that the sale of the Ashland, MA Parcel shall be subject to Buyer's receipt of a clean M.G.L. Chapter 21E Phase I site assessment, and all necessary Federal, State and Local permits (including, but not limited to subdivision approval, building permits, sewer extension and connection permits, water connection permits, order of conditions, etc.) with conditions, if any, as are satisfactory to the Buyer, thereby allowing the Buyer to have its intended use or uses approved for the subject premises. This contingency of the sale shall not be considered met until such permits, and approvals with satisfactory conditions, are issued and until the passage of the statutory appeal period, with no appeals being taken. All permits and approvals shall be secured at Buyer's expense on or before December 10, 2001. Buyer shall give quarterly reports during term of Agreement as to status of permits and approvals sought. Closing to occur thirty (30) days after receipt of all permits or January 10, 2002, whichever is earlier.[2]

---

[2]There is no evidence that Fafard ever gave Metro-Boston a written report on its progress in obtaining permits and approvals.

10.  The offer described the property to be purchased as the area below a sawtooth line on a McCarthy & Sullivan Survey Plan (McCarthy Plan) dated November 29, 1979. The line, which bisected Lot 11, was meant to define the boundary between the industrial and the residential zones.

11.  On January 30, 2001, a Purchase and Sale (P&S) Agreement was signed.  The P&S Agreement extended the deadline for Fafard to complete the permitting process to January 31, 2002 and moved the closing to February 28, 2002.  The agreed purchase price was $339,000.  A 10 percent deposit was to be held in escrow by Fafard's attorney.

12.  In drafting the P&S Agreement, the parties relied on the McCarthy Plan to describe the parcel.  The parties believed that the McCarthy Plan accurately plotted the zoning boundary between the residential and industrial portions of the parcel.[3]  A subdivision plan based on the McCarthy Plan was attached to the P&S Agreement to illustrate the parcel under contract.

13.  The P&S Agreement contained a standard provision permitting Metro-Boston, if it was unable to deliver clean title prior to the February 28, 2002 closing, to obtain an automatic 30-day extension by giving written notice to Fafard.  If at the expiration of the thirty days Metro-Boston remained unable to perform, Fafard had the option of either taking whatever title Metro-Boston could deliver or walking away from the deal.

---

[3]On August 7, 2002, a surveyor hired by Metro-Boston to investigate the siting of a road leading to Sewell Street informed Hannert that the McCarthy Plan was wrong and that the zoning boundary in fact conformed to the property line dividing Lot 11 and Lot 12.

The Sewell Street Access

14. To maximize its investment, Fafard planned to subdivide the parcel into smaller lots by installing a through road connecting Adams Road with Tri Street. Shortly after the P&S Agreement was signed, Fafard learned that the planned Tri Street connector could not be built because of wetlands restrictions. Fafard briefly considered buying and demolishing one of the private homes along Tri Street to provide an outlet. The alternative was an access to Sewell Street.

15. To connect with Sewell Street, Fafard needed an easement over the northwestern portion of Lot 11, or additional land in fee simple. On October 31, 2001, Hannert faxed Halcomb an offer to purchase 5 acres in the industrial portion of Lot 11 for $100,000. The offer included a hand-drawn sketch of a corridor running through Lot 11 to Sewell Street. On the fax cover sheet, Hannert wrote: "We need to acquire additional land to gain access to the residential portion of the property."

16. Fafard's offer received a noncommital response. Halcomb believed that Fafard's offered price was too low. She also feared that Metro-Boston's tower-tenants would be concerned that activity on the roadway would interfere with radio transmissions. Halcomb told Hannert that any sale would require the approval of an unnamed third party interested in purchasing the industrial portion of the property.

17. On November 30, 2001, Halcomb e-mailed Hannert a request for "more specific information regarding exactly where would Sewell [Street] be placed through the Industrial tract." On December 19, 2001, Hannert faxed Halcomb the same sketch provided earlier and suggested that the proposed road be built on the footprint of an existing cart path

running from Sewell Street to the residential boundary of Lot 11.  She also assured Halcomb that Fafard was interested only in acquiring access and was not seeking to acquire frontage at the expense of the purchaser of the industrial tract.  She also agreed to raise the offered purchase price to $150,000.  She concluded the message with the statement that Fafard was "still working on the residential portion and may need a short extension [of the closing date]."

