UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP. | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) NO. 04-11531-RGS ) ) |
| METRO-BOSTON BROADCASTING, INC., Defendant. | ) ) ) ) ) |

**MEMORANDUM OF FAFARD REAL ESTATE AND DEVELOPMENT CORP.
IN SUPPORT OF MOTION TO RECONSIDER AND TO AMEND FINDINGS**

Pursuant to Federal Rules of Civil Procedure 52(b), Plaintiff Fafard Real Estate &

Development Corp. ("Fafard") submits this Memorandum in Support of its Motion to

Reconsider and to Amend the Court's Findings of Fact and Rulinigs of Law dated August

26, 2005.

The Court's ultimate conclusion that Fafard is not entitled to specific performance

depends upon the unsustainable premise that, at the expiration of the last extension

agreement on May 21, 2004, Fafard lost the right to seek specific performance. This

premise is unsustainable because the undisputed facts demonstrate that: 1) Fafard never

made a definite and unequivocal statement to Metro-Boston that it would not perform

without an additional condition, so as to justify a finding of repudiation; 2) time was not

of the essence in this contract under circumstances where the time for performance had

been extended 25 times; and 3) Metro-Boston was in breach of the contract and unable to

perform as of the expiration of the last extension, never having even attempted to obtain

the requisite Land Court approval for the subdivision of the property, preferring to let the contract lapse so as to take advantage of a higher offer. Under these circumstances, Metro-Boston cannot successfully argue that it is excused from performing under the contract and equity, which abhors a forfeiture, demands specific performance.

In reaching its ultimate conclusion the Court appears to have operated under misconceptions of law regarding the conveyance of a portion of a lot of registered land and Metro-Boston's right to invoke a 30-day grace period under the P&S Agreement. The Court also misapplied the law of anticipatory breach or repudiation. This resulted in an erroneous conclusion respecting a "sham" closing and Fafard's willingness to perform. The Court also failed to even address the parties' critical discussion and agreement of November 11, 2003. As the Court noted, as of the summer of 2003 Metro-Boston "was becoming much more difficult to convince on extending the dates," and had accused Fafard of "ty[ing] the property up at a cheap price." Metro-Boston demanded assurance that Fafard was willing to perform, and Fafard provided it.

Fafard had not yet applied for permits, as it was waiting on resolution of the Sewell Street access issue. But on November 11, 2003, Fafard agreed to waive its permit contingency, as indisputably evidenced by Hannert's contemporaneous notes and the change to the language of all subsequent extension agreements. Hannert's notes also state that Metro-Boston was told that Fafard wanted to buy the property and "We are not holding up the closing to obtain permits for development of the site." That these statements were made is confirmed, again, by the amendment to the extension agreements waiving the permit contingency and putting Fafard's deposit money at risk. Consequently, all of Fafard's prior statements to the effect that they needed Sewell Street

access in order to develop the property were nullified/revoked or, at the very least, rendered ambiguous and not "definite and unequivocal," as the law requires in order to find a repudiation.

Moreover, under circumstances where the parties had agreed to extend the time for performance 25 times over a period of years, Fafard was not barred from seeking to have the contract performed less than two weeks after the last extension expired, when it initiated the present action. This lawsuit effectively constituted a revocation of any prior repudiation, as a matter of law, under circumstances where time was no longer of the essence under the agreement. And, in any case, where Metro-Boston did not even begin the process of seeking Land Court approval for the subdivision of the property, and was therefore in breach of the agreement and unable to perform at the expiration of the last extension, Metro-Boston is unable to rely on time being of the essence of the agreement. If time was not of the essence, Fafard was free to seek performance within a reasonable time after the expiration of the last extension, which it timely did.

For these reasons, Fafard respectfully requests that the Court reconsider its Findings of Fact and Rulings of Law After a Trial Without Jury and amend its findings. Fafard further requests that the Court order specific performance as requested by Fafard in Count I of its Complaint.

## ARGUMENT

**I.    THE COURT MISAPPLIED THE LAW OF REPUDIATION AND INCORRECTLY HELD THAT TIME WAS AN ESSENTIAL ELEMENT OF THE AGREEMENT**

   **A.         The History of Negotiations Over Access to Sewell Street are Insufficient to Constitute a Repudiation by Fafard**

Even if some ambiguity was created by Hannert's fax cover sheets that accompanied the most recent of the extension requests, referencing a need to "resolve the access issue out to Sewell Street," such ambiguity is insufficient to constitute a repudiation of the P&S Agreement by Fafard. "In order to operate as a discharge of the other party, the repudiation must be either with respect to the entire performance that was promised or with respect to so material a part of it as to go to the essence. It must involve a total and not merely a partial breach." Bucciero v. Drinkwater, 13 Mass. App. Ct. 551, 555 (1982) (citing 4 Corbin on Contracts s 975 at 918) (after trial court found that dispute over payment of taxes the day before closing led to seller stating there was no point in meeting the following day for closing, and buyer later reconsidered his position and decided to pay taxes but did not communicate same to seller and appeared for closing, appeals court reversed trial court's dismissal of buyer's action and ordered specific performance). Furthermore, repudiation must be "definite and unequivocal." Corbin on Contracts s 973. Thus, even if "resolving" the access issue to Sewell Street can be construed as an attempt to impose a condition on the closing (which it cannot in light of the parties' November 11, 2003, agreement), it cannot be construed as a total breach and repudiation of the agreement by Fafard. The facts are distinguishable from Kattor v. Adams, 323 Mass. 686 (1949), to which the Court cited, in which the plaintiff's repudiation of the agreement, prior to filing suit, was express, unambiguous and complete.

