UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
FAFARD REAL ESTATE &                        )
DEVELOPMENT CORP.,                          )
                                            )
    Plaintiff and Defendant-In-Counterclaim,  )
                                            )
vs.                                         )   CIVIL ACTION
                                            )   NO. 04-11531-RGS
METRO-BOSTON BROADCASTING,                  )
INC.,                                       )
                                            )
    Defendant and Plaintiff-In-Counterclaim,  )
_____)

**DEFENDANT'S OPPOSITION TO MOTION OF FAFARD REAL ESTATE
AND DEVELOPMENT CORP. TO RECONSIDER AND AMEND FINDINGS**

Introduction

    Fafard's Rule 52(b) motion presents snippets of supposedly favorable testimony, erroneously calls the testimony "uncontroverted" or "uncontested," and then requests that the Court completely reverse its original factual findings. Fafard is not entitled to such relief. Far from meeting its heavy burden under Rule 52(b) to show the Court made a manifest error of fact or law, Fafard's motion and overlong brief (28 pages) effectively attempt to relitigate the case to achieve the kind of wholesale revision of factual findings for which Rule 52(b) was not intended.

Analysis

I.    STANDARD UNDER RULE 52(B)

    Rule 52(b) provides: "On a party's motion … the court may amend its findings – or make additional findings – and may amend the judgment accordingly." "The decision of whether to grant or deny a motion to amend or enlarge the findings is within the discretion of the trial court." Dash v. Chicago Ins. Co., 2004 WL 2337021 at *1, (D. Mass. Oct. 18, 2004) (Woodlock, J.), citing 9 MOORE'S FEDERAL PRACTICE § 52.60[2].

Rule 52(b)'s purpose is "to correct, clarify, or amplify the findings" so that the appellate court can obtain a thorough and correct understanding of the factual and legal basis of the trial court's decision. Id. The rule is meant to correct any "manifest errors of law or fact" in the court's findings. National Metal Finishing Co., Inc. v. Barclays American/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990). Fafard "bears the burden of showing that a harmful error has been made … [and] [t]his burden is especially heavy when the court is asked to reconsider its decision." 9 MOORE'S FEDERAL PRACTICE § 52.60[4][a]. Fafard must set forth facts and law "of a strongly convincing nature." Id.

Rule 52(b) is not meant to provide an avenue for relitigating issues and claims on which the moving party lost at trial. "[A]n attempt at wholesale revision of findings to make them more favorable to the movant is not a proper basis for a motion to amend the findings." 9 MOORE'S FEDERAL PRACTICE § 52.60[4][d]. Fafard may not reassert arguments already considered and rejected at trial, National Metal Finishing, 899 F.2d at 123, or advance arguments it could and should have presented at trial. Aybar v. Crispin-Reyes, 118 F.3d 10, 16 (1st Cir. 1997) ("appellants may now realize that they did not make their initial case as compelling as they might have, but they cannot charge the district court with responsibility for that failure through this Rule 52(b) motion").

II. FAFARD IS NOT ENTITLED TO A FINDING THAT IT WAS READY, WILLING, AND ABLE TO PERFORM AS OF THE CLOSING DATE

Fafard argues there was insufficient evidence to support a finding that Fafard "repudiated" the purchase and sale agreement, and asks the Court to find that Fafard did not repudiate it. The Court though never found that Fafard "repudiated" the purchase and sale agreement per se, although perhaps the findings would support such a conclusion.

Fafard's fixation with "repudiation" is misguided. Repudiation is something a plaintiff

alleges and seeks to prove against a defendant. Fafard's Rule 52(b) motion implies that Metro-Boston had the burden of proving, but failed to prove, that Fafard repudiated the agreement. This was not Metro-Boston's burden. It was *Fafard's* burden to prove that (a) Fafard was ready, willing, and able to perform the agreement on the day it expired, and (b) it had given notice of this to Metro-Boston.[1]

On this issue, Fafard's motion implicitly asks the Court to reverse itself and find that, by the time the purchase and sale agreement expired, Fafard was not conditioning the closing on resolving the Sewall Street access issue, and that Fafard had so notified Metro-Boston. Fafard's theory is that there was a November 11, 2003 "discussion and agreement" between the parties in which Fafard waived its permitting contingency, and that this agreement was tantamount to a renunciation by Fafard of any effort to condition the closing on resolving the access issue to Sewall Street.

