UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FAFARD REAL ESTATE & DEVELOPMENT CORP. )<br><br>Plaintiff, )<br><br>vs. )<br><br>METRO-BOSTON BROADCASTING, INC., )<br>Defendant. ) | NO. 04-11531-RGS |

## PLAINTIFF FAFARD REAL ESTATE & DEVELOPMENT CORP.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52, Plaintiff Fafard Real Estate & Development Corp. respectfully submits the following proposed findings of fact and conclusions of law.

### PROPOSED FINDINGS OF FACT

**A. Fafard has Met its Burden to Establish its Case for Specific Performance.**

1.    Tower Sites, Ltd. ("Tower Sites") is a Texas limited partnership and is the record owner of registered land in Ashland, Massachusetts, consisting of Lots 6B, 9, 10, 11, 12. Halcomb direct/Trial Trans. Day 3, at 4:6 – 11.

2.    Metro-Boston Broadcasting, Inc. ("Metro-Boston") is a Texas corporation and is the general partner of Tower Sites. Mary Heller Halcomb is the President of Metro-Boston. Halcomb direct/Trial Trans. Day 3, at 3:25 – 4:2. Halcomb also owns forty five percent of Metro-Boston stock and has a partnership interest in Tower Sites.

Halcomb direct/ Trial Trans. Day 3, at 4:3 – 14.  In addition, Tower Sites owns real estate in Texas. Halcomb direct/ Trial Trans. Day 3, at 4:15 – 18.

3.     Fafard Real Estate & Development Corp. ("Fafard") is a real estate development company located in Ashland, MA.  See Complaint ¶¶ 1, 7; Answer & Counterclaim ¶¶ 1, 7.

4.     Metro-Boston tried for years to sell its Ashland property, but found no buyers.  Halcomb direct/Trial Trans. Day 3, at 8:5 – 7.  Metro-Boston had identified Fafard as the most likely buyer for the property "due to their strong presence and success in this area," and worked for years to sell the land to Fafard.  Halcomb direct/Trial Trans. Day 3, at 8:8 – 13; Trial Exhibit 4.

5.     In the mid-to-late 1990s, however, Fafard was not terribly interested in purchasing Metro-Boston's Ashland property, in part because of a town sewer moratorium.  Hannert direct/ Trial Trans. Day 1, at 66:4–17.  There was no particular urgency on either Fafard's part or Metro-Boston's part with respect to the sale of this land.  Hannert direct/Trial Trans. Day 1, at 68:14–21.  Nevertheless, the parties continued to discuss a potential land sale.  Hannert direct/Trial Trans. Day 1, at 67:17 – 68:13.

6.     On March 7, 2000, Metro-Boston faxed an offer to Fafard for the sale of "9.6 acres noted in Lot 12 and 6B, zoned residential [and] approx. 10 acres in Lot 11, zoned residential."  See Trial Exhibit 109.  In the offer letter to Hannert, Halcomb wrote,

> This offer is 'as is, where is', with no contingencies or approvals to be sought, etc.  Clean title will be delivered at the sale.  The only detail to be considered would be the straightening of the boundary line dividing the residential from the Industrial land.  This straightening would be beneficial to all concerned.  We may have to have an easement for one guy wire, located in the residential section of Lot 11, unless this is eliminated by the new boundary line.

> The Tower Sites, Ltd. Group would gladly accept $339,000 for the
> approximately 19 acres.

See Trial Exhibit 109.

7.     At that time, Fafard was not interested in an "as is, where is" offer from

Metro-Boston. Fafard normally conditioned its land contracts on receipt of permits, "or

at least having an opportunity to review what [Fafard] could anticipate what would be

approved by the town." Hannert direct/ Trial Trans. Day 1, at 69:19 – 70:1.

8.     In October 2000, Fafard made an Offer to Purchase to Metro-Boston to

purchase Lots 6B, 12 and the ten-acre portion of Lot 11. Fafard offered a price of

$339,000. Hannert direct/ Trial Trans. Day 1, at 70:2–11.

9.     Halcomb understood that Fafard was offering Metro-Boston a delayed

closing to obtain its permits, and that Fafard could declare the contract void and walk

away if it was unsuccessful in obtaining the permits it sought. Halcomb direct/ Trial

Trans. Day 3, at 7:6 – 12; 8:14 –19; Trial Exhibit 4. Halcomb also understood that

Fafard's deposit was refundable, and that Tower Sites would be able to retain all of

Fafard's due diligence and engineering work should that take place. Halcomb direct/

Trial Trans. Day 3, at 7:13 –15; Trial Exhibit 4.

10.     In addition, Halcomb believed that the purchase price of $339,000 would

net Tower Sites a substantial profit. Halcomb direct/ Trial Trans. Day 3, at 8:20 – 22. In

an October 18 memorandum to the Tower Sites' investors, in which Halcomb

summarized Fafard's offer, Halcomb wrote that Fafard's "purchase price of $339,000

represents a substantial profit to us. Our basis in the property was approximately

$100,000." See Trial Exhibit 4.

11.     On January 31, 2001, Metro-Boston and Fafard signed a Purchase and Sale Agreement ("P&S Agreement"). See Trial Exhibit 7. Richard Terrill, the Chief Financial Officer of Fafard, signed on behalf of Fafard and Mary Halcomb, as President of Metro-Boston, signed on behalf of Metro-Boston. Terrill direct/Trial Trans. Day 3, at 108:4 – 6.

12.     The P&S Agreement conditioned closing on Fafard's receipt of permits and set a permitting deadline of January 30, 2002, and a closing deadline of February 28, 2002. See Trial Exhibit 7. After signing the P&S Agreement, Fafard began its due diligence, including performing a title search, preparing a chapter 21E environmental report and flagging the wetlands. Hannert direct/ Trial Trans. Day 1, at 72:25 – 73:6.

13.     After flagging the wetlands, Fafard discovered that one of the two proposed means of access onto the site, Tri Street, was unusable because of wetlands. The discovery of wetlands did not affect Fafard's willingness to go forward with its purchase of the land. Terrill direct/Trial Trans. Day 3, at 108:10 – 16. A road could still be built across the other point of access to the property, Adams Road. Hannert direct/ Trial Trans. Day 1, at 73:7–73:23. Fafard also had other alternatives to access the property, which included buying a house on Tri Street to gain access. Fafard also could develop a 40B residential development with a waiver from the Town of Ashland. Terrill direct/Trial Trans. Day 3, at 108:17 – 109:11.

14.     Fafard also explored accessing the property through Sewell Street. Terrill direct/Trial Trans. Day 3, at 108:18 – 19. In October 2001, Fafard made an offer to Metro-Boston to purchase additional land in Lot 11, to the northeast of the land under the P&S Agreement, which would connect Sewell Street, a street that came into Metro-

4

Boston's property in Lot 11, to the portion of Lot 11 already under agreement with Fafard ("October 2001 Offer to Purchase"). See Trial Exhibit 10; Hannert direct/ Trial Trans. Day 1, at 73:24 – 74:10. Fafard offered $100,000 for the additional five acres of land and included with its offer a sketch of the land sought to be purchased. See Trial Exhibit 10.

15.    In addition, Fafard offered to pay for the entire development of a joint access road connecting Sewell Street to the residential portion of Lot 11 Fafard already had under agreement with Metro-Boston. See Trial Exhibit 27.

16.    Metro-Boston did not reject Fafard's offer, and, in fact, was favorably disposed towards Fafard's plans, but Halcomb told Fafard that she would need to clear Fafard's proposal with her other buyer who was interested in purchasing the Tower Sites' industrial land. Hannert direct/ Trial Trans. Day 1, at 77:17 – 76:1; Halcomb direct/Trial Trans. Day 3, at 9:17 – 20; Trial Exhibit 11. Over the course of the next twenty months, Halcomb continually represented to Fafard that she was working with another buyer for her industrial property (whose identity changed over time) to develop a "master plan" of land transfer, but that she was confident Fafard would be able to obtain the access and additional land it desired. See Trial Exhibits 12, 24, 27; Hannert direct/Trial Trans. Day 1, at 77:18 – 78:5, 78:24 – 79:4, 79:20 – 80:3, 83:5 – 16, 84:15 – 85:2, 84:24 – 85:2, 85:25 – 86:9; Halcomb direct/Trial Trans. Day 3, at 10:6 – 8, 18:11 – 17. Fafard forwarded sketches of the land and proposed road to Halcomb and waited for Halcomb to get back to it regarding its offer. Id.; Trial Exhibits 13, 14, 15, 36, 38. During this time, through August 2003, the parties executed five extensions of the P&S Agreement while Halcomb continued to work on her "master plan." See Trial Exhibits 17, 23, 30, 33, 40.

Halcomb never told Fafard that it was not possible to grant it access from Sewell Street. Halcomb direct/Trial Trans. Day 3, at 10:9 – 11.

17.     In the Spring of 2003, Halcomb was notified that the Town of Ashland would be installing sewer lines on Metro-Boston's property. Halcomb cross/Trial Trans. Day 3, at 96:18 – 23.

18.     Thereafter, Halcomb became dissatisfied with the purchase price of the land. Halcomb expressed to Fafard that she felt the land had increased in value since the P&S was signed and sewer lines had been installed and told Fafard that she wanted new "firm funds" in place. See Trial Exhibit 110; Halcomb direct/ Trial Trans. Day 3, at 18:1 – 5; Hannert direct/ Trial Trans. Day 1 at 87:5 – 11; Trial Trans. Day 2 at 4:3 – 12.

19.     After discussions between Richard Terrill and Halcomb in November 2003, Fafard agreed to put its deposit ($39,000, or ten percent of the purchase price) at risk and to place the deposit with Halcomb's attorney, who would be contacting Fafard. Hannert direct/Trial Trans. Day 2, at 12:11 – 13:1; Trial Exhibit 111. Fafard also agreed to pay the real estate taxes. Hannert direct/Trial Trans. Day 2, at 12:11 – 13:1; Trial Exhibit 111.

20.     From and after November 12, 2003, extensions executed by the parties contained a new provision making Fafard's deposit nonrefundable: "In the event the transaction contemplated by the Agreement does not occur due to no fault of the Seller, the deposit shall be delivered to the Seller and the transaction shall terminate." See Trial Exhibit 65; Hannert direct/Trial Trans. Day 2, at 13:2 – 15. These extensions also extended the permits and approvals deadline and the closing deadline to the same date. See, e.g., Trial Exhibit 65.

21.    As reflected by the consolidation of the dates for the permit contingency and the closing deadline, in November 2003, Fafard waived its permit contingency and told Halcomb that it would not hold up closing to obtain its permits. Hannert direct/Trial Trans. Day 2, at 12: 2 – 10; Terrill direct/Trial Trans. Day 3, at 111:19 – 112:1; Trial Exhibit 111. Thus, from this point forward, Fafard "had forgone th[e] possibility" that Fafard would back out of the transaction if did not receive its permits. Hannert direct/ Trial Trans. Day 2, 13:16 – 21.

22.    Beginning in November 2003, Fafard pushed to close the transaction. Fafard repeatedly asked Metro-Boston about the status of any title issues and for the Land Court survey, which was necessary in order for Metro-Boston to transfer title to Fafard. See Trial Exhibits 64, 70, 72, 81, 111, Hannert direct/ Trial Trans. Day 2, at 15:14 – 20, 18:10 – 17, 19:1 – 9. As Fafard waited for the new Land Court survey, Fafard sent numerous fax requests for extensions to Metro-Boston indicating it was "ready to close" on the property. See Trial Exhibits 87, 88, 90, 93, 94, 95, 97; Hannert direct/ Trial Trans. Day 2, at 18:10 – 17.

23.    Despite repeated requests by Fafard between December 2003 and April 2004, by May 2004, Metro-Boston did not provide Fafard with the new survey for the land transfer and ultimately became entirely unresponsive. In May 2004, Fafard sent Metro-Boston three separate faxes indicating it was "ready to close" on the property. See Trial Exhibits 94, 95, 97. Fafard also repeatedly called Metro-Boston. Metro-Boston, however, never returned any of the phone calls from Fafard. Hannert direct/Trial Trans. Day 2, at 23:5 – 9; Halcomb direct/Trial Trans. Day 3, at 23:24 – 24:2.

24.    On May 21, 2004, the parties' last extension of the P&S Agreement was set to expire. Thus, when no response from Metro-Boston was forthcoming on May 21, 2004, Richard Terrill directed Paul Beattie, Fafard's in house legal counsel, to go to the Registry of Deeds "to protect the agreement." Beattie direct/ Trial Trans. Day 1, at 15:4–14; Terrill direct/Trial Trans. Day 3, at 112:15 – 113:3. Beattie went to the Registry ready to close on the property. Terrill direct/Trial Trans. Day 3, at 114:3 – 12. Beattie brought a certified check in the amount of the purchase price, a list of title encumbrances that had to be addressed, and paper to prepare closing adjustments. Beattie direct/ Trial Trans. Day 1, at 15:4–15-16:6; Trial Exhibit 105.

25.    At the Registry, Beattie paged Metro-Boston for an hour, and, when no party responded, Beattie completed the form available at the Registry entitled, "Certification of Failure of One Party to Appear After Paging for Title Passing/Closing." Beattie direct/ Trial Trans. Day 1, at 16:18-23; Trial Exhibit 107.

26.    Had Metro-Boston appeared at the Registry on May 21, 2004, Beattie would have reviewed their documentation, including the new Land Court plan, prepared closing adjustments and "done everything in [his] power to do -- to perform a normal closing, a normal acquisition." Beattie direct/Trial Trans. Day 1, at 60:16 – 21. Beattie had full authority to tender Fafard's check and close that day had Metro-Boston appeared. Beattie direct/Trial Trans. Day 1, at 60:22 – 24.

