UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
FAFARD REAL ESTATE &                    )
DEVELOPMENT CORP.,                      )
                                        )
    Plaintiff/Defendant-in Counterclaim )
                                        )
vs.                                     )    Civil Action No. 04-11531 RGS
                                        )
METRO-BOSTON BROADCASTING, INC.,        )
                                        )
    Defendant/Plaintiff-in-Counterclaim )
_____)

METRO-BOSTON'S OPPOSITION TO
FAFARD'S MOTION FOR SUMMARY JUDGMENT
[ORAL ARGUMENT REQUESTED]

### Introduction

Fafard's motion for summary judgment on the counterclaim depends on the Court accepting, as a supposedly undisputed fact, that Fafard's motives were pure, and that Fafard never had any purpose in bringing suit other than to enforce the purchase and sale agreement as written.  To establish that point, Fafard relies on Richard Terrill's conclusory declaration as to Fafard's state of mind.  Fafard overlooks that summary judgment is usually inappropriate for resolving state of mind issues, for such issues typically require evaluating and interpreting circumstantial evidence in the context of background facts, evidence that in this case could lead the jury to disbelieve Terrill and draw the opposite conclusion.  For these and other reasons, discussed below, Fafard's motion for summary judgment must be denied.

### Facts

Material facts, with record references, are set out in Tower Sites' Statement of Additional Facts ("Tower Sites' Statement") and its Response to Fafard's "Statement of

Facts." Because the Court has already tried Fafard's complaint, Tower Sites will not burden

the Court by restating in this brief the details of the parties' dealings and conduct leading up to

the filing of this complaint, which are set out extensively in Tower Sites' Statement. However,

the following summary is useful in understanding Tower Sites' analysis of Fafard's motion:

- After Tower Sites and Fafard signed the purchase and sale agreement with Fafard
  intending to build a residential development on the land (Verified Complaint ¶¶ 11,
  14), Fafard determined that its development plans required it to buy additional land or
  an easement from Tower Sites to connect the land under agreement to a second means
  of access at Sewall Road. (Tower Sites' Statement, ¶ 8).

- Fafard sought and obtained about 25 extensions of the purchase and sale agreement in
  an effort to secure an easement or additional land from Tower Sites. (Tower Sites'
  Statement, ¶ 18).

- In the two weeks before the last extension expired, Fafard requested yet another
  extension of the purchase and sale agreement because it still needed to resolve the
  access issue to Sewall Road. Tower Sites did not grant the extension. In fact, Tower
  Sites had persistently notified Fafard of its impatience to close the transaction, and of
  its frustration about Fafard's unwillingness to close. (Tower Sites' Statement, ¶ 13).

- When the last extension expired, Fafard still had not succeeded in securing an
  easement or additional land from Tower Sites to connect to Sewall Road. (Tower
  Sites' Statement, ¶ 29).

- Intending to bring a lawsuit against Tower Sites, and not with the intent to close,
  Fafard went to the registry of deeds on the day the last extension expired to create the
  appearance of a willingness to close. Fafard gave no notice to Tower Sites of its

intention to close the transaction that day or of any willingness to take title without getting access to Sewall Road.  In fact, Fafard was not ready or willing to close the transaction without getting access to Sewall Road.  (Tower Sites' Statement, ¶¶ 25-26, 30).

- Eleven days later, and still not having notified Tower Sites of any willingness to close the transaction without getting access to Sewall Road, Fafard filed this lawsuit and moved for a *lis pendens*, knowing that a *lis pendens* would prevent Tower Sites from selling the property to anyone else or financing it.  (Tower Sites' Statement, ¶¶ 30, 33).

- Fafard knew that Tower Sites could make no economic use of the property itself and was eager to sell it.  Fafard knew that Tower Sites had been dealing with potential buyers of the adjoining industrial land, and that whoever would buy the industrial land would need to be assured that activity on the adjoining residential land would not interfere with the use of the industrial land.  (Tower Sites' Statement, ¶¶ 4-7).

Additional facts appear as necessary in the analysis below.

<u>Analysis</u>

I.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate *only* if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Any doubt about whether there is a genuine issue of material should be resolved *against* the moving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970); <u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000).  When construing the record, this Court must do so "in the light most favorable to, and drawing all

reasonable inferences in favor of, the nonmoving party." Feliciano, 218 F.3d at 5. "At the summary judgment stage, the nonmoving party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in genuine dispute accepted, and all internal conflicts in the evidence resolved favorably to him." Blanchard v. Peerless Ins. Co., 958 F.2d 483, 489 (1st Cir. 1992) (citations omitted).

