UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                      )
FAFARD REAL ESTATE &                                  )
DEVELOPMENT CORP.,                                    )
                                                      )
     Plaintiff/Defendant-in Counterclaim        )
                                                      )
vs.                                                   )        Civil Action No. 04-11531 RGS
                                                      )
METRO-BOSTON BROADCASTING,                            )
INC.,                                                 )
                                                      )
     Defendant/Plaintiff-in-Counterclaim        )
_____)

## METRO-BOSTON'S STATEMENT OF ADDITIONAL FACTS

     Pursuant to Local Rule 56.1, Defendant and Plaintiff-in-Counterclaim Metro-Boston Broadcasting, Inc. ("Metro-Boston") as general partner of Tower Sites Limited Partnership ("Tower Sites") submits this Statement of Additional Facts.  Tower Sites has not attached copies of any cited pleadings, trial exhibits, trial transcripts, or the Court's findings of fact, as these are already a matter of record.  Documents and deposition testimony that are not already a matter of record are attached to the Affidavit of Erik P. Bartenhagen in Opposition To Fafard's Motion for Summary Judgment ("Bartenhagen Aff.").

     1.     Fafard is a large, sophisticated real estate development company that has done over 1,000 real estate transactions in Massachusetts, including a number of transactions in Ashland.  Tr. 1 at 9; Tr. 3 at 20, 35, 109;[1] Findings of Fact and Rulings of Law After a Trial Without Jury dated August 26, 2005 ("Findings and Rulings"), at p. 2.  Fafard employed in-

_____

[1] The trial transcript is referred to as "Tr. X at Y" where X is the day number and Y is the page number.

house legal counsel (Paul Beattie) who had twenty-three years of experience.  Tr. 1 at 5, 27, 48; Tr. 3 at 111.

2.      Tower Sites is not a real estate company, and is not in the business of developing property.  Tr. 3 at 30, 39.

3.      The land owned by Tower Sites in Ashland, Massachusetts consists of three separate but abutting lots – Lot 6B, Lot 11, and Lot 12.  Tr. 3 at 32-33; Trial Exh. 7, at Exh. A; Trial Exh. 108.  These three parcels comprise about 40-50 acres.  Id.  Part of this land is zoned industrial, and part is zoned residential.  Tr. 3 at 32-33.  A portion of Tower Sites land was the subject of a Purchase and Sale Agreement between Towers Sites, as seller, and Fafard, as buyer (the "P&S Agreement").  For ease of reference, the part of the land covered by the P&S Agreement will be referred to as the "Property."

4.      The residentially zoned portion of Tower Sites' land is undeveloped.  Tr. 3 at 38-39.  Not being a real estate developer like Fafard, Tower Sites was not in a position to put the land to valuable use and sought to sell it.  Id.  At least as early as 1997, Tower Sites and Fafard had entered into discussions concerning the sale of Tower Sites' residentially zoned land in Ashland, Massachusetts to Fafard.  Trial Exh. 116.  In those discussions, Fafard had asked Tower Sites whether it was interested "in selling just the residential portion," and Tower Sites replied that it was.  Id.  As a result, Fafard had knowledge going back to 1997 that Tower Sites was eager to sell the residential portion of its land, since it was not a real estate developer and therefore was not in a position to put the land to valuable use.  Id.; Tr. 3 at 38-39.

5.      Because the Town of Ashland does not contain much developable land, the Property was a desirable parcel for real estate developers.  Terrill Dep. p. 149, attached to

Bartenhagen Aff. as <u>Exhibit A</u>.  Fafard was well aware that if it did not purchase the Property, another real estate developer was likely to do so.  <u>Id.</u>

6.      Tower Sites was interested in keeping the more valuable (at least to Tower Sites) industrially zoned parcel and selling it to someone else.  Tr. 3 at 38-39.  From the time the P&S Agreement was executed in January 2001 until May of 2004, numerous parties had expressed an interest in purchasing Tower Sites' industrial land (those specifically identified include Langer Broadcasting, Broadcasting Perspectives, and Carruth Capital).  Tr. 3 at 18; Halcomb Dep. pp. 51-53, attached to Bartenhagen Aff. as <u>Exhibit B</u>.  Fafard was well aware that Tower Sites had multiple potential buyers interesting in purchasing the industrial portion of Tower Sites' land during this time period.  Tr. 3 at 10, 18, 105.

