UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
**FAFARD REAL ESTATE &**                )
**DEVELOPMENT CORP.,**                  )
                                        )
    Plaintiff/Defendant-in Counterclaim  )
                                        )
vs.                                     )   Civil Action No. 04-11531 RGS
                                        )
**METRO-BOSTON BROADCASTING,**          )
**INC.,**                               )
                                        )
    Defendant/Plaintiff-in-Counterclaim  )
_____ )

METRO-BOSTON'S RESPONSE TO FAFARD'S
LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, and only for purposes of Fafard's motion for summary judgment on the counterclaim, Defendant and Plaintiff-in-Counterclaim Metro-Boston Broadcasting, Inc. ("Metro-Boston") as general partner of Tower Sites Limited Partnership ("Tower Sites"), responds to Plaintiff's Statement of Material Facts (hereinafter, "Fafard's Statement") as follows. For the Court's convenience, Tower Sites restates each of Fafard's alleged undisputed facts to which Tower Sites then responds.

    1.    *On or about January 31, 2001, Fafard and Metro-Boston Broadcasting, Inc. ("Metro-Boston") executed a Purchase and Sale Agreement (the "P&S Agreement") for the sale of real property in Ashland, Massachusetts. The P&S Agreement called for Metro-Boston to convey to Fafard Lots 12, 6B and a ten-acre portion of Lot 11 (the "Ashland Property"). See Fafard's Verified Complaint ("Complaint"), ¶8 and Exhibit 1 thereto, a true and complete copy of which is attached hereto as Exhibit A; see also Answer and Counterclaim, at Answer ¶8, a true and complete copy of which is attached hereto as Exhibit B.*

    1.    Metro-Boston admits that on or about January 31, 2001, Metro-Boston (as general partner of Tower Sites Limited Partnership) and Fafard executed a P&S Agreement for the sale of land in Ashland, Massachusetts, and that a copy of Fafard's Verified Complaint and

Tower Sites' Answer and Counterclaim are attached to Fafard's Statement as Exhibits A and B, respectively. Metro-Boston further admits that the P&S Agreement contains a textual description of the land as consisting of three parcels "shown as Lots 12 and 6B (9.6 acres) and a portion of Lot 11 (10 acres) on the Plan attached hereto and incorporated herein by reference as Exhibit A." Trial Exh. 7.

> **2.** *The P&S Agreement called for the conveyance of less than all of Lot 11, which is registered land. Accordingly, the P&S Agreement required Metro-Boston to, among other things, prepare a new subdivision plan. See Exhibit A hereto, at ¶12.*

**2.** Metro-Boston admits that Lot 11 is registered land. Otherwise, Metro-Boston denies these assertions. The P&S Agreement is unclear as to what portion of Lot 11, if any, was to be conveyed. Trial Exh. 7. It was the intention of the parties that Fafard was only buying residentially zoned land, and that Metro-Boston was retaining all industrially zoned land. Tr. 1 at 46; Tr. 3 at 43-44.[1] It was the parties' mistaken assumption that a portion of Lot 11 was zoned residential, when in fact the boundary between residentially zoned and industrially zoned land ran along the boundary of Lot 11 and Lot 12. Trial Exhs. 120, 121. The P&S Agreement also contains language indicating the possibility of straightening the zoning line, which the parties understood to be co-terminus with the boundary line. Trial Exh. 7, at Exh. B; Tr. 2, at 108-11. All of this suggests the absence of a meeting of the minds on the location of the actual boundary between the land to be conveyed and the land to be retained. Further, if any portion of Lot 11 was to be included in the sale (after agreement upon the location of the boundary), the P&S agreement assigned to Tower Sites the responsibility for preparing a new subdivision plan for local subdivision approval, which would

---

[1] The trial transcript is referred to as "Tr. X at Y" where X is the day number and Y is the page number.

