EXHIBITS A-H TO
AFFIDAVIT OF ERIK P. BARTENHAGEN IN
OPPOSITION TO FAFARD'S MOTION FOR
SUMMARY JUDGMENT

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS
Middlesex, ss                        Superior Court

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

FAFARD REAL ESTATE & DEVELOPMENT CORP.,
          Plaintiff

Vs.
METRO-BOSTON BROADCASTING, INC.,
          Defendant

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


          DEPOSITION OF *RICHARD E. TERRILL*, taken
on behalf of the Defendant, pursuant to the
Massachusetts Rules of Civil Procedure, before
Carol DiFazio, CSR: #108293, a Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the offices of
Nutter McClennen & Fish, 155 Seaport Blvd., on
Thursday, January 27, 2005, commencing at 10:30 a.m.

APPEARANCES:
JEFFREY J. UPTON, ESQ., of Hanify & King,
     One Beacon Street, Boston, MA 02108, on
     behalf of the Plaintiff.

KENNETH R. BERMAN ESQ., of Nutter McClennen & Fish,
     World Trade Center West, 155 Seaport
     Boulevard, Boston, MA 02210, on behalf
     of the Defendant.


## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

149

1    **Q.**    If Chris Egan does and if Fafard does, is

2    it reasonable to assume there are other people who

3    would be interested in buying that land?

4                        MR. UPTON:    Objection.

5    **A.**    I don't know.

6    **Q.**    I think you testified that there is not

7    much developable land in Ashland that is available,

8    correct?

9    **A.**    Yes.

10    **Q.**    And you regard the Metro-Boston property to

11    be developable land, correct?

12    **A.**    Yes.

13    **Q.**    And Fafard is not the only real estate

14    developer, correct?

15    **A.**    Yes.

16    **Q.**    And in fact Fafard is in competition with

17    other real estate developers to find and acquire

18    developable land, correct?

19    **A.**    Yes.

20    **Q.**    One of the challenges facing a real estate

21    development company like Fafard is to find land that

22    can be developed, isn't that so?

23    **A.**    Yes.

150

1    Q.    Do you know what a lis pendens is?

2    A.    Yes.

3    Q.    Has Fafard ever had a lis pendens put on

4    any property that it owns?

5              MR. UPTON:    Object to the form of the

6    question.

7              MR. BERMAN:    I'll rephrase it.

8    Q.    Has a lis pendens ever been recorded

9    against any property owned by Fafard or any Fafard

10   entity?

11   A.    I don't remember.

12   Q.    You understand that if a lis pendens is

13   recorded against the title to real estate that, as a

14   practical matter, makes the real estate unsalable

15   until the lis pendens is cleared from the title,

16   correct?

17   A.    Yes.

18   Q.    And it also makes the property unfinancible

19   until the lis pendens is cleared from the title,

20   correct, as a practical matter?

21   A.    I would imagine so, but I'm not a bank.

22   Q.    And you also know that Fafard asked the

23   court in this case to approve a memorandum of lis

151

1   pendens to record against the title Metro-Boston

2   property, right?

3        A.   Yes.

4        Q.   The reason that Fafard did that was to

5   insure that the land would not be sold to somebody

6   else so that if Fafard won this lawsuit Fafard could

7   get title to the land, right?

8        A.   We had to protect our rights, yes.

9        Q.   And so long as this lawsuit was in

10  existence or there was a lis pendens recorded

11  against Metro-Boston's land, Metro-Boston couldn't

12  sell the land to anyone else, correct?

13       A.   I don't know.

14       Q.   That's one of the reasons why you wanted to

15  get the lis pendens, isn't it?

16       A.   We wanted to protect our agreement.

17       Q.   And as part of that you wanted to get a

18  lis pendens on Metro-Boston's land to prevent

19  Metro-Boston from selling the land to someone else,

20  correct?

21       A.   You have to talk to Paul about that.  We

22  are just protecting our interest.  We want the land.

23       Q.   Okay.  But you understood the effect of

152

1   putting the lis pendens on Metro-Boston's land would

2   be that Metro-Boston couldn't sell the land to

3   anybody else while this lawsuit was still going on?

4             MR. UPTON:  Objection.

5       A.   I don't know.

6       Q.   You do know, however, that Fafard did apply

7   for a lis pendens and obtained a lis pendens on

8   Metro-Boston's land?

9       A.   Yes.

10      Q.   And you also know that the court had very

11  little discretion in whether to decide to allow

12  Fafard to put a lis pendens on the land; isn't that

13  right?

14      A.   I don't know.

15            MR. BERMAN:  Give me about five

16  minutes.

17            (Recess)

18      Q.   Mr. Terrill, in your answers to

19  Metro-Boston's counterclaim Fafard says the

20  counterclaims are barred under the doctrine of

21  waiver.  How did Metro-Boston waive its

22  counterclaims?

23      A.   Can I see that?

*Leavitt Reporting, Inc.*

# EXHIBIT B

Mary Heller Halcomb

Volume:   I

Pages:    1 to 207

Exhibits: 1 to 42

CONTAINS CONFIDENTIAL PORTIONS

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11531-RGS

- - - - - - - - - - - - - - - - - - - - - x

FAFARD REAL ESTATE & DEVELOPMENT CORP.,

               Plaintiff,

   v.