18.  On January 8, 2002, Hannert forwarded "a larger plan of the additional area [Fafard] would like to acquire."  She also repeated the assurance that Fafard "need[ed] access through the frontage out to Sewell Street but not the actual frontage."  During a telephone call on January 17, 2002, Hannert told Halcomb that Fafard "had not been able to do much of anything of planning for the site since [Fafard] determined that [Fafard] needed the additional access."[4]

19.  On January 30, 2002, Metro-Boston agreed to Fafard's request to extend the time for performance under the P&S Agreement to May, 31, 2002.  This was followed by four more requested extensions, all agreed to by Metro-Boston, successively deferring the closing to August 31, 2002, January 31, 2003, June 30, 2003, and September 30, 2003.

20.  On February 27, 2002, Hannert e-mailed Halcomb stating that Fafard "need[ed] to get an agreement on the additional 5 acres.  We need the access to get out to Sewell Street."  The same message was repeated in an e-mail sent on March 21, 2002, Hannert writing: "I need to get a response from you on the additional 5 acres.  We can not access

---

[4]On January 22, 2002, Halcomb gave Hannert written authorization for Fafard's engineers to enter Lot 11 to survey potential sites for the proposed Sewell Street extension.  Nothing by way of a detailed plan for a road resulted until May of 2003.

6

the residential portion of the land without it (2 access roads will be needed)." In response, Halcomb contacted Hancock Survey Associates (Hancock). She later hired the firm at Metro-Boston's expense to draw up plans for a Sewell Street connector. On March 27, 2002, Halcomb e-mailed Hannert from China informing Hannert of her plan to hire Hancock. She assured Hannert that if both sides (Fafard and the purchaser of the industrial portion) were satisfied with the result, she was certain that "your group will receive the access you need."

21.  On July 31, 2002, Hannert faxed a copy of the subdivision plan marking the portion of the property under agreement to Daniel Bremser, the Hancock surveyor. Hannert told Bremser that Fafard "can not access [the parcel] from Tri Street because of wetland buffer zones and need[s] to access the site through Sewell Street."

The Extensions Continue

22.  For the next nine months, little transpired apart from periodic agreements to extend the closing date. Eventually, on May 19, 2003, Hannert faxed Halcomb a more detailed sketch showing "the connection between the residential land we have under agreement and Sewell Street," and asking Halcomb for written confirmation "that this access is available for our use as joint access." On May 20, 2003, Hannert sought an extension of the closing to November 30, 2003. Halcomb would agree only to September 30, 2003, despite Hannert's offer to pay the real estate taxes on the parcel in exchange for

a longer extension. Halcomb endorsed the request with the proviso: "Time is of the essence. Buyer agrees to pursue the permits with due diligence."[5]

23. The latter half of 2003 brought a flurry of requests from Hannert for lengthy extensions, but as she noted in her file, Halcomb "was becoming much more difficult to convince on extending the dates," and had accused Fafard of "ty[ing] the property up at a cheap price based on a quick cash closing and it has been 3 years." Halcomb was now responding to Hannert's requests by granting extensions measured in days rather than months. On November 6, 2003, the day before the most recent extension was set to expire, Hannert sent Halcomb a fax reiterating that Fafard "need[s] an answer to the access issue. Attached is another copy of the sketch showing the location where we need to access the property. The Tri Street access is unusable so we need to access the property from Sewell Street as joint access with other adjacent owners. . . . We are ready to close on the property but need to obtain approval to access through Sewell Street and the update of the property line." Hannert requested an extension to December 1, 2003.