Moreover, when coupled with the statement "We are ready to close on this property," the reference to "need[ing] to resolve the access issue out to Sewell Street" is certainly not definite and unequivocal. When combined with the fact that, as the last

extension agreement was expiring, Metro-Boston refused to respond to Fafard's repeated telephone calls and faxes (which would have afforded the parties the opportunity to clear up any misunderstanding as to Fafard's intent had Metro-Boston done so), and Fafard's prompt action in seeking specific performance, thereby demonstrating its willingness to close on the agreed-upon terms, equity cannot favor the forfeiture of Fafard's rights over Metro-Boston's desire to avoid the contract in favor of a more lucrative deal. Indeed, "the absence of a finding that [buyer] was or is in fact ready, willing and able does not bar specific performance. A final decree conditioning specific performance upon payment of the remainder of the purchase price will adequately protect the defendants' interests in this respect." Limpus v. Armstrong, 3 Mass. App. Ct. 19, 23 (1975) (citations omitted).

Because Fafard is pressing a claim for specific performance and willing to pay the agreed-upon price in exchange for the property, and not seeking damages on a claim for breach, the issue of whether Fafard sought to impose additional conditions prior to the time for performance is less important. "[A]n action for damages under a purchase and sale agreement is predicated upon a showing of default by the party to be charged. A suit for specific performance, however, is not predicated upon a prior default. It is enough that one party clearly manifest his unwillingness to perform and that the other party not be in default or barred by acquiescence, laches, or other equitable considerations." Id. In this case Metro-Boston clearly manifested its unwillingness to perform when it first sent a letter to Fafard on May 21, 2004, indicating that it considered the agreement terminated, and then immediately signed an agreement to sell the property to another. Fafard, by contrast, never acquiesced to such termination, filed suit promptly and is not

guilty of laches, and in no way behaved inequitably. Consequently, there is no harm to

Metro-Boston in requiring it to honor its agreement, in exchange for full payment, so as

to outweigh Fafard's right to purchase the property. Raynor v. Russell, 353 Mass. 366

(1967) (specific performance ordered for sale of property where record revealed no

hardship to vendor disproportionate to benefit to purchasers of having benefit of their

bargain, as specific performance of real estate sales agreement is appropriate remedy in

absence of specific equitable reasons for refusing same).

> **B.**     **Where Time is not Essential Condition, Agreement is**
> **Not Extinguished by Failure to Perform on Date**
> **Specified**

Limpus, *supra*, involved a claim for specific performance of a contract for the

sale of land that did not include a clause making time of the essence. The court held:

"Because the time specified for performance was not an essential condition, and neither

party tendered performance on that day, neither was discharged, nor was either in breach

or default." Id. at 22. However, immediately after the time specified for performance the

seller contracted to sell the land to a third party, which the court found to constitute a

repudiation of the seller's still enforceable agreement with the plaintiff, excusing any

tender or offer of performance by the plaintiff, and awarding the plaintiff specific

performance. While the P&S Agreement in this case contains a "time is of the essence"

clause, that is not dispositive. Quite to the contrary, once the parties agree to modify the

date for performance, time is no longer of the essence and such condition can be

recreated only by a definite notice from the party seeking to recreate it, granting the other

party a reasonable opportunity to perform. Church of God in Christ, Inc. v. Congregation

Kehillath Jacob, 370 Mass. 828, 833 (1976) (citing Corbin on Contracts s 722) (two

extensions of time for performance rendered time no longer of the essence absent

required notice); Quirk v. Schenk, 34 Mass. App. Ct. 931 (1993) (seller of home could

not invoke time of essence provision as defense to specific performance where time

extended three times); .[1] In this case time clearly was not of the essence.

The argument that time was not of the essence in the P&S Agreement does not

conflict with Fafard's argument that Metro-Boston was in breach as of the expiration of

the last extension. Metro-Boston was not in breach simply by being unable to close.

Metro-Boston was in breach because it simply made no effort to be able to close,

violating its duty to exercise reasonable efforts in such regard. In any event, even if

Metro-Boston was not in breach, such fact does not preclude Fafard, which was also not

in breach, from seeking to enforce the contract, if time was not of the essence. Limpus,

*supra.* If time was of the essence, then Metro-Boston's inability to perform on the

closing date bars it from relying on time being of the essence in defending against a

specific performance claim. Gentile Bros., Corp. v. Rowena Homes, Inc., 352 Mass. 584,

589 (1967) (where seller is unable to convey title at time set for closing under contract

making time of the essence, buyer's right to enforce contract not extinguished and seller

not entitled to rely on clause to avoid performance); M. De Matteo Const. Co., Inc. v.

Daggett, 341 Mass. 252,  (1960) (where buyer was led to believe that seller, due to poor

health, was unable to perform by agreed-upon date for closing, lack of tender by buyer on

closing date is excused and specific performance awarded, notwithstanding "time is of

the essence" clause in purchase and sale agreement).

---

[1] Although, as the Court noted, Metro-Boston added "time is of the essence" language to two of the
extension agreements after Fafard had signed them, the last such extension (singed in may of 2003) was
followed by approximately a dozen more over the following year. None of these included such language
as, of course, the delay was no longer attributable to Fafard, which had waived its permit contingencies, but
to Metro-Boston, which had not yet obtained Land Court approval to sell the property.

## II.    THE COURT OPERATED UNDER A MISCONCEPTION CONCERNING THE LAW RELATING TO CONVEYANCE OF A PORTION OF A LOT OF REGISTERED LAND AND THE INTERPRETATION OF THE P&S AGREEMENT.