The record fails to support Fafard's creative interpretation of the evidence. Fafard's testimony on this point was as follows:

> Q    [To Janice Hannert]  What was the subject of the conference call on November 11, or subjects?
>
> A    Basically, it was a reiteration of what we needed to do to close on the property, and that we were not holding up the closing to obtain permits; that we needed the -- we still wanted to discuss the access issue, but at the point we weren't holding up permits, it was much less of an issue, but we needed the subdivision plan we could deed off of and clean title.

Trial Transcript Feb. 15, 2005, p. 12. In other words, according to Hannert, in the November 11 conference call, Fafard had simply said it was not holding up the closing "to obtain permits." Fafard had *not* said it was willing to close without getting access to Sewall. To the contrary,

---

[1] While undoubtedly a repudiation could be one way in which a buyer might not be ready, willing, and able to perform, there need be no finding that a buyer repudiated to find that the buyer was not ready, willing, or able to perform.

- 3 -

Hannert testified that "we needed the -- we still wanted to discuss the access issue" in the course of "reiterat[ing] … what we needed to do to close on the property."

Moreover, a willingness to close without obtaining permits, if that is what Fafard communicated on November 11, is not the same as a willingness to close without resolving the access issue. Fafard would like to equate the two, but the two are different.

Even assuming in Fafard's favor that a willingness to close without permits is the same as a willingness to close without having access to Sewall, the documentary evidence after November 11 shows Fafard was not willing to waive the contract's permitting contingency.[2] Every extension Fafard requested, and the parties signed, after November 11 extended the date for Fafard to get its permits (Tr. Exs. 65, 67, 69, 71, 75, 79, 80, 84, 86, 89, 91, 93). Fafard would not have sought an extension of the permitting contingency if it had waived it. These two concepts – extending the contingency and waiving it – are mutually inconsistent. By extending the permitting contingency, Fafard reserved it, and was communicating to Metro-Boston its unwillingness to waive it.

Further, and itself fatal to Fafard's position, every extension request from Fafard between February 2004 and May 21, 2004 gave, as a reason, that Fafard still "need[s] to resolve the access issue out to Sewall Street." (Tr. Exs. 87, 88, 90, 92, 94, 95, 97). Thus, whatever was said on November 11, 2003, Fafard had not given up its insistence on resolving the access issue out to Sewall Street.

There was also direct testimonial evidence – from Fafard's Executive Vice President Richard Terrill – that up until the time the purchase and sale agreement expired in May 2004, Fafard had *not* decided to close without obtaining access to Sewall:

---

[2] Fafard simply agreed to forfeit its deposit if it invoked the permitting contingency to terminate the transaction.

- 4 -

> Q   Mr. Terrill, there came a point in time when Fafard realized it needed another access, other than what Fafard had originally planned on, correct?
>
> A   Yes.
>
> \*\*\*
>
> Q   Well, were you always willing to close without having access to Sewell?
>
> A   I would have made that decision, you know, at that point in time.
>
> Q   At what point in time?
>
> A   When my agreement was getting close to running out or I didn't have an extension.

Trial Tr. Feb. 22, 2005, p. 115.  This testimony conclusively negates any argument that, as of November 11, 2003, Fafard had decided to close without getting access to Sewall Road.  And since the documentary evidence establishes that, on numerous occasions between the signing of the agreement and May 21, 2004, Fafard had told Metro-Boston that Fafard needed to have access to Sewall (Tr. Exs. 10, 19, 22, 31, 35, 60, 62, 87, 88, 90, 92, 94, 95, 97, 111), the testimonial evidence establishes that, by the time the agreement expired on May 21, 2004, Fafard had not made, or communicated to Metro-Boston, a contrary decision.[3]

Ample other evidence establishes that Fafard was unwilling to close the transaction without getting access to Sewall.  This evidence includes, among other things, the testimony of Mary Halcomb about her conversations with Janice Hannert, the absence of any letters, e-mails, or faxes from Fafard to Metro-Boston stating any willingness to close without having access to

---

[3] Fafard argues that the evidence does not support the finding that Beattie knew he was not to close without resolving the access issue to Sewall.  The evidence indeed supports such a finding.  Given the abundant evidence of Fafard's chronic unwillingness to close without having access to Sewall, there was no evidence that Terrill had made a contrary decision, or instructed Beattie, to take title without resolving the access issue.  Terrill's sole instruction to Beattie was to go to the registry "to default the seller, Metro-Boston" (Tr. 2/14/05 p.15), and Beattie had no realistic expectation that Metro-Boston would be there (Tr. 2/14/05 p.20).  Hence, there was no reason for Terrill to authorize Beattie to take title without resolving the access issue to Sewall.  Beattie was authorized simply to do exactly what he did: appear at the registry with a check, page Metro-Boston, obtain an affidavit attesting to his appearance, and come back to the office, just as he had done six months earlier on November 7, 2003, when Fafard was still pressing for access to Sewall.  Beattie further admitted that Fafard was just as ready, willing, and able to close on May 21, 2004 as it was on November 7, 2003 (Tr. 2/14/05 p.34).  Put another way, on May 21, 2004, Fafard was no more ready, willing, and able to close than it was on November 7, 2003, when it was also not willing to close without having access to Sewall (See Tr. Exs. 61, 62).