27.    At this time, Fafard "wanted to purchase the land. There is no question about that." Terrill direct/Trial Trans. Day 3, at 112:23 – 113:2.

28.    At 6:00 p.m., EST, on May 21, 2004, after the close of business hours on the east coast, Halcomb faxed to Fafard a letter informing Fafard that Metro-Boston

would not grant any additional extensions and declaring the P&S Agreement terminated.

See Trial Exhibit 98. Halcomb knew it was too late in the day for Fafard to be at the

Registry to close the transaction. Halcomb direct/Trial Trans. Day 3, at 24:6 – 21.

29.     The following business day, on Monday, May 24, 2004, Halcomb both

received and accepted an Offer to Purchase from Carruth Capital Lots 9, 10, 11, and 12

for $2.8 Million. See Trial Exhibit 99.

**B. Metro-Boston's defense that the parties never had a meeting of the minds as to the location of the northeast boundary line of the property to be conveyed is unsupported by the evidence.**

30.     At the time the parties signed the P&S Agreement, the parties had no

misunderstanding about what land would be conveyed to Fafard. Halcomb direct/Trial

Trans. Day 3, at 8:23 – 25.

31.     During ongoing discussions regarding the potential sale of Metro-Boston's

real estate to Fafard, Halcomb sent Janice Hannert, a Land Planner with Fafard, a copy of

a 1979 contour plan of land, prepared by McCarthy and Sullivan Engineering ("the 1979

McCarthy plan."). See Trial Exhibit 3; Hannert direct/Trial Trans. Day 1, at 67:3–16.

32.     The 1979 McCarthy plan is drawn to scale, and shows Lots 12 and 6B,

and Lot 11, and as well as other lots of land in Ashland, Massachusetts. See Trial Exhibit

3. Through the lower-right hand portion of Lot 11 is sawtooth line which divides Lot 11

between "Residential A" in the lower half and "Industrial" zoning in the upper or

northern portion. Id.

33.     Halcomb represented to Hannert that the portion of Lot 11 below the

sawtooth line consists of approximately ten acres of land and was zoned Residential.

Halcomb cross/Trial Trans. Day 3, at 38:12 – 17.

34.     The 1979 McCarthy plan also shows locations for five radio towers.
Bremser direct/Trial Trans Day 4, at 15:16 – 16:1.  The 1979 McCarthy plan is "not an
'as-built' plan" with respect to the towers, and their guy wires and anchors, but shows the
proposed locations of the towers, guy wires and anchors.  Id.  The five radio towers, as
proposed and shown on the McCarthy plan, appear in the "Industrial" zoned portion of
Lot 11 shown on the 1979 McCarthy Plan.  See Ex. 3.

35.     On April 15, 1998, Halcomb sent a letter to Fafard enclosing information
concerning the land that Metro-Boston proposed to convey to Fafard.  The letter
described the land as the following,

    1.  9.6 acres noted in Lot 12 and 6B; [and]

    2.  approx. 10 acres in Lot 11, zoned residential[.]

See Trial Exhibit 108.

36.     As the parties negotiated a purchase, on December 5, 2000, Fafard faxed
Metro-Boston a revised Offer to Purchase.  See Trial Exhibit 5.  The December 5 faxed
Offer to Purchase contained four pages:  a cover sheet, a one-page Offer to Purchase, a
Rider to the Offer to Purchase, and a small sketch of the land to be sold.  See Trial
Exhibits 5, 106; Hannert direct/Trial Trans. Day 1, at 70:12–71:14.  Hannert prepared the
sketch by taking a reduced sized copy of the 1979 McCarthy plan and outlining in
highlighter the area Fafard intended to make part of the offer.  Hannert testified as
follows:

    Q:     Now, who prepared the original of the plan, that front page of this
        December 5th offer?

    A:     I would have prepared it.

    Q:     And what did you do to prepare that plan?

A:     Basically, to take the McCarthy plan and to outline the area we were intending to purchase.

Q:     How did you determine what the northeast boundary, that sawtooth line, was?

A:     As previously discussed in the previous letters, it was necessary to subdivide the larger Lot 11 into the portion that we were buying, approximately 10 acres, and I took the area shown on the McCarthy plan and included it herein.

Q:     The tracing that you did in orange highlighter on that page, what were you tracing?

A:     I was outlining Lot 6B, Lot 11, and a portion of Lot 11 which at that time we believed to be residential.

Q:     How did you determine where to put the line across Lot 11?

A:     By following the McCarthy plan.

Q:     Following what in the McCarthy plan?

A:     The zoning line as shown on the McCarthy plan.

Q:     What happened next with respect to this December offer that you sent to Tower Sites?

A:     It was accepted and sent back to us.

Hannert direct/ Trial Trans. Day 1, at 71:15 – 72:13; See also Trial Exhibit 106.

37.     After Metro-Boston signed and faxed back the December 5 offer, Paul Beattie prepared the Purchase and Sale Agreement. Beattie direct/Trial Trans. Day 5:21 – 25.

38.     Exhibit A to the P&S Agreement is a copy of a Land Court Subdivision Plan of Land in Ashland, Plan 16849. It shows, among other things, Lots 12, 6B and all of Lot 11. Exhibit A also shows a hand-drawn, sawtooth-shaped (or zigzag) line through lower, right-hand (i.e. southwest) portion of Lot 11, drawn by Beattie. Below the

11

sawtooth line and throughout Lots 12 and 6B are handdrawn cross-hatch lines, also drawn by Beattie. See Trial Exhibit 7; Beattie direct/ Trial Trans. Day 1, at 6:1 – 5.

39.     In drawing the sawtooth and cross-hatched lines through Lot 11 as Exhibit A, Beattie relied on the December 5, 2000 Offer to Purchase, which contained the highlighted sketch of land prepared by Hannert using a small scaled version of the 1979 McCarthy plan. Beattie direct/ Trial Trans. Day 1, at 6:6 – 21; Trial Exhibit 106. The Subdivision Plan of Land 16849 was "an excellent starting point to start from, [because] it was a plan that the engineers would utilize to prepare the new subdivision plan, which would be used for a conveyance of land from Metro-Boston to Fafard Real Estate & Development Corp." Beattie direct/ Trial Trans. Day 1, at 6:22 – 7:11.

40.     Halcomb, and hence, Metro-Boston, understood that Metro-Boston was to convey to Fafard Lot 12, Lot 6B, and the portion of Lot 11 demarcated "residential" and denoted below the zigzag, Industrial/ Residential A zoning line shown on the 1979 McCarthy plan. Halcomb direct/trial Trans. Day 3, at 9:3 – 6; Halcomb cross/Trial Trans., Day 3, at 37:25 – 38:17.

C. **Metro-Boston's defense that the parties operated under a mistake of fact as to the zoning in Lot 11 is estopped by evidence that the parties, after learning of the new zoning line, reaffirmed their intent to proceed and ratified the original contract.**

41.     In the fall of 2003, Halcomb was informed by Dan Bremser, a professional land surveyor with Hancock Associates (retained by Metro-Boston), that the zigzag residential/industrial zoning line through Lot 11 as shown on the 1979 McCarthy plan differed from the zoning line shown on the Town of Ashland zoning maps. Specifically, Bremser informed Halcomb that all of Lot 11 was zoned industrial. Halcomb direct/Trial Trans. Day 3, at 100:20 – 101:20.

12

42.    The Ashland Zoning Map in effect in the fall of 2003 had been adopted by a vote of the Ashland Town Meeting in May 2001, replacing the prior zoning map, which had been prepared in 1979. See Trial Exhibit 123. Bremser, however, never compared the 1979 McCarthy plan to the Ashland zoning map in effect in January of 2001, when the P&S Agreement was signed. Bremser cross/Trial Trans. Day 4, at 32:18 – 22.

43.    Halcomb relayed the zoning information she received from Bremser to Hannert. Halcomb direct/Trial Trans. Day 3 at 100:24 – 101:12. Halcomb was concerned that Fafard would back out of the deal after learning that all of Lot 11 was zoned industrial. But Fafard never said anything to that effect to Halcomb, and Hannert told Halcomb that Fafard could "probably do something industrial" with the land as an alternative. Halcomb direct/Trial Trans. Day 3, at 20:16 – 22:6. 73.

44.    Fafard always wanted to purchase the land. Terrill direct/Trial Trans. Day 3, at 112:23 – 24.

45.    In November 2003, the parties added a new provision to their extensions to the P&S Agreement, making Fafard's deposit non-refundable should the transaction fail to close "due to no fault of the Seller." See Trial Exhibit 65. This provision was added after the parties learned that the Residential/Industrial zoning line shown through Lot 11 on the 1979 McCarthy plan may not have been correct, or had changed since the P&S Agreement was signed. Halcomb direct/Trial Trans. Day 3, at 17:21 – 25.

**D. Metro-Boston's defense that Halcomb was unsophisticated and unrepresented by counsel during the P&S Agreement negotiations and that Halcomb did not know it was Metro-Boston's obligation to prepare a new subdivision plan for Land Court approval to subdivide Lot 11 in order to convey a portion of Lot 11 to Fafard is unsupported by the evidence.**

46.    In addition to serving as the President of Metro-Boston and having a partnership interest in Tower Sites, Halcomb also holds numerous other business interests, including Heller Securities, a former NASD broker/dealer that is now an investment or holding company used by Halcomb to hold title to her other business interests. Halcomb direct/ Trial Trans. Day 3, at 4:18 – 5:2. In addition, Halcomb also owns and runs Foxmoor Corporation, which, among other things, operates a jewelry business and holds limited partnership interests for Halcomb's benefit. Halcomb direct/ Trial Trans. Day 3, at 5:3 – 10. Halcomb personally manages the operations of Metro-Boston, Tower Sites, Heller Securities and Foxmoor. Halcomb direct/ Trial Trans. Day 3, at 5:11 – 17.

47.    In conducting these various businesses, Halcomb on occasion has employed attorneys and on occasion has consulted an attorney before signing a contract. Halcomb direct/Trial Trans. Day 3, at 5:18 – 6:1. With respect to the P&S Agreement, Halcomb did not consult an attorney because "it seemed like a straightforward contract." Halcomb direct/Trial Trans. Day 3, at 6:6 – 14.

48.    Indeed, Halcomb understood Fafard's October 2000 Offer to Purchase and summarized its contents for her shareholders. In a memorandum, Halcomb wrote,

> Great News! Attached you will find an offer to purchase from the Fafard Real Estate and Development Corp. in Ashland, Ma. [sic] You will remember that this is the company with whom I have worked for several years to sell them on our land. The reason why movement on this property has been so slow is due to the fact that there is no sewer or water connection permits, or any of the various State, Federal or local permits which are needed to build a housing subdivision...

> Rider: Closing is delayed for a year to allow the Buyer to attempt to obtain all of the necessary permits and allowances needed for development of the site. In the event, [sic] Buyer does not obtain all that he seeks, he can declare the contract void. He does lose his engineering studies and permit

14

work which is extremely costly. Fafard has advised me that this type of Offer to Buy is standard in their office and after the full and very costly engineering work has been completed on a site and is presented, they have not been turned down. I believe this is a good calculated risk we must take. Fafard has always been the most likely Buyer due to their strong presence and success in this area.

See Trial Exhibit 4.

49.    Moreover, Halcomb understood and informed Hannert in a letter that the land sale would involve "9.6 acres noted in Lot 11 and 6B [and] approx. 10 acres in Lot 11, zoned residential." Halcomb further wrote to Hannert that Lot 11 would need "to be subdivided along the zoning boundary in Lot 11...," thus acknowledging her understanding that the land would need to be subdivided in order to make possible the transfer of a portion of Lot 11 to Fafard. See Trial Exhibit 108.

50.    Paul Beattie, Fafard's in-house legal counsel, prepared the P&S Agreement using the Greater Boston Real Estate Board Standard Form of Purchase and Sale Agreement. Beattie direct/ Trial Trans. Day 1, at 5:24-25; 6:4-5; 7:19-22. Beattie added to the existing boilerplate language a second sentence in Section 5 of P&S Agreement in order to alert Metro-Boston to its obligation to prepare a new Land Court plan of Plan 16849, necessary because this conveyance involved the sale of a portion of a Lot of registered land. Beattie direct/ Trial Trans. Day 1, at 7:12-25. Section 5 of the P&S Agreement provides, "PLANS: If said deed refers to a plan necessary to be recorded therewith the SELLER shall deliver such plan with the deed in form adequate for recording. New Subdivision of Plan 16849 provided by Seller." See Trial Exhibit 7. The first sentence is boilerplate in the Greater Boston Real Estate Board Standard Form. By adding the second sentence, Beattie intended:

15

It is a direction. It is a help, really, an aid to the seller to remind them, one, this was their obligation; but two, the preparation of a Land Court subdivision plan is a long-term assignment. It is something that takes a while to prepare, and it is basically alerting the seller that they have an obligation that is going to take some time to prepare.

Beattie direct/Trial Trans. Day 1, at 8:7 – 18.