Where, as here, Fafard seeks summary judgment based on Fafard's alleged state of mind, Fafard's burden is heavier. Summary judgment is generally inappropriate where an actor's "state of mind" is material. See, e.g., Maiorana v. MacDonald, 596 F.2d 1072, 1076-77 (1st Cir. 1979). This is because a determination of someone's state of mind usually entails the drawing of inferences as to which reasonable persons might differ, a function traditionally left to the jury. 10B Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2730 at 238 (3d ed. 1998). As this Court has noted, "credibility issues, particularly those delving into an actor's state of mind, cannot be resolved on summary judgment." Petsch-Schmid v. Boston Edison Co., 914 F. Supp. 697, 704 (D. Mass. 1996) (Stearns, J.).

II.     **THE EVIDENCE WOULD ENTITLE THE JURY TO FIND THAT FAFARD USED PROCESS FOR AN IMPROPER AND ULTERIOR PURPOSE**

A claim for abuse of process has the following three elements: (1) "process" was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage. Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389 (1975). The ulterior purpose need not be the sole purpose for which the action was commenced. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 776 (1986) (fact that "action was instituted at least in part as a marketing tool shows a misuse of the legal process"). See also Restatement (Second) of Torts § 682 (action commenced "primarily to accomplish a purpose for which it [was] not designed."). Even if process was properly issued or was obtained in proceedings brought with probable cause and

for a proper purpose, the subsequent misuse of the process also constitutes abuse of process for which liability is imposed.  Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406 (2001).

Fafard claims Tower Sites cannot prove that process was used for an ulterior or illegitimate purpose.  However, to defeat Fafard's summary judgment motion, Tower Sites need not *prove* that Fafard used process for an improper or ulterior purpose.  Rather, it need only show that the evidence on this point is disputed and that, with all inferences drawn in Tower Sites' favor, the jury would be entitled (even though not required) to find for Tower Sites on this issue.

Fafard's motion attempts to pit direct evidence – Terrill's self-serving denial of an improper purpose – against a sizeable amount of circumstantial evidence favoring Tower Sites.  But a summary judgment motion merely looks at the *existence* of supporting evidence, not its weight or character (i.e., direct v. circumstantial).  So long as the relevant evidence is in dispute, the motion must fail.  Even weak or circumstantial evidence defeats a summary judgment motion, no matter how strong the moving party's affidavits might seem.  Velez-Gomez v. SMA Life Assurance Co., 8 F.3d 873, 877 (1st Cir. 1993) ("At the summary judgment stage, however, there is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood.") (citations omitted); Morrissey v. Procter & Gamble Co., 379 F.2d 675, 678 (1st Cir. 1967) (affidavits of thirteen bishops cannot vary the principle that issues of fact are not to be resolved on summary judgment).

Here, Tower Sites' evidence is sufficient to warrant a finding that Fafard brought this suit "to achieve some end other than the apparent end of the litigation process which has been

launched." Silvia v. Building Insp. of W. Bridgewater, 35 Mass. App. Ct. 451, 453 (1993)

(footnote omitted). A rich trail of evidence would warrant a jury in finding that Fafard

brought this suit – and used the title-clouding consequences of the *lis pendens* statute – to gain

leverage over Tower Sites either to negotiate for the purchase of land that was not subject to

the purchase and sale agreement or to extort (in a non-criminal sense) collateral monetary

payments from Tower Sites.

The evidence shows that, at all material times, Fafard was unwilling to take title

without also obtaining title to, or an easement over, additional land owned by Tower Sites so

that Fafard could have a second means of access to the site from Sewall Road. Tower Sites'

Statement, ¶¶ 8-22, 31-33. Indeed, the jury would be warranted in making the same finding as

the Court, when it ruled against Fafard on its complaint:

> No reasonable person in Halcomb's position would have understood the coupling of the
> Sewell Street issue with a request to postpone the closing date as meaning anything but
> that the closing was contingent on Fafard's obtaining access to Sewell Street. . . . Had
> Metro-Boston in fact appeared at the closing, it is my finding that Fafard would not
> have closed without the concessions [on Sewall Street] it was seeking. . . .

Findings Of Fact And Rulings Of Law After Trial Without Jury dated August 26, 2005

("Findings and Rulings"), at p. 12; Tower Sites' Statement, ¶ 35. The Court reinforced this

conclusion when it denied Fafard's Rule 52(b) motion:

> [T]he court is more persuaded than ever that its ultimate conclusions are correct. At the
> end of the day, Fafard was not prepared to close on the parcel without first obtaining
> concessions on the Sewall Street issue.

Memorandum And Order On Defendant Fafard Real Estate & Development Corp.'s Motion

To Reconsider And Amend Findings ("Denial of Fafard's Motion to Reconsider"), at p. 1;

Tower Sites' Statement, ¶ 35.