7.      Because the industrially zoned parcel was more valuable to Tower Sites, it wanted to ensure that whatever development ultimately occurred on the residential parcels would not unduly impact or interfere with the activities of the then-existing lessees or the future use of the industrial parcel by the next owner.  Tr. 3 at 105.  Tower Sites communicated this concern to Fafard on numerous occasions.  <u>Id.</u>

8.      For Fafard to build its desired residential development, it needed to subdivide the land and build a road through the property.  Tr. 2 at 36-38; Tr. 3 at 122.  Sometime in 2001, after the P&S Agreement was signed, Fafard learned that it could not build a road into the property from the street it had originally intended (Tri Street) because the portion of the property abutting Tri Street consisted of wetlands that could not be disturbed.  Tr. 2 at 38, 41-42, 78.  Because Fafard needed to have two means of access into the property for its planned subdivision, Fafard reviewed the plans of the locus and surrounding property and identified

Sewall Road[2] as the only other possible way of obtaining a second means of access.  Tr. 3 at 127.

9.    Sewall Road is a public way that connects to Tower Sites' property at the northwest corner of Lot 11.  Trial Exh. 3.  It does not connect to the Property.  Id.  It could only have been used as a means of access by building a road across Tower Sites' industrial property on Lot 11 between the Property and Sewall Road.  Tr. 2 at 40; Tr. 3 at 129.  This would have required Fafard to work out an agreement for either an easement or acquisition of additional land in Lot 11 between the Property and Sewall Road.  Tr. 2 at 40; Tr. 3 at 129.  The P&S Agreement did not obligate Tower Sites to sell additional acreage or grant an easement to provide Fafard with access to Sewall Road.  Verified Complaint Exh. 1; Findings and Rulings, at p. 11.

10.    On October 31, 2001 Fafard offered to purchase an additional 5 acres in Lot 11 in order to connect the Property to Sewall Road.  Trial Exh. 10.  The offer included a rough, hand-drawn sketch of the portion of Lot 11 Fafard was proposing to buy from Tower Sites. Id.  On the fax cover sheet, Fafard said: "We need to acquire additional land to gain access to the residential portion of the property."  Id.

11.    In January 2002, Fafard reiterated that it "need[ed] access through the frontage out to Sewall Street but not the actual frontage," meaning that it needed to be able to connect a road from the Property to Sewall Road.  Trial Exh. 15.  During a phone call with Tower Sites' Mary Halcomb on January 17, 2002, Fafard's Janice said that Fafard "had not been able to do much of anything of planning for the site since [Fafard] determined that [Fafard] needed the additional access."  Trial Exh. 111.

---

[2] This public way is alternatively referred to as both "Sewall Road" and "Sewall Street."

12.     On February 27, 2002, Fafard sent an e-mail to Tower Sites stating that Fafard "need[ed] to get an agreement on the additional 5 acres.  We need the access to get out to Sewall Street."  Trial Exh. 19.  On March 21, 2002, as Fafard's extended deadline to obtain permits and approvals (Trial Exh. 17) was coming up, Ms. Hannert wrote another e-mail to Tower Sites and said: "I need to get a response from you on the additional 5 acres.  We can not access the residential portion of the land without it (2 access roads will be needed)."  Trial Exh. 19.

13.     By these e-mails and its other communications with Tower Sites, Fafard meant to convey a sense not simply of importance, but of essentialness, about Fafard's need to get access to Sewall Road.  Fafard knew that Tower Sites was eager to close on the property by virtue of Tower Sites having shortened the extension periods requested by Fafard on numerous occasions (Trial Exhs. 17, 40, 44, 49, 51-52, 55, 65), inserting handwritten language into the extension agreements stating that if Fafard is able to obtain permits prior to the extended deadlines closing could take place at an earlier date (Trial Exh. 30), and writing on the extension agreements that "time is of the essence" and that "buyer agrees to pursue the permits with due diligence."  Trial Exhs. 33 and 40.  It is a fair inference that, knowing of Tower Sites' eagerness to close, and that Tower Sites understood Fafard could basically walk away from the P&S Agreement without penalty, Fafard's e-mails and communications were meant to gain some negotiating leverage over Tower Sites with respect to Sewall Road by inducing Tower Sites to believe that unless Tower Sites agreed on an arrangement to give Fafard access to Sewall Road, Fafard would not go forward with the purchase of the Property.