**have had to occur before the closing.  Trial** Exh. 7, at Ex. B.  **The P&S Agreement contains an incomplete sentence referring to a recordable plan, but if that sentence could be construed as imposing on Metro-Boston an obligation to prepare a plan for recording, Metro-Boston would first have had to have been provided with the subdivision plan prepared by Fafard for local subdivision approval.  Trial Exh. 7.**

  **3.** *The P&S Agreement also required Metro-Boston to take any steps necessary to cure certain easements, restrictions, and encumbrances of record that would interfere with Fafard's proposed use.  See Exhibit A hereto, at ¶11; see also Exhibit B hereto, at Answer ¶11.*

  **3.** **Metro-Boston admits that the P&S Agreement states that the deed "shall convey a good and clear record and marketable title thereto," and excepted certain encumbrances from this requirement, including any "easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the [use] of said premises for residential development."  Trial Exh. 7.  Otherwise, Metro-Boston disputes this statement. The P&S Agreement evidences the parties' mutual understanding that the adjoining towers on the industrial land would need to remain undisturbed, and that Fafard would have to determine whether that would be accomplished by granting Metro-Boston suitable easements or by moving guy wires.  Trial Exh. 7, at Ex. B.  The P&S Agreement did not obligate Metro-Boston to move guy wires.  Id.  Properly construed, and as was consistent with the intent of the parties, the P&S Agreement would have required Fafard to undertake the expense of moving guy wires if Fafard refused to grant an easement.  If the P&S Agreement were to be construed to impose this obligation or any encumbrance-removal obligation on Metro-Boston, and if Metro-Boston could not feasibly do so, then the agreement provided, in substance, that the agreement would come to an end, without recourse to either party.  Id.**

*4.     The P&S Agreement set a time for Fafard to obtain any necessary permits and called for Closing by February 28, 2002.  See Exhibit A, at ¶15; see also Exhibit B hereto, at Answer ¶15.*

**4.     Tower Sites admits that the P&S Agreement states: "All permits and approvals shall be secured at Buyer's expense on or before January 31, 2002.  Buyer shall give quarterly reports during term of Agreement as to status of permits and approvals sought.  Closing to occur thirty (30) days after receipt of all permits or February 28, 2002, whichever is earlier."**

*5.     Metro-Boston failed to provide Fafard with a new subdivision plan as required by the P&S Agreement.  See Exhibit A, ¶16; see also Exhibit B hereto, at Answer ¶16.  As a result, the parties were unable to close the transaction on February 28, 2002.  See Exhibit A hereto, at ¶¶16-18.*

**5.     Tower Sites admits that it did not provide Fafard with a subdivision plan and that the transaction did not close on February 28, 2002.  Tower Sites denies the remaining allegations.  See Resp. to ¶ 2, supra.  The transaction did not close on February 28, 2002 because Fafard claimed it needed additional time to obtain its permits and approvals.  Trial Exh. 17.**

*6.     Fafard and Metro-Boston agreed to numerous extensions of the closing date, ultimately agreeing to close on May 31, 2002.  Id. at ¶19; see Exhibit B hereto, at Answer ¶19.*

**6.     Tower Sites admits that on or about January 30, 2002, the parties executed an "Extension For Purchase and Sale Agreement," which stated: "Permit and Approval date extended to April 30, 2002 and the time for performance under the Purchase and Sale Agreement dated 30 January 2001 for the above-mentioned property between Metro-Boston Broadcasting, Inc., General Partner, Tower Sites Limited and Fafard Real Estate and Development Corp. or Nominee is extended until May 31, 2002."  Tower Sites denies that the parties had agreed to "numerous extensions" at this period of time since this was the first extension entered into by the parties.  Trial Exh. 17.**

7.   *Despite the extensions, Metro-Boston again failed to provide Fafard with a new subdivision plan.  See Exhibit A hereto, at ¶20; see also Exhibit B hereto, at Answer ¶20.  The parties again extended the closing date numerous times, ultimately to May 21, 2004.  See Exhibit A hereto, at ¶21; see also Exhibit B hereto, at Answer ¶21.*

7.   **Tower Sites admits that it did not provide Fafard with a subdivision plan, but denies that it was obligated to do so, see Resp. to ¶ 2, supra.  Tower Sites admits that the parties signed a number of documents entitled "Extension For Purchase and Sale Agreement," all at Fafard's request, the effect of which was to extend the time for performance under the closing agreement, and that the last such document extended the time for performance to May 21, 2004.  See Affidavit of Erik P. Bartenhagen in Opposition To Fafard's Motion for Summary Judgment ("Bartenhagen Aff."), at Exhibit C.**

8.   *In addition to failing to provide Fafard with a new subdivision plan, Metro-Boston also failed to take the necessary steps to clear title, and cure easements, restrictions and encumbrances, as required by the P&S Agreement and despite repeated requests by Fafard that it do so.  See Exhibit A hereto, at ¶¶22-23.*