METRO-BOSTON BROADCASTING, INC.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - x


DEPOSITION OF MARY HELLER HALCOMB

Tuesday, February 1, 2005

10:15 a.m.

Hanify & King

One Beacon Street

Boston, Massachusetts


Reporter:  Lisa A. Moreira, RMR/CRR

Mary Heller Halcomb

51

1    Q.   You reference in this e-mail of Exhibit 10

2    towards the top of the e-mail, "As we discussed over

3    the phone, we are working on a contract currently on

4    the large industrial tract."

5            Can you tell me, with whom were you

6    working on a contract for the large industrial tract

7    at the end of November of 2001?

8    A.   I don't know.  I mean, I can't tell you

9    definitively.

10   Q.   Might it have been Mr. Langer still?

11   A.   It could be.

12   Q.   Do you recall discussing Fafard's proposal

13   to extend Sewall Road and acquire additional acreage

14   with any potential purchasers of the large

15   industrial tract?

16            MR. BARTENHAGEN:  At any time?

17            MR. UPTON:  At any time.

18   A.   Yes.

19   Q.   Did you discuss that with more than one

20   potential purchaser of this tract?

21   A.   Yes.

22   Q.   And with which potential purchasers did you

23   discuss Fafard's proposal to acquire additional

24   acreage and extend Sewall Road?

Mary Heller Halcomb

52

1    A.   Alex Langer, Brad Bleidt, Chris Egan.

2    Q.   And what company was Mr. Langer associated

3 with at the time?

4    A.   Langer Broadcasting.

5    Q.   And what company was Mr. Bleidt associated

6 with at the time you had these discussions?

7    A.   I believe it was called Broadcast

8 Perspectives.

9    Q.   Did you understand there to be any

10 relationship between Langer Broadcasting and

11 Broadcast Perspectives?

12    A.   A relationship?  At some point in time there

13 was not.  At another point in time there was,

14 Perspectives Broadcasting bought radio time on Alex

15 Langer's station, radio station.  Alex Langer was a

16 tenant of ours.

17         Later on, Perspectives Broadcasting was

18 going to buy Alex Langer's radio station.

19    Q.   And I gather there's a relationship between

20 Chris Egan and Perspectives Broadcasting or there

21 was at the time you were having these discussions,

22 rather?

23    A.   Initially, no.  Initially, Perspectives

24 Broadcasting was going to buy the radio station and

Mary Heller Halcomb

53

1  the Tower Site.  Later on, months later, they found

2  a new buyer in Chris Egan, and he was going to sell

3  the radio station and the Tower Site to him.  Is

4  that confusing?

5      Q.  Perspectives Broadcasting was going to buy

6  the Tower Site and then sell it to Chris Egan?

7      A.  As part of the package deal, or sell their

8  contract to buy.

9      Q.  Sell their option to the contract?

10     A.  Right.

11     Q.  What company was Chris Egan associated with

12 when you began negotiations with him?

13     A.  He had two companies.  One was called Egan

14 Communications, but I'm not sure that was the one

15 that actually issued the contract.  The other one

16 was called Carruth Capital.

17     Q.  C-a-r-r-u-t-h.  We'll get to the agreement.

18     A.  I know another company called Carruth

19 Capital in Dallas.  Is that the same one?  Is it

20 Carruth Capital?

21     Q.  I'll show you a document.

22     A.  That's it, Carruth Capital.

23     Q.  We'll get to Carruth Capital.  It's

24 C-a-r-r-u-t-h.

Mary Heller Halcomb

176

1     MR. UPTON:  Mark this, please.

2     (Exhibit No. 40, Document, Bates

3     MB000192 through MB000194, marked for

4     identification)

5     MR. UPTON:  Did you want to designate

6 the next part of the transcript confidential?

7     MR. BARTENHAGEN:  You read my mind.  Any

8 questions regarding Exhibit 40 should be

9 confidential pursuant to the parties' agreement.

10    Q.  Have you had a chance to review what we've

11 marked as Exhibit 40, Ms. Halcomb?

12    A.  Yes.

13    Q.  And can you identify the document for us,

14 please?

15    A.  Yes.  It's an offer to purchase the antenna

16 site from Carruth Capital.

17    Q.  The second sentence of this offer states,

18 "The land includes Lots 9, 10, 11 and 12 shown in

19 Exhibit B to the lease attached hereto."  Do you see

20 that?

21    A.  Yes.

22    Q.  There's no lease attached to this document,

23 would you agree with me?

24    A.  Yes.

Mary Heller Halcomb

177

1    Q.   Was this an offer to purchase Lots 9, 10,

2   12, and the entirety of Lot 11?

3    A.   Yes.

4    Q.   When did you learn that this May 24, 2004

5   offer would be forthcoming?

6    A.   On that date.

7    Q.   Mr. Egan or a representative of his did not

8   inform you before May 24th that they would be

9   sending you an offer?

10    A.   Well, they were interested.  Remember, they

11   had the information from Mr. Bleidt, so they had

12   looked at all his information, but this is just an

13   offer.  It doesn't mean anything.  You have to

14   develop a purchase and sale agreement.  This is just

15   saying that they're mutually interested in looking

16   at it.

17    Q.   Well, had you discussed the purchase price

18   terms with anyone, either Mr. Egan or anyone

19   representing Carruth Capital, prior to May 24th of

20   2004?