The First "Closing"

24. By the afternoon of November 7, 2003, Halcomb had not responded to the latest request for an extension. Terrill dispatched Beattie, Fafard's in-house counsel, to the Registry of Deeds with the object of placing Metro-Boston in default. Beattie arrived at the Registry at 3:30 p.m., and twice paged Metro-Boston before leaving at 4:00 p.m. As Fafard had decided not to give notice to Metro-Boston of the purported closing, Beattie knew that

---

[5]Halcomb had also endorsed the December 12, 2002 request for an extension to June 30, 2003 with the legend "[t]ime is of the essence," noting that the closing had been delayed two years because of the permitting issue.

no representative of Metro-Boston would appear. While Beattie was at the Registry, Fafard received a fax from Halcomb granting an extension to November 14, 2003. Fafard did not tell Metro-Boston of Beattie's trip to the Registry. Instead, Hannert by return fax wrote to Halcomb: "We are ready to close on this property. We need to resolve the access issue out to Sewell Street, need clean title . . . and need a plan we can deed off of." The same day, Hannert composed a formal letter to Halcomb warning her of various "easements, restrictions and encumbrances of record that either prevent Purchaser from receiving good clear record and marketable title or materially interfere with the use of the premises for residential development."

25. The next extension (to November 21, 2003) contained a provision declaring the 10 percent deposit nonrefundable in the event that the transaction failed through no fault of Metro-Boston. A flurry of agreements followed extending the closing to December 3, 2003, December 10, 2003, December 19, 2003, January 9, 2004, January 16, 2004, January 30, 2004, February 17, 2004, March 4, 2004, March 25, 2004, April 23, 2004, and ultimately May 21, 2004. The negotiations over the extensions struck two common chords, the acknowledgment by Halcomb and Hannert of the need to complete a survey fixing the boundaries between the property's industrial and the residential zones, and Hannert's assurances of Fafard's readiness to close once the title, land survey, and Sewell Street access issues were settled. In a fax to Halcomb on February 12, 2004, Hannert echoed her earlier refrain: "We are ready to close on this property. We need to resolve the access issue out to Sewell Street, need clean title and need a plan we can deed off of." This recital was repeated verbatim on all subsequent requests for an extension.

26. Prior to the expiration of the last agreed extension on May 21, 2004, Hannert faxed Halcomb on May 7, May 14, and May 20, 2004, requesting a further extension. Halcomb did not respond. From the time that the P&S Agreement was signed in January of 2001, until the last extension was granted in April of 2004, Metro-Boston had agreed twenty-five times to postpone the closing.

The Second "Closing"

27. On May 21, 2004, the last agreed extension expired. Terrill again ordered Beattie to the Registry of Deeds. Beattie brought a certified check in the amount of the purchase price and a list of the outstanding title issues, but he did not bring most of the papers that are typically exchanged at a closing. No attempt was made to notify Metro-Boston that Beattie was at the Registry. Beattie understood that if Metro-Boston did appear, he was not to close without a resolution of the Sewell Street issue and an assurance of clean title. Beattie arrived at the Registry at 11:30 a.m., paged Metro-Boston four times over the course of an hour, and then left.

28. At the end of the day on May 21, Halcomb faxed a letter to Terrill stating that:

We have been advised by Ms. Janice Hannert that Primary Access through Sewell Street and across our large industrial property is required for the development of the residential property for the purpose you desire. This is not compatible with the current tenants of the Tower Site and therefore, the board does not believe that this alternate access route can be made available. Therefore, the proposed project is not feasible. . . . [T]his transaction should be considered terminated.

29. On May 24, 2004, Hannert accepted an offer from Caruth Capital, LLC, to purchase the entire Ashland property for $2.8 million.