The Court's Findings of Fact and Rulings of Law indicate that the Court believed that Metro-Boston was in a position to close under the purchase and sale agreement, or at least had the right to invoke the 30-day grace period under the P&S Agreement and try to be in a position to close, and that Fafard was unwilling to close and sought to put Metro-Boston in default through an attempted "sham" closing. Aside from the fact that the Court's findings are silent with respect to the November 11, 2003, conversation between Mary Heller Halcomb, Janice Hannert and Rick Terrill, in which Fafard agreed: to waive its permit contingency – putting its deposit money at risk; to pay the real estate taxes going forward; and, most importantly, expressed its willingness to close immediately and without first resolving the Sewell Street access issue, the Court's findings depend upon misconstructions of the law. As a matter of law Metro-Boston was <u>unable</u> to perform its obligations under the P&S Agreement, *i.e.* prepare a deed and close, as of the expiration of the last extension agreement, and was therefore in default. As a matter of law Metro-Boston was unable to avail itself of the 30-day grace period under the P&S Agreement to provide clean title, as it never satisfied the condition precedent of providing the expressly required written notice. As a matter of law Metro-Boston was in default on May 21, 2004, regardless of whether Fafard appeared at the Registry with a check for the purchase amount, and the only legal significance to Fafard's appearance at the Registry with a check was as supporting evidence of Fafard's readiness, willingness and ability to close. The appearance was legally irrelevant to the issue of default (Metro-Boston already being in default), and therefore could not constitute a "sham" closing. Consequently, the

Court's finding that Fafard was unwilling to close without first resolving the Sewell Street access issue, in addition to being unsupported by the record evidence and contradicted by unrebutted evidence, is unsupported by the Court's legally erroneous conclusion with respect to a "sham" closing.

### A. Land Court Rules Require a Seller to Prepare and Obtain a New Subdivision of a Portion of a Lot of Registered Land in Order to Convey that Portion.

The conveyance of registered land falls under the jurisdiction of the Massachusetts Land Court. Land Court procedures are explicit regarding the transfer of a portion of a lot of registered land. In order to transfer title to a portion of a lot of registered land, the Land Court requires the seller to prepare a new plan of land and to submit that plan to the Land Court engineering department for approval. As explained by Paul Beattie, this new Land Court plan must show the encumbrances, and "requires various mathematical calculations on angles, acreage, on meets [sic] and bounds, all of which are taken into consideration by the engineering department of the Land Court of the Commonwealth in order to approve or disapprove a new Land Court subdivision plan." See Beattie direct/ Trial Trans. Day 1, at 8:19–9:7. See also Fafard's Proposed Findings of Facts and Conclusions of Law ("Fafard's Proposed Findings") ¶ 69.

Moreover, as set forth in the Land Court Guidelines on Registered Land,

> **A deed of registered land will be accepted for filing only if it conveys a lot or lots shown on a Land Court plan. Before conveyance of any lot or lots constituting less than all of the land described in the certificate of title, the owner shall file a plan of such lot or lots, which shall accurately depict the boundaries and monuments describing such lot.** The deed shall convey the lot by reference to its identification on the plan. A new certificate will issue for the lot conveyed, and the deed will note on the certificate of title for the original parcel stating that the certificate is canceled as to the lot conveyed.

Commonwealth of Massachusetts, Land Court Guidelines on Registered Land (May 2000), at 42. Moreover, as further provided by the Land Court Guidelines, "When there is a new subdivision of a registered land parcel pending in the Engineering Department of the Land Court and that subdivision plan has not yet been received at the registry district for approval, no instrument may be accepted for registration against that plan until the said instruments have been first stamped for approval by the Land Court." Id. at 13.

Accordingly, a seller of less than full lot of registered land **cannot convey** such land without first completing the Land Court approval process to create and obtain a new subdivision of that lot. Fafard was thus never in the position of being able to elect to accept such title as Metro-Boston was able to convey, as Metro-Boston was barred by law from conveying any title whatsoever, not having even commenced, much less completed, the lengthy process required.

### B. The Thirty-Day Grace Period Was Unavailable to Metro-Boston Due to the Lack of the Required Written Notice, Placing metro-Boston in Default as a Matter of Law.

No evidence was presented that Metro-Boston ever gave Fafard the written notice required under the purchase and sale agreement that it was unable to convey clean title, so as to enable Metro-Boston to take advantage of the 30-day grace period. Absent the required written notice, the 30-day grace period does not come into play. Therefore, the Court's ruling that "Fafard's argument that its decision not to notify Metro-Boston of its May 21 appearance at the Registry was excused by Metro-Boston's inability to provide a contemporaneous clean title ignores the 30-day grace period available to Metro-Boston under the P&S Agreement" is erroneous as a matter of law. Quite to the contrary, as a matter of law, Fafard was required neither to notify Metro-Boston of its intention to

appear at the Registry, nor to even appear at the Registry, in order to place Metro-Boston in default and bring a successful action for specific performance. Bucciero v. Drinkwater, 13 Mass. App. Ct. 551, 552 (1982). This very circumstance was recently addressed by a judge of the Barnstable Superior Court in Pierce v. Clark, BACV2001-00496 (attached to Fafard's Proposed Findings of Fact and Rulings of Law), a case notable for its eerily similar facts to the case at bar. While this decision comes from a state trial court and of course does not constitute binding precedent, Fafard urges the Court to review its careful and well-researched analysis of the law.

Quite simply, the seller's option to take advantage of the 30-day grace period under paragraph 10 of the standard form purchase and sale agreement expressly provides; "IF the SELLER shall be unable to give title or make conveyance . . . then the SELLER shall use reasonable efforts to remove any defect in title or to deliver possession as herein provided, or to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER **shall give written notice thereof to the BUYER at or before the time for performance hereunder**, and thereupon the time for performance hereof shall be extended for a period of thirty 30 [sic] days." (emphasis added). As Metro-Boston never provided written notice of its intent to invoke the 30-day grace period, Metro-Boston was not entitled to the benefit of the extension. Metro-Boston was therefore in default as of the expiration of the last extension as it was unable to deliver title and had not given the required written notice of its intent to invoke the 30-day grace period. Consequently, to prove entitlement to specific performance all Fafard needed to prove is that it was ready, willing and able to close – a low threshold under the case law, as set forth below – and Fafard did not need to prove that it placed Metro-Boston in

11

default, or that it tendered performance by sending notice of its intent to close or by appearing at the Registry.