Sewall, the absence of any project site plan showing a development with simply a single access into the site, Hannert's refusal to state, under oath, whether she meant what she said when she wrote in her extension requests that Fafard needed to resolve the access issue to Sewall, and the like.

Ignoring this evidence, Fafard's motion tries to explain away as "ambiguous" Hannert's extension requests, which said that Fafard needs to resolve the access issue to Sewall. There was no ambiguity. The statement in question immediately followed the sentence that requested an extension of the closing date, and purported to explain the reasons for the request. In a single sentence, Fafard listed three things it "needed," two of which were undeniably closing items: clean title and a plan "to deed off of." Fafard wants to construe the third thing it said it needed as something it did not need at all, whether for closing or otherwise. The statement could not have been clearer. Fafard did not say it merely *wanted* to resolve the access issue. It said it *needed* to resolve it.

But even if the Court were to indulge Fafard and assume that the statement was ambiguous, the ambiguity would not help Fafard's case. Fafard relies on Corbin on Contracts § 973, which says that a *repudiation* must be "definite and unequivocal," not ambiguous. The Corbin cite has no application here. It deals only with what "constitutes an anticipatory breach of contract" "creat[ing] an immediate right of action" before the time for performance. Corbin on Contracts § 973 at 801-02. It deals with what a plaintiff must unambiguously prove about the *defendant's* intention not to perform. It does not deal with what a plaintiff must prove about its own intentions. It was Fafard's burden to prove that Fafard was ready, willing, and able to perform. Assuming Hannert's statements were "ambiguous," which charitably casts Hannert's statements in the light most favorable to Fafard, ambiguous statements do not help Fafard meet

- 6 -

its burden of proof or earn Fafard a finding that it was ready, willing, and able to perform.[4]

III.   FAFARD IS NOT ENTITLED TO A FINDING OR RULING THAT TIME WAS NOT OF THE ESSENCE

Disregarding that a Rule 52(b) motion is no time for presenting entirely new case theories, Aybar v. Crispin-Reyes, 118 F.3d 10, 16 (1st Cir. 1997), Fafard's motion presents a new theory of the case. Fafard now argues that, despite the time-is-of-the-essence clause in the purchase and sale agreement, time was really *not* of the essence, that the time for performance was some reasonable time *after* May 21, 2004, that Fafard therefore did not need to be ready, willing, and able to perform the agreement on May 21, 2004, that Metro-Boston anticipatorily repudiated the agreement when it wrote on May 21 that the transaction should be considered terminated, and that Fafard therefore could sue for specific performance in June based on Metro-Boston's supposed anticipatory repudiation.

This new theory is a far cry from Fafard's trial theory. Throughout this case, Fafard's theory was that the contract called for a closing on May 21, 2004, and that Metro-Boston breached by not appearing at the closing. Thus, in the complaint, Fafard pleaded:

> 37. Fafard appeared at the Middlesex South Registry of Deeds on May 21, 2004, the mutually agreed upon closing date, prepared to tender a check for the full purchase price to Defendant.
>
> 38. Defendant failed to appear at the closing, and in doing so, has failed to perform under the P&S Agreement.

In the joint pre-trial memorandum, Fafard described May 21, 2004 as "the closing deadline." Joint Pre-Trial Memorandum p.18. And in its requests for findings and rulings, Fafard presented its case on the theory that "Fafard's final extension expired on Friday, May 21, 2004," Fafard's

---

[4] Quoting Limpus v. Armstrong, 3 Mass. App. Ct. 19, 23 (1975), Fafard asserts that "the absence of a finding that [buyer] was or is in fact ready, willing and able does not bar specific performance." Fafard's Memo at 5. This proves nothing. There is a difference between the *absence* of such a finding (as in Limpus), and an affirmative finding that the buyer was *not* ready, willing or able, as we have here. In the latter instance, specific performance is not available.

Requests For Findings And Rulings (Proposed Finding No. 62), and that Metro-Boston breached on that day by failing to appear at the registry "and offering whatever title it could deliver." Id. (Proposed Ruling No. 22). Nowhere – not in Fafard's complaint, pre-trial memorandum, opening statement, closing argument, or requests for rulings and findings – did Fafard even hint that the time for performance went beyond May 21, 2004, or that time was not of the essence.