51.    In November 2003, Halcomb and Beattie had a conversation about the new Land Court plan. Beattie direct/ Trial Trans. Day 1, at 9:20 – 10:25. In a phone call to Beattie, Halcomb expressed concern that the new Land Court survey, when prepared, may not show exactly 19.6 acres because Halcomb needed to provide for "guy wires and tower services." Id. Beattie told Halcomb, "If indeed there are issues that we have to address that gives us a slight bit less than 19.6 acres, perhaps we can live with that. On the other hand, if there is a major deviation from 19.6 acres, we will have to talk." Beattie direct/ Trial Trans. Day 1, at 10:19 – 24. Beattie and Halcomb also discussed Halcomb's preparation of the survey, and Beattie understood from this call that Halcomb would prepare the new survey for the Land Court necessary to divide Lot 11, and that he and Halcomb would likely have discussions after it was prepared. Beattie direct/ Trial Trans. Day 1, at 12:2 – 25; 13:3 – 10.

52.    After the phone call with Halcomb, Beattie faxed Halcomb a confirmatory note which stated, "Purchaser is in receipt of the Extension of our Purchase and Sale Agreement for the Ashland land to December 3, 2003 with the additional hand-written language. To confirm, the required Land Court Subdivision Plan to be provided by Seller will indicate the acreage to be deeded to Buyer (19.6 Acres +/-) and acknowledge the Zoning boundaries." See Trial Exhibit 104; Beattie direct/Trial Trans. Day 1, at 11: 2 – 9. On an extension executed November 20, 2003, Halcomb handwrote, "Parties

16

acknowledge that a survey or land defined plan needs to be constructed acknowledging the zoning boundaries." See Trial Exhibit 67.

53.    Halcomb also acknowledged in a phone call in early November 2003 with Rick Terrill and Janice Hannert that the Land Court Survey was "an outstanding item" and that she "would respond" to it.  Hannert direct/Trial Trans. Day 2, 9:25 – 11:19

54.    Finally, Halcomb discussed the preparation of a new survey and Land Court plan with Metro-Boston shareholders during a shareholder meeting on March 19, 2004.  See Trial Exhibit 96.  The meeting's Agenda provides, in relevant part,

> Hancock and Associates have been hired and have developed a cursory initial draft to utilize with both potential buyers first.  Since the land is Land Court property, it will be necessary to have a complete survey with accurate boundaries submitted to the Town before transfer of title in fee can be made. … After the Primary Buyer and the tenants are satisfied with the easement proposal, determine the price for the Easement for the residential land, complete the survey and land court approval and execute a new contract for the sale of this land.

See Trial Exhibit 96.

**E.    No evidence supports Metro-Boston's defense that Fafard intended to "warehouse" the property and keep it off the market and that Fafard was unwilling to close unless Metro-Boston would also convey Sewell Street access.  To the contrary, the evidence demonstrates that Metro-Boston intentionally ignored requests from Fafard to prepare for a closing in an effort to let Fafard's contract expire and free up Metro-Boston to enter into a more lucrative contract.**

55.    Between January 2002 and August 2003, Metro-Boston and Fafard executed only five extensions of the P&S Agreement.  See Trial Exhibits 17, 23, 30, 33, 40.  During that time, Fafard had made an offer for additional acreage and access, and was waiting to hear from Metro-Boston as to whether it would accept Fafard's offer.  See Trial Exhibit 10; Hannert direct/ Trial Trans. Day 1, at 79:20 – 80:3, 83:5 – 16.  During 2002 and early 2003, Halcomb was tied up with her other business interests, often

traveling overseas to China, and did not visit Boston until late 2002. See Trial Exhibits

11, 12, 19, 22, 24, 25, 27, 28; Halcomb direct/Trial Trans. Day 3, at 11:21 – 12:15.

Halcomb continued to represent to Fafard that she was working on a "master plan" with

her other buyer for the industrial site -- whose identity kept changing. Hannert direct/

Trial Trans. Day 1, at 77:17 – 78:5; Halcomb direct/Trial Trans. Day 3, at 10:6 – 8,

18:11- 17; Trial Exhibits 24, 27, 28.  Thus, Fafard continued to wait for a response from

Halcomb.  Hannert direct/ Trial Trans. Day 1, at 79:20 – 80:3.

56.     Halcomb testified that Fafard told her it had applied for and been turned

down for permits.  Halcomb cross/Trial Trans. Day 3, at 48:3 – 6.  But at no time did

Fafard tell Halcomb that Fafard had been "turned down" respecting their development of

the property.  Hannert direct/Trial Trans. Day 2, at 24:17 – 21.  Contrary to Halcomb's

trial testimony, Halcomb stated in her interrogatory responses, "In another telephone

conversation between Ms. Hannert and Mary Heller Halcomb, Ms. Hannert told Ms.

Halcomb that Fafard's approvals for its proposed project either had been turned down

because Fafard did not have access to Sewell Road or that Fafard would be turned down

unless Fafard could get primary ingress to and egress from the site through Sewell Road."

Trial Trans. Day 4, at 2:4 – 22 (emphasis added).

57.     Moreover, after Fafard agreed to waive its permit contingency and place

its deposit at risk in November 2003, Fafard began pressing for a closing.  See Trial

Exhibits 64, 70, 72, 81, 111, Hannert direct/ Trial Trans. Day 2, at 15:14 – 20, 18:10 –

17, 19:1 – 9.  Fafard requested from Metro-Boston the status of title issues and Halcomb

told Fafard that she had an attorney working on the title issues.  Hannert direct/ Trial

Trans. Day 2, at 18:18 – 21.  Fafard also requested the new Land Court plan, and in

January 2004 Halcomb responded that her engineer (Hancock Associates) was working on a sketch which would be available in a few days. Hannert direct/ Trial Trans. Day 2, at 15:14 – 20, 18:10 – 17; Trial Exhibit 111. Thus, the parties executed an extension of the P&S Agreement. See Trial Exhibit 111.

58.    Halcomb received the sketch from Hancock Associates in January 2004, but did not provide a copy of the sketch to Fafard, or provide Fafard any other plan of the land. Halcomb direct/ Trial Trans. Day 3 at 12:15 – 23; Hannert direct/ Trial Trans. Day 2, at 18:22 – 25. At this point, Hancock Associates had developed a "proposed scheme of land transfer" and Halcomb and Hancock Associates were discussing "how to best sell this concept" to Fafard. See Trial Exhibit 77.

59.    On December 8, 2003, Hannert sent a fax to Halcomb requesting an extension, and on the fax cover sheet wrote, "I tried to call you today about the status of Sewell Street. We are ready to close as soon as the survey and title issues are done." See Trial Exhibit 72. Thereafter, Fafard sent numerous fax requests to Metro-Boston in which Fafard indicated that it was "ready to close" on the property. See Trial Exhibits 87, 88, 90, 93, 94, 95, 97. During this time, Fafard remained interested in obtaining Sewell Street access and would wait for a response from Halcomb on its offer (Halcomb had never rejected the offer), but because Fafard waived its permit condition, Fafard was not holding up a closing on receipt of permits. Terrill direct/Trial Trans., Day 3, at 111:19 – 112:3; Hannert direct/Trial Trans. Day 2, at 17:12 – 23.

60.    In May 2004, Fafard sent three separate fax requests to Halcomb to execute another extension. See Trial Exhibits 94, 95, 97. Hannert also placed numerous phone calls to Halcomb throughout May 2004. Halcomb ignored Fafard's fax requests.

Halcomb also never responded to Hannert's phone calls.  Hannert direct/Trial Trans. Day

2, at 23:5 – 9; Halcomb direct/Trial Trans. Day 3, at 23:24 – 24:2.

61.     When, on May 21, 2004, as the parties' last extension of the P&S

Agreement was set to expire, Halcomb still had not responded to Fafard's phone calls and

faxes, Rick Terrill directed Paul Beattie to go the Registry of Deeds with good funds and

ready to close on the property, "to protect the agreement."  Beattie direct/ Trial Trans.

Day 1, at 15:4–14; Terrill direct/Trial Trans. Day 3, at 112:15 – 113:3, 114:3 – 12.

62.     Discovery in this case revealed that the real reason Metro-Boston did not

return any phone calls to Fafard was because Metro-Boston was preparing to enter into an

agreement with Chris Egan and his company, Carruth Capital, LLC, to sell its land to that

entity.  Indeed, Fafard's final extension expired on Friday, May 21, 2004, and only at that

point did Halcomb consider herself free to accept an offer from Egan's company.

Halcomb direct/Trial Trans. Day 3, at 29:1 – 7; Trial Exhibit 93.

63.     The very next business day, on Monday, May 24, 2004, Carruth Capital

made an offer to purchase Lots 9, 10, 11 and 12 for $2.8 Million.  See Trial Exhibit 99.

Halcomb, on behalf of Tower Sites, accepted Egan's offer that same day.  Id.

64.     Unbeknownst to Fafard, throughout May 2004 (prior to the expiration of

Fafard's extension and when Halcomb was ignoring Fafard's phone calls and faxes)

Halcomb already was negotiating with Chris Egan regarding sale of Tower Sites'

industrial and residential land in Ashland, Massachusetts.  Egan was Tower Sites' most

recent buyer in a long series of potential buyers.  Halcomb direct/Trial Trans. Day 3, at

18:15 – 17.

65.    In mid-May 2004, Egan and Halcomb discussed a purchase price for

Tower Sites' residential and industrial land.  Halcomb also told Egan that Fafard's last

extension would expire May 21, 2004.  Halcomb direct/Trial Trans. Day 3, at 28:3 – 8.

As Halcomb testified:

> Q:    Well, had you discussed the purchase price terms with anyone, either Mr. Egan or anyone representing Carruth Capital, prior to May 24th of 2004?
>
> A:    Yes, the week before.
>
> Q:    Had you indicated to -- who were you dealing with at Carruth Capital?
>
> A:    Chris Egan and an associate of his.  I can't remember his name.
>
> Q:    Had you indicated to Mr. Egan that an offer of $2.8 million, of which $140,000 was to be paid at the execution of a purchase and sale agreement, was an offer that Tower Sites Limited was prepared to accept?
>
> A:    Well, initially I told him no, we were -- everybody knew we were under contract with Fafard, and that this is what the problem was.  And, of course, they were party to the drawings and the whole situation, and I said, "It is contingent upon access to Sewall.  They have to have it.  They cannot do it without it.  They've told me over and over and over.  And if you're not going to grant that, then our investors obviously aren't going to go that way, either, because it's going to hamper us ever selling that Tower Site.  That was never part of the deal.  We don't have to do that.
>
> Q:    And when was it that you had that discussion or those discussions with Mr. Egan?
>
> A:    Probably the week before, the last few days before.
>
> Q:    Last few days before what?
>
> A:    Before this May 21st.
>
> Q:    You mean May 24th?
>
> A:    I mean 24th.
>
> Q:    Did you tell Mr. Egan prior to May 24th that a portion of Lot 11 was under agreement with Fafard?

A:    Oh, yes, of course.

Q:    Did you tell Mr. Egan when the last extended deadline for closing was to expire?

A:    Yes.

Q:    When did you tell him that?

A:    I told him it was May 21st.

Q:    When did you tell him it was May 21st?

A:    Oh, the last few days before that. You know, around that same time.

Halcomb direct/Trial Trans. Day 3, at 26:8 – 28: 5.

66.    Thus, Egan was informed of Fafard's contract and its deadline, and in fact, would have agreed to purchase Tower Sites' land, less the land under agreement to Fafard, for $1.8 Million. Halcomb direct/Trial Trans. Day 3, at 18:18 – 23.

67.    Halcomb did not, prior to the expiration of the extension, notify Fafard that Metro-Boston would not agree to any further extensions. Instead, Halcomb consulted an attorney in May 2004:

Q:    Why did you wait until the day the extension expired to notify Mr. Terrill that no further extensions would be forthcoming?

A:    I mean, that's -- I usually got their requests for extensions the day before they were going to request another extension. You know, we were batting it back and forth, what could we do, but clearly the board said, you know, "There's no way we're going to run off our potential big buyers for the Tower Site if you have to give them access through Sewall, which means all this huge traffic, and this was never part of the deal. We don't have to do this." I consulted an attorney, and they said you don't have -- I'm not going to say anything. Anyway, it was not part of the deal.

Halcomb direct/Trial Trans. Day 3 at 22:23 – 23:12.

68.    On July 28, 2004, Egan and Halcomb executed a P&S Agreement. See Trial Exhibit 101.

F. **Metro-Boston's defense that Fafard did not tender performance and never notified Metro-Boston that it would be at the Registry of Deeds on May 21 is not viable because the evidence demonstrates that tender by Fafard would have been a useless act because Metro-Boston had not yet prepared a new survey to obtain Land Court approval of Lot 11 subdivision.**

69.    In order to transfer title to a portion of a lot of registered land, such as a portion of Lot 11, the Land Court requires that a new plan be prepared and submitted to the Land Court engineering department for approval. Beattie direct/ Trial Trans. Day 1, at 8:19–9:7. This new plan must show the encumbrances, and "requires various mathematical calculations on angles, acreage, on meets [sic] and bounds, all of which are taken into consideration by the engineering department of the Land Court of the Commonwealth in order to approve or disapprove a new Land Court subdivision plan." Beattie direct/ Trial Trans. Day 1, at 8:19 – 9:7. It is not possible to convey less than an entire lot of registered land without going through the Land Court approval process for a new subdivision. Beattie direct/ Trial Trans. Day 1, at 9:17 – 19.

70.    Metro-Boston knew that it was required to prepare new survey for the Land Court in order subdivide the portion of Lot 11 that would be conveyed to Fafard. See Trial Exhibits 96, 108. And indeed, Halcomb had discussed Metro-Boston's preparation of a new Land Court survey with Paul Beattie in November 2003. Beattie understood from their conversation that he would see the new survey before it was submitted for Land Court approval so he and Halcomb could discuss whether there was a "major" or "minor deviation" from the 19.6 acres as set forth in the P&S Agreement. Beattie direct/ Trial Trans. Day 1, at 9:20 – 10:24, 12:2 – 25, 13:3 – 10.