This was Fafard's state of mind on May 21, 2004 when Fafard sent Paul Beattie to the registry "to place Metro-Boston in default *as a prelude to litigation*." **Findings and Rulings, p. 12 (emphasis added); Tower Sites' Statement, ¶ 36.  And almost immediately after Beattie appeared at the registry on May 21, Fafard instructed Beattie to contact Hanify & King to start this very lawsuit.  Tower Sites' Statement, ¶ 30.  Thus, on May 21, 2004, when Fafard was unwilling to take title without gaining access to Sewall, Fafard put in motion the steps to commence this lawsuit.  From this, the jury could find that litigation was Fafard's solution to achieve its desired end – acquisition of the land under contract,** *plus* **access to Sewall.**

**To grant Fafard's summary judgment motion, the evidence would have to leave the jury with no choice but to find that between May 21, 2004 and June 2, 2004 – when Fafard commenced this suit in Middlesex Superior Court – Fafard (a) abandoned its previous state of mind, (b) suddenly became willing to take title without getting access to Sewall, and (c) filed this lawsuit without any intention of using the leverage provided by this suit and by the** *lis pendens* **statute to negotiate for the access to Sewall that, only 11 days earlier, it felt it had to have.  Working against Fafard is the evidence that Fafard never notified Tower Sites of its willingness to take title without getting access to Sewall.  Tower Sites' Statement, ¶ 34.**

**Another revealing piece of evidence, itself sufficient to defeat Fafard's motion, is a so-called "Settlement Communication" letter from Fafard's counsel dated March 29, 2005, following the close of evidence on Fafard's complaint but before final argument had occurred.**[1]

---

[1] **Federal Rule of Evidence 408 does not exclude this letter.  Rule 408 is not a blanket rule of inadmissibility for any and all statements in the settlement context.  If evidence is offered for another purpose apart from liability for (or damages resulting from) the claim under settlement discussion, it may be admitted. See, e.g., Carr v. Health Ins. Plan of Greater New York, Inc., 2001 U.S. Dist. LEXIS 6766 *13 (S.D.N.Y. May 24, 2001).  Although Rule 408 lists illustrative purposes for which such statements are admissible (e.g. undue delay, bias, proving an effort to obstruct a prosecution), "the list is merely suggestive, and is not intended to be exclusive."  RLS Assoc., LLC v. United Bank of Kuwait, PLC, 2005 U.S. Dist. LEXIS 3815 *6 (S.D.N.Y. (continued . . . )**

Tower Sites' Statement, ¶ 38.  In that letter, Fafard boasted it would win this suit and said that it wanted Tower Sites to (i) convey to Fafard lots 12 and 6B, the only lots zoned residential, and (ii) *pay Fafard $1.2 million* (more than triple what Fafard was supposed to pay Tower Sites under the P&S agreement), in exchange for which Fafard would give up its claim to any portion of Lot 11, the industrially zoned parcel.  Id.  While Fafard might argue that this letter is nothing more than a good faith settlement offer, the jury could draw a different conclusion. The jury could conclude that this letter bespeaks Fafard's keen awareness of the power of its leverage arising from this lawsuit and its willingness to use that leverage to extract an outcome very different from the relief intended by the complaint.

In the complaint, Fafard is purportedly attempting to buy land from Tower Sites.  In its post-trial demand, Fafard wants the residentially zoned piece of Tower Sites' land *for free*, and in addition wants a $1.2 million payment from Tower Sites to walk away from its claim for

---

2005).  For example, correspondence in settlement negotiations "can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination)."  Carney v. The American Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998).

    Although Fafard's counsel's letter contained a settlement offer, it is admissible to prove a violation (improper motive in use of process) independent from the now-adjudicated claim that was the subject of the settlement letter, i.e. Fafard's suit to enforce the purchase and sale agreement.  See 23 Wright & Graham, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5314, at 282 (1980) ("Rule 408 is inapplicable when the claim is based upon some wrong that was committed in the course of settlement discussions"); Bradshaw v. State Farm Auto Ins., 758 P.2d 1313,1322 (Ariz. 1988) (insurer's statements in settlement negotiations admissible to show that it filed action it knew to be meritless as method of strong-arming plaintiff into settlement).  See also Dow Chem. Co. v. United States, 250 F. Supp. 2d 748, 803 (E.D. Mich. 2003), mod. by 278 F. Supp. 2d 844 (E.D. Mich. 2003) (settlement statements made in bad faith are admissible); ESPN, Inc. v. Office Of Comm'r Of Baseball, 76 F. Supp. 2d 383, 412-13 (S.D.N.Y. 1999) (evidence of settlement statement admissible to show defendants' motivation; evidence could not have been construed as admission of liability or as statement of weakness or concession).