14.     These e-mails and similar statements by Fafard had the effect Fafard desired.  In the spring of 2002, Tower Sites, at its own expense and without any obligation to do so (Tr. 3

at 55), retained the engineering firm of Hancock Survey Associates ("Hancock") to explore ways in which a connecting road could be laid out between the Property and Sewall Road over Lot 11.  Trial Exhs. 20, 21.

15.     Fafard was aware of the effect its statements had on Tower Sites.  On July 31, 2002, Ms. Hannert had faxed Daniel Bremser from Hancock a drawing of the Property, intending to give him information that he could use for finding a way to provide Fafard with access to Sewall Road.  Trial Exh. 31.  To reinforce the essential nature of Sewall Road access, Fafard told Bremser (knowing Bremser had been retained by Tower Sites) that Fafard "can not access [the Property] from Tri Street because of wetland buffer zones and need[s] to access the site through Sewall Street." Id.

16.     In a May 19, 2003 fax from Fafard, Ms. Hannert told Tower Sites that Fafard "need[ed] written confirmation from [Tower Sites] that this access [to Sewall Road] is available for our use as a joint access.  We would also like to obtain additional acreage if it is available but that is a separate issue." Trial Exh. 35.  It is a fair inference that, by this message, Fafard intended to reinforce in Tower Sites mind not simply that Fafard had a need for access to Sewall Road, but that Fafard would not go forward with the purchase of the Property unless Tower Sites granted Fafard at least an easement – a writing granting Fafard "use as a joint access" – to Sewall Road.  This was in contrast to purchasing additional land in Lot 11, which Fafard indicated was desirable but not essential.

17.     On November 6, 2003, after obtaining a number of additional extensions of the P&S Agreement from Tower Sites, and with an extension about to expire that very day, Fafard sent Tower Sites a fax (Trial Exh. 60), stating that Fafard "need[s] an answer to the access issue.  Attached is another copy of the sketch showing the location where we need to access the

property.  The Tri Street access is unusable so we need to access the property from Sewall Street as joint access with other adjacent owners. . . .  We are ready to close on the property but need to obtain approval to access through Sewall Street and the update of the property line."  By this fax, Fafard was still communicating to Tower Sites its unwillingness to close on the purchase of the Property in the absence of an agreement giving Fafard the right to connect the Property to Sewall Road by way of a connecting road over Lot 11.  This is the same message Fafard had been giving Tower Sites for a year and half.

18.      Thereafter, Fafard asked Tower Sites for, and Tower Sites granted, a number of additional extensions of the P&S Agreement.  On November 7, 2003 (Trial Exh. 62), February 14, 2004 (Trial Exh. 87), February 26, 2004 (Trial Exh. 88), March 19, 2004 (Trial Exh. 90), April 16, 2004 (Trial Exh. 92), May 7, 2004 (Trial Exh. 94), May 17, 2004 (Trial Exh. 95), and May 20, 2004 (Trial Exh. 97), Fafard sent extension requests to Tower Sites with a transmittal fax stating:  "We are ready to close on this property.  We need to resolve the access issue out to Sewall Street, need clean title … and need a plan we can deed off of."  In total, between the time the P&S Agreement was executed in January 2001 and April 2004, Fafard had requested and obtained 25 extensions of the deadlines set forth in the P&S Agreement.  (See Bartenhagen Aff., Exhibit C).

19.      Tower Sites understood this statement to mean that Fafard was not ready or willing to close unless Tower Sites' granted Fafard an easement or some other right of access to Sewall Road.  Tr. 3 at 94-95.