8.   **Tower Sites admits that it did not provide Fafard with a subdivision plan, but denies that it was required to do so.  See Resp. to ¶ 2, supra.  Tower Sites denies the remainder of this paragraph.  Trial Exhs. 20, 21; Tr. 3 at 55, 101-102; Tr. 4 at 19-20.**

9.   *On November 11, 2003, the parties conducted a telephone conference call to discuss outstanding issues.  During the call, Fafard told Metro-Boston that Fafard waived its permitting condition and specifically told Metro-Boston that Fafard was ready to close without Sewell Street.  See Memorandum Of Law In Support Of Motion To Reconsider And Amend Findings, at p. 2, a copy of which is attached hereto as Exhibit C.  Fafard waived its permit contingency as a result of agreements reached during this telephone conference, and waiving the permit contingency was the practical result of Fafard agreeing not to further delay the closing until the Sewall Street access issue was resolved.  During the November 11, 2003 conference call, Fafard also agreed that its deposit would be nonrefundable and that it would assume the tax liability for the premises.  See Fafard's Proposed Findings, a copy of which is attached hereto as Exhibit D, at ¶19.*

9.   **Tower Sites admits that Janice Hannert, Richard Terrill and Mary Halcomb conducted a telephone conference call on November 11, 2003 concerning issues surrounding**

- 5 -

the P&S Agreement, but otherwise denies these allegations.  Trial Exhs. 10, 19, 22, 31, 35, 60, 62, 65, 67, 69, 71, 75, 79, 80, 84, 86-95, 97, 111; Tr. 2 at 12; Tr. 3 at 115; <u>see also</u> Memorandum And Order On Defendant Fafard Real Estate & Development Corp.'s Motion To Reconsider And Amend Findings dated October 24, 2005, at p.1, n.1.

*10.     The P&S Agreement extensions executed by the parties after November 11, 2003 confirmed Fafard's agreement that its deposit was nonrefundable: "[i]n the event the transaction contemplated by the Agreement does not occur due to no fault of the Seller, the deposit shall be delivered to the Seller and the transaction shall terminate."  See Exhibit D, at ¶ 20.*

**10.     Tower Sites admits that the extensions executed by the parties after November 11, 2003 contained the language quoted above, but otherwise denies this allegation.  See Resp. to ¶ 9, supra.**

*11.     On May 21, 2004, the closing date set for the Ashland Property in the last extension agreed to by the parties, Fafard went to the Registry of Deeds with a check for the purchase price.  Metro-Boston did not appear.  Instead, Metro-Boston sent a letter to Fafard purporting to terminate its contractual obligation to convey the Ashland Property to Fafard.  See Exhibit A hereto, at ¶25.  The May 21, 2004 letter, a copy of which is attached hereto as Exhibit E, did not identify any actual or prospective purchaser of the Ashland Property.*

**11.     Tower Sites admits the first and second sentences but denies that its letter of May 21, 2004 "purport[ed] to terminate" the P&S Agreement.  Instead, it confirmed that the P&S Agreement had expired.  The letter speaks for itself.**

*12.     Fafard commenced an action in the Superior Court of Middlesex County on June 2, 2004, alleging breach of contract and seeking specific performance under the P&S Agreement. See Exhibit A hereto.  Fafard also moved the Court to endorse a memorandum of lis pendens, because interests in real property were and are at issue.*

**12.     To the extent the first sentence recites what Fafard's complaint purported to seek, Tower Sites admits the first sentence.  To the extent the second sentence recites the legal basis upon which Fafard sought the *lis pendens*, Tower Sites admits the second sentence. Tower Sites denies that this paragraph accurately states Fafard's motives.**

13. *On June 25, 2004, Metro-Boston moved to dismiss the Complaint under Massachusetts G.L. c. 184, §15. Fafard opposed the motion.*

13. **Admitted.**

14. *Shortly thereafter, on July 8, 2004, Metro-Boston removed the case to this Court.*

14. **Admitted.**

15. *One week later, Metro-Boston again filed a special motion to dismiss under Massachusetts G.L. c. 184, §15. The Motion was denied by this Court (Stearns, J.) on August 10, 2004. A copy of the Order On Defendant's Special Motion To Dismiss is attached hereto as Exhibit F. The Court found that Fafard's action was one that affected right and title to real property. See id. Shortly thereafter, on August 24, 2004, the Court endorsed Fafard's memorandum of lis pendens.*

15. **Admitted, although Tower Sites clarifies that the memorandum of** *lis pendens* **was subsequently amended by Fafard, and that this amended memorandum was endorsed by the Court on December 13, 2004.**