21    A.   Yes, the week before.

22    Q.   Had you indicated to -- who were you dealing

23   with at Carruth Capital?

24    A.   Chris Egan and an associate of his.  I can't

Mary Heller Halcomb

178

1    remember his name.

2        Q.  Had you indicated to Mr. Egan that an offer

3    of $2.8 million, of which $140,000 was to be paid at

4    the execution of a purchase and sale agreement, was

5    an offer that Tower Sites Limited was prepared to

6    accept?

7        A.  Well, initially I told him no, we were --

8    everybody knew we were under contract with Fafard,

9    and that this is what the problem was.  And, of

10   course, they were party to the drawings and the

11   whole situation, and I said, "It is contingent upon

12   access to Sewall.  They have to have it.  They

13   cannot do it without it.  They've told me over and

14   over and over.  And if you're not going to grant

15   that, then our investors obviously aren't going to

16   go that way, either, because it's going to hamper us

17   ever selling that Tower Site.  That was never part

18   of the deal.  We don't have to do that."

19       Q.  And when was it that you had that discussion

20   or those discussions with Mr. Egan?

21       A.  Probably the week before, the last few days

22   before.

23       Q.  Last few days before what?

24       A.  Before this May 21st.

Mary Heller Halcomb

179

1    Q.   You mean May 24th?

2    A.   I mean 24th.

3    Q.   Did you tell Mr. Egan prior to May 24th that

4  a portion of Lot 11 was under agreement with Fafard?

5    A.   Oh, yes, of course.

6    Q.   Did you tell Mr. Egan when the last extended

7  deadline for closing was to expire?

8    A.   Yes.

9    Q.   When did you tell him that?

10   A.   I told him it was May 21st.

11   Q.   When did you tell him it was May 21st?

12   A.   Oh, the last few days before that.  You

13 know, around that same time.  And I told him, I

14 said, "You know, I've talked to our board, and they

15 have voted not to give them access to Sewall, not to

16 enter a new contract with them, not to have them

17 build the road.  It was never part of the agreement,

18 and we don't have to do that."

19   Q.   Was Tower Sites Limited prepared to close

20 under the purchase and sale agreement that it

21 executed with Fafard on May 21st of 2004?

22   A.   Oh, yes, of course.  Of course.  But they

23 absolutely told me they would not do it.  They

24 absolutely had to have Sewall.  That's why I said,

# EXHIBIT C

| Date of Extension Request | Date Signed By Buyer | Date Signed By Seller | New Date For Performance | Exhibit(s) |
|---|---|---|---|---|
| 1/22/2002 | undated | 1/30/2002 | 5/31/2002 | 16, 17 |
| 4/3/2002 | 3/27/2002 | 4/4/2002 | 8/31/2002 | 25, 23 |
| | 7/29/2002 | 7/25/2002 | 1/31/2003 | 30 |
| 12/12/2002 | 12/12/2002 | 12/20/2002 | 6/30/2003 | 32, 33 |
| 5/20/2003 | | | | 39 |
| 5/29/2003 | 5/20/2003 | 5/29/2003 | 9/30/2003 | 41, 40 |
| 8/21/2003 | | | | 43 |
| 8/27/2003 | 8/21/2003 | 8/28/2003 | 9/15/2003 | 45, 44 |
| 9/11/2003 | 9/11/2003 | 9/12/2003 | 11/1/2003 | 46, 47 |
| 9/26/2003 | | | | 48 |
| | 9/29/2003 | 9/29/2003 | 11/18/2003 | 49 |
| 10/14/2003 | 10/14/2003 | 10/15/2003 | 10/17/2003 | 50, 51 |
| | 10/14/2003 | 10/17/2003 | 12/1/2003 | 52 |
| 10/23/2003 | 10/23/2003 | 10/24/2003 | 11/3/2003 | 54, 53 |
| 10/30/2003 | 10/30/2003 | 11/3/2003 | 11/7/2003 | 56, 55 |
| 11/6/2003 | 11/6/2003 | 11/6/2003 | 11/14/2003 | 60, 59 |
| 11/12/2003 | 11/12/2003 | 11/12/2003 | 11/21/2003 | 66, 65 |
| 11/19/2003 | 11/19/2003 | 11/20/2003 | 12/3/2003 | 68, 67 |
| 12/1/2003 | 12/1/2003 | 12/2/2003 | 12/10/2003 | 70, 69 |
| 12/8/2003 | 12/8/2003 | 12/8/2003 | 12/19/2003 | 72, 71 |
| 12/17/2003 | 12/17/2003 | 12/18/2003 | 1/9/2004 | 76, 75 |
| 1/5/2004 | 1/5/2004 | 1/8/2004 | 1/16/2004 | 79, 80 |
| 1/14/2004 | 1/14/2004 | 1/15/2004 | 1/30/2004 | 81 |
| 1/27/2004 | 1/27/2004 | 1/27/2004 | 2/17/2004 | 83, 84 |
| 2/12/2004 | 2/11/2004 | 2/12/2004 | 3/4/2004 | 87, 86 |
| 2/26/2004 | 2/26/2004 | 3/3/2004 | 3/25/2004 | 88, 89 |
| 3/19/2004 | 3/19/2004 | 3/19/2004 | 4/23/2004 | 90, 91 |
| 4/16/2004 | 4/16/2004 | 4/20/2004 | 5/21/2004 | 92, 93 |
| 5/7/2004 | | | | 94 |
| 5/17/2004 | | | | 95 |
| 5/20/2004 | | | | 97 |