CONCLUSIONS AND RULINGS OF LAW

When a P&S Agreement has been executed, the seller holds legal title to the property subject to the equitable obligation to convey title on payment of the full purchase price; thus, the rights of the purchaser are contractual rights rather than rights based on ownership. Lauren v. DeCarolis Construction Co., 372 Mass. 688, 691 (1977). To enforce its contractual rights under a P&S agreement, a buyer must satisfy two conditions: it must be ready, able, and willing to perform; and it must give the seller reasonable notice of its intention to do so. Leigh v. Rule, 331 Mass. 664, 668 (1954). The buyer may not condition performance on a material condition that was not contemplated by the P&S Agreement without the consent of the seller. Kattor v. Adams, 323 Mass. 686, 688-689 (1949). If the buyer subsequently waives a contingency, it must seasonably communicate its retraction to the seller. M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960). If without giving notice of the retraction to the seller, the buyer appears at the Registry with the sole purpose of putting the seller into default, a court will consider the appearance a sham and refuse to grant specific performance. Schilling v. Levin, 328 Mass. 2, 4-5 (1951). This is especially so where the P&S Agreement does not specify the time of day for the closing. Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 520-521 (1998).

Three indisputable facts determine the decision in this case. (1) The P&S Agreement did not address the issue of a second access road nor did it obligate Metro-Boston to sell additional acreage or grant an easement to secure Fafard an access to Sewell Street. (2) Despite Fafard's claim that it was prepared to close without a resolution of the Sewell Street issue, its willingness to do so was never communicated to Metro-

11

Boston. To the contrary, as the final May 21, 2004 closing date approached, Hannert's faxes were insistent on the "need to resolve the access issue out to Sewell Street" before the transaction could take place. Moreover, every fax raising the Sewell Street issue did so in the context of a request for a further extension of the closing date. No reasonable person in Halcomb's position would have understood the coupling of the Sewell Street issue with a request to postpone the closing date as meaning anything but that the closing was contingent on Fafard's obtaining access to Sewell Street. (3) Although Beattie appeared at the Registry on May 21, 2004, with a check for the purchase price, he did so without notice to Metro-Boston, nor did he have the authority to close without a resolution of the Sewell Street issues. As Beattie candidly testified at trial, his true mission was to place Metro-Boston in default as a prelude to litigation.[6] Had Metro-Boston in fact appeared at the closing, it is my finding that Fafard would not have closed without the concessions it was seeking, and that its appearance at the closing was a "sham." Because Fafard was not a "ready, willing, and able" buyer, or if it was, because there would have been no reason for Metro-Boston to so believe, Fafard is not entitled to specific performance.[7]

---

[6]Terrill testified that he could not say whether Fafard would have in fact closed without obtaining access to Sewell Street because "we never had to make that decision."

[7]Because I think the issue is more straightforward than do the parties, I will comment but briefly on some of their additional arguments. As to Metro-Boston's contention that the P&S Agreement was voidable because of a mutual mistake regarding the positioning of the boundary line between the residential and industrial portions of the property, Fafard is surely correct that by granting extension after extension after the mistake became known to the parties, Metro-Boston ratified the P&S Agreement as written. Moreover, a party cannot avoid a contract merely because of a mistake as to an assumption; the mistake must be shared by both parties and be of such magnitude as to

12

ORDER

For the foregoing reasons, Fafard's motion for specific performance is DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

undermine the very basis of the contract. Shawmut-Canton LLC v. Great Spring Waters of America, Inc., 62 Mass. App. Ct. 330, 337, 338 (2004). Fafard's argument that its decision not to notify Metro-Boston of its May 21 appearance at the Registry was excused by Metro-Boston's inability to provide a contemporaneous clean title ignores the 30-day grace period available to Metro-Boston under the P&S Agreement. Metro-Boston's Statute of Frauds argument – that the mistake as to the exact boundary line between the industrial and residential zones left the written contract bereft of an essential term – confuses contract formation principles with after-the-fact oral clarifications of the terms of performance under a written instrument. See McKinley Invest., Inc. v. Middleborough Land, LLC, 62 Mass. App. Ct. 616, 619 (2004). Finally, Fafard's repeated requests for extensions (cheerfully granted for the most part by Metro-Boston) are no more a sign of bad faith or inequitable conduct than was Metro-Boston's initiation of discussions regarding the sale of the property to a third party after it became convinced that Fafard had no intention of closing without wresting extra-contractual concessions from Metro-Boston.