### C. Uncontested Evidence Shows that Metro-Boston Never Applied For or Obtained Land Court Approval of a New Subdivision for Lot 11.

The evidence is uncontroverted that Metro-Boston knew it was obligated to prepare a new survey of Lot 11 for Land Court approval in order to convey to Fafard the ten-acre portion of that lot, but <u>never</u> applied for and <u>never</u> obtained Land Court approval of a new subdivision plan.[2] As early as April 1998, during the time Metro-Boston tried to sell its Ashland property to Fafard, Mary Heller Halcomb sent a letter to Fafard in which she described the property for sale as, "two parcels of zoned residential land: 1. 9.6 acres noted in lot 12 and 6B and 2. approx. 10 acres in Lot 11, zoned residential. *Please note that the land will have to be subdivided along the zoning boundary in Lot 11*." <u>See</u> Trial Exhibit 108 (emphasis added). Moreover, in an agenda Halcomb prepared for a Metro-Boston stockholder meeting in March 2004, Halcomb again acknowledged that Lot 11 must be subdivided per Land Court requirements. In relevant part, Halcomb wrote, "Since the [Fafard residential property agreement] is Land Court Property, it will be necessary to have a complete survey with accurate boundaries submitted to the Town before transfer of title in fee can be made." <u>See</u> Trial Exhibit 96, at ¶ 4(c). The agenda further states, in relevant part, "After the Primary Buyer and the tenants are satisfied with the easement proposal, determine the price for the Easement for the residential land,

---

[2] The survey plan that Metro-Boston commissioned in 2003, as the Court accurately noted, was in connection with Metro-Boston's master plan for joint access for both Fafard and the commercial buyer. The sketch bore no resemblance to Schedule A to the P&S Agreement and no evidence was presented to suggest that it was prepared in connection with metro-Boston's obligations under the P&S Agreement. Indeed, Halcomb admitted that she never sought or obtained Land Court approval of the contemplated subdivision.

***complete the survey and land court approval*** and execute a new contract for the sale of this land." Id. at 6(d) (emphasis added).

Moreover, Metro-Boston discussed with Fafard its obligation to prepare this new Land Court plan and told Fafard that it would share with Fafard the engineering survey of land before Metro-Boston submitted it to the Land Court for approval. First, in November 2003, Halcomb called Paul Beattie to discuss the Land Court plan because Halcomb was concerned that her draft survey of the new lot may show less than the 19.6 acres of land as set forth in the P&S Agreement. Beattie and Halcomb discussed that Halcomb would share the survey with Fafard before it was submitted for Land Court approval so Beattie could determine whether there was a "major" or "minor deviation" from the 19.6 acres as set forth in the P&S Agreement. See Fafard's Proposed Findings ¶ 70. Also in November 2003, Fafard and Metro-Boston specifically discussed Halcomb's obligation to obtain the new Land Court survey. See Hannert Direct/ Trial Trans. Day 2, at 11:2 – 5. Second, on January 5, 2004, Halcomb and Janice Hannert of Fafard spoke by telephone. During this call, Hannert specifically inquired about the status of the engineering survey for the new Land Court subdivision plan. Halcomb responded to Hannert that she expected to get something from her engineer that week. See Fafard's Proposed Findings ¶ 71. Third, in multiple faxes sent by Fafard to Metro-Boston in December 2003 and January 2004, Hannert again specifically asked about the status of the Land Court survey. See Fafard's Proposed Findings ¶¶ 71-72. Throughout the early part of 2004, Fafard continued to wait to hear from Halcomb regarding her sketch from her engineer and the Land Court survey and title issues "so that [Fafard] could close on

the property." See Fafard's Proposed Findings ¶ 72. It is undisputed that Metro-Boston never applied for or obtained a new Land Court subdivision plan.

The significance of this undisputed fact is that the record evidence overwhelmingly demonstrates that from and after the parties' November 11, 2003, agreement, which resulted in Fafard waiving its permit contingency and putting its deposit money at risk, agreeing to pay the real estate taxes and expressly stating that it wanted to buy the property and was willing to close immediately (without first resolving the Sewell Street access issue), Metro-Boston's preparation of the survey plan and the Land Court approval of same were the only things holding up the closing.[3] The extension agreements executed in the winter of 2003/2004 and into the spring were to allow Metro-Boston to obtain Land Court approval of the subdivision plan, which Fafard repeatedly inquired about and Metro-Boston falsely claimed to be in process, while in fact negotiating with another buyer and consulting counsel as to how to get out of the contract with Fafard.

**III.    THE COURT'S ERROR OF LAW APPEARS TO HAVE RESULTED IN UNNECESSARY FINDINGS, LACK OF ESSENTIAL FINDINGS, AND ERRONEOUS FINDINGS AND RESULT.**

    **A.    Because Metro-Boston was Unable to Perform, Fafard's Tender of Performance was Excused and the Court's Findings With Respect to Paul Beattie's Appearance at the Registry are Misplaced and Unsupported.**

Because Metro-Boston was unable to perform, *i.e.* prepare a deed and convey any title to Fafard, the law excuses any requirement that Fafard tender performance in order to be entitled to specific performance. Although "[t]he general rule is that when performance under a contract is concurrent[,] one party cannot put the other in default

---

[3] Both parties testified that the title encumbrances appeared minimal and could easily be resolved.