The Court should also reject this brand-new theory on the merits. Parties will be held to the deadlines they impose on themselves when, as here, they agree in writing that time is of the essence. McCarthy v. Tobin, 429 Mass. 84, 88 (1999); Vickery v. Walton, 26 Mass. App. Ct. 1030, 1031 (1989). "A 'time is of the essence clause' means that contractual deadlines will be strictly enforced." Owen v. Kessler, 56 Mass. App. Ct. 466, 466-67 (2002) (emphasis added). "If the parties were inclined to insert a specific time and date in their agreement as a deadline, they ought to be held accountable for that." Id. at 469. The deadline is a condition, and if the condition is not met or waived, then the parties' obligations to each other are extinguished. See McCarthy, 429 Mass. at 88.

Fafard's waiver theory rests on the erroneous argument that an extension agreement, as a matter of law, waives a time-is-of-the-essence clause. But whether there is a waiver is a question of fact. KACT, Inc. v. Rubin, 62 Mass. App. Ct. 689, 695 (2004). Absent an *express* waiver, the conduct that is alleged to constitute an *implied* waiver must be "clear, decisive, and unequivocal" such that "no other reasonable explanation of the conduct is possible." Id. (brackets and citations omitted). See Perroncello v. Donahue, 64 Mass. App. Ct. 564 (2005) ("It is possible to waive a 'time is of the essence' clause orally or implicitly, but doing so requires unequivocal actions on the part of the waiving party"); Owen v. Kessler, 56 Mass. App. Ct. 466, 469-70 (2002) (to find a waiver of a "time is of the essence" clause, the evidence of waiver must be "unassailable" and

"compelling"). Such "unequivocal" and "unassailable" evidence must consist of "parties engaging in conduct inconsistent with rigid enforcement of the closing date." Davis v. First Nat'l Bank, 15 F. Supp. 2d 64, 120 (D. Mass. 1998).

Fafard does not have the facts it needs to meet this burden. To the contrary, both parties regarded the specific dates in their numerous contract extensions, including the last one, May 21, 2004, to be the contractually required time for performance, and not simply some reference point that would start an open-ended "reasonable time" for performance. During the life of the contract, Fafard insisted that Metro-Boston sign new extensions before the expiration of any existing extension. This rigid respect for contractual deadlines bespeaks an intention to be bound by the dates for performance in the written extensions. Moreover, on the two occasions when Fafard perceived that an extension was about to expire with no new extension in hand – November 7, 2003 and May 21, 2004 – Fafard sent an emissary to the Registry of Deeds for the purpose of "defaulting" Metro-Boston (Tr. 2/14/05 pp. 13, 15). Had Fafard believed that time was not of the essence, Fafard would not have deemed it essential to send someone to the Registry on those days, particularly to "default" Metro-Boston, as Metro-Boston could not have been in default if the contractual time for performance were some reasonable period of time thereafter.

For Metro-Boston's part, Metro-Boston continually manifested its impatience to close, had twice reminded Fafard in writing that time was of the essence (Tr. Exs. 33, 40),[5] had on a number of instances rejected Fafard's proposed dates and designated earlier dates (Tr. Exs. 40,

---

[5] Fafard attempts to draw significance from the fact that Metro-Boston had written "time is of the essence" on only two of the extensions, as if the failure to write it on others made time no longer of the essence. However, Metro-Boston did not need to repeat these words or even use them at all to make time of the essence. Preferred Underwriters, Inc. v. New York, N. H. & H. R. Co., 243 Mass. 457, 464 (1923) ("The agreement does not in apt and express words declare that time is of the essence of the contract, but as has been before said time is of the essence of a contract in equity as at law, when the purpose of the parties, as appears upon a consideration of the entire instrument, is to make time an essential element of the contract").

44, 49, 51, 52, 53, 55, 59, 65, 67, 69, 75, 79), and had gotten Fafard to add language to the extensions to the effect that the parties could close sooner than the extended dates if Fafard's permits were received sooner.  And on May 21, 2004, the last of the extension dates, Metro-Boston wrote Fafard a letter that the transaction was terminated due to Fafard's insistence on conditioning the closing upon a resolution of the Sewall access issue, plainly manifesting Metro-Boston's understanding – identical to Fafard's – that May 21, 2004 was the contractually required day for performance, not some mere reference point that would start a reasonable time for performance.