71.    Moreover, on January 5, 2004, Hannert spoke with Halcomb on the telephone. Hannert inquired about the survey for the new Land Court plan, and Halcomb

responded to Hannert she expected to get something from her engineer that week. At this point, the plan "was the largest outstanding issue" to be resolved for a closing. Hannert direct/ Trial Trans. Day 2, at 18:10 – 17; Trial Exhibit 111. In a fax on December 8, 2003, Hannert wrote to Halcomb, "I tried to call you today about the status of Sewell Street. We are ready to close as soon as the survey and title issues are done." See Trial Exhibit 73.

72.    Throughout the early part of 2004, Fafard continued waited to hear from Halcomb regarding her sketch from her engineer and the Land Court survey and title issues "so that [Fafard] could close on the property." Hannert direct/Trial Trans. 19:1 – 9. On January 14, 2004, Hannert sent Halcomb another extension, and in the fax cover sheet again wrote, "I tried to call you today about the status of Sewell Street. Is there any progress on the survey and title issues?" See Trial Exhibit 81.

73.    Thus, both Paul Beattie and Hannert expected to see the new survey before it was submitted for Land Court approval. Although Halcomb received a draft sketch (not the new survey plan) from Hancock Associates in January 2004, she never sent it to Fafard – despite Hannert's repeated requests. Hannert direct/Trial Trans. Day 2, at 18:22 – 25, 19:1 – 9.

74.    Beattie did not inform Metro-Boston that he would be at the Registry because he believed Metro-Boston was not ready to close on May 21, as Beattie had not yet seen the Land Court survey that he had discussed with Halcomb in November 2003. Beattie direct/Trial Trans. Day 1, at 16:18 – 17:4, 17:24–18:3.

75.     Indeed, the reason Fafard had not closed by May 21, 2004, was because

Fafard did not have a survey plan or any title information from Metro-Boston.  Terrill

direct/Trial Trans. Day 3, at 113:4 – 8.

### G. No evidence supports Metro-Boston's contention Fafard would have refused to go forward with the transaction absent Sewell Street.

76.     Fafard waived its permit condition in November 2003.  See Trial Exhibits

65, 111.  Thus, from that point forward Fafard "put [its] deposit money at risk and agreed

that we were not waiting on permits, [and] Sewell Street … was not something that

[Fafard] was conditioning the closing on in terms of the residential portion of the

property."  Hannert direct/Trial Trans. Day 2, at 19:22 – 20:9.  Fafard discussed with

Halcomb that it was ready to close without permits but was still interested in Sewell

Street.  Hannert direct/ Trial Trans. Day 2, at 20:10 – 14.  Moreover, despite Halcomb's

testimony, Hannert never told Halcomb that Fafard needed "primary access" through

Sewell Street.  Hannert direct/Trial Trans. Day 2, at 24:8 – 16.

77.     Indeed, Fafard was always interested in purchasing Metro-Boston's

property.  According to Richard Terrill, " [Fafard] knew that there was value in [the

property].  [Fafard] had it under agreement for $339,000.  So from [Fafard's] standpoint

it was kind of a no-brainer.  [Fafard was] going to buy it one way or another."  Terrill

direct/Trial Trans. Day 3, at 110:1 – 15.  See also Trial Exhibit 111.  Indeed, Fafard had

spent a "significant" amount of money on the transaction, including the title search,

flagging wetlands, and preparing the Chapter 21E report, plus the nonrefundable $39,000

deposit.  Hannert direct/ Trial Trans. Day 2, at 13:22 – 14:5.  Fafard "would not have put

that much money on a piece of property that [it] did not intend to finalize and close on."

Id.

78.     While Fafard agreed to place the deposit money in escrow with Metro-
Boston's attorney, this did not occur because Metro-Boston's attorney never contacted
Fafard.  Hannert direct/Trial Trans. Day 2, at 12:14 – 13:1; Hannert redirect/Trial Trans.
Day 2, at 119:6 – 13:1.  Moreover, while Fafard agreed to pay the real estate taxes,
Metro-Boston never calculated the amount payable or billed Fafard for same.  Hannert
redirect/Trial Trans. Day 2, at 119:14 – 120:1.

**H. Metro-Boston's defense to specific performance on the grounds that
Fafard never identified any guy wires on the property fails because the
evidence shows that no new, accurate survey plan was ever presented to
Fafard from which Fafard could locate such guy wires.**

79.     During negotiations regarding the potential sale of Metro-Boston's land to
Fafard, Halcomb sent Fafard the 1979 McCarthy plan, which was later relied upon by the
parties to draft the P&S Agreement.  Hannert direct/Trial Trans. Day 1, at 67:3 –16.  The
McCarthy plan, however, is "not an 'as-built' plan" with respect to the towers, and their
guy wires and anchors, but shows the proposed locations of the towers, guy wires and
anchors.  Bremser direct/Trial Trans Day 5, at 15:17 – 16:1.

80.     During the contract negotiations, Halcomb told Fafard about the potential
that at least one tower guy wire was located on the land Fafard was to purchase.  In a
letter dated April 1998, Halcomb wrote that Metro-Boston would "need to retain an
easement for, I believe, one guy wire which is located on a residential section of Lot 11."
See Trial Exhibit 108.  Thus, prior to entering into the P&S Agreement, the parties
"realized … that there was at least one guy wire on th[e] property [Fafard was to
purchase] and maybe more."  Halcomb cross/Trial Trans. Day 3, at 40:20 – 23.

81.     Reflecting this understanding, the Rider to the P&S Agreement provided
in relevant part, "Buyer will locate existing guy wire on plan and determine whether

easement or relocation is necessary." <u>See</u> Trial Exhibit 7.  Halcomb had proposed

language shifting the cost of relocation to Fafard, but Fafard rejected that language and it

was not included in the final P&S Agreement. <u>See</u> Trial Exhibits 6, 7.

82.    Metro-Boston, however, never provided Fafard with a sketch of the land,

new Land Court survey, or plan which accurately depicted the guy wires.  Hannert

direct/Trial Trans. Day 2, at 18:22 – 24.  Thus, Fafard could not "locate existing guy wire

on plan and determine whether easement or relocation is necessary" as set forth in the

P&S Agreement Rider because Fafard did not have the plan from Metro-Boston on which

it would locate such guy wire.  Beattie redirect/ Trial Trans. Day 1, at 61:25 – 62:9.

## PROPOSED CONCLUSIONS OF LAW

1.    "The object of the court is to construe contracts as a whole, in a reasonable

and practical way, consistent with its language, background and purpose." <u>USM Corp. v.</u>

<u>Arthur D. Little Sys., Inc.</u>, 28 Mass. App. Ct. 108, 116 (1989).

2.    A contract that is unambiguous must be "enforced according to its terms."

<u>Coll v. PB Diagnostic Systems, Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995) (quoting

<u>Freelander v. G&K Realty Corp.</u>, 357 Mass. 512, 513 (1970)).

3.    Where contract language is unambiguous, the court must "construe the

words of the [contract] in their usual and ordinary sense." <u>Gateway Group Advantage,</u>

<u>Inc. v. McCarthy</u>, 300 F. Supp. 2d 236, 241 (D. Mass. 2003) (quoting <u>Citation Ins. Co. v.</u>

<u>Gomez</u>, 426 Mass. 379, 381 (1998)). <u>See also</u> <u>Am. Home Assurance Co. v. Fore River</u>

<u>Dock & Dredge, Inc.</u>, 321 F. Supp. 2d 209 (D. Mass. 2004) ("Absent ambiguity, the

terms of a [contract] are given their plain and ordinary meaning."); <u>Cody v. Connecticut</u>

<u>Gen. Life Ins. Co.</u>, 387 Mass. 142, 146 (1982) (where a contract is unambiguous, the

court "construe[s] the words of [a contract] in their usual and ordinary sense"); Suffolk

Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999) ("In

interpreting a contract, the court must construe all words that are plain and free from

ambiguity according to their usual and ordinary sense."). Indeed, the words of an

unambiguous contract should be enforced, even where enforcement may seem unfair or

inequitable. See Siegel v. Shaw, 337 Mass. 170, 174 (1958) ("The written agreement

controls. We do not think we should change the rules of construction of written

agreement, especially those affecting the transfer of real estate, to try to fit the equities of

a particular case.").

    4.    "[A]n ambiguity is not created merely because an imaginative reader

devises a way to split hairs. Nor is [a contract] ambiguous simply because its

terminology sparks a controversy between two parties, each of whom advocates an

interpretation contrary to the other." Lexington Ins. Co. v. Gen. Accident Ins. Co. of

Am., 338 F.3d 42, 47 (1st Cir. 2003). A contract is ambiguous where its terms are

"inconsistent on their face or where the phraseology can support reasonable difference of

opinion as to the meaning of the words employed and the obligations undertaken."

Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999), quoted

in Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 47 (1st Cir. 2003).

    5.    Where a contract is ambiguous, "the court cannot subvert its plain

meaning." Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970). The court

"must determine the meaning from the intent of the parties upon consideration of the

words in question, the entire instrument, and the surrounding circumstances." City of

Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999). Moreover, "justice,

common sense and the probable intention of the parties are guides to construction of a written instrument." Id. (quoting Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701 (1964)).

6.      Moreover, the existence of ambiguity in a contract "does not enable a party to contend that the minds never met." Bucciero v. Drinkwater, 13 Mass. App. Ct. 551, 554 (1982) (quoting Benjamin Foster Co. v. Commonwealth, 318 Mass. 190, 196 (1945)).

7.      Where there is ambiguity in a contract, or the meaning of a contract is not plain, extraneous evidence is admissible "to explain significance of terms used or to show relations and methods of parties in light of which their written words are to be interpreted." Petricca Constr. Co. v. Commonwealth, 13 Mass. App. Ct. 981, 982 (1982) (citing Levin v. Century Indemnity Co., 279 Mass. 256, 258 (1932). See also Am. Home Assurance Co. v. Fore River Dock & Dredge, Inc., 321 F. Supp. 2d 209 (D. Mass. 2004) ("If a contractual term is ambiguous, then consideration of parol evidence is appropriate."); Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496 (1997) (if a contract term is ambiguous, evidence that explains or "elucidates the meaning of an ambiguous contract term" is admissible for that purpose); USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass. App. Ct. 108, 116 (1989) (extrinsic evidence can be used in construction of ambiguous contract and in "resolving uncertainties in applying the terms of the written contract to the subject matter").

8.      Parol evidence is not admissible, however, to vary, contradict or broaden a final agreement. See Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496 (1997). Nor may parol evidence be used to "create ambiguity where otherwise none

exists." Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) (quoting Rey

v. Lafferty, 990 F.2d 1379, 1385 (1st Cir. 1993)). Moreover, "even when courts allow

parol evidence, the words themselves remain the most important evidence of intention."

Am. Home Assurance Co. v. Fore River Dock & Dredge, Inc., 321 F. Supp. 2d 209 (D.

Mass. 2004).

       9.    A contract should be interpreted "so as to make it a valid and enforceable

undertaking rather than one of no force and effect." Finn v. McNeil, 23 Mass. App. Ct.

367, 372, 502 N.E.2d 557 (1987) (quoting Shayeb v. Holland, 321 Mass. 429, 432, 73

N.E. 2d 731 (1947)). See also Lafayette Place Assocs. v. Boston Redevelopment Auth.,

427 Mass. 509, 518 (1998) (same). "A construction rendering a contract valid and

enforceable is preferred to one which makes it void or its performance impossible or

meaningless." Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 411 Mass. 39, 52

(1991) (quoting Berger v. Siegel, 329 Mass. 74, 77-78 (1952)).

       10.    "[E]ven if an aspect of an agreement is informal, obscure, difficult of

satisfactory interpretation, and the subject of dispute by the parties as to its meaning, a

court should so far as reasonably practicable give a construction which appears to have

been the intention of the parties." Finn v. McNeil, 23 Mass. App. Ct. 367, 372, 502

N.E.2d 557 (1987) (quoting Bray v. Hickman, 263 Mass. 409, 412, 161 N.E. 612 (1928)).

See also Starr v. Fordham, 420 Mass. 178, 192 (1995) (quoting Shane v. Winter Hill Fed.

Sav. & Loan Ass'n, 397 Mass. 479, 483 (1986)) (court should construe a contract, "to

give it effect as a rational business instrument and in a manner which will carry out the

intent of the parties").

11.    Thus, a court will "decline to adopt a construction of a contract that will render it illegal where a reasonable alternative is available." Lowney v. Genrad, Inc., 925 F. Supp. 40, 48 (D. Mass. 1995) (declining to adopt plaintiff's interpretation of retirement agreement because to do would violate ERISA). Contracts "generally will not be interpreted so as to render them illegal." Dorn v. Astra USA, 975 F. Supp. 388, 392 (D. Mass. 1997) (citing Conservation Law Found. of New England v. Andrus, 623 F.2d 712, 715 (1st Cir. 1979)).

12.    In order to satisfy the statute of frauds, a contract for the sale of real property must "contain a description of the land sufficient for purposes of identification when read in the light of all the circumstances of ownership of the property by the vendor." Harrington v. Dodge, 200 Mass. 357, 359, 86 N.E.2d (1909). Where there is any ambiguity in a memorandum, the Court can rely on parol evidence to explain, or translate, the memorandum. See Blackston Realty LLC v. FDIC, 244 F.3d 193 (1st Cir. 2001) (Massachusetts law permits introduction of parol evidence regarding circumstances of the parties' dealings in order to resolve any ambiguities in a contract for the sale of land); Cohen v. Garelick, 344 Mass. 654, 657 (1962) (noting that statute of frauds does not bar reference to outside circumstances to resolve an ambiguity in contract for sale of land); Michelson v. Sherman, 310 Mass. 774, 776 (1942) (parol evidence can be used to translate words used in contract for sale of land).