    When dealing with evidence to prove an abuse of process claim, the very nature of such a claim requires an examination of settlement demands, for "the ulterior motive may be shown by showing *a direct demand for collateral advantage*, or it may be inferred from what is said or done about the process." Ladd v. Polidaro, 424 Mass. 196, 198 (1997) (emphasis added).  But see Coppinger v. Superior Court, 134 Cal. App. 3d 883, 890 (1982), where the court, without analysis, affirmed the exclusion of a settlement demand that was offered to prove motive in an abuse of process claim, noting that the proponent of the evidence offered no authority for its admissibility.

Tower Sites' industrial land.[2]  Tower Sites' Statement, ¶ 38.  The startling disparity between Fafard's prayer for specific performance and Fafard's post-trial demand is evidence (albeit circumstantial) of Fafard's intent to use the leverage afforded by this litigation to extract a collateral advantage not intended by the litigation process.   "[T]he ulterior motive may be shown by showing *a direct demand for collateral advantage*, or it may *be inferred* from what is said or done about the process."  Ladd v. Polidaro, 424 Mass. 196, 198 (1997) (emphasis added).  The letter belies Fafard's statement in its brief that, after filing its complaint, it "never asked for more" than to enforce the terms of the purchase and sale agreement nor "sought to use the Complaint as leverage to obtain something more."  Fafard's Memorandum in Support of Motion for Summary Judgment ("Fafard's Memo"), at p. 4.  It also belies Richard Terrill's affidavit, in which he claims that Fafard "sought to obtain no collateral advantage whatsoever as a result of bringing [this] suit. . . .  Fafard simply hoped to . . . obtain specific performance of the P&S Agreement."

On this motion and under this record, Tower Sites is also entitled to the inference – and the jury could so find – that Fafard knew or had reason to know that its suit for specific performance was groundless.  After nearly three years of telling Tower Sites that it needed to have access to Sewall, Fafard went to the registry not to close the transaction but to "default" Tower Sites.  Tower Sites' Statement, ¶¶ 22, 24-26, 32.  It never told Tower Sites that it would take title without having access to Sewall, and indeed never told Tower Sites that it

---

[2]  While the evidence is disputed as to what the bargained-for boundaries were, the jury could well conclude that the parties thought they were contracting only for residentially-zoned land and that Tower Sites was to keep the industrially-zoned land.  See Trial Exhs. 7 (Exh. B, last para.), 108, 109, 112, 116.  Indeed, in its original proposed *lis pendens* memorandum, Fafard sought a *lis pendens* only on so much of Tower Sites' land as was zoned residential.  See Fafard's proposed Memorandum of Lis Pendens dated June 3, 2004, filed in Middlesex Superior Court before removal.

intended to appear at the registry for a closing. Id. at ¶¶ 23, 25-26. Tower Sites is entitled to the inference that Fafard gave Tower Sites no notice of its appearance at the registry because such notice would have alerted Tower Sites to send a representative to the registry and invoke its right to extend the closing date for 30 days, which could have led to the termination of the P&S Agreement without recourse and certainly would have interfered with Fafard's plan to sue Tower Sites. Id. at ¶ 28. With the benefit of in-house real estate counsel, Fafard knew or should have known that it had no right to enforce the P&S Agreement because it never notified Tower Sites of a willingness to go forward with the transaction on May 21, or of a willingness to go forward with it without the added condition of getting access to Sewall. Id. at ¶¶ 1, 31. Simpson v. Vasiliou, 29 Mass. App. Ct. 699, 703 (1991) ("To place the seller in default, the buyer was required, before the deadline for performance, to manifest that he was ready, able and willing to perform by setting a time and place for passing papers or making some other concrete offer of performance."); M. De Matteo Constr. Co. v. Daggett, 341 Mass. 252, 258 (1960) (where seller told buyer that seller wanted to negotiate an alternative arrangement and that seller was not willing to close until such an alternative arrangement was made, buyer was not obliged to appear at closing or tender performance and was not in breach for failing to do so "in the absence of seasonable notice [from seller] that performance was to take place" on date called for by agreement); Schilling v. Levin, 328 Mass. 2, 5 (1951) (where buyer had manifested intention not to appear for closing and "*[n]o change of purpose on his part was ever communicated to the [seller,]*" buyer may not enforce agreement); Leigh v. Rule, 331 Mass. 664, 668 (1954) ("The general rule is that when performance under a contract is concurrent one party cannot put the other in default unless he is ready, able, and willing to perform *and has manifested this by some offer of performance*").