20.      This evidence permits the inference that Fafard was not ready or willing to close unless Tower Sites also granted Fafard an easement or some other right of access to connect the Property to Sewall Road, for at least the following reasons:

a.      If Fafard were ready and willing to close without getting an easement or some other right of access to Sewall Road, Fafard would have said so unequivocally and unambiguously.  Because of the strength of Fafard's consistent message to Tower Sites over a period of one and a half to two years about Fafard's need to have access to Sewall Road, and Fafard's need to have those rights in writing, Fafard would not have used this language in the May 2004 faxes if Fafard had changed its mind.

b.      Fafard's statements were made in conjunction with Fafard's requests for an extension of the P&S Agreement.  Parties do not request extensions of time for performance when they are ready, willing, and able to perform.  Rather, they tell the other party unambiguously that they are ready to close, without seeking additional time for performance.  In this case, Fafard had consistently justified and explained its repeated extension requests on its need for access through Sewall Road.  Trial Exhs. 35, 60, 62, 87-88, 90, 92, 94-95, 97.

c.      The other two things Fafard said it needed, in addition to resolving the issue of access to Sewall Road, were (a) clean title and (b) a plan to deed off of.  Trial Exhs. 87-88, 90, 92, 94-95, 97.  These latter two things were things Fafard needed for closing and expected Tower Sites to provide.  Tr. 2 at 99; Tr. 3 at 111, 118.  By including them in the same sentence as Fafard's expressed need to resolve the issue of access to Sewall Road, Fafard communicated its position that it needed access to Sewall Road, just as it needed clean title and a plan to deed off of, before it would close.

d.   Fafard's senior vice president Richard Terrill admitted that Fafard's decision whether to close on the property without getting access to Sewall Road would not have been made until the "agreement was close to running out or [Fafard] didn't have an extension." Tr. 3 at 115. Because (i) the evidence shows that, from 2001 forward, Fafard was unwilling to close without getting access to Sewall Road, (ii) Mr. Terrill admitted that a contrary decision would not have been made until the agreement was about to expire without an extension in place, (iii) it was not until May 21, 2004 when the agreement was about to expire and Fafard had failed in its effort to obtain an extension, it follows that at the time Fafard had sent Trial Exhibits 62, 87, 88, 90, 92, 94, 95, and 97 to Tower Sites, Fafard was still neither ready nor willing to close on the property unless it had been granted access to Sewall Road.

e.   On May 21, 2004, the day the P&S Agreement expired, Tower Sites wrote a letter to Fafard explaining that, because Fafard had consistently said it needed access to Sewall Road, and because Tower Sites had determined that it was unable to provide such access, Tower Sites would not extend the P&S Agreement any more and would consider the agreement to be terminated. Trial Exh. 98. Fafard did not contact Tower Sites to say that Tower Sites was mistaken or that Fafard was willing to close without getting access to Sewall Road, or to try to set up a new closing date. Tr. 1 at 47; Tr. 3 at 105-106.

21.   Fafard would not have been able to get access to Sewall Road without Tower Sites' agreement.

22.     Between the time the P&S was signed and May 21, 2004, there are at least 20 documented instances – in Fafard's own words – of Fafard telling Tower Sites that it "needed" to have access to Sewall Road.  (See Bartenhagen Aff., Exhibit D).  These statements also included, at various times, Fafard's informing Tower Sites that Fafard is at a standstill and needed such access to make Fafard's project work, (Trial Exh. 111, note of February 21, 2002), that Fafard could not get out of the Property without access to Sewall Road (Trial Exhs. 19 and 22), that Fafard "need[s] written confirmation from [Tower sites] that this access is available for [Fafard's] use as joint access" (Trial Exh. 35), that Fafard "cannot move forward" without access to Sewall Road (Trial Exh. 111, note of May 27, 2003), that Fafard is ready to close "but need[s] to obtain approval to access through Sewall Street (Trial Exh. 60), and that the purchase of a house on Tri Street was not a solution to Fafard's access problems. Trial Exh. 111, note of October 16, 2003.

23.     During this time, Fafard made two trips to the registry of deeds.  On the first occasion, the P&S Agreement had previously been extended to November 7, 2003.  Trial Exhs. 55-56.  Although Fafard had requested a new extension, Tower Sites had not sent one in.  On the afternoon of November 7, not having received a signed extension back from Tower Sites, Fafard sent Mr. Beattie to the registry for the purpose of "defaulting" Tower Sites.  Tr. 1 at 13.  Although the P&S Agreement did not state a time of day for the closing, Mr. Beattie arrived at the registry at 3:30 p.m., which was the soonest he could get there after Mr. Terrill told him to go to the registry to "default" Tower Sites.  Id. at 35, 38.  Mr. Beattie stayed at the registry for a half hour, paged Tower Sites twice, and left.  Id. at 35.  Mr. Beattie knew that nobody from Tower Sites would be appearing.  Id. at 14-15.  Although Fafard had contemplated giving Tower Sites contemporaneous (not advanced) notice of Mr. Beattie's