16. *On August 23, 2004, Metro-Boston served its Answer and Counterclaim. See Exhibit B, hereto.*

16. **Admitted.**

17. *In the Counterclaim, Metro-Boston admits that Fafard and Metro-Boston contracted for the purchase and sale of the Ashland Property and that the parties agreed to extensions of the closing date until May 21, 2004. See Exhibit B hereto, Counterclaim, at ¶6.*

17. **Tower Sites admits that, in paragraph 6 of its counterclaim, Tower Sites alleged that the parties "entered into a purchase and sale agreement for land in Ashland, Massachusetts" and that "the parties, by numerous written extension agreements requested by Fafard, extended the date for performance, the last such extension expiring on May 21, 2004." The counterclaim speaks for itself.**

18. *In its Counterclaim, Metro-Boston maintains that Fafard insisted on access to the Ashland Property via a different point of entry and refused to close without such access. See Exhibit B hereto, at Counterclaim ¶¶7-8. Metro-Boston further alleges that Fafard's suit to enforce the P&S Agreement is "groundless" and brought with "malice for the improper and unlawful purpose of clouding [Metro-Boston's] title, interfering with [Metro Boston's] ability to*

*convey the property to others, and thereby gain leverage over [Metro-Boston] to negotiate for the acquisition of [Metro-Boston's] property." Id. at Counterclaim ¶11.  Metro Boston claims these actions constitute an abuse of process, interference with advantageous business relations and a violation of Massachusetts G.L. c. 93A.  See id. at Counterclaim ¶12.*

**18.    Tower Sites admits that, in paragraph 10 of its counterclaim, Tower Sites alleges that Fafard "had repeatedly informed Tower Sites that it would need access to Sewall Road before it would close the transaction," an allegation that has since been found to be true by the Court.  See Findings of Fact and Rulings of Law After a Trial Without Jury dated August 26, 2005, at pp. 11-12.  Tower Sites admits that Fafard accurately quotes from paragraphs 10-11 of Tower Sites' counterclaim, and that Tower Sites' counterclaim as a whole alleges that Fafard's actions "constitute an abuse of process, interference with Tower Sites' advantageous relations with other potential buyers for the property, and unfair or deceptive acts or practices in the course of Fafard's trade or commerce."  The remainder of this paragraph is disputed.**

19.    *In its Counterclaim, Metro-Boston does not identify any "ulterior purpose" or collateral advantage gained by Fafard as a result of Fafard's suit against Metro-Boston for breach of contract and for specific performance of the P&S Agreement.  See generally Exhibit B hereto, at Counterclaim.*

**19.    Denied.  The counterclaim identifies in ¶ 11 that Fafard brought its suit for the improper and unlawful purpose of clouding Tower Sites' title, interfering with Tower Sites' ability to convey the property to others, and thereby gain leverage over Tower Sites to negotiate for the acquisition of Tower Sites' property.**

20.    *In its Counterclaim, Metro-Boston does not allege that it had a relationship with any other potential, prospective or actual buyer for the Ashland Property.  See generally Exhibit B hereto, at Counterclaim.  Indeed, no such relationship is identified.  Rather, Metro-Boston only vaguely alludes to "others," id. at Counterclaim ¶11, and "other potential buyers of the property."  Id. at Counterclaim ¶12.*

20. Tower Sites admits that Fafard accurately quotes from paragraphs 11-12 of Tower Sites' counterclaim, and that the Counterclaim does not recite in words that Metro-Boston had a relationship with any actual buyer for the property. The Counterclaim does, however, recite that Tower Sites has "advantageous relations with other potential buyers for the property." Tower Sites denies the remaining allegations in this paragraph.

21. *In its Counterclaim, Metro-Boston does not allege that Fafard knew of any relationship between Metro Boston and any potential, prospective or actual buyer for the Ashland property. See Exhibit B hereto, at Counterclaim.*

21. Disputed. <u>See</u> paragraph 14 of the Counterclaim.

**METRO-BOSTON BROADCASTING, INC.**

By its attorneys,

/s/ Kenneth R. Berman_____
**Kenneth R. Berman (BBO #040320)
Erik P. Bartenhagen (BBO #640003)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000**

**Date: January 13, 2006**

<u>Certificate of Service</u>

I certify that I served the foregoing document today on opposing counsel by email and by mail.

/s/ Erik P. Bartenhagen
**Erik P. Bartenhagen**

**1496256.1**