1403584.1

# EXHIBIT D

| Date | Form of Communication | Substance of Statement | Exhibit |
|---|---|---|---|
| Oct. 31, 2001 | Fax from Hannert to Halcomb transmitting offer to purchase additional land | "We need to acquire additional land to gain access to the residential portion of the property." | 10 |
| Jan. 17, 2002 | Telephone conversation between Hannert and Halcomb | [Hannert's version:] We (Fafard) have not been able to do much of anything of planning for the property since we determined that we needed the additional access. | 111 |
| Feb. 21, 2002 | Message left by Hannert for Halcomb | [Hannert's version:] Fafard and Metro-Boston are at a standstill. Fafard needs additional 5 acres and access to Sewall to make Fafard's project work. | 111 |
| On or shortly before Feb. 27, 2002 | Message left by Hannert for Halcomb | "[W]e need to get an agreement on the additional 5 acres. We need the access to get out to Sewall Street." | 19, 22 |
| Feb. 27, 2002 | E-mail from Hannert to Halcomb | "[W]e need to get an agreement on the additional 5 acres. We need the access to get out to Sewall Street." | 19, 22 |
| March 21, 2002 | E-mail from Hannert to Halcomb | "I need to get a response from you on the additional 5 acres [that provide access to Sewall Street]. We cannot access the residential portion of the land without it (2 access roads will be needed)." | 19, 22 |
| July 31, 2002 | Fax from Hannert to Dan Bremser (Tower Sites' engineer) | "We cannot access the [land under agreement] from Tri Street because of wetland buffer zones and need to access the site through Sewall Street." | 31 |
| May 19, 2003 | Fax from Hannert to Halcomb proposing extension of the purchase and sale agreement | "Please find a sketch which shows the connection between the residential land we have under agreement and Sewall Street. As we discussed, we need written confirmation from you that this access is available for our use as joint access. We would also like to obtain additional acreage if that is available but that is a separate issue.... [T]he Tri Street access is unusable." | 35 |
| May 27, 2003 | Telephone conversation between Hannert and Halcomb | Fafard has been waiting for other parties [who are interested in Tower Sites' industrial property, to decide whether they could agree to an arrangement that would give Fafard access to Sewall Street]. Because Fafard has been waiting for the other parties, Fafard cannot move forward. | 111 |

1403583.1

| Date | Form of Communication | Substance of Statement | Exhibit |
|---|---|---|---|
| Oct. 16, 2003 | Telephone conversation between Hannert and Halcomb | "[Hannert's version:] Fafard has been waiting for a response on the plans Fafard sent on needing the Sewall Street access and additional acreage. Fafard cannot get access to the site by purchasing a house on Tri Street because that would be expensive access, it would only provide [a] one way [access], and would also cause problems with getting approvals. | 111 |
| Nov. 6, 2003 | Faxed extension request from Hannert to Halcomb | "We also need an answer to the access issue. Attached is another copy of the sketch showing the location where we need to access the property. The Tri Street access is unusable so we need to access the property from Sewall Street as joint access with other adjacent uses.... We are ready to close on this property but need to obtain approval to access through Sewall Street and the update of the property line. Please find an extension of the purchase and sale agreement until we can obtain these items. | 60 |
| Nov. 7, 2003 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of.'" | 62 |
| Nov. 11, 2003 | Telephone conversation between Hannert (with Richard Terril present) and Halcomb | [Hannert's version:] We need access issue resolved and an extension of the purchase and sale agreement to resolve this (and other) issues (pertaining to the closing). | 111 |
| Feb. 12, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 87 |
| Feb. 26, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 88 |
| March 19, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 90 |
| April 16, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 92 |
| May 7, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 94 |
| May 17, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 95 |
| May 20, 2004 | Faxed extension request from Hannert to Halcomb | "We need to resolve the access issue out to Sewall Street, need clean title ... and need a plan we can deed off of." | 97 |

# EXHIBIT E

Paul J. Beattie

1                                          VOL. 1

2                                          PAGES 1 - 173

3                    UNITED STATES DISTRICT COURT

4                FOR THE DISTRICT OF MASSACHUSETTS

5        No. 04-11531 RGS

6        ------------------------------------------

7        FAFARD REAL ESTATE & DEVELOPMENT          )

8        CORP.,                                    )

9        Plaintiff/Defendant-in-Counterclaim       )

10       v.                                        )

11       METRO-BOSTON BROADCASTING, INC.,          )

12       Defendant/Plaintiff-in-counterclaim       )

13       ------------------------------------------

14

15                    DEPOSITION OF PAUL J. BEATTIE

16                    Wednesday, February 2, 2005

17                          10:42 a.m.

18                    Nutter, McClennen & Fish, LLP

19                       155 Seaport Boulevard

20                    Boston, Massachusetts 02210-2604

21

22                          *********

23

24           Reporter: Lauren M. Mitchell, CSR, RPR, CRR

Paul J. Beattie

90

1    He said he was aware of that, something to that

2    effect.

3        Q.  All right.  What else was said in that

4    conversation?

5            MS. SUGARMAN:  Objection.

6            Let's go off the record and see what the

7    testimony is.  There's a privilege issue.