unless he is ready, able, and willing to perform and has manifested this by some offer of performance ... *the law does not require a party to tender performance if the other party has shown that he cannot or will not perform.* ... One seeking to put the other party in default must show that he has offered to perform or has given notice of his readiness to do so *unless excused from performance by the refusal of the other party to perform, or some conduct equivalent to a refusal.*" <u>Leigh v. Rule</u>, 331 Mass. 664, 668 (1954) (internal citations omitted) (emphasis added). <u>See also</u> <u>Kanavos v. Hancock Bank & Tr. Co.</u>, 395 Mass. 199, 202 (1985) ("tender of performance is not necessary if the other party has shown that he cannot or will not perform."); <u>Lafayette Place Assoc. v. Boston Redevelopment Auth.</u>, 427 Mass. 209, 519 (1998) (same). Thus, where a party shows that it is unable to perform, or demonstrates "conduct equivalent to a refusal" to perform, the other party is excused from making an offer of performance. <u>See, e.g.</u> <u>Leigh</u>, 331 Mass. at 668 (holding buyer's tender excused where seller had not vacated premises, therefore demonstrating "conduct equivalent to refusal" because seller could not perform on closing date); <u>Mahoney v. Beebe</u>, 334 Mass. 165, 169 (1956) (buyer's tender excused where defendant failed to perform). The uncontroverted facts show that is *exactly* the case here: Metro-Boston demonstrated its inability to perform by not seeking or obtaining the required Land Court approval to convey a portion of a lot of registered land and Fafard was therefore excused from having to make any tender of performance. As set forth above, Metro-Boston never satisfied the condition precedent to invoking the 30-day grace period, nor, as a practical matter, could Metro-Boston have started and completed the process in 30 days, rendering the issue moot.

That Fafard's tender is excused renders the Court's finding of a "sham closing" inapposite. A sham closing is a false or insincere tender of performance in order to create a default. See Schilling v. Levin, 328 Mass. 2, 4-5 (1951). However, in a case where tender is excused, as in this case, a finding that Fafard's appearance at the Registry of Deeds is a sham is misplaced because Metro-Boston was in default *regardless* of whether Fafard appeared at the Registry or not. See Leigh, 331 Mass. at 668. See also, e.g., Vander Realty Co. v. Gabriel, 334 Mass. 267, 271 (1956) (buyer not required to tender performance where seller unable to perform on the date for performance set forth in the purchase and sale agreement; on date of performance seller "had demonstrated his inability to perform by not having tarred the roadway as he agreed to" and buyer was thus not obligated to tender performance). There can be no insincere intent to manufacture a default so as to constitute a "sham closing" where the party appearing at the Registry knows that the other party is *already in default*. See Foster v. Bartolomeo, 31 Mass. App. Ct. 592, 594-595 (1991) (when it was apparent that seller would not perform, the buyers "did not have to go through the sham of a tender"). The evidence was undisputed that Mr. Beattie's appearance at the Registry was intended to *create a record* of Fafard's readiness, willingness and ability to perform, using the Registry form *provided for such purpose,* so as to more easily prove such facts. But Mr. Beattie's appearance at the Registry, as a matter of law, was unnecessary in order to put Metro-Boston in default. Indeed, it was not even necessary in order to prove Fafard's readiness, willingness and ability to perform. Rutanen v. Ballard, 424 Mass. 723, 734-735 (1997) (court held buyer ready, willing and able to perform based on testimony of oral commitment from bank to fund purchase); LeBlanc v. Malloy, 335 Mass. 636, 638 (1957) (buyer not required to

actually tender purchase price to hold seller in default); Hastings v. Gay, 55 Mass. App. Ct. 157, 165 (2002) (buyer need only testify that he had funds available).  Mr. Beattie's appearance at the Registry served only to remove any doubt as to Fafard's readiness, willingness and ability to perform.  It was otherwise irrelevant to the issue of default and cannot be construed as an attempt at a sham closing.

In short, the Court's erroneous conclusion that Metro-Boston was not in default as of the expiration of the last extension agreement on May 21, 2004, depends upon two conclusions that are erroneous as a matter of law.  First, that Beattie's appearance at the Registry was an attempted "sham" closing and therefore ineffective to meet the tender requirement and put Metro-Boston in default and, second, that Metro-Boston was not in default as a consequence of the 30-day grace period.  As a matter of law Fafard was excused from tendering performance in light of the undisputed fact of Metro-Boston's inability to perform, and Metro-Boston never invoked the 30-day grace period through the required written notice at or before the time for performance.

**B.        The Court's Finding of a "Sham Closing" Includes Erroneous Findings of Fafard's Unwillingness to Close without Additional Conditions.**

In addition to being unnecessary, the Court's finding of a "sham closing" also includes findings concerning Fafard's willingness to close that are completely unsupported, and contradicted, by the record.

*i.        The Testimony is Consistent and Unrebutted that Beattie Appeared at the Registry to Make a Record of Fafard's Readiness, Willingness and Ability to Perform and that He was Authorized to and Prepared to Close, But that He Did Not Expect Metro-Boston to Appear Because He Knew Metro-Boston Had Not Yet Subdivided Lot 11 and Was Therefore Unable to Perform.*

Unrebutted testimony shows that Beattie did not appear at the Registry in order to manufacture a "default" of Metro-Boston or for a "sham closing," but to create a record of Fafard's readiness, willingness and ability to close.[4]  As Beattie testified with respect to his appearance on May 21:

> Q:     Now, when you went to the Registry on May 21, 2004, with your bank check for the closing price, did you notify Metro-Boston that you would be going?
>
> A:     I did not.
>
> Q:     Why not?
>
> A:     Because I did not believe they were ready to close.
>
> …
>
> **Q:     Why did you not believe that Metro-Boston was ready to close?**
>
> …
>
> **A:     My primary basis was that I had not seen a Land Court subdivision plan.**
>
> Q:     The plan that you had discussed with Ms. Halcomb in November 2003?
>
> A:     That is correct.

See Beattie Direct/Trial Trans. Day 1, at 16:24 – 18:3 (emphasis added).