While Fafard cites two cases where the parties agreed to extend a closing date and the Court did not enforce the time-is-of-the-essence clause, Fafard's cases do not hold, as Fafard argues, that an extension agreement ipso facto waives a time-is-of-the-essence clause.  In the first of Fafard's cited cases, Church of God in Christ, Inc. v. Congregation Kehillath Jacob, 370 Mass. 828 (1976), the parties entered into a written modification conditionally extending the closing to a date certain, and after the expiration of that date, "enter[ed] into an oral extension … *which did not set a specific date for performance.*" Id. at 830.  It was this oral open-ended extension, coupled with the seller's receipt of payments toward the purchase price thereafter, that barred the seller from enforcing the time-is-of-the-essence clause.  Id. at 832-34.  See Owen v. Kessler, 56 Mass. App. Ct. 466, 470 (2002) (in *Church of God*, "a waiver was established by the acceptance of payments and continued dealings between the parties after the deadline").

In Quirk v. Schenk, 34 Mass. App. Ct. 931 (1993), on which Fafard also relies, the issue was not waiver but estoppel.  In Quirk, the parties "executed the third extension *after* the closing date mentioned in the second extension."  Id. at 932.  The parties also arranged for the seller "to occupy the [property] beyond the stated closing date" because the seller was not ready to vacate,

- 10 -

and the buyer had "made a substantial payment ahead of the closing date." Id. These facts – including the seller's unfair position that that the seller "could retain the [deposit] money … as well as the house" – led the court to conclude that the seller could not "equitably rely" on the time clause. Id. at 932-33. There are no comparable facts here.

IV. FAFARD IS NOT ENTITLED TO A FINDING OR RULING THAT METRO-BOSTON BREACHED FOR NOT HAVING A RECORDABLE LAND COURT PLAN ON MAY 21, 2004

Fafard presents the convoluted argument that because (allegedly) Metro-Boston did not have a recordable land court plan on May 21, 2004, Fafard was excused from tendering performance on that day (making Fafard's appearance at the registry unnecessary and irrelevant, rather than a sham), and that Fafard therefore can still obtain specific performance. See Fafard's Memo at pp. 8-17. Fafard's argument again misunderstands the nature of Fafard's underlying burden of proof, misconstrues the case law, and misperceives the evidence.

A. Fafard's Burden – To Prove It Was Ready, Willing, And Able To Perform On May 21, 2004 And So Notified Metro-Boston – Is Not Excused By Showing That Metro-Boston Allegedly Was Not Ready, Willing, Or Able To Perform

Fafard's argument confuses two concepts: (a) a buyer's readiness, willingness, and ability to perform (and notice of same to the seller), and (b) a buyer's actual *tender* of performance, i.e. appearing at the time and place scheduled for closing and tendering a check for the purchase price. To enforce its rights under a purchase and sale agreement, a plaintiff buyer has the burden of proving it was ready, willing, and able to perform when required by the contract, and that it so notified the seller. Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969). If a buyer fails to meet this burden, the buyer acquires no rights under the contract, even if the seller is not ready, willing, or able to perform or has repudiated the agreement. Id.; Kanavos v. Hancock Bank & Tr. Co., 395 Mass. 199, 202 (1985).

A somewhat related issue – which Fafard's motion invokes, although it is not applicable

on the facts – deals with the concept of concurrent conditions and tender of performance. Under a purchase and sale agreement, "the performance by the seller (giving the deed) and the buyer's return performance of paying the price are to be simultaneous." Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969). If neither performs, neither acquires any rights under the agreement. Id. *Tendering* performance, though, is different from *offering* to perform. Atlantic Pipe Corp. v. R.J. Longo Constr. Co., 35 Mass. App. Ct. 459, 464 (1993). A tender involves actual performance of the act required by the contract, as opposed to a mere offer to do so. Id.

When a plaintiff has not *tendered* performance but makes claim under the agreement nonetheless,[6] a defendant will sometimes assert that the plaintiff's failure to tender bars relief under the doctrine of concurrent conditions. Hunt v. Bassett, 269 Mass. 298, 302 (1929) ("The conditions are concurrent and mutually dependent. In such a case it is not necessary for the plaintiff to make an actual tender of the purchase money until he receives the deed and it is not necessary for the defendant to deliver the deed until he receives the purchase price."). In response, the plaintiff needs to show that tender was excused. A body of law has developed to the effect that a plaintiff's tender is excused if plaintiff can show that defendant *refused* to perform or engaged in conduct tantamount to a refusal. Id. (tender is excused if plaintiff offered to perform, "*demanded* performance" from defendant, and, absent waiver, was ready, willing, and able to make timely performance). See also Leigh v. Rule, 331 Mass. 664, 668 (1954) ("the law does not require a party to *tender performance* if the other party has shown that he cannot or will not perform;" plaintiff must show "he has offered to perform or has given notice of his readiness to do so, unless excused from performance by the *refusal* of the other party to perform,

---

[6] This typically happens when neither party appears at the closing, and one of the parties sues to recover the deposit or obtain liquidated damages.

or some conduct *equivalent to a refusal*"). This body of law stems from the principle that "the law does not insist on useless rituals." Id. at 669.