13.    Moreover, evidence showing that the contracting parties considered "two or more papers [to be] so connected in [their] minds [that the parties] adopted all of them as indicating their purpose" can be used to overcome a statute of frauds defense. See Tzitzon Realty Co. v. Mustonen, 352 Mass. 648, 652-63 (1967). See also Clark, 240

31

Mass. at 217-18 (where there is at least "some evidence" that different papers "were connected in the minds of the parties so that they adopted all the papers as indicating their purpose," the Court can consider such papers as so connected that taken together they constitute a memorandum sufficient to satisfy the statute of frauds); Nickerson v. Weld, 204 Mass. 346, 356 (1910) (oral evidence can be used to show the connection between different papers, linked together in the minds of the parties, so that they may be considered together to determine sufficiency for statute of frauds purposes).

14.    The fact that some uncertainty exists in contracting does not necessarily make an agreement not binding on the parties, even with respect to the sale of land. Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 518 (1998). See also Town of Franklin v. Wyllie, 443 Mass. 187, 193-94 (2005) (finding offer to purchase real estate binding and enforceable, even where purchase price was an issue left open, subject to certain contingencies, that would be determined by specified formula).

15.    For example, in Moore v. Galante, the parties contracted for the sale of real estate, specifically a house lot that existed on a larger piece of registered land owned by the sellers. See 14 Mass. L. Rptr. 264, No. 12 (March 25, 2002) (Botsford, J.). The sellers were to retain the balance of the registered land and intended to create a residential subdivision on their remaining property. In "Exhibit A" to the purchase and sale agreement, the parties attached an unrecorded plan which depicted the land to be conveyed. In addition, because the sellers had not yet obtained approval of their subdivision plan, the parties included an "exchange option" in the purchase and sale agreement, which, if exercised by the sellers, would allow the parties to "swap" a portion of each other's land. The parties attached as "Exhibit B" to their agreement a plan

purporting to show the boundaries of the buyer's property, should the sellers exercise their exchange option.  In relevant part, the language of the purchase and sale agreement provided,

> The BUYER acknowledges that the SELLER plans to subdivide other premises owned by the SELLER adjacent to the premises to be conveyed to the BUYER.  If at any time prior to December 11, 2005, the SELLER shall obtain the necessary final approvals to subdivide their adjacent property, then the BUYER and SELLER agree that upon ten (10) days' written notice from the SELLER to the BUYER:
>
> (a) The BUYER shall convey to the SELLER, for consideration of $1.00, the area necessary to make the premises conform to the boundaries shown on Exhibit "B" attached hereto and entitled "Plan of Land 'B'"; and
>
> (b) The SELLER shall convey to the BUYER, for consideration of $1.00, the area necessary to make the premises conform to the boundaries shown on Exhibit 'B' attached hereto and entitled 'Plan of Land 'B'"
>
> The BUYER acknowledges that the location of the boundaries shown on Exhibits 'A' and 'B' may change during the approval process...

After the closing, the sellers obtained subdivision approval and exercised their exchange option, but attempted to force the buyers to exchange land different from that described in Exhibits A and B to the purchase and sale agreement, called "Revised Exhibit B".  The buyers refused to comply with the "Revised Exhibit B" option, which would have decreased their acreage.  In seeking to enforce the exchange option, the sellers argued that the option unambiguously provided that the parties agreed to exchange land at a future date, and that the land might not "exactly match" the exhibits in the agreement.  On the other hand, the buyers argued the clause was ambiguous, and that if sellers exercised the exchange option, they were obligated to convey the boundaries in accordance with "Exhibit B."

The Court disagreed with the sellers and found the contract ambiguous because of an inconsistency: on the one hand, the agreement was explicitly clear that if the exchange option is exercised, the parties will take all necessary steps to ensure that the buyer's lot conforms to the plan set out in "Exhibit B," however, on the other hand, the agreement also contained language regarding possible changes to the boundaries in Exhibits A and B. Notwithstanding this inconsistency, the Court did not find that the purchase and sale agreement failed as a matter of law. Rather, the Court agreed with the buyer's position, thereby adopting an interpretation of the contract which "ma[de] it a valid and enforceable undertaking rather than one of no force and effect." Id., citing Finn v. McNeil, 23 Mass. App. Ct. 367, 375 (1987) and Lafayette Place Assoc. v. Boston Redevelopment Auth., 427 Mass. 509, 519 (1998). If, on the other hand, the sellers' interpretation of the agreement prevailed, the agreement would fail under the statute of frauds. In rejecting the seller's argument that the agreement unambiguously allowed the seller to change the boundaries, the Court explained that the contract language, "The BUYER acknowledges that the location of the boundaries as shown on Exhibits A and B may change during the approval process" cannot control or affect the exchange option "since it allows for post-execution boundary provisions that were inherently incapable of being identified at the time of execution." Id. Judge Botsford upheld the contract and granted summary judgment in favor of the buyers.

16.    A "mistake" is a belief that is not in accord with the facts. See Restatement (Second) Contracts § 151. The term "mistake" refers to an erroneous belief. Id. cmt. a. "The belief need not be an articulated one, and a party may have a belief as to

a fact when he merely makes an assumption with respect to it, without being aware of alternatives." Id.

17.     A mistake by parties to a contract does not void a written contract. Nor does a mistake make a contract automatically voidable. A mistake by both parties at the time of contracting makes the contract voidable, but only where (1) the mistake goes to a basic assumption upon which the contract was made, and (2) the mistake has a material effect on the agreed exchange of performances. If these criteria are met, then the contract is voidable, but only by the adversely affected party, unless he bears the risk of mistake. See Restatement (Second) Contracts § 152(1). See also Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629 (1975).

18.     A party bears the risk of mistake when it is expressly allocated to him by the agreement or the party is aware at the time of contracting "that he has only limited knowledge with respect to the facts to which the mistake relates" but he treats his limited knowledge as sufficient. See Restatement (Second) Contracts § 154. The Court may also allocate risk to a party where "it is reasonable in the circumstances to do so." Id. For example, in a case where a vendor contracts to sell farm land, the seller of such farm land "cannot avoid the contract upon the later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming and the effect on the agreed exchange is material." See Restatement (Second) Contracts § 154 *cmt. a.* "In such case a court will ordinarily allocate the risk to the seller so that he is under a duty perform regardless of the mistake." Id.

19.    Even if a contract is voidable because of a mutual mistake, where the

parties reaffirm their intent to perform under the contract after learning of the mistake,

the opportunity to void the contract is deemed waived. "The power of a party to avoid a

contract for mistake … is lost if after he knows or has reason to know of the mistake …

he manifests to the other party his intention to affirm it or acts with respect to anything

that he has received in a manner inconsistent with disaffirmance." Restatement (Second)

Contracts § 380(2). Moreover, the "power of a party to avoid a contract for … mistake is

lost if after he … knows or has reason to know of a …mistake he does not within a

reasonable time manifest to the other party his intention to avoid it. The power of the

party to avoid a contract for … mistake is also lost if the contract has been so far

performed or the circumstances have otherwise so changed that avoidance would be

inequitable and if damages will be adequate compensation." See Restatement (Second)

Contract § 381(2).

20.    Moreover, execution of an amendment to a contract extending the time for

performance, after discovery of a mistake, constitutes ratification or affirmance of the

original contract, thereby waiving the opportunity for the complaining party to void the

contract on such grounds. See e.g., B&R Development, Inc. v. Rogers, 561 S.W.2d 639

(Tx. Ct. App. 1978) (buyer of real estate sued seller after learning of mistake or

misrepresentation in amount of acreage to be sold; court held buyer not entitled to

damages for mistake or misrepresentation because he affirmed and ratified the contract

by renewing and extending notes for balance of purchase price after learning of mistake

in acreage); Hogh v. Ferguson, 171 P. 804 (Cal. Dist. Ct. App. 1918) (parties exchanged

properties, plaintiffs took back mortgage on property conveyed to defendants; plaintiff

sued to foreclose on mortgage and defendant alleged fraudulent misrepresentations regarding irrigation of land; court affirmed judgment in favor of plaintiff, in part, because defendant had sought extensions of time to make payments on mortgage after living on property for several months and being made aware of the fraud); Thweatt v. McLeod, 56 Ala. 375 (1876) (after learning of mistake in amount of acreage to be sold, buyer not entitled to rescind where parties modified the contract after learning of the mistake; court held that buyer "must have intended an affirmation of the original contract").

21.     The law generally requires that, when performance under a contract for the purchase and sale of real estate is concurrent, one party cannot put the other in default unless he is ready, able and willing to perform and has manifested this by some offer of performance. However, the law does not require such party to tender performance if the other party has shown that he cannot or will not perform. Lafayette Place Assoc. v. Boston Redev. Auth., 427 Mass. 509, 519, 694 N.E.2d 820, 827 (1998); Leigh v. Rule, 331 Mass. 664, 668, 121 N.E.2d 854, 857 (1954). Thus, when the time for performance has arrived, but one party has demonstrated his inability to perform by failing to satisfy conditions set forth in the contract, the other party's obligation to tender performance is excused. See, e.g., M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258-59 (1960) (buyer relieved of obligation to tender performance where seller indicated through his words and conduct that he was unable to perform on agreed-upon date and extended date; seller's conduct "reasonably led" buyer to believe that seller "was not yet ready to negotiate or perform"; buyer not obligated to tender because "it had been made clear that any tender by [buyer] would have been useless"); LeBlanc v. Molloy, 335 Mass. 636, 367-68 (1957) (buyer not obligated to tender performance where seller had indicated its

unwillingness to perform unless buyer agreed to extend time for sellers to vacate premises); Vander Realty Co. v. Gabriel, 334 Mass. 267, 271 (1956) (buyer of real estate not obligated to tender performance because seller had not tarred roadway as required by purchase and sale agreement; buyer had not waived contingency and seller had demonstrated inability to perform); Leigh v. Rule, 331 Mass. 664, 668 (1954) (in action to recover deposit for purchase of real estate, plaintiff excused from tendering performance where, on day performance was due, seller remained in occupation at premises thus she was "unable ... to give plaintiffs full possession of the premises, free from all tenants, in accordance with the terms of the agreement"); Limpus v. Armstrong, 3 Mass. App. Ct. 19 (1975) (buyer of real estate not obligated to tender performance where seller entered into "an inconsistent agreement with another" for the sale of the same land).  See also Lese v. Lawson, 118 A.D. 254, 103 N.Y.S. 303 (App. Div. 1907) (buyer of real estate sought specific performance; tender excused where seller had contracted to convey property free from encumbrances and on closing date an inheritance tax remained unpaid and constituted encumbrance; plaintiff buyer did not appear at closing "very probably because he knew that the defendant could not make a conveyance [free] from encumbrance;" and because of tax encumbrance seller "was not [on the closing date] in a position to comply with his contract").

22.    Where a buyer of real estate indicates his intention to perform and appears at the Registry of Deeds with good funds ready to close the transaction, the buyer has satisfied his obligation to tender performance and the seller is in default for failing to appear and offering whatever title it could deliver. See Pierce v. Clark, Case No. BACV

2001-00496, Findings of Fact, Rulings of Law and Order for Judgment, Lawyers Weekly

No. 12-076-05 (March 19, 2005) (Rufo. J.) (copy attached hereto as Exhibit A).

23.     Where a purchase and sale agreement sets forth certain obligations to be

performed by the seller, such as to clean title or to prepare a survey for a new Land Court

subdivision plan, the seller has an implied obligation to exercise good faith and

reasonable efforts to fulfill such obligations.  See Lafond v. Frame, 327 Mass. 364, 366-

368 (1951) (escape clause permitting seller to back out if unable to provide good title "is

no protection to an owner who is not acting in good faith and does not intend to carry out

the agreement"; here, seller made no attempt to discharge mortgage, seller therefore not

acting in good faith and thus not protected by escape clause ).  See also Gentile Bros.,

Corp. v. Rowena Homes, Inc., 352 Mass. 584, 590 (1967) (escape clause that obligations

of parties shall cease if seller unable to give clean title "affords no protection to a seller

who is not acting in good faith and does not intend to carry out the agreement"; seller

here failed to act in good faith in discharging attachments on property); Hastings v. Gay,

55 Mass. App. Ct. 157 (2002) (escape clause in purchase and sale agreement "will not

apply to void an agreement where the seller's inability to convey good and clear title was

the result of his own fault or collusion"; moreover, seller was first obligated to afford

buyer opportunity to accept title defects at original or extended closing date, before seller

could invoke benefit of escape clause).

24.     Where a contingency or condition in a purchase and sale agreement exists

for the benefit of one party, that party may waive the contingency.  See Bossi v. Whalen,

19 Mass. App. Ct. 966, 967, 473 N.E.2d 1167 (1985) (provision making sale subject to

buyer's receipt of mortgage was "inserted in the contract for the benefit of the buyers and

could be waived by them"); DeFreitas v. Cote, 342 Mass. 474, 477, 174 N.E.2d 371

(1961) (language in purchase and sale agreement that sale was subject to buyer's receipt

of G.I. loan "was a condition inserted for the benefit of the buyer and as such could be

waived by the buyer").

     25.    Specific performance of real estate contracts is appropriate "in the absence

of significant equitable reasons for refusing such relief." Raynor v. Russell, 353 Mass.