Fafard resists the significance of this evidence by recycling an argument that failed in its earlier Motion to Dismiss Tower Sites' abuse of process counterclaim.  Fafard argues, as it did before, that the knowing commencement of groundless litigation is "insufficient to make out a claim of abuse of process."  Fafard's Memo at p. 6, citing Beecy v. Pucciarelli, 387 Mass. 589, 596 (1982).  The correct statement of the law is that, although "the groundlessness of an action is not an essential element of an action for abuse of process," when a "person [who] commenc[es] . . . litigation knew or had reason to know his claim was groundless," this "is relevant … as tending to show that the process was used for an ulterior purpose."  Fishman v. Brooks, 396 Mass. 643, 652 (1986).  Because Tower Sites is entitled to the inference that Fafard knew or had reason to know of the groundlessness of its suit, on this motion Tower Sites is entitled to the further inference that it used this suit for an ulterior purpose.

Fafard also repeats the argument that a memorandum of *lis pendens* is not "process" and therefore cannot support a claim of abuse of process.  Fafard's Memo at p. 6.  Whether a *lis pendens* memorandum qualifies as process is academic because Fafard concedes that "commencement of a civil action" is a type of process that will support an action for abuse of process.  Fafard's Memo p. 6, n.2.  An aspect of a suit for specific performance, which makes such a suit peculiarly capable of being abused, is that, with nothing more than a mere unsupportable allegation, the plaintiff can cloud the defendant's title and make it unmarketable for the duration of the litigation.  Debral Realty, Inc. v. DiChiara, 383 Mass. 559, 564 (1981).  At common law, the mere filing of such a suit had this effect.  Id. at 560.  Because of the potential for abuse, the legislature adopted a statute to provide for a small amount of judicial

oversight before the recording of a *lis pendens* memorandum, but the statute endows the court with next to no discretion.  Id. at 564-65.[3]

Given the ease with which such a suit, and the companion *lis pendens* statute, can be used to cloud title, a suit for specific performance for which a *lis pendens* memorandum is recorded can be the basis for an abuse of process claim.  Cappy's Way Realty Trust v. New Dedham Development, 18 Mass. L. Rptr. 84 (Mass. Super. May 28, 2004) (where plaintiff obtained a *lis pendens*, claim for abuse of process may lie where defendant/plaintiff-in-counterclaim contends that "plaintiff filed the lawsuit to interfere with the development of [his] real estate project"); Powell v. Stevens, 17 Mass. L. Rptr. 592 (Mass. Super. May 3, 2004) (because "the authorization of a *lis pendens* memorandum lies inside, not outside, the process of the underlying litigation" and "is an element of the lawsuit, and not a separate or independent event," an action for abuse of process will lie for bad faith claims involving *lis pendens*); Strachan v. Sheedy, 13 Mass. L. Rptr. 48 (Mass. Super. Mar. 15, 2001) ("process" at issue was "commencement of the plaintiffs' lawsuit *and* recording of the *lis pendens;*" motion to dismiss abuse of process counterclaim denied where plaintiff buyer was alleged to have filed groundless suit to enforce purchase and sale agreement and obtain *lis pendens* for ulterior purposes).[4]

---

[3] There is nothing to Fafard's argument that the restraints on alienation from a *lis pendens* memorandum are not a cloud on title.  Anything that interferes with the ability to convey a good and clean title is a cloud on title.  New York, New Haven & Hartford R. Co. v. Butter, 276 Mass. 236, 239 (1931).  A *lis pendens* memorandum does just that.  Debral Realty, Inc. v. DiChiara, 383 Mass. 559, 564 (1981) ("A memorandum of lis pendens, like an attachment of real estate, temporarily restricts the power of a landowner to sell his or her property, by depriving the owner of the ability to convey clear title while the litigation is pending.").  See also Giuliano v. GTWO, LLC, 2000 WL 744363 *3 (Mass. Super. May 14, 2000) ("As a result of the cloud on title placed on the Property by the filing of the Lis Pendens…").  Cf. Burke v. Sun America, Inc., 2000 WL 1273412 * 12 (Mass. Super. Apr. 25, 2000) ("While a memorandum of lis pendens may not be a true cloud on title, neither [prospective purchaser] was willing to take title subject to it.").

[4] In Strachan, the Court also held that "where the lis pendens prevents defendants from entering into any (continued . . . )

Fafard focuses on the effect of a suit for specific performance and memorandum of *lis pendens* – clouding title and interfering with the defendant's ability to convey the property to others – and argues that because such consequences naturally flow from, and indeed are the purpose of, a memorandum of *lis pendens*, it cannot be an abuse of process to invoke the *lis pendens* procedure.  Fafard's Memo p.7.  Fafard's argument confuses means and ends.  Simply because a *lis pendens* memorandum is meant to cloud title in order to protect a claim for specific performance does not mean that a plaintiff who invokes this procedure has no other purpose in mind.  It is no defense to an abuse of process claim that the plaintiff is using a proper or lawful means (e.g. complaint and *lis pendens*) if the plaintiff has an improper motive or seeks to achieve an improper *ulterior* purpose.  Restatement (Second) of Torts § 682 *comment a* (1977).