presence at the registry (Trial Exh. 117), Fafard decided not to notify Tower Sites at all.  Tr. 2 at 116-17.  While Mr. Beattie was at the registry, Fafard received a signed extension from Tower Sites, which Tower Sites had signed the previous day (Trial Exh. 59), and Fafard therefore abandoned the idea of telling Tower Sites about Mr. Beattie's trip to the registry. Tr. 2 at 116-17.

24.    The second occasion Fafard went to the registry was on May 21, 2004, the day the parties' last extension expired.  Trial Exhs. 92-93.  For two weeks before that date, Fafard had tried to get another extension from Tower Sites by faxing extension requests on May 7, May 14, and May 20.  Trial Exhs. 94-95, 97.  Although Fafard had left telephone messages for Tower Sites to the effect that Tower Sites should check its fax machine for extension requests, Fafard did not say anything about an intention to close on the property if Tower Sites did not sign and return the extensions.  Tr. 3 at 102-103.

25.    On May 21, 2004, not having received any further extension from Tower Sites, Mr. Terrill told Mr. Beattie to go the registry to "default" Tower Sites.  Tr. 1 at 15.  As it did in November 2003, Fafard did not attempt to call, fax, or email Tower Sites to give notice that Mr. Beattie would be appearing at the registry.  Tr. 1 at 16-17; Tr. 3 at 75.  Because the P&S Agreement did not set a time of day for closing, Mr. Beattie simply showed up at the registry at about 11:30 a.m., a time unilaterally chosen by Fafard without notice to Tower Sites.  Tr. 1 at 33.

26.    Fafard had no expectation that Tower Sites would appear at the registry.  Tr. 1 at 20.  No one from Fafard actually believed that Tower Sites would be present at the registry, and indeed Mr. Beattie expected that Tower Sites would <u>not</u> appear.  <u>Id.</u>  Up until that time,

Fafard had led Tower Sites to believe that Fafard needed access to Sewall Road as part of the transaction, and had said nothing to the contrary to Tower Sites.

27.     As Fafard expected, Tower Sites did not appear at the registry on May 21, 2004.  When Mr. Beattie arrived at the registry, he paged Tower Sites four times over the course of an hour, and then left.  Tr. 1 at 33.

28.     Had Fafard told Tower Sites of its intention to appear at the registry, and had the disclosure been done in a timely manner, Tower Sites not only would have sent a representative to the registry but, if necessary to avoid a claim of breach, would have exercised its automatic right for a 30 day extension of time to take whatever actions were required of Tower Sites to perform in accordance with the P&S Agreement.  Tr. 3 at 106-107. See Memorandum And Order On Defendant Fafard Real Estate & Development Corp.'s Motion To Reconsider And Amend Findings dated October 24, 2005 ("Denial of Fafard's Motion to Reconsider"), at p. 2.  If Tower Sites had exercised it and then, after 30 days, been unable to perform in accordance with the P&S Agreement, Tower Sites could have terminated the agreement and neither party would have had recourse against the other.  Trial Exh. 7, ¶ 10. So long as Fafard was telling Tower Sites that it needed access to Sewall Road, Tower Sites did not have any reason to exercise this contract right.  This contract right would only have come into play if (a) Fafard no longer was requiring access to Sewall Road and was otherwise ready, willing, and able to close, and (b) Fafard had so informed Tower Sites.  By going to the registry in secret, i.e. by not telling Tower Sites it was going to the registry, Fafard deprived Tower Sites of the opportunity to exercise this contract right.

29.     Later in the day on May 21, 2004 Fafard received a letter from Tower Sites (Trial Exh. 98), stating that because Tower Sites was unable to obtain all the approvals it

needed to grant Fafard access to Sewall Road, and because Fafard had consistently made it known that it needed to have access to Sewall Road, Tower Sites considered the P&S Agreement to be at an end.