8            MR. BERMAN:  Oh, okay.

9            MS. SUGARMAN:  If that's okay.

10           (Witness confers with counsel.)

11       A.  Could you just repeat the question?

12       Q.  Sure.  What else did you and Mr. Terrill say

13   to one another in that conversation?

14       A.  Mr. Terrill and I discussed bringing

15   Hanify & King into this matter for the purpose of

16   starting a specific lawsuit against Metro-Boston.

17       Q.  And you had that conversation with

18   Mr. Terrill either on May 21, 2004 or May 22, of

19   2004?

20       A.  That is correct.

21       Q.  What else did you say to Mr. Terrill or did

22   he say to you during that conversation?

23       A.  Again, to the best of my recollection, I

24   made this sheet of paper available to him.

Paul J. Beattie

91

1    Q.   When you say this sheet of paper, you're
2    referring to Beattie Exhibit 3?
3    A.   Right.
4    Q.   Okay.  What else?
5    A.   I believe I returned the consideration to
6    the accounting department.
7    Q.   You mean the check that you had brought to
8    the Registry of Deeds?
9    A.   Yes.
10   Q.   Okay.  And a photocopy or a carbon copy of
11   the check is attached to Beattie Exhibit 3 with the
12   Bates No. FA 00034, correct?
13   A.   Correct.
14   Q.   Okay.  What else?
15   A.   I think, again, he may have directed me,
16   best of my knowledge, best of my recollection, to
17   start assembling the documentation for this
18   transaction for a specific-performance lawsuit.
19   Q.   Okay.  What else?
20   A.   Okay.
21   Q.   And did you start assembling the
22   documentation for a specific-performance suit?
23   A.   If not that day, very soon thereafter.
24   Q.   Did Fafard make any other decisions as a

Paul J. Beattie

92

1    result of receiving Ms. Halcomb's May 21, 2004

2    letter, Beattie Exhibit 2, other than to start a

3    specific-performance lawsuit?

4              MS. SUGARMAN:  Objection.

5        A.  I can't recall today what other things,

6    matters were discussed in that regard.

7        Q.  Has Fafard ever been a plaintiff before in a

8    specific-performance lawsuit?

9        A.  Yes.

10       Q.  Can you tell me in which courts and against

11   which parties?

12       A.  Middlesex Superior Court, Jet Realty Trust.

13       Q.  Any other lawsuits, specific-performance

14   lawsuits?

15       A.  To the best of my knowledge, the answer is

16   no.

17       Q.  And in the suit against Jet Realty Trust,

18   did Fafard obtain a memorandum of lis pendens?

19       A.  I believe they did, but I am unsure.

20       Q.  Are you familiar with what a memorandum of

21   lis pendens is?

22       A.  Yes.

23       Q.  What is a lis pendens?

24       A.  Lis pendens is notice to the world that

# EXHIBIT F

6/24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11531 RGS

```
                                        )
FAFARD REAL ESTATE &                    )
DEVELOPMENT CORP.,                      )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )
                                        )
METRO-BOSTON BROADCASTING,              )
INC.,                                   )
                                        )
            Defendant,                  )
                                        )
```

AFFIDAVIT OF MARY HELLER
HALCOMB IN SUPPORT OF
DEFENDANT'S SPECIAL MOTION TO
DISMISS AND IN OPPOSITION TO
PLAINTIFF'S MOTION TO ENDORSE
LIS PENDENS

I, Mary Heller Halcomb, depose and say:

1.      I am the president of defendant Metro-Boston Broadcasting, Inc., 8411 Preston
Road, Dallas, Texas. Metro-Boston is general partner of Tower Sites Limited Partnership a/k/a
Tower Sites, Ltd. ("Tower Sites").

2.      Tower Sites owns land in Ashland, Massachusetts, a portion of which is in dispute
in this lawsuit.

3.      Beginning about six years ago, I began having discussions with Fafard Real
Estate & Development Corp. ("Fafard") about a possible sale of portion of the Ashland land to
Fafard. At that time, I was dealing with Janice Hannert from Fafard who had told me of Fafard's
interest in purchasing the portion of Tower Site's land that was zoned residential.

4.      In January 2001, Tower Sites and Fafard signed a purchase and sale agreement by
which Fafard was going to buy a portion of Tower Site's land. The land to be sold consisted of
two lots (Lot 6B and Lot 12, which are contiguous) and portion of Lot 11, which is contiguous to
Lot 12.

5.    Of the land to be sold to Fafard, Lot 6B and a small portion of Lot 12 have

frontage on a public way. These lots front on Tri Street. The portion of Lot 11 to be sold to

Fafard does not front on a public way. The portion of Lot 11 to be retained by Tower Sites is

accessible from Sewall Road.

A.    Extensions Of The Closing Date

6.    Because Fafard told me that it wanted to purchase the land for purposes of

building a residential development, Fafard asked for, and Tower Sites, agreed, to a clause in the

purchase and sale agreement giving Fafard a certain period of time to obtain various permits and

approvals that Fafard claimed it needed. This clause is contained in Exhibit B to the agreement.

Among other things, this clause obligated Fafard to submit quarterly reports to Tower Sites

setting forth the status of Fafard's permitting efforts. Fafard never submitted any such reports to

Tower Sites. Nor did Fafard present me with any engineering drawings or copies of permit

requests.