Moreover, Beattie did not testify that he did not have authority to close.  Nor does Metro-Boston argue otherwise.  There is simply no record support for the Court's finding to that effect.  To the contrary, in preparation of a closing, Beattie brought a certified

---

[4] The testimony of Rick Terrill, a non-lawyer, that he sent Beattie to the Registry "to default" Metro-Boston is not inconsistent, as he was not using the phrase as a legal term of art and, in any case, a party already in default cannot be defaulted.  Mr. Terrill further testified that he sent Beattie to the Registry to preserve Fafard's rights which is, in fact, what Beattie was doing.

check, paper for closing adjustments, and the list of title encumbrances.[5] See Beattie

Direct/ Trial Trans. Day 1, at 15-16.  Beattie further testified that, had Metro-Boston

appeared, he would have done "everything in his power" to perform a normal closing and

that he had authority to tender the check if Metro-Boston had met its obligations.  On

cross-examination, Beattie testified as follows:

> Q:    Now, when you appeared at the Registry on May 21, 2004, did you have
>       in mind what you would have done had Metro-Boston appeared, ready,
>       willing and able to close?
>
> A:    Yes.
>
> Q:    What would you have done?
>
> A:    **If they had come to the closing, I would have reviewed the
>       documentation they brought.  I would have prepared the closing
>       adjustments.  I would have reviewed the plan that we had wanted for
>       a long time to review, the Land Court plan.  I would have done
>       everything in my power to do – to perform a normal closing, a normal
>       acquisition.**
>
> Q:    **Did you have authority to tender the check and close on that day if the
>       seller met its obligations?**
>
> A:    **Yes, I would have.**

See Beattie Cross/ Trial Trans., Day 1, at 60:8 – 24 (emphasis added).

When Metro-Boston did not appear, Beattie utilized a form provided by the

Registry of Deeds entitled "Certification of Failure of One Party to Appear After Paging

for Title Passing/Closing."  This form exists so that buyers and sellers can create a record

of a their readiness, willingness and ability to perform.  See Beattie Direct, Trial Trans.

Day 1, at 13:19 – 14:22.  See Pierce v. Clark, supra.

---

[5] While he did not bring all of the documents that one typically brings to a closing that one expects to
occur, this was explained by the fact that he did not expect the closing to occur and, moreover, that Metro-
Boston was not returning phone calls or responding to faxes, and did not provide the additional documents
that a seller typically provides prior to closing, such as municipal lien certificates, evidence of clean title
and a draft deed, so there was nothing additional for Beattie to bring.

There is simply <u>no</u> evidence in the record to support the Court's finding, at paragraph 27, that "Beattie understood that if Metro-Boston did appear, he was not to close without a resolution of the Sewell Street issue . . . "

> ii.    *Record Evidence Shows Fafard Told Metro-Boston it was Willing to Close Prior to Resolving Sewell Street Access.*

The Court's Findings of Fact do not appear to appreciate the significance of the November 11, 2003, telephone conference between Rick Terrill, Janice Hannert and Mary Heller-Halcomb. Record evidence shows that both Rick Terrill and Janice Hannert of Fafard told Metro-Boston during a conference call on November 11, 2003, that Fafard waived its permitting condition <u>and</u> specifically told Metro-Boston that Fafard was ready to close without Sewell Street.  As Janice Hannert testified,

Q:    How is it you were ready to close if you say, "We need to resolve the access issue out to Sewell Street?

A:    Again, the Sewell Street – after we put our deposit at risk and agreed we were not waiting on permits, **Sewell Street was something we were pursuing, it was not something that we were conditioning the closing on in terms of the residential portion of the property.**

Q:    **Had you told Mary Halcomb this?**

Mr. Berman:   Objection.

A:    **That had been --**

The Court:    Overruled.

A:    **-- part of our discussions.**

<u>See</u> Hannert Direct, Trial Trans., Day 2, at 20:9 – 14 (emphasis added).

This testimony is confirmed by Hannert's contemporaneous notes – the only non-testamentary evidence of the parties' conversation – in which Hannert wrote, "11-11-03 Rt [Rick Terrill] & JH [Janice Hannert] spoke w/ Mary Halcomb on a conference call.

**RT told her that we wanted to close on the property. We are not holding up the closing to obtain permits for development of the site.**" See Trial Exhibit 111 (emphasis added). The evidence was uncontested that Fafard waived its permit contingency as a result of agreements reached during this telephone conference, and that waiving the permit contingency was the practical result of Fafard agreeing to no longer delay a closing until after resolution of the Sewell Street access issue.

Prior to the November 11, 2003 conference call, Fafard had held off pursuing its permits and approvals after learning of the presence of wetlands on Tri Street, one of two access points to the premises, because Fafard did not know whether it would be seeking approval of a project with one point of access (*i.e.* only Adams Road) or two points of access (*i.e.* Adams Road and Sewell Street).[6] As the evidence shows, it would have been inefficient and expensive for Fafard to pursue permits with the Town of Ashland *before* Fafard knew from Metro-Boston whether Metro-Boston would sell Fafard this second means of access to the property via Sewell Street. As Richard Terrill, Fafard's Senior Vice President and Chief Financial Officer, testified,

> Q:    Is there any relationship between the access issue and the permit applications?
>
> A:    Well, the permit applications – the access situation is, if you know what access you're going to utilize, then you would go and get your permits based upon that. You don't want to not have – know whether you need a second access or whether you're going to go for a waiver and do all the engineering, and find out you don't have an agreement on it. So, needless to say, you want to know which way you're going to go.

---

[6] As is standard with Fafard purchase and sale agreements, Fafard contracted for a period of time to pursue permits and approvals specific to the project it intended to develop. To reflect this contingency, the P&S Agreement contained two deadlines: a permit and approval deadline and a separate, and subsequent, closing date. See Trial Exhibit 7. If Fafard did not obtain its permits or otherwise backed out of the deal, Fafard retained its deposit, but Metro-Boston was entitled to Fafard's due diligence work product. Id. All evidence indicates Metro-Boston understood this contingency and determined it was a "good and calculated risk" for Metro-Boston. See Trial Exhibit 4.