The instant case does not raise an issue about whether Fafard was excused from appearing at the registry with a check. After all, Fafard was there with check in hand. Rather, this case raises the more fundamental issue whether Fafard was ready, willing, and able to perform, and had so notified Metro-Boston. Fafard does not satisfy its burden on this issue merely by showing that it was at the registry with a check, for an insincere appearance at the registry intended to create the illusion of a willingness to perform is – as Fafard concedes and the Court has found – a sham. Schilling v. Levin, 328 Mass. 2, 4-5 (1951). Nor does Fafard satisfy its burden by showing that it would have been excused from appearing at the registry if Metro-Boston had previously demonstrated a refusal to perform. A defendant's refusal to perform might excuse a plaintiff from *tendering* performance, but it would not excuse the plaintiff from being ready, willing, and able to perform, for even a defendant who has refused to perform is entitled to prevail if the plaintiff has not met its burden of proving its own readiness, willingness, and ability to perform. Kanavos v. Hancock Bank & Tr. Co., 395 Mass. 199, 202 (1985); Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354 (1969).

> B. Even If A Seller's Refusal To Perform Could Excuse A Buyer From Being Ready, Willing, And Able To Perform, And From So Notifying The Seller, The Evidence Does Not Support A Finding That Metro-Boston Refused To Perform Or Engaged In Conduct Tantamount To A Refusal

Fafard points to the absence of a land court recordable plan on May 21, 2004, asserts that the absence of such a plan proves Metro-Boston's *inability* to perform on May 21, and argues that this is tantamount to a *refusal* by Metro-Boston to perform. To be sure, in some cases a seller's inability to close has excused a buyer's own tender of performance. For example, in Leigh v. Rule, 331 Mass. 664 (1954), the plaintiff was suing to recover its deposit under a clause

that allowed for the deposit's return if the defendant seller was unable to deliver on the closing date. The seller had refused to vacate the premises by the closing date, making it impossible for her to convey the property free of tenants, as the contract required. Under these circumstances, the buyer was entitled to recover its deposit without having to prove its own tender of performance, as the seller's refusal to vacate was tantamount to a refusal to perform. Id. at 668-69. Similarly, in Vander Realty Co. v. Gabriel, 334 Mass. 267 (1956), the plaintiff buyer was entitled to recover its deposit from a seller who failed to tar a roadway by the closing date, as required by the agreement. Id. at 271. As in Leigh, the agreement in Vander Realty provided for the deposit's return if the defendant was unable to convey, and the Court held that the buyer did not need to prove its own tender of performance. Id.

The present case is different from Leigh and Vander Realty. Fafard is not suing to recover a deposit under an agreement providing for the deposit's return if the seller is unable to perform. Fafard already has its deposit. Rather, this is a suit for specific performance.

Moreover, the asserted inability to perform – the alleged failure to have a recordable land court plan on May 21 – was contemplated by the contract and would not have put Metro-Boston into default. Under the contract, if the seller were unable to convey for reasons that would have included the failure to have a recordable plan on the closing date, the seller would have been entitled to an automatic 30 day extension of time, after which, if the inability to convey continued, the agreement's escape clause would have ended the agreement, with neither party having recourse against the other.[7] Tr. Ex. 7 ¶¶ 10, 11.

Further, the character of the asserted inability to convey is not of a type that rises to the level of a *refusal* to perform. In Leigh and Vander Realty, the seller had sole control over his or

---

[7] Although the contract would have given Fafard a right, at the end of the 30 day period, to take such title as the seller was then able to convey, by Fafard's own admission a conveyance would have been impossible without a recordable plan. Thus, if the inability to convey had continued, the agreement would have ended.

- 14 -

her own ability to perform, but utterly failed, without excuse or explanation, to perform. Here, the creation of a land court recordable plan was not solely in Metro-Boston's control nor solely Metro-Boston's responsibility. It depended on cooperation from Fafard, particularly with respect to the identification of the northeastern boundary of the property through approval of a subdivision or perimeter plan from the from local planning board, dividing the land to be sold from the land to be retained. The purchase and sale agreement assigned this responsibility to Fafard,[8] yet Fafard did not obtain this approval.