366, 367-68, 231 N.E.2d 563 (1967).  "Mere increase in the value of the property, which

did not result from action of the defendant after the breach, is not the type of change in

circumstances over time which would make an order of specific performance

inequitable." Costello v. Pet, Inc., 17 Mass. App. Ct. 382, 388, 458 N.E.2d 790 (1984).

     26.    Moreover, the court will grant specific performance for a purchase where

there is evidence that the seller understood the purchase and sale agreement and any

extensions thereto and there is no evidence of inequitable conduct or dishonesty by the

purchaser. Kaplan v. Bessette, 357 Mass. 233, 257 N.E.2d 926 (1970).

     27.    The general rule in Massachusetts entitles a landowner "to mandatory

equitable relief to compel removal of a structure significantly encroaching on his land,

even though the encroachment was unintentional or negligent and the cost of removal is

substantial in comparison to any injury suffered by the owner of the lot upon which the

encroachment takes place." Peters v. Achambault, 361 Mass. 91, 92 (1972). See, e.g.,

Ottavia v. Savarese, 338 Mass. 330, 336 (1959) (granting mandatory injunction requiring

defendant remove supporting beams that encroached on plaintiff's property, where

construction of beams was "intentional, open trespass").  "The readiness to grant

injunctions [to remove encroachments] derives from the historic notion that land is

unique and that money is an inadequate substitute." Franchi v. Boulger, 12 Mass. App.

Ct. 376, 379 (1981). Moreover, the law "simply does not sanction ... private eminent

domain." Goulding v. Cook, 422 Mass. 276, 277 (1996) (ordering defendant to remove

septic system on neighbor's land and pay damages).

28.     There is a limited, narrow exception to the rule that a defendant must

remove encroachments where the encroachment was made innocently and the cost of

removal is greatly disproportionate to the injury suffered, or where the "substantial rights

of the owner may be protected" without the injunction. Capodilupo v. Vozzella, 46

Mass. App. Ct. 224, 226 (1999). See also Franchi v. Boulger, 12 Mass. App. Ct. 376,

379 (1981) ("limited exception where the encroachment is de minimus"). These so-

called "exceptional cases" are rare, and "depend[] very much on the particular facts and

circumstances disclosed" in the case. Goulding v. Cook, 422 Mass. 276, 277 n. 3 (1996)

Moreover, in "exceptional" cases, the courts "draw the line at permanent physical

occupations amounting to a transfer of a traditional estate in land." Id. at 277. Where

injunctive relief is denied under these circumstances, the encroaching defendant must pay

damages. Ottavia v. Savarese, 338 Mass. 330, 336 (1959).

29.     A buyer is not required to accept a deed on terms different from those

stated in a purchase and sale agreement. See Gentile Bros., Corp. v. Rowena Homes,

Inc., 352 Mass. 584, 589 (1967) (buyer not obligated to accept deed where seller had not

discharged two attachments; seller could not fulfill obligation to convey clear title and

buyer "not obligated to accept a deed on terms different from those stated in the

agreement").

30.    Registered land "is protected to a greater extent than other land from unrecorded and unregistered liens, prescriptive rights, encumbrances and other burdens." Peters v. Achambault, 361 Mass. 91, 93 (1972).

Respectfully submitted,

FAFARD REAL ESTATE &
DEVELOPMENT CORP.,

By its attorneys,

/s/ Halye A. Sugarman

_____

Jeffrey J. Upton (BBO #552221)
Halye A. Sugarman (BBO#646773)

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

Dated: April 4, 2005
426955

CERTIFICATE OF SERVICE

I, Halye A. Sugarman, certify that on April 4, 2005, I served a copy of the foregoing Proposed Findings of Fact and Conclusions of Law, by hand on:

Kenneth Berman
Nutter McClennan & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02110

/s/ Halye A. Sugarman

_____

Halye A. Sugarman

*12-076-05*

## COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT
CIVIL ACTION
No. BACV2001-00496

ROBERT M. PIERCE and RICHARD J. PIERCE

vs.

BETSY G. CLARK & others[1]

## FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT

### FINDINGS OF FACT

After a trial without jury conducted on January 3, 4, 5, 7, 10, 11, 2005[2] and based upon all the credible evidence, including exhibits admitted a trial, drawing such fair inferences as I find to be reasonable, and resolving questions of credibility where they occur, I find the following material facts:

### The Parties

The plaintiffs, Robert M. Pierce and Richard J. Pierce ( "Pierces") are brothers and reside in Dennis, Massachusetts. The defendant, Betsy G. Clark ("Clark") resides in Washington, D.C. and the defendant, Cindy Lee Caldwell Cordeiro ("Caldwell") resides in Hyannis, Massachusetts. The defendant, Ross Joly ("Joly") resides in Yarmouthport, Massachusetts and the defendant, Joly McAbee & Weinert, LLC ("Joly McAbee & Weinert") is a Massachusetts Limited Liability

---

[1] Cindy Lee Caldwell Cordeiro, Ross A. Joly and Joly, McAbee & Weinert, LLC.

[2] Closing arguments were heard on February 14, 2005.

*24*

Company with its usual place of business in Yarmouthport, Massachusetts.

The Property

The property which is the subject of this action is located in Brewster, Barnstable County, Massachusetts, being the land and improvements as bounded, described and shown as Lot #1 and Lot #2, totaling 5.155 acres, more or less, on the "Subdivision Plan of Land in Brewster, Mass." dated April 2, 1993, by Schofield Brothers, registered professional engineers and land surveyors, on Land Court Plan 42026A3, being a portion of the premises conveyed by deed of Marguerite L. Gammons to Robert S. Clark and Betsy G. Clark, dated February 6, 1989 and recorded at the Barnstable County Registry of Deeds at Book 6638, Page 58, being the subject of a Land Court Registration Case #43349. (Ex.30). ("Property"). Clark used the Property as a farm and had received an agricultural tax exemption from the Town of Brewster under the provisions of G.L. c.61A. On January 18, 2000, the Town of Brewster voted to release the Town's right of first refusal to purchase the Property under M.G.L.A. c. 61A. (Ex.7).

Conduct of the Parties

In 1998, the Pierces sought to purchase land in Barnstable county on which they could each build a single-family home with a detached garage and workshop. Robert Pierce has an MBA in finance and is a licensed real estate broker. Richard Pierce is a licenced real estate salesperson. The Pierces are each employed as marine engineers on oceangoing vessels which requires them to be away from their homes for extended periods of time. In August, 1998, a real estate broker from McAbee Real Estate, Inc., Kathy McAbee, first showed the Pierces the

2

Property. Fillmore McAbee was the principal and broker of record of McAbee Real Estate, Inc.[3] Until October, 2000, Caldwell was a licensed salesperson working at McAbee Real Estate, Inc. and had previously obtained the listing from Clark to sell the Property. Thereafter, on October 16, 2000, after McAbee Real Estate, Inc. stopped actively selling real estate, Caldwell started working at Joly McAbee & Weinert and continued to serve as Clark's real estate salesperson. After joining Joly McAbee & Weinert, Caldwell had prior real estate sales pending which were later completed and all brokers fees realized were paid to McAbee Real Estate, Inc. In October, 2000, Joly McAbee & Weinert came into existence as a new legal entity and was not a successor of interest of McAbee Real Estate, Inc. Joly is the principal and broker of record registered with the Massachusetts Board of Registration of Real Estate Brokers of Joly McAbee & Weinert. From October, 2000 to September, 2001, Caldwell continued to discuss issues concerning the sale of the Property with Fillmore McAbee and never discussed the sale of the Property with Joly or anyone working at Joly McAbee & Weinert.

Prior to making an offer to purchase the Property, the Pierces took a number of steps to determine whether the Property would be suitable for their plans to each build a residence containing at least five bedrooms along with a detached garage and workshop. Those efforts included speaking with officials of the Town of Brewster, getting estimates concerning the cost of installing utilities, and walking the land with an architect and engineer. (Exs. 34, 35). The Pierces never engaged the services of an architect or engineer and did not have plans drawn or specifications prepared for the proposed dwellings they intended to erect on the Property.

---

[3] A stipulation of Dismissal with prejudice as to former defendants Fillmore McAbee and McAbee Real Estate, Inc. was filed with this Court on May 26, 2004.

On November 30, 1998, through Caldwell, the Pierces made an offer to purchase the Property which contained a number of contingencies that was accepted by Clark. (Ex. 2). Together with the offer, the Pierces paid a deposit in the amount of $1,000 to Clark's agent, McAbee Real Estate, Inc. In December, 1998, the Pierces and Clark initially entered into a Purchase and Sale Agreement with an Addendum, where Clark agreed to sell the Property to the Pierces for $438,000, with an additional $123,500 to be paid if Clark constructed a road and installed water on the Property. Upon signing the Purchase and Sale Agreement of December, 1998, the Pierces had paid a total deposit in the amount of $21,900 to McAbee Real Estate, Inc. The December 1998 purchase and sales agreement used the standard Greater Boston Real Estate Board form, contained a sales price of $438,000, a closing date of April 16, 1999 and contained the provision that "time is of the essence." (Ex.4).

Between the execution of the December, 1998 purchase and sale agreement and February, 1999, Clark installed a road with water and drainage on the Property. The Pierces and Clark entered into a new purchase and sale agreement with an Addendum utilizing the standard Greater Boston Real Estate Board form dated February 15, 1999 intending to supercede the December, 1998 purchase and sale agreement.[4] ("Agreement") (Ex. 6). Under the terms of the new

---

[4]The Agreement dated February 15, 1999 utilized the Greater Boston Real Estate Board standard form which contained paragraph 12, Buyer's Election to Accept Title: The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the Seller shall, unless the SELLER has previously restored the premises to their former condition, either (a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or (b) if a holder of a mortgage on said premises shall not permit the insurance

4

Agreement, Clark agreed to sell the Property to the Pierces for the total amount of $561,500

which reflected the cost of the new road construction.  Paragraph 4 concerning conveyance by a

Quitclaim Title Deed was deleted from the Agreement as paragraph 2 of the Addendum made

the sale of the Property contingent on the Seller (Clark) obtaining a Land Court Decree so that

the Property would acquire registered Land Court title.  The Addendum provided that the closing

date for the transfer of title to the Property would be automatically extended in three (3) month

increments on up to eight (8) occasions in order to provide Clark with additional time to obtain a

Final Land Court Decree.  Under this Agreement the Pierces' $21,900 deposit was

acknowledged, McAbee Real Estate, Inc. was to receive $17,500 as a broker's fee, the closing

date was scheduled for April 16, 1999 and the Agreement contained the provision that "time is of

the essence."  At the time of the execution of both the December, 1998 and February 15, 1999

purchase and sale agreements, the Pierces were represented by Attorney Herb Roberts and Clark

was not represented by counsel.

    At the time Clark and the Pierces entered in the Agreement, Clark, together with her

husband Robert Clark, had previously filed a petition for registration of the Property with the

Land Court.  At the time they signed the Agreement, the Pierces knew that Clark's husband,

Robert Clark, was deceased and that the Land Court Registration process had been ongoing for

possibly as long as ten years.  The closing date for the Agreement was automatically extended

pursuant to paragraph five (5) of the Addendum on eight (8) occasions.  As a result of the

---

proceeds or a part thereof to be used to restore the said premises to their former condition or to be
so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of
the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said
mortgage less any amounts reasonably expended by the SELLER for any partial restoration.
(emphasis added)

5

automatic extensions, the final closing date was to have been April 16, 2001.

From February, 1999 through August, 2000, Clark retained the services of Attorney Joseph D'Elia to work on the Land Court registration case.[5] During the same time period, while represented by counsel, the Pierces spoke with representatives of the Town of Brewster, Caldwell, the Land Court, and, on a number of occasions, called Attorney D'Elia directly regarding the status of the Land Court registration. In addition, the Pierces made several trips to the Land Court in Boston to check on the progress of the registration process. In late August or early September, 2000, Attorney D'Elia resigned his representation of Clark in the Land Court registration case. Thereafter, in September, 2000, on behalf of Clark, Caldwell facilitated the engagement of replacement counsel, Attorney John Creney. During October, 2000, Attorney Creney reviewed Attorney D'Elia's file and agreed to take over the Land Court registration case for Clark.

On October 19, 2000, on behalf of the Pierces, Attorney Charles Sabatt wrote to Attorney Creney requesting a three month extension of the April 16, 2001 closing date. (Ex. 9).[6] Becoming impatient, Clark denied this request for an extension and expressed concern to Caldwell about the Pierces' financial ability to purchase the Property. Caldwell assured Clark the Pierces were qualified buyers and had the financial ability to complete the purchase of the Property. Caldwell informed the Pierces that Clark was becoming impatient and that real estate values were increasing on Cape Cod. On February 14, 2001, Attorney Sabatt sent a letter to

---

[5]Clark had previously retained the services of Attorney Paul Killeen concerning the Land Court registration case.

[6]Attorney Charles Sabatt succeeded Attorney Roberts in representing the Pierces.

6

Attorney Creney wherein he expressed concern about completion of the Land Court registration process in a timely fashion, accused Clark of dilatory conduct, and threatened future legal action. (Ex. 12). Clark was disturbed about the content of Attorney Sabatt's letter and directed that all future conversations regarding the Property be directed to Attorney Creney. Other than at the time of the signing of the Agreement in February, 1999, the Pierces had no direct contact with Clark.