III.    **THE EVIDENCE WOULD ENTITLE THE JURY TO FIND THAT FAFARD TORTIOUSLY INTERFERED WITH TOWER SITES' ADVANTAGEOUS RELATIONSHIPS**

Although Massachusetts "cases have been imprecise on the elements of the tort[]" of interference with prospective or advantageous business relations, <u>United Truck Leasing Corp. v. Geltman</u>, 406 Mass. 811, 813 (1990), it is sometimes said that the tort has four elements: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) the plaintiff's loss of advantage resulting from the defendant's conduct.  <u>American Private Line Services, Inc. v. Eastern Microwave, Inc.</u>, 980 F.2d 33, 36 (1st Cir. 1992), <u>citing</u> <u>United Truck Leasing Corp. v. Geltman</u>, 406 Mass. 811 (1990).

---

financial transaction for their property, the element of damages is sufficiently pled" to support an abuse of process claim.  <u>Id.</u>

Embracing these as the elements of this tort, Fafard challenges Tower Sites' ability to prove each one. Once again, Tower Sites is not required at this stage to prove its case conclusively, but need only offer up some evidence, even disputed evidence, that, if credited and with all inferences drawn in Tower Sites' favor, would allow the jury to find for Tower Sites.

Fafard first claims that Tower Sites cannot identify a specific contemplated business relationship with which Fafard interfered. Fafard is wrong, both legally and factually. A plaintiff bringing a claim for intentional interference with advantageous relations need not identify any specific business relationship. "It is well settled that … a *probable* future business relationship from which there is a reasonable expectancy of financial benefit is enough." Owen v. Williams, 322 Mass. 356, 361-62 (1948). Where, as here, the inherent nature and intent of Fafard's interference is to preclude *all* potential buyers from purchasing the property other than Fafard and to ensure that Tower Sites can deal *only* with Fafard, the prospective advantageous relationship with which Fafard interfered is the relationship between Tower Sites and prospective purchasers of the property.[5] See Malatesta v. Leichter, 186 Ill. App. 3d 602, 619, 542 N.E.2d 768, 780-81 (Ill. App. Ct. 1989) ("plaintiff alleged a cause of action for interference with prospective economic advantage by alleging that the defendant intentionally sought to prevent the plaintiff from entering into credit agreements with potential creditors by publishing a negative credit report, although there was no indication that the defendant knew the nature of the proposed dealings between the plaintiff and its potential customers when it published its report").[6]

---

[5] Interested buyers sometimes pay landowners for rights of first refusal or for the exclusive right to purchase over defined periods of time. By filing a *lis pendens*, Fafard has gotten the same benefit that such an agreement would have had, but without paying Tower Sites anything for it.

[6] Fafard cites Laser Labs, Inc. v. ETL Testing Laboratories, Inc., 29 F. Supp. 2d 21, 23-24 (D. Mass. (continued . . . )

To the extent Tower Sites needs to identify a more specific advantageous relationship with which Fafard interfered, the jury need look no further than the relationship between Tower Sites, on one hand, and Carruth Capital and its principal Christopher Egan, on the other hand, who on May 24, 2004 made an offer to purchase the property at issue, which Tower Sites accepted.  Tower Sites' Statement, ¶ 39.  This lawsuit and Fafard's *lis pendens* precluded Tower Sites, Carruth, and Egan from going forward with the transaction, leading Carruth and Egan ultimately to terminate the deal.  Id. at ¶ 40.

Fafard next denies that it had actual knowledge of any prospective relationship that Tower Sites was attempting to forge regarding the property.  Fafard's position rests on a supposed legal standard regarding the level of knowledge required for a tortious interference claim that the case law does not support.  Fafard argues that Tower Sites must show Fafard's knowledge of "*the* purportedly advantageous relationship," Fafard's Memo p. 9 (emphasis added), as if there must be some relationship that rises to a certain level of specificity, although Fafard does not articulate what that level might be.  In fact, the law does not so specify.