30.     This letter did not prompt Fafard to tell Tower Sites that it was mistaken about Fafard's need for access to Sewall Road, or to contact Tower Sites to try to schedule a closing without Sewall Road. Tr. 1 at 47; Tr. 3 at 105-106. Instead, upon receipt of this letter, Mr. Terrill instructed Mr. Beattie to contact Fafard's outside counsel at Hanify & King to commence a specific performance lawsuit. Tr. 1 at 47. In other words, almost immediately after Mr. Beattie appeared at the Registry of Deeds on May 21, 2004, Fafard gave Mr. Beattie instructions to contact Hanify & King to commence the instant lawsuit. Id.; Beattie Dep. at pp. 90-92, attached to Bartenhagen Aff. as Exhibit E.

31.     This evidence would permit the inference that, and indeed the court already found, when Fafard had gone to the registry on November 7, 2003 and again on May 21, 2004, it did not go for the purpose of closing on the property but only for the purpose of staking out a position in a later lawsuit. Fafard is a sophisticated and experienced real estate development company. It has closed on the purchase of thousands of properties. Tr. 1 at 9; Tr. 3 at 20, 35, 109. Typically, when Fafard gets ready for a closing, its closing attorney Mr. Beattie does a number of things in advance of the closing, including scheduling the time and place of the closing with the seller or seller's counsel, obtaining a municipal lien certificate to see whether the municipality has a lien on the property for unpaid taxes or other assessments, preparing a closing agenda, reviewing and approving a settlement sheet or list of adjustments, obtaining a title insurance commitment, and conferring with the seller or the seller's attorney to iron out any problems that might be come up. Tr. 1 at 22-28. Fafard did none of these

things in connection with its two trips to the registry to put Tower Sites in default.  Id.  In fact, Mr. Beattie had never actually done a closing at a registry of deeds without first having spoken to the seller or the seller's attorney (Tr. 1 at 27-29),[3] which he did not do in these two instances.

32.     Mr. Beattie's trip to the registry on May 21, 2004 was six months after a November 7, 2003 letter that Fafard had sent to Tower Sites identifying potential clouds on title.  Trial Exh. 64.  Obtaining clean title was so important to Fafard that Fafard made it a condition of the closing, and Fafard would not have closed on the property without getting clean title.  Tr. 1 at 42.  This November 7, 2003 letter was based on a title report that Fafard had gotten more than two years earlier in 2001.  Trial Exh. 8; Tr. 1 at 42-44.  The fact that Fafard delayed more than two years in calling Tower Sites' attention to possible title defects, and that Fafard's letter of November 7, 2003 was not based on a recent title search, permits the inference that Fafard's sending of the letter was for tactical reasons, rather than out of a genuine desire to have all title issues resolved so that Tower Sites and Fafard would be in a position to close.  Second, the November 7, 2003 letter was sent on the same day as Fafard's first trip to the registry "to default" Tower Sites.  The timing of this letter shows that Fafard was not ready and willing to close when it went to the registry on November 7, 2003, since title issues that were of potential concern to Fafard had not been resolved, much less disclosed to Tower Sites in a timely enough manner for Tower Sites to have addressed them for a November 7, 2003 closing.  Given Mr. Beattie's testimony that "Fafard was just as ready,

---

[3]  There is a transcription error on page 28, line 19 in volume 1 of the trial transcript.  The words "other than the seller's attorney" should read "or the seller's attorney."

willing, and able to close on May 21, 2004, as [it was] on November 7, 2003" (Tr. 1 at 34), it follows that Fafard was not ready or willing to close on May 21, 2004 either.[4]

33.    This evidence establishes that, just because Fafard appeared at a registry of deeds and paged Tower Sites did not mean that Fafard was ready, willing, and able to close on the purchase of the property.  It does, however, permit the inference that Fafard was trying to create the appearance of being ready, willing, and able to close in order to position itself for litigation.

34.    At no time did Fafard notify Tower Sites that it was willing to take title to the Property without also getting access to Sewall Street.  <u>See</u> Halcomb Aff. dated June 24, 2004, ("First Halcomb Aff."), attached to Bartenhagen Aff. as <u>Exhibit F</u>, at ¶ 20;[5] Findings and Rulings, p. 11.

35.    The above evidence warrants an inference that, at all material times, Fafard was unwilling to take title to the Property without also obtaining title to, or an easement over, additional land owned by Tower Sites so that Fafard could have a second means of access to the site from Sewall Road.  Findings and Rulings, pp. 11-12; Denial of Fafard's Motion to Reconsider, p. 1.