7.    The purchase and sale agreement called for a closing to occur no later than

February 28, 2002. However, before that date arrived, Janice Hannert told me that Fafard was

not ready to close because it had not obtained all of its permits and approvals, and Fafard

therefore asked me to agree to an extension of the closing date. I agreed to such an extension.

On January 30, 2002, I signed a document extending the closing date until May 31, 2002, a copy

of which is included in Exhibit A.

8.    After I signed the first extension, Fafard asked Tower Sites to sign additional

extensions of the closing date. In total, Fafard and Tower Sites signed at least 25 written

extensions, copies of which are attached as Exhibit A. All of these extensions were initiated and

requested by Fafard. Indeed, between the time we signed the purchase and sale agreement and

2

the present, Fafard made at least 28 written requests to Tower Sites for an extension of the closing date. Copies of these requests are included in Exhibit B.

9.    During the time that Fafard had been requesting additional extensions of the closing date, I had some conversations with Janice Hannert from Fafard about Fafard's extension requests. Ms. Hannert had explained to me that Fafard was not ready to close because it was still trying to get all the permits it needed and because there were some open issues it was trying to resolve concerning access to the site and the location of the zoning line (discussed below). I told Ms. Hannert that I was not happy with how Fafard kept delaying the closing, that I was getting the feeling that Fafard was just simply warehousing the property to keep it off the market and would not be ready to close until the market value had sufficiently increased to make the purchase price attractive in relation to the market, and that Fafard could not count on Tower Sites continuing to agree to extensions of the closing date. Indeed, shortly before I signed an extension on December 20, 2002, Ms. Hannert had explained to me that Fafard needed an additional extension because it had not yet obtained all of it permits. Although I signed the requested extension (included in Exhibit A), in frustration I wrote on it that the closing had been delayed for two years.

10.    Attached as Exhibit C is a table summarizing the dates on which Fafard requested extensions of the closing date, the dates on which the parties signed them, and the dates to which the closing had been extended. This table was prepared from the documents in Exhibits A and B.

11.    The last extension date to which Tower Sites had agreed was May 21, 2004. However, the closing did not take place on that date. In the two weeks preceding that date, Fafard had made three written requests for an extension of the closing, discussed in more detail

3

below. See Exhibit B (extension requests dated May 7, May 17, and May 20, 2004). Tower

Sites did not agree to any further extension. On May 21, 2004, Tower Sites wrote to Fafard to

confirm that no further extensions would be granted and that Tower Sites considered the

agreement to have expired. See Exhibit D.

      12.    Fafard never told Tower Sites that Fafard intended to appear at the registry of

deeds on May 21, 2004 to close the transaction. The last information Fafard gave me (see faxes

dated May 7, 17, and 20, 2004 in Exhibit B) was that Fafard needed to resolve its access issues to

Sewall Road (discussed below) before closing the sale. The issues remained unresolved as of

May 21, 2004.

B.    The Access Issue

      13.    Sometime in the fall of 2001, Fafard called me to explain that it wanted to have

access to the site from Sewall Road and that it wanted to obtain additional land in Lot 11 for that

purpose. At that time, I believed that Fafard merely wanted a secondary means of access into the

site, such as for emergency vehicles. On October 31, 2001, Fafard sent me an offer to purchase

additional acreage in Lot 11. Attached as Exhibit E is a copy of Fafard's transmittal letter and

Fafard's offer, from which I have redacted Fafard's proposed price. Tower Sites did not accept

the offer. In January 2002, Fafard sent me a memo (Exhibit F) reiterating its "need [to have]

access through the frontage out to Sewall Street."

      14.    On May 19, 2003, I received a fax from Fafard (Exhibit G) informing me that

Fafard "need[ed] written confirmation" that Fafard would have access between Sewall Road and

the "land we have under agreement." This fax explained that the "Tri Street access [is]

unusable." This fax came at around the same time Janice Hannert from Fafard told me that

Fafard was unable to access the site through Tri Street because the part of the site fronting on Tri

4

Street was wetlands. Hannert told me that Fafard would not be able to access the site at all or develop it unless Fafard could get access from Sewall Road. In other words, as I came to understand it in 2003, Fafard did not simply want a secondary means of access from Sewall Road, as I had previously thought. Fafard needed primary and sole access from Sewall Road, without which Fafard would not be able to do anything with the land.

15.     For Fafard to get access to the land from Sewall Road would have required either that Tower Sites agree to sell more land in Lot 11 (enough to make a connection between Sewall Road and the portion of Lot 11 covered by the purchase and sale agreement) or that Tower Sites give Fafard an easement to build a road over the portion of Lot 11 that would remain under Tower Sites' ownership. Either approach (sale or easement) would be problematical for the following reasons.

16.     The portion of Lot 11 that is not covered by the purchase and sale agreement has five large radio antenna towers on it, each 550 feet high, equivalent to 55 stories in height. Each one is tethered and supported by at least 12 guy wires that tie into 5-ton concrete blocks embedded in the ground. The towers are used by radio broadcasters who have tower space leases for their radio transmitting antennas.