Q:    Could you just present alternative proposals to the Town [of Ashland] or sequential proposals to the Town?

A:    It becomes very expensive, and you know, you don't want to have the Town going in on three or four different proposals.  It doesn't make sense. A lot of times the towns will want to see evidence that you have an access under control or a piece of land under control before they will let you do it.

See Terrill Direct, Trial Trans. Day 3, at 113:9 – 114:2.

Further record evidence confirms Fafard's willingness to close without Sewell Street.  By November 2003, the land had tripled in value and there was no doubt in Fafard's mind that it wanted to buy the property.  As Richard Terrill testified, "[Fafard] knew that there was value in [the property].  [Fafard] had it under agreement for $339,000.  So from [Fafard's] standpoint it was kind of a no-brainer.  [Fafard was] going to buy it one way or another."  See Fafard's Proposed Findings ¶ 77.  Metro-Boston does not dispute that the land increased in value and that Fafard's contract, therefore, had intrinsic value.

Also in November 2003, Fafard agreed to place at risk its deposit of $33,900 (10 percent of the purchase price) and to assume the tax liability for the premises.  See Fafard's Proposed Findings ¶ 19.  The P&S Agreement extensions executed by the parties after November 11 confirmed that Fafard's deposit was nonrefundable:  "In the event the transaction contemplated by the Agreement does not occur due to no fault of the Seller, the deposit shall be delivered to the Seller and the transaction shall terminate." See Fafard's Proposed Findings ¶ 20.

While Fafard expressly waived its permitting condition and told Metro-Boston it was willing to close without Sewell Street, Fafard continued to pursue an agreement as to Sewell Street.  Metro-Boston was still working on selling the balance of its property to

another buyer (whose identity continued to change over time) and Fafard continued to

inquire as to Halcomb's progress in working out a "master plan" for joint access.

However, as Hannert testified,

> **After the August '03 to, say, November '03 time frame, access to Sewell Street, because we no longer had the permit contingency, was something we were still discussing;** *but it was never a requirement for closing, and it was much less of an issue after that time.* **We were still discussing it as something we would like to have and as part of [Halcomb's] master plan that she would be doing for the rest of the property,** *but it was not something that would have held up the closing on the property. We were proceeding. We had the money at risk, and intended to proceed on the property.*

See Halcomb Direct/ Trial Trans. Day 2, at 17:12-23 (emphasis added).  Thus, Sewell

Street was still open for discussion between the parties and, for that reason, Hannert

continued after November 2003 to include in her fax cover sheets to Metro-Boston a

resolution of the Sewell Street issue as an action item.  There is no record evidence that,

particularly after November 2003, Fafard insisted on Sewell Street access as a condition

of closing.  To the contrary, the consistent evidence shows that Fafard was ready, willing

and able to close from and after November 2003 and was not conditioning a closing on

Sewell Street. The only evidence to the contrary was Mary Heller-Halcomb's testimony

that she did not remember the November 11, 2003, telephone conversation.  That the

conversation occurred, however, is beyond doubt, as evidenced by Hannert's

contemporaneous notes and the change to the language of the subsequent extension

agreements, signed by Metro-Boston, removing the permit contingency.  That change

resulted from the agreement reached during the telephone call, which call included

Fafard's representation that it wanted to buy the land and was willing to close

immediately, without waiting to resolve the Sewell Street access issue.

C.        **The Finding that Fafard was Not Willing to Close**
          **Without Sewell Street is Unsupported by Logic.**

Not only is the Court's finding of Fafard's unwillingness to close unsupported by

the record and contradicted the record, it is inherently an unreasonable and illogical

finding under the circumstances and undisputed facts.  It is illogical that Fafard, an

experienced real estate developer, would walk away from a deal for land that had tripled

in value since the contract was signed.  Fafard and Metro-Boston agreed to a price of

$339,900 in 2000.  Between 2000 and 2004, sewerage was installed on the land and the

area experienced a real estate boom.  It is simply not logical that Fafard would abandon

this lucrative transaction.  Indeed, as Terrill testified, the deal was a "no brainer" from

Fafard's perspective.  Nor is it logical that Fafard would agree to place its deposit at risk

(nearly $40,000) and agree to pay real estate taxes going forward if Fafard were

unwilling to close without receiving a concession from Metro-Boston that Metro-Boston

was under no obligation provide.  It would be inherently unreasonable for Metro-Boston

to believe that was the case.  The transaction was no longer a good deal for Metro-

Boston, given the increase in property values.  Metro-Boston had no incentive to do

anything to preserve the deal, whereas Fafard had <u>every</u> incentive to preserve the deal.  It

is utterly illogical under the circumstances for Fafard to simultaneously put nearly

$40,000 at risk <u>and</u> refuse to close without reaching an additional agreement with Metro-

Boston.

To the contrary, as set forth above, the logical and consistent evidence shows that

from and after November 2003, Fafard was ready to close and pursued Metro-Boston to

perform.  <u>See</u> Fafard's Findings ¶¶ 22-23.  Fafard sought extensions in order to <u>protect its</u>

<u>rights</u> under the P&S Agreement, under circumstances where Metro-Boston was not yet

ready to perform. There is no evidence that Fafard sought extensions after November of 2003 in order to buy time, delay a closing, resolve the access issue, or because it had not yet determined whether it wanted the property without access to Sewell Street. To the contrary, the evidence is undisputed that Fafard sought such extensions because Metro-Boston was not yet able to close, and without the extensions Fafard feared losing its right to purchase property that it wanted, regardless of the resolution of the access issue, and that such intent had been communicated to Metro-Boston.[7]

Metro-Boston failed to perform so it could pursue a more lucrative deal. Although Metro-Boston may have been privileged to negotiate for a better deal, Metro-Boston's receipt of a higher offer for the property from a third party does not excuse Metro-Boston's breach of its agreement to sell the land to Fafard. Furthermore, Metro-Boston's claim that it thought Fafard was insisting on additional conditions to closing, outside the scope of the P&S Agreement, rings hollow in the face of Metro-Boston's conscious effort to avoid communicating with Fafard in the weeks leading up to the expiration of the last extension agreement.