Moreover, it is simply not true that Metro-Boston did nothing toward development of a land court recordable plan such that Metro-Boston could be deemed to have *refused* to perform. Metro-Boston was working toward bringing this deal to closure and, toward that end, hired Dan Bremser from Hancock Survey to prepare a plan showing the land to be conveyed and the land to be retained, complete with the location of guy-wire easements, the identification of which, incidentally, was Fafard's responsibility under the contract.

C. Fafard Cannot Equitably Claim That Metro-Boston Refused To Perform

When a plaintiff accuses a defendant seller of refusal to perform, the plaintiff must show that it "did nothing to cause the defendant to believe that [the plaintiff] would not perform on the [closing] date." Leigh v. Rule, 331 Mass. 664, 665 (1954). In Leigh, the plaintiff had actually notified the seller of its intention to close on the required date, as it was required to do. Id.

In the instant case, however, Fafard did everything to cause Metro-Boston to believe that Fafard would not close on the closing date. Fafard created a three year history of consistently seeking extensions and consistently telling Metro-Boston that it needed access to Sewall Street. Following this pattern, in the weeks leading up to May 21, 2004, Fafard sent three requests to

---

[8] **The agreement (Tr. Ex. 7, Rider Ex. B), drafted by Fafard, required Fafard to obtain all permits and approvals, including subdivision approval.**

extend the closing date once more, to beyond May 21, each time saying that it needed to resolve the access issue to Sewall. These requests in fact caused Metro-Boston to believe that Fafard would not close on May 21 unless Metro-Boston would grant an easement to solve Fafard's access problem, something Metro-Boston was under no obligation to do. Having left Metro-Boston believing it would not close on May 21, Fafard then did nothing to disabuse Metro-Boston of that impression or to inform Metro-Boston that Fafard would go forward with the transaction on May 21 after all.

Under the circumstances, Fafard is estopped from taking advantage of Metro-Boston's alleged failure to be ready to close on May 21. Fafard is not permitted to lead Metro-Boston into thinking that Fafard is not prepared to close until Metro-Boston grants extra-contractual concessions, and then, when Metro-Boston fails to close, claim that Metro-Boston *refused* to go forward. **Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass 119, 123 (1992).** For there to be a refusal, Fafard would have needed to give timely notice of its own intention to go forward, and make demand that Metro-Boston go forward as well. Hunt v. Bassett, 269 Mass. 298, 302 (1929). This never happened.

Fafard argues it would have been futile to make this demand because (allegedly) it would have been impossible for Metro-Boston to come up with a land court recordable plan in time for the closing. This argument fails for at least two reasons. First, Fafard failed to offer any evidence of impossibility, and this is not something the Court can simply assume in Fafard's favor, particularly on a Rule 52(b) motion. Strahan v. Coxe, 127 F.3d 155, 172 (1st Cir. 1997); Aybar v. Crispin-Reyes, 118 F.3d 10, 16 (1st Cir. 1997). Second, under the contract, if Metro-Boston had the obligation to come up with such a plan and was unable to do so after exercising

- 16 -

its right to extend the closing for 30 days, the agreement would have come to an end, and Fafard would not have been entitled to specific performance (Tr. Ex. 7 ¶¶ 10, 11).

Fafard responds that Metro-Boston never exercised its right to extend for 30 days.  This is true enough, but Metro-Boston would have had the right to do so at the closing, assuming Fafard had informed Metro-Boston of its intention to close.  By leading Metro-Boston to believe there would be no closing, Fafard left no reason or opportunity for Metro-Boston to exercise that right.  Once again, by its conduct, Metro-Boston is estopped from arguing that Metro-Boston would not have been protected by the escape clause. **Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass 119, 123 (1992).**

The record is rife with evidence of Fafard's inequitable conduct in luring Metro Boston to believe that Fafard would not close without getting access to Sewall, and then, when the last extension expired, secretly going to the registry of deeds not to close the deal but to set a trap for Metro-Boston to posture for a specific performance suit.  Thus, even if Fafard had otherwise proved its case, specific performance is not available to Fafard since its actions were tainted by unfairness or inequitable conduct. See Hawthorne's Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 208 (1993) (specific performance is an equitable remedy which should not be granted when the requesting party has engaged in conduct "savored with injustice touching the transaction"); Lundgren v. Gray, 41 Mass. App. Ct. 451, 458 (1996) (a party seeking specific performance must itself be free from blame); Chute v. Quincy, 156 Mass. 189, 191 (1892) ("specific performance may be refused ... where there has been ... unfair conduct").