In February, 2001, the Pierces understood that the Land Court registration case might not be completed by the extended closing date of April 16, 2001 and decided to retain Attorney Lester Murphy, a real estate attorney. Attorney Sabatt continued to represent the Pierces along with Attorney Murphy. In February and March, 2001, the Pierces, with Attorney Murphy, assessed the status of the Land Court Registration case by, among other things, speaking to Attorney Creney, Land Court Examiner William Crowell, and Land Court Examiner Edmond Williams. On April 6, 2001, at the request of the Pierces, Clark agreed to extend the closing date for the Agreement from April 16, 2001 to May 18, 2001. (Ex. 15). At the time she granted the extension of the closing date, Clark knew the value of the Property had significantly increased.

On April 11, 2001, Richard Pierce, for himself and as power of attorney for Robert Pierce, executed a Limited Power of Attorney naming Attorney Murphy as their attorney-in-fact, granting him the power to effectuate the purchase of the Property. (Exs. 16, 33). At no time prior to May 18, 2001 did the Pierces or Attorney Murphy make the existence of the Power of Attorney known to Attorney Creney, Clark or Caldwell. Attorney Murphy did not disclose to anyone that he could or would act in the Pierces' stead at the scheduled closing on May 18, 2001.

In April, 2001, Clark informed Attorney Creney that Clark's husband, Robert Clark, one

7

of the petitioners in the Land Court registration case, had died in November, 1996. Knowing that Robert Clark's death created an automatic Massachusetts Estate Tax lien on the Property, Attorney Creney sent a copy of Robert Clark's death certificate to the Land Court on April 30, 2001. (Ex. 22). On April 17, 2001, Land Court Examiner Edmond Williams wrote to Attorney Creney indicating that the Land Court judge in the registration case would sign a "draft" Order for Decree for the Property if "a few minor items" were addressed. (Ex. 17). In correspondence to the Land Court dated April 26, 2001, with a copy sent to Attorney Murphy, Attorney Creney submitted the requested additional information to Mr. Williams relative to obtaining a draft Order for Decree. (Ex. 21).

On April 25, 2001, Attorney Murphy wrote to Attorney Creney advising that he was preparing for a closing on May 18, 2001 and that he would keep Attorney Creney advised of his efforts. (Ex. 20). At that time, both Attorney Murphy and Attorney Creney understood there would not be a Final Decree from the Land Court by the May 18, 2001 closing date. Attorney Murphy ordered a title rundown, obtained a municipal lien certificate from the Town of Brewster, inquired about outstanding Agricultural taxes, and arranged with the Pierces and Fleet Bank for the Pierces' funds to be available to him knowing the Pierces were scheduled to be working "at sea" as marine engineers at the time of the scheduled closing. (Ex. 36). In January, 2001, at their request, Caldwell had provided the Pierces with a list of potential lending institutions and the Pierces eventually borrowed $250,000 from Fleet Bank in April, 2001 in connection with the anticipated purchase of the Property.

Attorney Murphy placed telephone calls to Attorney Creney during the first two weeks of May, 2001 without response. Attorney Creney was out of the country on a ten day vacation from

8

May 7, 2001, until his return on May 17, 2001 and had no contact with Clark or Attorney Murphy during this time period. On May 15, 2001, unable to reach Attorney Creney, Attorney Murphy had a brief conversation with Caldwell and followed up with a letter requesting, among other things, a thirty (30) day extension of the May 18, 2001 closing date. (Ex. 25). By facsimile, Attorney Murphy sent a copy of his letter to Caldwell to Attorney Creney on May 15, 2001 indicating the Pierces had made funds in the amount of the purchase price available to him and that the "Pierces were ready, willing and able to purchase the property as soon as Clark completed her obligations under the Agreement." (Ex. 24). Also by facsimile, Caldwell sent a copy of Attorney Murphy's letter to Clark on May 15, 2001 and she informed Fillmore McAbee as to the contents of Attorney Murphy's letter. Fillmore McAbee advised Caldwell to keep working with Attorney Creney regarding the sale of the Property.

Attorney Murphy acknowledged that his May 15, 2001 letter contained two errors. The first was in the second paragraph where he stated that the Agreement was contingent upon Clark obtaining an Order for Decree when, in fact, a Final Decree was required under the Agreement. The second error was the claim that Attorney Creney had not filed a motion to sever lots 1 and 2 from lot 3 so as to permit an Order for Decree to issue in the Land Court Registration case when, in fact, Attorney Creney had previously filed the required motion. On May 17, 2001, the Land Court issued an Order for Decree (No. 43349) in the Land Court Registration case. (Ex. 53). That same, May 17, 2001, Attorney Creney spoke to Land Court Examiner Edmond Williams and learned that the Land Court had issued the Order for Decree. Attorney Murphy also learned the Order for Decree had issued on May 17, 2001.

On May 17, 2001, Attorney Murphy spoke to Attorney Creney by telephone to inquire

9

whether Clark was prepared to close the next day, May 18, 2001 at 10:00 a.m. Creney's response was that he did not have a deed and that he could not reach his client, Clark. There was no further discussion as to how the Pierces would take title to the Property or whether the Pierces would elect to take such title Clark could deliver at the time of the scheduled closing on May 18, 2001. Attorney Murphy requested a further extension of the Agreement and inquired about whether any amounts were due the Commonwealth as a result of the estate tax lien created by the death of Clark's husband, Robert Clark. Attorney Creney replied he was without authority from Clark to grant a further extension and did not have any information regarding the estate tax lien. During the course of the telephone conversation, Attorney Murphy did not tell Attorney Creney he would appear at the Barnstable Registry of Deeds at 10:00 a.m. on May 18, 2001. Attorney Murphy told Attorney Creney that he did not know what he would do and Attorney Creney ended the conversation by saying, "I guess you'll have to do what you have to do."

Attorney Murphy did not speak to Attorney Creney again until after 10:00 a.m. on May 18, 2001. Notwithstanding his efforts, Attorney Creney was unable to make direct contact with Clark on May 17, 2001. Clark, after getting an answering machine message from Attorney Creney, assumed that his call was for a request for an extension of the closing. Thereafter, Clark sent Attorney Creney a facsimile through Caldwell from her home in Washington, D.C. at 3:12 a.m. on May 18, 2001 opposing any further extension of the Agreement. In her facsimile to Attorney Creney, Clark indicated that the Pierces would have to pay an additional $200,000 over the purchase price contained in the Agreement in order to purchase the Property. (Ex. 40). Prior to the May 18, 2001 closing date, Clark had discussions with Caldwell concerning the increase in value to the Property and ordered a present market value appraisal of the Property from Davis

10

Appraisals. The Davis appraisal indicated that Lots 1 and 2 on the Property had increased in value to $400,000 each. (Ex. 42).

On May 18, 2001, at 10:00 a.m., Attorney Murphy appeared at the Barnstable County Registry of Deeds. Attorney Murphy paged Clark and her counsel without response on three occasions. Before departing, Attorney Murphy wrote in the Barnstable County Registry of Deeds "default book" that he had appeared at 10:00 a.m. on May 18, 2001 and as attorney for the Pierces he was ready, willing and able to tender performance and purchase the Property. (Ex. 38). Neither Clark nor her attorney were present at the Barnstable County Registry of Deeds on May 18, 2001, and, since that time, Clark has refused to transfer title to the Property to the Pierces.

Five hours after his appearance at the Barnstable County Registry of Deeds, Attorney Murphy faxed a letter to Attorney Creney dated May 18, 2001 at 3:28 p.m. (Ex. 26). In his letter, Attorney Murphy never mentioned his appearance at the Barnstable County Registry of Deeds, but again requested an extension of the Agreement and indicated that his clients "are ready, willing and able to purchase the property as soon as your client is able to tender clear title." Prior to 10:00 a.m., May 18, 2001, Attorney Murphy never informed Attorney Creney, Clark or Caldwell, orally or in writing, that he, on behalf of the Pierces, would elect to take such title Clark could deliver at the time of the scheduled closing on May 18, 2001. Prior to 10:00 a.m., May 18, 2001, the Pierces never informed Attorney Creney, Clark or Caldwell, orally or in writing, that they would elect to take such title Clark could deliver at the time of the scheduled closing on May 18, 2001. On July 20, 2001, Attorney Murphy notified the Pierces that Attorney Creney had sent him a facsimile stating: "Not to be the bearer of bad news, but Mrs. Clark tells

11

me (in writing) that she has had an updated appraisal performed, and that the new price for her Brewster property is now $825,000." (Ex. 29).

Sometime in April, 2001, Mr. Jay Merchant, a neighbor to the Property, spoke to Clark and expressed an interest in purchasing the Property. Clark directed Mr. Merchant to Caldwell who informed him the Property was currently under a purchase and sale agreement. Prior to May 18, 2001, Caldwell received an offer to purchase the Property from Mr. Merchant and informed Clark about the offer. On May 18, 2001, Caldwell had further discussions with Mr. Merchant, however Clark took no further action in response to Mr. Merchant's offer to purchase the Property. (Ex. 43).

After the Pierces commenced this action, Caldwell had discussions with Attorney Creney and Fillmore McAbee in August, 2001 concerning the manner of returning the Pierces' $21,900 deposit paid under the Agreement. (Exs. 41,49). Caldwell never discussed any issues pertaining to the sale of the Property at any time with Joly as it was her understanding that any pending real estate sales she had under agreement at the time she began working at Joly McAbee & Weinert in October, 2000 remained with her prior employer, McAbee Real Estate, Inc. Joly did not became aware of the sale of the Property until after receipt of a G.L. c.93A letter from the Pierces' counsel on July 8, 2002. (Ex. 46). Prior to that time, the Pierces never spoke to Joly about the Property.

The Pierces introduced evidence from a construction estimator that suggested the delay in purchasing the Property from May 18, 2001 to present has increased their anticipated construction costs by a combined total of $231,000. The Court does not credit this evidence as all calculations of increased construction costs lacked certainty and were not based on any drawn

12

plans or written specifications for the Pierces' proposed residences and detached garages. Accordingly, the Pierces amount of suggested damages is rejected as the Court finds this amount to be purely speculative and not proven to a reasonable certainty by sufficient or substantial evidence.

On August 2, 2001, the Pierces filed this action alleging Clark breached her contractual obligations seeking specific performance and damages against Clark (Count I); alleging tortious interference with a contractual relationship against Caldwell, Joly and Joly McAbee & Weinert (Count II); and alleging violations of G.L. c. 93A by Caldwell, Joly and Joly McAbee & Weinert (Count III). Count IV alleging a private right of action for violations of G.L. c. 112 §87RR and 87AAA against Caldwell, Joly and Joly McAbee & Weinert was dismissed with prejudice by the Court at the close of all of the evidence without objection from the Pierces.

**RULINGS OF LAW**

### Count I: Breach of Contract against Clark

Clark argues that the Pierces, or Attorney Murphy acting under power of attorney from the Pierces, have not demonstrated that they were ready, willing, and able to perform under the terms and conditions of the Agreement. "The general rule is that when performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested some offer of performance." *Lafayette Place Associates v. Boston Redevelopment Auth.*, 427 Mass. 509, 519 (1998), quoting *Leigh v. Rule*, 331 Mass. 664, 668 (1954); *Frostar Corp. v. Malloy*, 63 Mass. App. Ct. 96 ( 2005). Even if a potential buyer notifies the seller of the buyer's intention to perform on the closing date and appears at the

13

registry of deeds on the closing date with the required consideration, "there may not be the 'readiness to perform' that is a necessary condition of placing the defendant [seller] in breach." *Lafayette Place Associates*, 427 Mass. at 520, quoting *Mayer v. Boston Metro. Airport, Inc.*, 355 Mass. 344, 350 (1969). In order for a seller to be in default, the buyer must manifest that he is "ready, able, and willing to perform by setting a time and place for passing papers or making some other concrete offer of performance." *Lafayette Place Associates*, 427 Mass. at 520. "The weight of authority in this country is that the financial ability of a prospective buyer of property is a material issue in his action for damages against a repudiating defendant for breach of an agreement to sell that property for an established price." *Kanavos v. Hancock Bank & Trust Co.*, 395 Mass. 199, 202 (1985).

For instance, in *Bucciero v. Drinkwater*, the buyer and seller had a disagreement over the payment of real estate taxes the day before the expected closing date. 13 Mass. App. Ct. 551, 552 (1982). The conflict could not be resolved during a meeting between the buyer and seller and the seller's attorney conveyed that it was pointless to meet the next day. *Id* at 553. After the meeting, the buyer changed his mind and arrived at the closing with certified checks for the purchase price and for the full amount of the taxes due. *Id.* The Appeals Court found the seller in default and demanded specific performance noting that the by arriving at the closing with full payment, the buyer was "ready, willing and able to purchase the property." *Id.*

In *Hastings v. Gay*, the Appeals Court found that the buyer was ready, willing, able to pay the agreed upon purchase price on the closing date where the buyer "presented admissible, probative evidence in the form of his own deposition testimony that he had sufficient funds available in his various bank accounts to pay cash for the property, or alternatively, that he had

14

sources available from which he readily could have borrowed the available funds." *55 Mass.*
*App. Ct. 157, 165* (2002). Similarly, in *LeBlanc v. Molloy*, the Court found that the buyer was
ready, willing, and able to perform when the buyer merely sent a notice letter to the sellers
notifying them that the buyer was ready, willing, and able to perform and of the time and location
of the closing. *335 Mass. 636, 637* (1957). The *LeBlanc* court held that the buyer was not
required to actually tender the purchase price to hold the seller in default. *Id. at 638*. Similarly,
in *Rutanen v. Ballard*, *424 Mass. 723, 734-735* (1997), the Court set a low threshold for a buyer
to meet his burden. The *Rutanen* court held that the buyer was ready, willing, and able to
perform where a trustee of the buyer testified that he had an oral commitment from a bank where
the buyer routinely did business to provide funds for the purchase price.