---

1998) for the proposition that an interference action will not lie when the prospective advantageous relationship is with customers in a "potential market" for the plaintiffs' products.  Laser Labs arose in a very different context from this case, and the court's statements in that case have no applicability to the facts here.  In Laser Labs, plaintiff claimed that an independent testing lab tortiously interfered with plaintiff's ability to sell its photometers in the marketplace because the lab's analysis resulted in the photometers failing to obtain regulatory approval.  Plaintiff had hired the lab to meet a regulatory requirement, and there was no evidence "that would support a factfinder's conclusion that any unfair testing by the defendant was *intended* to interfere with any such prospective relationships."  Id. at 24 (emphasis added).  Because plaintiff's product had never even gotten regulatory approval, the court viewed the market for plaintiff's product as "inchoate."  Id. at 24.  The court did not hold that interference with access to the marketplace is always non-actionable, but rather implied that, in other contexts, intentional interference with access to the marketplace would be actionable.  Id. at 23 ("The plaintiff's definition of 'advantageous relations' *for these purposes* is too expansive") (emphasis added).  In the instant case, the real estate market is not inchoate.  Tower Sites had already found at least two specific buyers, Fafard and Carruth.  Tower Sites' Statement, ¶ 39.  This case involves one of those buyers, Fafard, attempting to prevent Tower Sites from getting access to others.  Fafard already succeeded by knocking away Carruth, and – through the *lis pendens* – has cut off Tower Sites from all other potential buyers.  Id. at ¶ 40.  The facts are thus very different from those in Laser Labs, where the alleged interferor was not attempting to position itself as the sole and exclusive buyer of the plaintiff's products and indeed had no desire at all to prevent plaintiff's access to the marketplace.

Assuming improper motive or means, the law only requires that Fafard have intended to prevent an *opportunity* for an advantageous contractual relationship from developing.  An intent to prevent an opportunity to sell land to a third person would qualify:

> The relations protected against intentional interference by the rule stated in this Section [766B] include any prospective contractual relations, except those leading to contracts to marry . . . , if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees [or] the *opportunity* of selling or buying land . . . . The expression, prospective contractual relation, is not used in this Section in a strict, technical sense.  It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract.

Restatement (Second) of Torts § 766B *comment c* (1979) (emphasis added).[7]  <u>See also</u> <u>Chemawa Country Golf, Inc. v. Wnuk</u>, 9 Mass. App. Ct. 506, 510 (1980) (tort of interference "includes in the field of potential harm 'any other relations leading to potentially profitable contracts'").

Fafard certainly knew that, if Tower Sites did not sell the property to Fafard, there was a high likelihood Tower Sites would try to sell the property to someone else, or so the jury could find.  Such a finding can be drawn from evidence of Fafard's knowledge that:

- Tower Sites was eager to sell the property (Tower Sites' Statement, ¶ 4);

- The residentially zoned land was undeveloped and was itself offering no economic return to Tower Sites (<u>id.</u>);

- Tower Sites was not a residential developer, and could only realize value from the land by selling it to a developer (<u>id.</u>);

- Tower Sites had been engaged with other potential buyers for the remainder of Tower Sites' land, and wanted to ensure that what happened on the residential piece would not

---

[7] Section 766B of Restatement (Second) of Torts "reflect[s] the law of Massachusetts."  <u>Shafir v. Steele</u>, 431 Mass. 365, 369 (2000).

interfere with the sale of the industrial piece or its use by the next owner.  To ensure compatibility of use, a buyer of the industrially zoned piece would logically be interested in buying or having some control over the residentially zoned piece as well (id. at ¶¶ 6-7);

- Tower Sites would have had no reason to retain ownership of the residentially zoned land for its own account if the deal with Fafard fell through (id. at ¶¶ 2, 4);

- There was not much developable land in Ashland.  Tower Sites' land was developable, and Fafard was in competition with other developers to find developable land.  As a result, Fafard was well aware that, if it did not purchase the Property, another real estate developer was likely to do so (id. at ¶ 5).

From this evidence and the inferences to which Tower Sites is entitled on this motion, the jury could conclude Fafard knew that, unless it did something to prevent Tower Sites from selling the land, Tower Sites would likely make a deal to sell the land to another buyer.

Fafard next denies that it did anything "intentionally and improperly" to interfere with Tower Sites' advantageous relationship because (a) it supposedly did not know of any advantageous relationship available to Tower Sites, and (b) it brought suit ostensibly for only one purpose: "to enforce the terms of the P&S agreement as written." Fafard's Memo pp. 9-10.  Fafard does not appear to dispute that it actually interfered with Tower Sites ability to sell or finance its property.  Tower Sites' Statement, ¶ 42.  It simply asserts that it did so without any knowledge of any opportunity for an advantageous relationship with someone else, and without any intent or motive to prevent such a relationship from ripening.

But as shown above, there is ample evidence that Fafard was improperly motivated and had sufficient knowledge of Tower Sites' prospective advantageous relationships.  Further,

where there is an abuse of process, there is also improper motive or means for a tortious interference claim. See, e.g., Skenderian v. Data Technology, Inc., 2001 Mass. Super. LEXIS 654 *7 (Mass. Super. May 23, 2001) ("[T]he filing of a lawsuit is an improper means of interference with advantageous business relations if it constitutes as abuse of process; i.e., the defendant does not have probable cause to believe that the suit will succeed and is acting primarily for an ulterior purpose other than that of properly adjudicating his claims.").