36.    This evidence also supports an inference that, although Beattie appeared at the Registry of Deeds on May 21, 2004 with a check for the purchase price, his true mission in doing so was as a prelude to litigation, and to bring pressure on Tower Sites to provide access

---

[4] This conclusion is also supported by Mr. Beattie's testimony that, even by the time of trial, Fafard had not decided whether the title matters presented in Fafard's letter of November 7, 2003 were or were not acceptable to Fafard.  Tr. 1 at 45.  In other words, Fafard had identified some potential title issues but had not made a decision whether, if those title issues were still a matter of record by the time of closing, Fafard would or would not accept a deed from Tower Sites.  Parties who are ready to close know whether a particular matter potentially affecting title, of which they are aware, is or is not acceptable.

[5] This affidavit was filed in support of Tower Sites' special motion to dismiss and in opposition to Fafard's motion for a *lis pendens*.

to Sewall Street.  Findings and Rulings, p. 12; Denial of Fafard's Motion to Reconsider, p. 1.
In other words, Fafard's appearance at the Registry was a "sham."  Findings and Rulings, p.
12.

37.    If Fafard had genuinely intended to close on the Property on May 21, 2004, it
would have given Tower Sites reasonable notice of its intent to do so despite the absence of an
agreement on Sewall Street.  Denial of Fafard's Motion to Reconsider, pp. 1-2.

38.    Following the close of evidence on Fafard's complaint but before closing
argument had taken place, Fafard's counsel sent a letter dated March 29, 2005 to Tower Sites'
counsel (see Bartenhagen Aff. at Exhibit G).  In that letter, Fafard demanded that Tower Sites
(i) convey to Fafard lots 12 and 6B, the only lots zoned residential, and (ii) pay Fafard $1.2
million, in exchange for which Fafard would give up its claim to any portion of Lot 11, the
industrially zoned parcel.

39.    On May 24, 2004, Tower Sites and Carruth Capital, LLC (through its President
Christopher Egan) executed an Offer to Purchase all land owned by Tower Sites in Ashland,
Massachusetts, which included the Property subject to the P&S Agreement, for $2.8 million
(the "Egan Offer").  Trial Exh. 99; Tr. 3 at 26-29; Halcomb Dep., pp. 176-179.

40.    As a result of the delay caused by the instant litigation and Fafard's *lis pendens*,
the Egan Offer was withdrawn.  See Affidavit of Mary Heller Halcomb dated September 19,
2005, attached to Bartenhagen Aff. as Exhibit H ("Second Halcomb Aff."), at ¶ 6.

41.    The current rising interest rate environment can be expected to have a
depressive effect on the value of the Property, make the Property less attractive to prospective
buyers, and make it more difficult for Tower Sites to find another buyer willing to purchase
the Property for at least the same price set forth in the Egan Offer.  Second Halcomb Aff., ¶ 8.

42.    Fafard's *lis pendens* prevents Tower Sites from borrowing against the Property, and therefore until Fafard's *lis pendens* is lifted, Tower Sites will not have access to the equity on the Property and will be unable to use such equity to take advantage of business opportunities or necessities that might arise.  Id.  As the litigation-induced delay continues, the delay will mean that, when Tower Sites is finally free to borrow against the Property, the cost to borrow will be higher in this rising interest rate environment.  Id.  Fafard knew that a memorandum of lis pendens would make the Property unmarketable and unfinanceable.  Terrill Dep., pp. 150-52.

43.    During this litigation, Tower Sites has had to continue to pay property taxes and insurance for the Property.  Id.

44.    Tower Sites has identified a potential new purchaser of the Property, but Tower Sites' ability to negotiate a contract is being compromised by the continued presence of the memorandum of *lis pendens* on the land's record title.  Id. at ¶ 9.

METRO-BOSTON BROADCASTING, INC.

By its attorneys,

/s/ Kenneth R. Berman_____
Kenneth R. Berman (BBO #040320)
Erik P. Bartenhagen (BBO #640003)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

Date:  January 13, 2006

Certificate of Service

I certify that I served the foregoing document today on opposing counsel by email and by mail.

/s/ Erik P. Bartenhagen
Erik P. Bartenhagen

1495961.1