17.     If Fafard were to be granted the right to build over the balance of Lot 11 in order to connect up with Sewall Road, the tower lessees could well contend that the creation and use of such a road would be in conflict with their use of the towers. At present, Sewall Road leads into a dirt cartpath on Lot 11, which is used intermittently by the tower lessees. It is no simple matter to turn this cartpath into a roadway to service Fafard's proposed residential development (which I am told would be a 30-40 unit condominium project with an affordable housing component under Chapter 40B). Upon information and belief, such a new road would need to be sufficient

5

to accommodate the daily traffic of a large residential development, would need to be adequate to handle emergency vehicles entering and exiting from the same point of access/egress, would probably need to be engineered and built to town specifications, and could well need approval under the subdivision control law. This would present difficult issues of siting and engineering, given the location of the towers, the guy wires, and the concrete anchors. As a matter of prudence, I am not in a position to have Tower Sites agree to sell more land in Lot 11 to Fafard, or to sell Fafard an easement, for the creation of a road without, at a minimum, making sure that the tower lessees consent to such an arrangement. To the best of my knowledge, the tower lessees have never consented to such an arrangement.

18.    Further, even if the tower lessees were to give their consent, Fafard has never offered Tower Sites an attractive enough price for any additional land in, or easement over, Lot 11. Tower Sites is not under any obligation to sell Fafard additional land or an easement in the balance of Lot 11 to help Fafard get access to and from Sewall Road.

19.    In its November 6, 2003 extension request (included in Exhibit B), Fafard informed Tower Sites that it needed to resolve the access issue to Sewall Road before it could close. Fafard repeated this in its extension requests dated February 12, 2004, February 26, 2004, March 19, 2004, and April 16, 2004 (included in Exhibit B). Indeed in the three extension requests that Fafard sent to Tower Sites in the two week period before the May 21, 2004 expiration of the purchase and sale agreement, Fafard repeated – as a reason for its extension request – that it needed to resolve access issues to Sewall Road. See extension requests dated May 7, 17, and 20, 2004 (included in Exhibit B). Thus, in total, Fafard sent me eight extension requests in the last eight months, asserting its need to resolve the access issue to Sewall Road before closing.

6

20.     Fafard has never informed me that it has resolved its access issues to Sewall Road. It cannot actually resolve those issues without making a new agreement with Tower Sites, which Tower Sites is not obliged to make. And from the time the access issue first arose, Fafard has never told me that it is willing to purchase the land covered by the purchase and sale agreement without resolving the access issues to Sewall Road.

C.      The Northeastern Boundary Line

21.     Because the portion of Lot 11 that was to be sold to Fafard had never been segregated into a separate legal lot, it was necessary to identify and fix a boundary line through Lot 11 that would separate the portion of Lot 11 to be sold to Fafard from the portion of Lot 11 that would be retained by Tower Sites.

22.     In the purchase and sale agreement, a proposed northeastern boundary line for the site was shown as a hand-drawn sawtooth-shaped line superimposed over a copy of a recorded plan. However, it was my understanding that this hand-drawn line might or might not end up being the boundary line. Fafard had told me that it wanted to purchase the portion of Lot 11 that was zoned residential, leaving for Tower Sites the portion of the land that was zoned industrial. At the time, I had thought that the zoning line was as shown in a 1979 "contour plan" prepared by an engineering firm named McCarthy & Sullivan. A copy of the portion of the McCarthy & Sullivan plan showing a sawtooth shaped zoning line is attached as Exhibit H. A naked-eye comparison of that line to the one shown in the purchase and sale agreement shows that the two lines are similar but not the same. The angles of the lines are different.

23.     Moreover, in Exhibit B of the purchase and sale agreement, Fafard was given the right to petition the Ashland town meeting to straighten the zoning line in Lot 11, which I took to mean that Fafard would ask the town meeting to retain the two end points of the zoning line

7

(where it intersected the boundaries of Lot 11) and to eliminate the angles in between. I thought that, if Fafard were successful in getting the town meeting to straighten the zoning line, then, at such time as a subdivision plan was going to be prepared, the boundary line would be positioned at the straightened zoning line. However, Fafard never told me what progress it had made in straightening the zoning line.

24.    At some point after we signed the purchase and sale agreement, I discovered that the zoning line shown in the McCarthy & Sullivan plan was not the actual zoning line, and that the zoning line actually ran along (i.e. it coincided with) the existing boundary between Lot 11 and Lot 12. Attached as Exhibit I is a copy of the Ashland zoning map, available from the internet. Attached as Exhibit J is a blow-up of a portion of that map, showing the general area that encompasses the land covered by the purchase and sale agreement and the separation of the residential zone from the industrial zone. Attached as Exhibits K and L are copies of portions of two other zoning maps that I came across showing the separation of the residential zone from the industrial zone. As can be seen from these blow-ups, the zoning line is nearly straight, and not sawtooth-shaped. A naked-eye comparison of these blowups to the drawing attached to the purchase and sale agreement shows that the zoning line runs along the boundary between Lots 11 and 12.

25.    After discovering that the zoning line ran along the existing boundary line between Lot 11 and Lot 12, I called this information to Janice Hannert's attention. She told me that Fafard wanted additional time to consider this information.

26.    Fafard and Tower Sites have never resolved the issue of where the actual property line (through Lot 11) would be located. In particular, Fafard says it needs "a plan to deed off of" (see extension requests on and after November 6, 2003 in Exhibit B). However, in its November

8

6, 2003 extension request, Fafard told me that it was looking for a copy of the "plan ... where the property line has been straightened out." Since I did not mention such a plan, but rather had mentioned a zoning map showing the location of the zoning line, I believe that, in its November 6, 2003 extension request, Fafard was conflating the issue of the location of the boundary line with the location of the zoning line. I call this to the Court's attention to alert the Court that the issue of the location of the northeastern property line is another unresolved issue.