---

[7] The Court references Hannert's note from her file stating that Halcomb "was becoming more difficult to convince on extending the dates." This note predates the November 11, 2003, agreement to waive the permit contingency and close immediately. If anything, it is evidence that Fafard realized that Metro-Boston was running out of patience and Fafard could no longer hold up the closing in order to first resolve the access issue and obtain permits. It was in recognition of this fact that Fafard subsequently agreed, in November, 2003, to waive its permit contingency and close immediately. Indeed, all of the evidence referenced by the Court in support of its finding that Fafard sought to delay the closing and expressed a need for access to Sewell Street in order to proceed with development predates the agreement to waive the permit contingency. This was a fundamental change in the parties' agreement which the Court's findings do not address. Statements such as "We are ready to close on the property but need to obtain approval to access through Sewell Street," as expressed in a fax dated November 6, 2003, just prior to the new agreement, do not appear in subsequent communications. The condition is removed and the statement "We are ready to close on the property" becomes a stand-alone declarative statement, followed by the statement that the parties "need to resolve the access issue." The distinction only appears subtle if one ignores the change to the parties' agreement from and after November 11, 2003, and the express representation by Fafard on that date that it would not hold up the closing to resolve the access issue. As for the Court's comment that the references to Sewell Street in the later faxes were coupled with a request for an extension, the Court fails to note that the extensions were made necessary by Metro-Boston's failure to obtain subdivision approval and its inability to close. Fafard, as it had stated both orally and in writing to Metro-Boston, was ready to close immediately.

**IV.    FAFARD REQUESTS THE COURT TO STRIKE ITS FINDINGS CONCERNING FAFARD'S UNWILLINGNESS TO CLOSE AND ISSUE ADDITIONAL FINDINGS THAT FAFARD WAS READY, WILLING, AND ABLE TO CLOSE, AND TO ORDER SPECIFIC PERFORMANCE.**

For the forgoing reasons, Fafard requests that the Court strike its findings concerning Fafard's unwillingness to close, including that:  (1) Fafard's willingness to close was never communicated to Metro-Boston; (2) Beattie appeared at the Registry on May 21 without authority to close without a resolution of the Sewell Street issues; and (3) Beattie's true mission was to place Metro-Boston in default as a prelude to litigation.

Fafard further requests that the Court issue specific additional findings that Fafard was willing to close and conveyed that willingness to Metro-Boston, but that Metro-Boston was unable to perform.  Specifically, Fafard requests that the Court issue the following findings:

1.      Although the P&S Agreement provides that time is of the essence, the parties' subsequent 25 agreements to extend the time for performance, in the absence of a notice by one party to the other recreating the condition, rendered the time for performance no longer an essential element.

2.      Because time was no longer of the essence, the parties' rights to enforce the agreement were not extinguished upon the expiration of the last extension agreement and the parties continued to be bound by the agreement for a reasonable time thereafter.

3.      Fafard did not repudiate the agreement by making a definite and unequivocal demand for an additional condition.

4.     In order to convey less than a full lot of registered land, the Land Court requires the seller to prepare a new survey and obtain Land Court approval of a new subdivision plan of that parcel.

5.     Metro-Boston never prepared such a survey or applied for or obtained Land Court approval of a new subdivision of Lot 11 into two parcels and, thus, Metro-Boston was unable to perform under the P&S Agreement (*i.e.* prepare a deed and convey any title) on May 21, 2004, and Metro-Boston made no good-faith effort to be able to close.

6.     Fafard knew that Metro-Boston was unable to perform and Fafard's tender of performance was excused.

7.     Nevertheless, from and after November 2003, Fafard was ready, willing, and able to close and did not condition a closing on Sewell Street access or other condition not contained in the P&S Agreement.

8.     Fafard specifically told Metro-Boston on November 11, 2003, that it was waiving its permitting contingency and was ready to close and the parties amended their agreement accordingly.

9.     Beattie appeared at the Registry on May 21, 2004, with good funds and an intention and authority to close.  Fafard was ready, willing and able to consummate the transaction at that time.

10.    Had Metro-Boston appeared, Fafard would have done everything in its power to effectuate a closing.  However, when Metro-Boston

failed to appear, Beattie made a record of that failure to use as

evidence of Fafard's readiness, willingness, and ability to close.

11.         Metro-Boston never provided Fafard with written notice of its

intent to invoke the 30-day grace period under the P&S

Agreement.

For these reasons, Fafard requests that Court order specific performance of the

P&S Agreement.

## CONCLUSION

For the foregoing reasons, Fafard respectfully requests that the Court reconsider

amend its Findings, and find in favor of Fafard on its claim for specific performance.

Respectfully submitted,

FAFARD REAL ESTATE &
DEVELOPMENT CORP.

By its attorneys,

Jeffrey J. Upton (BBO#552221)
Halye A. Sugarman (BBO#646773)

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108-3107
(617) 423-0400

DATED: September 26, 2005
437293

## CERTIFICATE OF SERVICE

I, Jeffrey J. Upton, certify that on September __, 2005, I served a copy of the foregoing Memorandum of Fafard Real Estate and Development Corp. in Support of Motion to Reconsider and to Amend Findings, by hand on:

Kenneth Berman, Esq.
Nutter McClennan & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02110

Jeffrey J. Upton