V.   THE COURT'S FINDINGS ARE SUPPORTED BY LOGIC

In a desperate attempt to circumvent the evidence, Fafard claims that logic requires a finding that Fafard was ready, willing, and able to buy the property on May 21 without having

- 17 -

access to Sewall. Fafard's "logic" is that, in 2004, the land was worth more than the purchase price, and therefore Fafard would have wanted it with or without access to Sewall. Of course, the issue is not whether, at some time after May 21, 2004, Fafard would have wanted the land without access to Sewall. The issue is whether, as of May 21, 2004, Fafard in fact was ready and willing to buy the land without access to Sewall, and had timely notified Metro-Boston.

Logic does not lead Fafard to the finding it seeks. To the contrary, it is eminently logical that, as of May 21, 2004, Fafard was not ready or willing to buy the land without having access to Sewall. For three years, Fafard made known that it "needed" access to Sewall. Fafard knew that having this second means of access was the key to mining the land's value. As between taking the land with access to Sewall or without such access, Fafard was doing everything it could to get the land *with* access to Sewall.

If, on May 21, Fafard had been ready and willing to take the land without access to Sewall, then – logically – Fafard would have followed a different course of conduct. First, to counter the massive written record that had developed over three years, Fafard would have seasonably notified Metro-Boston, in writing and before May 21, that it was no longer insisting on access to Sewall and was now willing to close without getting such access. Second, realizing it did not have an extension beyond May 21, it would have informed Metro-Boston that it intended to appear at the registry of deeds, and would have worked with Metro-Boston or its counsel to get all the papers together necessary to conduct a closing. Third, upon receipt of Metro-Boston's letter on May 21 that the deal was terminated because of Fafard's insistence on having access to Sewall, it would have immediately contacted Metro-Boston to say that Metro-Boston was mistaken and to put the deal back on track if possible.

Logic also shows why Fafard did none of these things. Fafard wanted access to Sewall,

and knew that, if it said anything else to Metro-Boston, Metro-Boston would stop trying to make that happen and would schedule a closing. Fafard did not want a closing to occur under those circumstances, because that would ensure it would get the land without access to Sewall or, under the escape clause, not get the land at all (if Metro-Boston, despite reasonable efforts, were unable to record a land court plan). The only way Fafard could get access to Sewall was by continuing to request extensions, hoping meanwhile to work out something with Metro-Boston. If Metro-Boston ever refused to grant an extension, Fafard would secretly appear at the registry of deeds (as it had done earlier on November 7, 2003) without notifying Metro-Boston. Metro-Boston would not be there (for want of notice from Fafard), and Fafard would use Metro-Boston's absence as the basis to sue for specific performance. In such a suit, Fafard would get a lis pendens, thereby preventing a sale to anyone else, and would then try to use the leverage, uncertainty, and expense of the suit to negotiate a deal with Metro-Boston.

Given this strategy, Fafard did not have to decide by May 21 whether to take title without getting access to Sewall, because it figured that, in the worst case, the litigation would compel a conveyance of the land, albeit without access to Sewall. Fafard's plan went awry because Fafard mistakenly believed that the only thing it needed to do to save its rights – and its leverage – was to appear at the registry on May 21 to default Metro-Boston. Fafard was unaware of the case law on sham closings. It also did not anticipate a removal to federal court, a speedy trial, and a judgment for defendant.

## Conclusion

Fafard's motion for reconsideration and to amend findings should be denied. If, after the denial of Fafard's motion, the parties are unable to reach agreement whereby Fafard would waive its right of appeal in exchange for a waiver of Metro-Boston's counterclaim, then the

Court should grant Metro-Boston's motion for entry of separate judgment or to sever, and then stay the counterclaim until the conclusion of Fafard's appeal. An attempt to avoid the separate judgment issue by entertaining a motion for summary judgment on the counterclaim would needlessly require the parties to incur many thousands of dollars in legal fees on such a motion. Consistent with Fed. R. Civ. P. 1, such an expense (and the delay associated with such a procedure) should be avoided. It *would* be avoided by the entry of separate judgment on the complaint and a stay of the counterclaim.

        METRO BOSTON BROADCASTING, INC.

        By its attorneys,

        s/ Kenneth R. Berman
        Kenneth R. Berman (BBO 040320)
        Erik Bartenhagen (BBO 640003)
        Nutter McClennen & Fish LLP
        World Trade Center West
        155 Seaport Boulevard
        Boston, MA 02210
        (617) 439-2000

Date: October 18, 2005

### Certificate of Service

I certify that I served this document on opposing counsel today by e-mail.

        s/ Kenneth R. Berman

October 18, 2005

**1469477.5**