In the instant case, there is sufficient evidence that the Pierces were ready, willing, and
able to accept whatever title Clark could provide on the date of the closing. Most importantly,
the Pierces provided credible evidence at trial that they borrowed $250,000 from Fleet Bank in
connection with the anticipated purchase of the property and had made arrangements with Fleet
Bank to make sufficient funds available to Attorney Murphy to consummate the purchase. *See
Kanavos, 395 Mass. at 202.* Additionally, on April 25, 2001, Attorney Murphy notified Attorney
Creney that he was preparing for the closing on May 18, 2001 and both attorneys understood that
there would not be a Final Decree from the Land Court by the closing date. On May 15, 2001,
just three days before the closing, Attorney Murphy told Attorney Creney that the Pierces had
funds in the amount of the purchase price and were ready, willing, and able to perform on the
closing date. *See Hastings, 55 Mass. App. Ct. at 165; LeBlanc, 335 Mass. at 637.* On May 17,
2001, the day before the closing, Attorney Creney informed Attorney Murphy that he did not

15

have deed and could not reach Clark, but ended the conversation by saying that, "I guess you'll [Murphy] have to do what you have to do." Both Attorney Creney and Attorney Murphy knew that the Land Court had issued an Order for Decree for the Property on May 17, 2001.

Finally, on May 18, 2001, the day of the closing, Attorney Murphy appeared at the Barnstable Registry of Deeds at the agreed upon time with Power of Attorney from the Pierces. When Clark or her representative did not appear, Murphy wrote in the "default book" that he appeared at the agreed upon time and as attorney for the Pierces, he was ready, willing, and able to tender performance and purchase the Property. For these reasons, there is ample probative evidence that the Pierces were ready, willing, and able to perform on the specified closing date. By not appearing on the specified date and time for the closing and not offering whatever title she could deliver, Clark was in default of the Agreement.

Clark further argues that if the Pierces were ready, willing, and able to perform, the Pierces' election to purchase the property under paragraph 12, had to come *prior to the delivery of the deed*. (emphasis added) Clark contends that neither the Pierces nor their attorney acting under power of attorney, ever informed Clark or her attorney of their decision to take whatever title to the Property that Clark was able to tender. Clark argues the Pierces' failure to make such an election prior to the delivery of a deed bars their recovery. Construing the "Buyer's Election Clause" contained in paragraph 12 of the Agreement, Clark was required to afford the Pierces the opportunity to accept title as Clark could deliver *at the date set for performance*, which was, at a minimum, a title less than a Final Decree from the Land Court. See *Hastings v. Gay*, 55 Mass. App. Ct. 157, 163 (2002)(sellers required to afford buyer opportunity provided by paragraph 12 to accept such title as they could deliver *either at original or at the extended date set for*

16

*performance*)(emphasis added). The language contained in paragraph 12 of the Agreement is clear and unambiguous. Clark's contention that the Pierces, or their attorney acting under power of attorney, had to make an election to accept whatever title Clark could provide prior to the delivery of the deed is clearly erroneous. Where there is no ambiguity in contract, it must be enforced according to its terms. *Freelander v. G.&K. Realth Corp.*, 357 Mass. 512 (1970).

There is no evidence that Clark or her representative afforded the Pierces the opportunity to purchase the property in accordance with paragraph 12 on the date set for performance of the Agreement. In fact, Clark concedes that neither she nor her representatives were present at the closing. By not appearing at the closing, neither Clark nor her representatives could have given the Pierces the opportunity to elect to purchase the property in accordance with paragraph 12 of the Agreement. Significantly, the Agreement included a "time is of the essence" clause, an enforceable provision strictly limiting each party to a rigid closing date. *Owen v. Kessler*, 56 Mass. App. Ct. 466, 469 (2002). Consequently, Clark breached paragraph 12 of the Agreement. "A judge generally has considerable discretion with respect to granting specific performance, but it is usually granted in disputes involving the conveyance of land." *McCarthy v. Tobin*, 429 Mass. 84, 89 (1999). "It is well-settled law in this Commonwealth that real property is unique and that money damages will often be inadequate to redress a deprivation of an interest in land." *Greenfield Country Estates Ass'n, Inc. v. Deep*, 423 Mass. 81, 88 (1996). Therefore, I find it is appropriate in this case to specifically enforce the Agreement between the Pierces and Clark.

17

**Count II: Interference with Contract by Caldwell, Joly and Joly, McAbea & Weinert**

In order to succeed on a claim of unlawful interference with a contract relationship, plaintiff must prove that: "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Draghetti v. Chmielewski*, 416 Mass. 808, 816 (1994). Massachusetts courts have looked to a serious of factors set forth in the Restatement (Second) of Torts § 767 when determining whether a defendant's conduct in intentionally interfering with a contract of another is improper. *Dowd v. Iantosca*, 27 Mass. App. Ct. 325, 334 (1989). These factors include: (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interest in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties. Restatement (Second) of Torts § 767.

The Pierces contend that Caldwell intentionally interfered with the Agreement they had with Clark by being the substantial causative factor in Clark's decision not to appear at the closing to complete the sale of the Property. They urge the Court to infer that Caldwell was a substantiative causative factor due to a variety of reasons: (a) Caldwell's failure to inform Clark she had an obligation to appear at the closing, (b) Caldwell's failure to call the Pierces and Clark in the days preceding the closing date, (c) conversations Caldwell had with Mr. Jay Merchant, a prospective buyer of the property in April, 2001, (d) receiving an offer from Mr. Merchant while

18

the Property was under agreement with the Pierces, (e) Caldwell's statements to the Pierces that the Property had increased in value since the date of the Agreement, and (f) that Clark was growing impatient with requests for extensions to the closing date. However, inferences "must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture." *Continental Assur. Co. v. Diorio-Volungis*, 51 Mass. App. Ct. 403, 409 (2001), quoting *Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 438 (1992). The Pierces presented no substantive probative evidence that Caldwell induced Clark not to complete the sale of the Property pursuant to the Agreement. Accordingly, based on the record before this Court, the Pierces have failed to establish by a fair preponderance of the credible evidence, that Caldwell intentionally interfered with their contract with Clark.

The Pierces contend Joly and Joly, McAbee & Weinert are vicariously liable for Caldwell's conduct as she was affiliated with them as of the extended closing date, May 18, 2001. The principles of vicarious liability apply only where the agent has committed a wrongful act. *Elias v. Unisys Corporation*, 410 Mass 479, 481 (1991). As a matter of law, the Pierces cannot maintain a cause of action against Joly and Joly, McAbee & Weinert for interference with their contract with Clark. For all these reasons, Caldwell, Joly and Joly, McAbee & Weinert are entitled to judgment on Count II of the Pierces' complaint.

## Count III: G.L. c.93A Claims

On May 23, 2002, the Pierces' counsel filed a Motion for Leave to Amend their Complaint to add G. L. c. 93A claims against defendants Caldwell, Joly and Joly, McAbee & Weinert. The proposed amended complaint was signed by Pierces' counsel, dated May 23,

19

2002 and attached to the Motion for Leave as an exhibit. On June 7, 2002, the Court granted the Pierces' request to amend their complaint and sent a notice to that effect to counsel for the Pierces and Clark. On the same day, June 7, 2002, the Court took the signed amended complaint previously attached as an exhibit and filed it as the newly amended complaint in this action. The notice sent by the Court to the parties dated June 10, 2002 indicated that the Motion for Leave to Amend the Complaint had been allowed but did not mention the amended complaint had been filed. On July 1, 2002, the Pierces, through counsel, sent Chapter 93A demand letters to each of the newly named defendants. (Ex. 46). On July 16, 2002, Caldwell's counsel responded to the Pierces' 93A demand letter and on July 26, 2002, counsel for Joly and Joly, McAbee & Weinert answered with a response. (Exs. 47,51). It appears neither counsel for Caldwell, Joly and Joly, McAbee & Weinert nor the Pierces were aware when they wrote response letters on behalf of their clients that the amended complaint had been filed by the Court. Thereafter, defendants Caldwell, Joly and Joly, McAbee & Weinert filed answers to the amended complaint where the defense of failure to comply with the statutory scheme of G.L. c. 93A was properly raised.

At the close of all of the evidence, Caldwell, Joly and Joly, McAbee & Weinert filed Motions to Dismiss the Pierces' Chapter 93A claims based, among other things, upon a failure to comply with the jurisdictional prerequisite to filing a consumer claim, specifically the 30-day demand letter. In response, at the close of all the evidence, the Pierces have moved under Mass. R. Civ. P. 15 (a) to amend their amended complaint to cure the alleged 30-day demand letter defect.

The amended complaint was filed by the court without knowledge of Pierces's counsel prior to the thirty day time period, however the purpose of notice under Chapter 93A has been

accomplished in this case   There has been no showing of prejudice to the defendants who have had the opportunity to respond to the Pierces' 30-day demand letter as well as the opportunity to answer and litigate the substance of the Pierces' Chapter 93A claims during the course of a six day trial.  The court finds no inappropriate conduct on the part of the Pierces or their counsel concerning the filing of the amended complaint and absent a showing of prejudice to the defendants, denies Caldwell, Joly and Joly, McAbee & Weinert's Motion to Dismiss the Chapter 93A claims.

The Massachusetts Consumer Protection Act, G.L. c. 93A (Chapter 93A) prohibits unfair methods of competition and unfair or deceptive acts or practices.[7] Often used in combination with other common law and statutory claims, chapter 93A offers plaintiffs strong remedies, such as treble damages and attorneys' fees.

The subject matter jurisdiction requirement under chapter 93A, §2 mandates that the defendant be engaged in "trade or commerce."[8]  A consumer may bring a 93A action under section nine; a business may bring a 93A action under section eleven.

A plaintiff in a section nine action must meet the statutory definition of "person" in G.L. c. 93A, § 1(a). Chapter 93A § 1(a) defines "person" as follows: "natural persons, corporations,

---

[7] G.L. c. 93A is modeled after the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). State law requires that regulations promulgated under and interpretations of chapter 93A be guided by federal law.

[8] G.L. c. 93A § 1(b) states, "'trade' and 'commerce' shall include the advertising, the offering for sale, rent or lease . . . or distribution of any services and any property, tangible or intangible, real, personal, or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth."

21

trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." See
*Bretton v. State Lottery Commission*, 41 Mass. App. Ct. 736 (1996), rev. denied, 424 Mass. 1103
(1997) (The State Lottery Commission, a statutorily created entity, is not a "person" subject to
the provisions of 93A). In order to bring suit under section nine, the plaintiff must not be
engaged in the conduct of any trade or commerce. The "person" need not have suffered a loss of
money or property. Chapter 93A, § 9(1) requires only that the plaintiff be "injured" and that the
act complained of occurred primarily and substantially in Massachusetts. Any invasion of a legal
right or interest is an injury. *Leardi v. Brown*, 394 Mass. 151 (1985); *Clegg v. Butler*, 424
Mass. 413, 418 (1997)

    In determining what constitutes "unfair or deceptive acts or practices" the courts shall be
guided by the interpretations given by the Federal Trade Commission and the Federal Courts to
section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)). G.L. c. 93A, § 2(b).
The attorney general may make rules and regulations interpreting the phrase "unfair or deceptive
acts or practices." G.L. c. 93A, §2 (c). The Supreme Judicial Court has looked to federal
regulations in interpreting chapter 93A. The court must consider, "(1) whether the practice . . .
is within at least the penumbra of some common-law, statutory, or other established concept of
unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it
causes substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs.,
Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) citing *Federal Trade Commn. v.
Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972), citing 29 Fed. Reg. 8325, 8355 (1964). In
deciding questions of unfairness under G.L. c. 93A the court must, focus on the nature of
challenged conduct and on the purpose and effect of that conduct as the crucial factors in making

a G.L. c. 93A fairness determination." *Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 42-43 (1995).

The Pierces contend Caldwell, Joly and Joly, McAbee & Weinert violated Chapter 93A by inducing Clark to break her contract with them. Specifically, they allege Caldwell acted unfairly and deceptively by advising Clark not to appear at the scheduled closing in order to sell the Property at a higher price. Regarding Joly and Joly, McAbee & Weinert, the Pierces allege these defendants acted unfairly when they failed to properly supervise Caldwell. Unfairness must be determined from all the circumstances. *Martin v. Factory Mutual Research Corp.*, 411 Mass. 621 (1988). Inasmuch as the Court has determined that Caldwell, Joly and Joly, McAbee & Weinert did not engage in conduct amounting to interference with Clark's contractual obligations to the Pierces, the Pierces Chapter 93A claims must fail as Chapter 93A does not transform alleged interferences with contractual obligations into deceptive trade practices. The Pierces have not demonstrated the defendants engaged in conduct that was immoral, unethical, oppressive, or unscrupulous. For these reasons, Caldwell, Joly and Joly, McAbee & Weinert are entitled to judgment on Count III of the Pierces' complaint.

23

## ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby **ORDERED** that judgment enter in favor of the plaintiffs, Robert M. Pierce and Richard J. Pierce against defendant Betsy G. Clark on Count I of the complaint and that the defendant, Betsy G. Clark be and hereby is **ORDERED** to convey the Property to the plaintiffs under the provisions of the Agreement dated February 15, 1999 within thirty (30) days of the final judgment.

It is further **ORDERED** that judgment enter in favor of defendants Caldwell, Joly and Joly, McAbee & Weiner on Counts II and III of the complaint.

Robert C. Rufo
Justice of the Superior Court

March 18, 2005

A true copy, Attest:

*Clerk*
*asst.*

24