Finally, without any evidentiary support, Fafard contends that Tower Sites suffered no damages from Fafard's interference because Tower Sites still owns the Property. Fafard asserts that the Property "has enjoyed an exponential increase in value since Metro-Boston's termination of the P&S Agreement," but provides no evidentiary support for this statement. Against such unsupported assertions stands the recent affidavit of Mary Halcomb dated September 19, 2005, in which she provided numerous examples of how Fafard's interference has damaged Tower Sites, including but not limited to the loss of Carruth Capital's and Mr. Egan's offer for the Property (Tower Sites' Statement ¶ 40); the diminution in property value associated with a rising interest rate environment (id. at ¶ 41); the inability to borrow against the property until the *lis pendens* is lifted, which (a) deprives Tower Sites of the ability to use its equity in the property to take advantage of business opportunities or address necessities that might arise, and (b) puts Tower Sites into a higher interest rate loan when it is finally free to borrow against the Property (id. at ¶ 42); the continued obligation to pay property taxes and insurance on the property, which would have been avoided had Tower Sites been able to consummate the sale to Carruth or another buyer (id. at ¶ 43); and the loss of other buyers who have declined the opportunity to buy the property because it is tied up in a lawsuit and subject to a memorandum of *lis pendens*. Id. at ¶ 44.

**IV.    THE EVIDENCE WOULD WARRANT A FINDING THAT FAFARD VIOLATED CHAPTER 93A**

Because Fafard is unable to show that it is entitled to summary judgment on Tower Sites' claims of abuse of process or intentional interference with advantageous business relations, Fafard is not entitled summary judgment on Tower Sites' claim under Mass. G.L. c. 93A.  See Savin Corp. v. Rayne, 2001 U.S. Dist. LEXIS 20574 *5 (D. Mass. Apr. 4, 2001) ("Generally speaking, an abuse of process claim is also actionable under Chapter 93A"), citing Refuse & Environmental Sys., Inc. v. Industrial Servs. of Am., 932 F.2d 37, 43 (1st Cir. 1991).  In G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 277 (1991), the Supreme Judicial Court reversed a summary judgment that dismissed a chapter 93A claim, noting that, "Because we have decided that the question of intentional interference … is for the jury, we reach the same conclusion [of no entitlement to summary judgment] as to the related c. 93A allegations."

The abuse of process and tortious interference claims are jury claims.  The Chapter 93A claim is tried to the Court.  Perhaps the Court may have already formed an opinion, based on the evidence it heard at the trial of Fafard's complaint, as to whether Fafard's motives and conduct rise to the level of a Chapter 93A violation.  However, any previously formed opinion would have no part in the decision on this motion.  So long as the facts are in dispute, which they are, Tower Sites is entitled to present its evidence at a trial on the counterclaim, to cross-examine witnesses, and to argue to the judge to make findings and rulings in Tower Sites' favor.

When the Court held the Phase I trial on Fafard's complaint, it postponed the trial on Tower Sites' counterclaims to a later day.  Consequently, Tower Sites did not try its Chapter 93A case in Phase I.  While the evidence previously adduced in the Phase I trial (along with

the additional documents, discovery materials, and affidavits Tower Sites is citing in its opposition) can be examined to determine the existence, or not, of a genuine dispute of material fact on the remaining claims, this motion is not an opportunity for the Court to *resolve* disputed issues of fact based on the Phase I evidence. That must happen in a later trial.

<u>Conclusion And Request For Oral Argument</u>

For the foregoing reasons, Fafard's motion for summary judgment on Tower Sites' counterclaim should be denied. Thereafter, for the reasons stated in defendant's previously filed motion for the entry of a separate judgment on the complaint or to sever the complaint from the counterclaim, the Court should enter a separate judgment dismissing the complaint along with a Rule 54(b) certificate, or sever the counterclaim from the complaint and enter judgment dismissing the complaint, after which the Court should stay the counterclaim until the expiration or exhaustion of Fafard's rights of appeal. Tower Sites requests oral argument on Fafard's motion.

METRO-BOSTON BROADCASTING, INC.

By its attorneys,

/s/ Kenneth R. Berman_____
Kenneth R. Berman (BBO #040320)
Erik P. Bartenhagen (BBO #640003)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

Date: January 13, 2006

<u>Certificate of Service</u>

I certify that I served the foregoing document today on opposing counsel by email and by mail.

/s/ Erik P. Bartenhagen
Erik P. Bartenhagen

1496165.1