SIGNED under the pains and penalties of perjury this 24th day of June 2004.

_Mary Heller Halcomb_

Mary Heller Halcomb

1338685.5

9

# EXHIBIT G

# HK    Hanify&King

**JEFFREY J. UPTON**
Email: jju@hanify.com

March 29, 2005

**CONFIDENTIAL**
**FOR SETTLEMENT PURPOSES ONLY**

Kenneth R. Berman, Esq.
Nutter, McClennan & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604

RE:    Fafard Real Estate and Development Corp.
V.      Metro-Boston Broadcasting, Inc.
        <u>U.S.D.C. Case No. 04-11531-RGS</u>

Dear Ken:

A review of the trial transcript confirms my belief that we have proved our case and that the Court will order the conveyance of the property subject to the Purchase & Sale Agreement. Moreover, given the testimony of Dan Bremser that he had located the southern tower anchors and guy wires, and that, in fact, there are multiple anchors and guy wires which encroach significantly on the land to be conveyed, Fafard will exercise its option to require that they be relocated. In conversation during the trial, you mentioned to me that relocating the wires would be a rather complex and expensive undertaking. Consequently, I have asked my client whether they might be inclined to settle this dispute rather then require such an undertaking.

My client has authorized me to settle the matter on the following terms. In settlement of its claims, Fafard will accept the conveyance of lots 12 and 6B (approximately 9.6 acres and a cash payment of $1.2 million, and in exchange will release its claim to the conveyance of any portion of lot 11.

Very truly yours,

Jeffrey J. Upton

cc:    Halye A. Sugarman, Esq.
       Rick Terrill

JJU/hjb 126761

Professional Corporation
Counsellors at Law

One Beacon Street
Boston, Massachusetts 02108-3107
Tel   617-423-0400
Fax   617-423-0498
www.hanify.com

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FAFARD REAL ESTATE &<br>DEVELOPMENT CORP.,<br><br>      Plaintiff and Defendant-In-Counterclaim,<br><br>vs.<br><br>METRO-BOSTON BROADCASTING,<br>INC.,<br><br>      Defendant and Plaintiff-In-Counterclaim, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
NO. 04-11531-RGS

**AFFIDAVIT OF MARY HELLER HALCOMB IN SUPPORT OF DEFENDANT'S
MOTION FOR ENTRY OF SEPARATE JUDGMENT ON COMPLAINT OR,
ALTERNATIVELY, TO SEVER COMPLAINT FROM COUNTERCLAIM**

I, Mary Heller Halcomb, depose and say:

1.    I am the president of defendant Metro-Boston Broadcasting, Inc., which is the general partner of Tower Sites Limited Partnership a/k/a Tower Sites, Ltd. ("Tower Sites").

2.    Tower Sites owns land in Ashland, Massachusetts (the "Property"), a portion of which has been in dispute in this lawsuit. The dispute involved a purchase and sale agreement Tower Sites entered into with the plaintiff Fafard Real Estate Development Corp. ("Fafard") on January 30, 2001 (the "Fafard P&S Agreement").

3.    On May 24, 2004, three days after the expiration of the last extension to the Fafard P&S Agreement, Tower Sites accepted an offer from Carruth Capital, LLC and its president, Christopher Egan, to purchase the Property. This offer to purchase ultimately led to the execution on or about July 28, 2004 of a Real Estate Purchase Agreement between Tower Sites and Egan Communications, LLC (hereinafter, the "Egan P&S Agreement").

4.    In the meantime, however, Fafard had filed a Verified Complaint for specific performance and for breach of contract on June 2, 2004 related to the Fafard P&S Agreement.

On July 8, 2004, Fafard also obtained an endorsement of its memorandum of lis pendens, which it promptly recorded.

5.    The memorandum of lis pendens has effectively prevented Tower Sites from selling or refinancing that portion of the Property in dispute.

6.    As a result of delay caused by this litigation and Fafard's lis pendens, Mr. Egan withdrew his offer for the Property.

7.    Tower Sites needs to be in a position to be able to sell the Property when a new buyer is ready to buy it. The continued presence of a memorandum of lis pendens on the land is preventing such a sale from occurring.

8.    We are now in a rising interest rate environment. This can be expected to have a depressive effect on value, make the property less attractive to prospective buyers, and make it more difficult for Tower Sites to find another buyer willing to purchase the land at the same price set forth in the Egan P&S Agreement. Rising interest rates also make it more expensive for Tower Sites to borrow against the land. Tower Sites will now have to continue to pay property taxes and incur the liability and business risks associated with maintaining this property, with no protection against continued weaknesses in the economy and no assurance that any future deal will be a fair substitute for the deal Tower Sites had with Mr. Egan. Any further delay would only exacerbate such economic hardships.

9.    Tower Sites has identified a potential new purchaser of the Property, but negotiations are at a preliminary stage. Tower Sites' ability to negotiate the best price possible for the Property with this potential new purchaser and ultimately to convey the Property is being compromised by the continued presence of the memorandum of lis pendens on the land's record title.

SIGNED under the penalties of perjury this /7// day of September, 2005.

Mary Heller Halcomb